**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen
Nicole Stefanelli
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| New York City Opera, Inc. | Case No. 13-13240 (SHL) |
| Debtor. | |

**DEBTOR'S MOTION FOR ORDERS (I) APPROVING (A) BIDDING PROCEDURES, (B) CERTAIN BID PROTECTIONS, (C) FORM AND MANNER OF SALE NOTICE, AND (D) SALE HEARING DATE, (II) AUTHORIZING THE DEBTOR TO ENTER INTO THE ASSIGNED CONTRACT, AND (III) AUTHORIZING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

New York City Opera, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**" or "**Seller**"), submits this motion (the "**Motion**") for entry of orders: (i) approving (a) bidding procedures, (b) certain bid protections, (c) form and manner of sale notices, and (d) sale hearing date, (ii) authorizing the Debtor to enter into the Assigned Contract (defined below), and (iii) authorizing the sale of certain assets free and clear of liens, claims, and encumbrances. In support of the Motion, the Debtor respectfully state as follows:

## JURISDICTION

1.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Standing Order of Reference* dated February 1, 2012 (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.        Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory bases for the relief sought herein are sections 105, 363 and 365 (to the extent applicable) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 (to the extent applicable), 7052, 9007, and 9014of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 6004-1, 6006-1 (to the extent applicable) and 9006-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), and the Amended Guidelines for the Conduct of Asset Sales, General Order M-383 of the Bankruptcy Court for the Southern District of New York (the "**SDNY Sale Guidelines**").

## BACKGROUND

4.        On October 3, 2013 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

5.        The Debtor is currently operating its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of this Motion, no request has been made for the appointment of a trustee or examiner.

6.        On October 23, 2013, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "**Committee**") pursuant to section 1102(a)(1) of the Bankruptcy Code.  *See*  Docket No. 39.

7.        Additional background facts surrounding the commencement of this Chapter 11 Case are more fully described in the *Declaration of George Steel, General Manager and Artistic Director of New York City Opera, Inc. in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 2] (the "**Steel Declaration**").

8.      The Debtor also operates City Opera Thrift Shop located at 222 East 23rd Street, New York, New York 10010 (the "**Thrift Shop**").   The Thrift Shop is a two-level boutique in Gramercy Park that offers customers a unique theatrical shopping experience unlike any other thrift shop in New York City. Described as "the highest quality thrift shop in New York City" by *Vogue*, the Thrift Shop has been regularly featured in trendsetting publications including *Vanity Fair*, *The New York Times*, and *New York* magazine.

**RELIEF REQUESTED**

9.      By this Motion the Debtor seeks: (i) entry of an order substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**") (a) approving the certain bidding procedures, notice procedures, and certain bid protections to be provided to Buyer (defined below) pursuant to the Asset Purchase Agreement (defined below) as described more fully herein and (b) authorizing the Debtor to enter into the Assigned Contract, and (ii) subject to the terms of the Bidding Procedures Order, at a hearing to be scheduled by the Court, entry of an order substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**") authorizing and approving the sale to Buyer, free and clear of liens, claims and encumbrances.

A.      **The Proposed Sale**

10.      In late 2013 the Debtors determined that a sale of its assets would be the most advantageous route to conclude its Chapter 11 Case.   Accordingly, the Debtor began soliciting proposals for the purchase of its assets.  As a result, in early 2014, the Debtor received proposals from various parties, including NYCO Renaissance LTD, a Delaware not-for-profit corporation ("**Buyer**").

11.      After careful consideration of the proposals received, and having given each of the interested parties the opportunity to expand and/or improve their proposals over the past year, the Debtor's Board of Directors (the "**Board**") has proposed to transfer all assets related to the Thrift Shop and its intellectual property, namely the New York City Opera trademark, to Buyer pursuant to the terms and conditions of that certain Asset Purchase

Agreement dated December 5, 2014, a copy of which is attached hereto as **Exhibit C** (collectively with all amendments, related agreements, documents or instruments and all exhibits, schedules and addenda to any of the foregoing, the "**Asset Purchase Agreement**"). The various proposals sought the transfer of the Debtor's assets, including its Endowment (defined below), however, relatively few proposals expressed an interested specifically in the trademark and the Thrift Shop.

**B.    The Asset Purchase Agreement**

12.    The salient terms of the Asset Purchase Agreement are summarized as follows:[1]

(a)    Acquired Assets:  Buyer will acquire all of Seller's right, title and interest in, to and under the following assets, free and clear of all liens, claims and encumbrances (the "**Acquired Assets**"):

- all inventory of any kind or nature, merchandise and goods exclusively related to the Business and maintained, held or stored by, for or on behalf of Seller, as of the Closing (the "**Inventories**");

- all equipment, machinery, fixtures, furniture and other tangible property used by Seller exclusively in the Business (the "**Tangible Personal Property**");

- the trademark "NEW YORK CITY OPERA" (the "**Trademark**"), including U.S. Registration No. 1243203, and all goodwill associated therewith;

- the domain name "www.nycopera.com" and all URLs associated therewith, and any logins and passwords necessary to effectuate access to, and transfer ownership of, such URLs;

- the Assignment and License Agreement dated as of December 1, 2014 between Seller and Lincoln Center for the Performing Arts, Inc. (the "**Assigned Contract**"); and

---

[1]    The following summary is qualified entirely by the terms of the Asset Purchase Agreement.  To the extent there are any inconsistencies between the description of the Asset Purchase Agreement contained herein and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall control.  Capitalized terms used but not defined in this summary shall have the meaning(s) ascribed to them in the Asset Purchase Agreement.

- subject to applicable law, Seller's existing privacy policy and such protocols and procedures as are approved by the Bankruptcy Court (after consultation with a consumer privacy ombudsman, if one is appointed pursuant to section 332 of the Bankruptcy Code), all lists of customer, subscriber or ticket holder names, addresses and phone numbers and donor information maintained by the Seller (the "**Lists**"), which shall be delivered in Tessatura format, if possible.

(b)    <u>Excluded Assets</u>:  Buyer shall not acquire any assets, properties, interests and rights of the Debtor other than the Acquired Assets.

(c)    <u>Assumed Liabilities</u>:  Buyer will not assume any liabilities or obligations of the Debtor, other than the Assumed Liabilities identified in the Asset Purchase Agreement:

- all liabilities and obligations (including, without limitation, liabilities and obligations relating to employees and Taxes) arising out of the operation or ownership by Buyer of the Acquired Assets first arising during, and related to, any period following the Closing Date as a result of, or in connection with Buyer's ownership, operation or use of the Acquired Assets after the Closing;

- all of Seller's liabilities and obligations in respect of ordinary accruals for vacation days and other paid time off of the Transferred Employees as set forth on Schedule 2.3(b) to the Asset Purchase Agreement but expressly excluding all such liabilities and obligations (i) relating to worker's compensation claims incurred prior to the Closing which remain unpaid as of the Closing Date (whether reported or not), (ii) relating to the exempt or non-exempt status of any Transferred Employee for periods of employment with Seller prior to the Closing, and/or (iii) relating to employment litigation, including claims for wrongful termination, discrimination or any whistleblower claims, with respect any Transferred Employee's period of employment with Seller prior to the Closing; and

- all liabilities and obligations of Seller in respect of the Assigned Contract, if any.

(d)    <u>Excluded Liabilities</u>:  Buyer shall not assume any Excluded Liabilities. Excluded Liabilities are all liabilities or obligations of the Debtor that are not the Assumed Liabilities.

(e)    Consideration:   In consideration of the sale of the Acquired Assets to Buyer, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the Acquired Assets shall be:

- an amount in cash equal to ten thousand dollars ($10,000) (the "**Cash Purchase Price**");

- the sum of five hundred thousand dollars ($500,000) payable to the Seller's estate or such entity to be designated by any chapter 11 plan confirmed in the Seller's Bankruptcy Case (the "**Holder**") in ten (10) equal annual installments of fifty thousand dollars ($50,000) per installment, with the first such installment due on the 1st anniversary of the Closing of the Asset Purchase Agreement (the "**Annual Payment Date**"), and continuing thereafter for nine (9) consecutive years (the "**Purchase Note**").  Notwithstanding the foregoing, in the event of an Acceleration Event,[2] the Purchase Note shall be accelerated such that, on the next Annual Payment Date that is at least twelve (12) months following the Acceleration Event, and on each subsequent anniversary of the Closing, the balance of the Purchase Note then outstanding shall be paid in installments of one hundred thousand dollars ($100,000) until paid in full; and

- the assumption of the Assumed Liabilities.

(f)    Payment:   On the Closing Date, Buyer shall pay the Cash Purchase Price to Seller, which shall be paid by wire transfer of immediately available funds into an account designated by Seller and issue to the Holder the Purchase Note in substantially the form annexed to the Asset Purchase Agreement as Exhibit E, evidencing the obligation of Buyer to pay the amounts contemplated by Section 3.1(b) of the Asset Purchase Agreement.

(g)    Representations & Warranties:   The Asset Purchase Agreement includes customary representations and warranties.  The Asset Purchase Agreement provides that Buyer acknowledges and agrees that, except as otherwise provided therein, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis.

(h)    Covenants:   The Asset Purchase Agreement includes customary pre-closing covenants.  The Asset Purchase Agreement includes the following additional covenants:

---

[2]    "**Acceleration Event**" means, if and to the extent that Buyer, at some point in the future, is eligible to receive a distribution from income, earnings or dividends from the Endowment (a "**Distribution Amount**"), the first date upon which Buyer  receives such Distribution Amount.

- <u>Access to Records after Closing</u>.  From and after the Closing Date, Seller and Buyer shall each provide the other reasonable access to its books and records solely to the extent required to enable Buyer and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities relating to the Acquired Assets or Assumed Liabilities, and to prosecute and defend legal Actions relating to the Acquired Assets or Assumed Liabilities or for other like purposes, including Claims, objections and resolutions.

- <u>Assumed Name; Limited License-Back</u>.  (1)  By the Closing Date, Seller shall use commercially reasonable efforts to file a Certificate of Assumed Name with the appropriate authorities for purposes of the Bankruptcy Case and the wind down of Seller's organization (such assumed name, the "**<u>DBA</u>**"), and to seek an order from the Bankruptcy Court approving the substitution of Seller's DBA for its legal name in the Bankruptcy Case caption.  Subject to approval by the relevant government authorities and the Bankruptcy Court, Seller agrees that the DBA may include the abbreviation "NYCO" in conjunction with other terms or abbreviations and shall be "TNYCO Wind Down" or such other name (that may or may not incorporate the abbreviation "NYCO") that reasonably distinguishes Seller's DBA from Buyer; (2) Notwithstanding anything to the contrary herein, Buyer acknowledges and agrees that Seller's legal name shall remain "New York City Opera, Inc." and that Seller shall not be required to modify its legal name until the later of the following events: (i) Seller's Bankruptcy Case has been closed pursuant to a final, non-appealable order of the Bankruptcy Court or (ii) Seller has been fully dissolved (the "**<u>Dissolution Events</u>**").  Effective as of the Closing, Buyer hereby grants to Seller a non-exclusive, non-transferable, royalty-free and fully paid-up right and license to use the name "New York City Opera" (or any variation or derivative thereof) solely in connection with the Bankruptcy Case, the winding down of Seller's organization, and any of Seller's transactional or administrative purposes associated therewith.  The foregoing license will terminate upon the later to occur of the Dissolution Events, and thereafter Seller shall discontinue the use of, and shall not subsequently change its name to or otherwise use the name "New York City Opera" (or any variation or derivate thereof) or use any name that implies an association with Buyer.

- <u>Subscriber Discount</u>.  Buyer shall, promptly following the Closing, make the following offers to pre-paid ticket buyers/subscribers that have a Claim against Seller in the Bankruptcy Case (each, a

"**Subscriber**"): (1) For each Subscriber holding a Claim of more than $500, Buyer will offer and provide a 25% discount on a subscription to Buyer's first season (6 operas) in exchange for waiver of such Subscriber's Claim in the Bankruptcy Case; and (2) For each Subscriber holding a Claim equal to or less than $500, Buyer will offer and provide a 25% discount off the single ticket box office price to any one performance in the first season, in exchange for waiver of such Subscriber's claim in the Bankruptcy Case.

- Employees.  At the Closing, Buyer shall offer to employ, in each case on an at-will basis, all of the Employees listed on Schedule 6.3(a).  Each such offer of employment shall be at no less than the same salary or hourly wage rate and position in effect immediately prior to the Closing.  Each employment offer shall provide that such offer of employment shall take effect on the Closing Date.  Any Employees who accept such offer of employment by Buyer are referred to herein as "Transferred Employees."  Seller shall deliver to Buyer on or before the Closing Date all personnel files and employment records in its possession relating to the Transferred Employees to the extent relating to such Transferred Employees and permitted by applicable law (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such Employees as Seller certifies in writing are exempt from such requirement); provided that Seller shall have the right to make and retain copies thereof.

(i)     Break-Up Fee and Expense Reimbursement:   The Asset Purchase Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "**Competing Bid**") until the transactions contemplated by the Asset Purchase Agreement are approved by entry of the Sale Order.  In the event that a Competing Bid is received by the Seller prior to the entry of the Sale Order, the cash consideration of such initial bid shall be at least ten thousand dollars ($10,000) plus the following: (i) a break-up fee and expense reimbursement payable to Buyer in the event that the Acquired Assets are sold to a competing bidder of ten thousand dollars ($10,000) and twenty thousand dollars ($20,000), respectively, and (ii) a minimum overbid of thirty thousand dollars ($30,000).

(j)     Closing Conditions:  The Asset Purchase Agreement includes customary conditions to Closing.

(k)     Termination Date:  The Asset Purchase Agreement may be terminated by either Seller or Buyer if the Closing shall not have occurred by January 22,

2015 (the "**Termination Date**") (pursuant to the Amendment to Asset Purchase Agreement).

**C.**    **Certain "Extraordinary" Provisions that Require Separate Disclosure**

13.    The SDNY Sale Guidelines require disclosure of certain "Extraordinary Provisions," pertaining to the conduct of asset sales, which ordinarily will not be approved without good cause shown for such Extraordinary Provisions and reasonable notice. The proposed sale includes the following Extraordinary Provisions:

(a)    Sale to Insider.  Roy G. Niederhoffer, a former member of the Debtor's Board, is an officer and director of Buyer and serves as chairman of Buyer's board.  Consistent with governing law, Mr. Niederhoffer did not participate in the Board's deliberations nor the Board's vote with respect to the proposed sale while he was a member of Debtor's Board of Directors.

(b)    No Good Faith Deposit.  A good faith deposit is not required under the circumstances and based on the amount of the Purchase Price and the financial wherewithal demonstrated by Buyer.

(c)    Relief from Bankruptcy Rule 6004(h).  The proposed Sale Order seeks a waiver of the 14-day stay imposed under Bankruptcy Rule 6004(h).  As set forth below, the Debtor submits that such relief is appropriate under the circumstances.

(d)    Break-Up Fee and Expense Reimbursement.  The Asset Purchase Agreement provides that in the event that a Competing Bid is received by Seller prior to the entry of the Sale Order, the cash consideration of such initial bid shall be at least ten thousand dollars ($10,000) plus the following: (i) a break-up fee and expense reimbursement payable to Buyer in the event that the Acquired Assets are sold to a competing bidder of ten thousand dollars ($10,000) and twenty thousand dollars ($20,000), respectively, and (ii) a minimum overbid of thirty thousand dollars ($30,000).

**D.**    **Proposed Bidding Procedures**

14.    The sale of the Acquired Assets is subject to higher or otherwise better offers (each, a "**Bid**") by any potential bidder (each, a "**Bidder**") pursuant to the following procedures (the "**Bidding Procedures**"):

(a)    Assets To Be Sold. The assets proposed to be sold are the Acquired Assets (as defined and as more fully set forth in section 2.1 of the Asset Purchase

Agreement). Competing Bids shall not include the Debtor's endowment and other donor-restricted funds (together, the "**Endowment**")[3] as an Acquired Asset.

(b)     <u>As Is, Where Is</u>.  The sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Seller, its agents, or estate, except, with respect to Buyer, to the extent set forth in the Asset Purchase Agreement and, with respect to a Successful Bidder (defined below), to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

(c)     <u>Free of Any and All Claims and Interests</u>.  The Acquired Assets shall be sold free and clear, to the fullest extent available under the Bankruptcy Code or any other applicable law, of all liens (statutory, contractual, or otherwise), claims (including those that constitute a "claim" as defined in Bankruptcy Code 101(5)), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever, and all Excluded Liabilities (all of the foregoing (excluding the Assumed Liabilities) are hereinafter collectively referred to as "**Claims**") and the Claims shall attach to the net proceeds of the sale of such Assets.

(d)     <u>Participation Requirements</u>.  To ensure that only Bidders with a serious interest in the purchase of the Purchased Assets participate, the Bidding Procedures provide for certain minimal requirements for a Bidder to become a "**Qualified Bidder**."  These requirements include that the Bidder must provide, in form and substance satisfactory to the Debtor, in advance of the Bid Deadline (defined below), the following: (i) an executed confidentiality agreement, in form and substance satisfactory to the Debtor, (ii) proof of such Bidder's not-for-profit status and a mission statement compatible with that of the Debtor, and (iii) certain financial assurances as to such Bidder's ability to close a transaction.  Any party who has previously submitted a proposal to the Debtor shall automatically be deemed a Qualified Bidder.

---

[3]     For convenience, throughout this proceeding, the parties have been referring to the Debtor's donor-restricted funds as its Endowment.  However, the Endowment in fact consists of over twelve different funds, each with different restrictions placed on them by their respective donors. While each of these funds was contributed to the Debtor for charitable purposes, not all of them are permanently restricted in perpetuity and therefore truly "endowment" funds in a legal sense, *e.g.*, the donor specified that the funds are not fully expendable.  *See* N-PCL §551(b) (defining endowment fund). The bulk of the Debtor's donor-restricted funds are true endowment funds, meaning that the donors intended them to serve as a perpetual source of funding for the Debtor.  The Debtor has certain other funds which, by the terms of their respective gift agreements, are fully expendable but only can be used for certain specified purposes.

(e)     Due Diligence.   Qualified Bidders may request additional information regarding the Acquired Assets and conduct due diligence after executing and delivering an executed confidentiality agreement, in form and substance satisfactory to the Debtor.   The Debtor will coordinate all reasonable requests for additional information and due diligence through the date that is one (1) business day prior to the Bid Deadline.

(f)     Bid Deadline.   The Debtor proposes a bid deadline of **January 8, 2015 at 11:00 a.m.   (prevailing Eastern time)** (the "**Bid Deadline**").   All bids must be submitted on or before the Bid Deadline to (i) counsel for the Debtor, Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland, New Jersey 07068, Attn: Kenneth A. Rosen, Esq., krosen@lowenstein.com and Nicole Stefanelli, Esq., nstefanelli@lowenstein.com; (ii) counsel to the Committee, Klestadt & Winters, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018, Attn: Sean C. Southard, Esq., ssouthard@klestadt.com; (iii) counsel to Buyer, Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York  10036, Attn: Gerard S. Catalanello, Esq., gcatalanello@duanemorris.com and James J. Vincequerra, Esq., jvincequerra@duanemorris.com; and (iv) the Office of the United States Trustee for the Southern District of New York, Attn: Susan D. Golden, Esq., U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014.   Bids may be submitted via electronic mail.

(g)     Qualified Bid Requirements.   All Bids must be in writing, on terms at least as favorable to the Debtor as the Asset Purchase Agreement, and include the following: (i) a binding, executed, definitive agreement, substantially in the form of the Asset Purchase Agreement and marked to show the amendments and modifications thereto, offering: (x) cash consideration of at least ten thousand dollars ($10,000) plus the following: (i) a break-up fee and expense reimbursement payable to Buyer in the event that the Acquired Assets are sold to a competing bidder of ten thousand dollars ($10,000) and twenty thousand dollars ($20,000), respectively, and (ii) a minimum overbid of thirty thousand dollars ($30,000), and (z) the assumption of all the Assumed Liabilities; (ii) confirmation that the Bidder's offer is irrevocable until immediately following the closing of the Sale; (iii) evidence of a binding commitment for financing, available cash, undrawn lines of credit, or other ability to obtain the funds necessary to consummate the proposed transaction; (iv) a commitment to consummate the purchase of the Acquired Assets within not more than seven (7) days after entry of the Sale Order by the Bankruptcy Court, but in no event later than January 22, 2015, and (v) evidence of corporate authority to enter into such transaction (such a Bid, a "**Qualified Bid**").   A Qualified Bid must not contain any conditions to closing other than Bankruptcy Court approval.   A Qualified Bid must not include the Endowment as an Acquired Asset.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it (i) is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party including the Debtor and its respective agents and representatives, regarding the Acquired Assets, the Bidding Procedures or any information provided in connection therewith and (ii) consents to the jurisdiction of the Bankruptcy Court.

(h)     **Auction Required**.  If more than one Qualified Bid is submitted by the Bid Deadline, the Debtor shall conduct a public auction (the "**Auction**") at the Sale Hearing (defined below), in accordance with the following procedures: (i) by 8:00 p.m. (prevailing Eastern time) on the day before the Auction, the Debtor will (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its Bid is a Qualified Bid and (b) will provide such Qualified Bidders with copies of the Qualified Bid(s) that the Debtor believes is the highest or otherwise best offer for the Purchased Assets (the "**Baseline Bid(s)**") and (i) bidding at the Auction will begin with the Baseline Bid(s), and conclude after each participating Qualified Bidder has had the opportunity to submit one or more additional Bids.

The Debtor, in consultation with the Committee, may conduct the Auction, and adopt additional rules with respect thereto, in the manner the Debtor and the Committee determine in their reasonable discretion will result in the highest and best Bids for the Acquired Assets.

After the conclusion of the Auction, the Debtor, in consultation with the Committee, shall select the highest or otherwise best Qualified Bid(s), and shall request approval to enter into and consummate such transaction(s) (the "**Successful Bid(s)**") with the Bidder(s) making such Bid(s) (the "**Successful Bidder(s)**"); provided, however, that the Debtor may request an adjournment of the Sale Hearing if the Debtor determines that it needs more time to select the Successful Bidder following the Auction.

(i)     **No Auction Required**.  If no Qualified Bids are submitted by the Bid Deadline, the Debtor shall not conduct the Auction.

(j)     **Sale Hearing**.  The Debtor seeks to have a hearing to consider approval of the sale (the "**Sale Hearing**") on **January 15, 2015 at 10:00 a.m. (prevailing Eastern time)** before the Honorable Sean H. Lane, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, Room 701, New York, New York 10004.  The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing.  If the Debtor receives more than one Qualified Bid, then, at the Sale Hearing, the

Debtor shall seek approval of the Successful Bid(s), and may also seek approval of the second highest or best Qualified Bid (the "**Alternate Bid(s)**" and such Bidder, the "**Alternate Bidder(s)**").

The Debtor will not be bound by the Successful Bid(s) or Alternate Bid(s) unless and until such Bids shall have been approved by the Bankruptcy Court pursuant to an unstayed order. Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail to consummate the sale for any reason, then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtor will effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court, and the Debtor and any other person may pursue any and all remedies available under law against the Successful Bidder(s) in connection with its failure to consummate such sale.

(k)     **Reservation of Rights**.  Notwithstanding anything to the contrary herein, the Debtor reserves the right, in its business judgment, and in consultation with the Committee, to modify the Bidding Procedures at any time, with notice to Bidders and potential Bidders, including, without limitation, to (i) adjourn the Auction, the Sale Hearing or any of the dates set forth herein one or more times for any reason, (ii) terminate the Bidding Procedures at any time to pursue confirmation of a chapter 11 plan or an alternative restructuring strategy that maximizes value for the Debtor's estate, (iii) determine which Qualified Bid, if any, is the Successful Bid and the Alternate Bid, (iv) reject at any time, any Bid that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the proposed sale, or (c) contrary to the best interests of the Debtor, the Debtor's estate and creditors, or (v) accept as a Qualified Bidder or Qualified Bid a Bidder or Bid that does not otherwise meet the requirements set forth in the Bidding Procedures.

**E.     Proposed Form and Manner of Notice of the Sale and Sale Hearing**

15.     In accordance with Bankruptcy Rules 2002 and 6004, and the SDNY Sale Guidelines, within two (2) business days after entry of the Bidding Procedures Order (the "**Mailing Date**"), notice of the proposed sale substantially in the form attached as **Exhibit 1** to the Bidding Procedures Order (the "**Sale Notice**"), shall be served by either electronic mail or first-class mail, postage prepaid, upon: (i) the Office of the United States Trustee for Region 2, Attn: Susan D. Golden, Esq.; (ii) counsel to the Committee; (iii) counsel to Buyer; (iv) the counterparty to the Assigned Contract; (v) the New York State Attorney General, Attn: Paula

Gellman, Esq., Enid Stewart, Esq. and Rose Firestein, Esq.; (vi) the United States Attorney's office; (vii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the Acquired Assets; (viii) all known creditors of the Debtor; (ix) any entities known or reasonably believed to have expressed an interest in acquiring the Acquired Assets; and (x) those parties who have filed a notice of appearance and request for service of pleadings in this Chapter 11 Case pursuant to Bankruptcy Rule 2002. In addition, Buyer intends to publish notice of the proposed sale in a newspaper or other publication.

16.     The Debtor requests that if any party objects to the relief requested in the Motion, that such party be required to file an objection (the "**Sale Objection**") on or before **January 8, 2015 at 11:00 a.m.  (prevailing Eastern time)** (the "**Sale Objection Deadline**") and serve a copy of the Sale Objection, so as to be actually received by the Sale Objection Deadline, upon (i) counsel for the Debtor, Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland, New Jersey 07068, Attn: Kenneth A. Rosen, Esq. and Nicole Stefanelli, Esq.; (ii) counsel to the Committee, Klestadt & Winters, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018, Attn: Sean C. Southard, Esq.; (iii) counsel to Buyer, Duane Morris, LLP, 1540 Broadway, 14th Floor, New York, New York  10036, Attn: Gerard S. Catalanello, Esq. and James J. Vincequerra, Esq.; and (iv) the Office of the United States Trustee for the Southern District of New York, Attn:  Susan D. Golden, Esq., U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014.

**F.      Approval of the Assigned Contract**

17.     In connection with the proposed sale, and subject to this Court's approval, the Debtor has entered into the terms of the Assigned Contract with Lincoln Center for the Performing Arts, Inc. ("**Lincoln Center**") and seeks to transfer the Assigned Contract to Buyer. Pursuant to the Assigned Contract (a copy of which is attached hereto as **Exhibit D**), the Debtor has agreed to assign and transfer to Lincoln Center all of its worldwide rights, title and interest in and to Lincoln Center's recordings of any broadcast, telecast, simulcast or other production or

performance of the Debtor's works, productions, and performances during the period from 1976-2008, including any and all intellectual property rights in and to such recordings arising in any jurisdiction throughout the world, as are set forth on Exhibit A to the Assigned Contract (the "**Recordings**").  The Debtor has further agreed to grant to Lincoln Center a worldwide, non-exclusive, perpetual, irrevocable, transferable and sublicensable right and license to use the any and all trademarks, service marks, trade names, service names, trade dress rights, logos, and other identifiers of source, in each case containing or comprising the "New York City Opera" name or any variation, abbreviation or derivative thereof, and used by the Debtor on or in connection with the Recordings, including all goodwill therein or arising therefrom, on or in connection with the Recordings from and after December 1, 2014.

18.    The Assigned Contract provides that it is subject to this Court's approval. Accordingly, by this Motion, the Debtor also seeks the entry of an order, authorizing the Debtor to enter into the Assigned Contract and, pursuant to section 365 of the Bankruptcy Code (to the extent applicable), to assume and assign the Assigned Contract to Buyer.

**G.    Finality of Order**

19.    The Debtor further seeks, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the Bankruptcy Court expressly provide that the effectiveness of any order approving the Sale not be stayed for any period of time after the entry of such order(s).

**BASIS FOR RELIEF**

**A.    The Bidding Procedures Order Should Be Entered on the Terms Proposed.**

**(i)    The Bidding Procedures Are Fair and Appropriate.**

20.    The ultimate goal of an auction in a sale pursuant to section 363 of the Bankruptcy Code is to maximize the value realized by the bankruptcy estate.  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the…[debtors'] duty with respect to such sales is to obtain the highest price or greatest overall

benefit possible for the estate.") (internal quote omitted).  Competitive auctions "encourage bidding and…maximize the value of the debtor's assets." *See id.*

21.    The Debtor submits that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Debtor's estate.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized from the sale of the Acquired Assets.  In particular, the Bidding Procedures contemplate an open and fair auction process with minimum barriers to entry and provide potential Bidders with sufficient time to submit a timely and well-informed bid.

22.    Accordingly, the Bidding Procedures are justified and reasonable, and the Bidding Procedures Order should be entered on the terms proposed.

**(ii)    The Form and Manner of the Sale Notice Should Be Approved.**

23.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide its creditors with twenty-one (21) days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

24.    The Debtor submits that notice of this Motion and the Sale Hearing, coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice proposed herein.

**(iii)    The Bid Protections are Appropriate and Should Be Approved.**

25.    The Debtor has agreed, after negotiations with Buyer, that in the event a Qualified Bidder becomes the Successful Bidder, subject to this Court's approval, the Debtor will pay Purchaser a break-up fee of ten thousand dollars ($10,000) (the "**Break-Up Fee**") and expense reimbursement of twenty thousand dollars ($20,000) (the "**Expense Reimbursement**"

and together with the Break-Up Fee, the "**Bid Protections**") from the proceeds received from the Successful Bidder.

26.     The Debtor submits that the Bid Protections are fair and reasonable in light of the time and effort expended by Buyer in making its proposal to purchase the Acquired Assets and negotiating the Asset Purchase Agreement.  Buyer has incurred substantial costs relating to due diligence, negotiation of the Asset Purchase Agreement, and preparation of contracts attendant to the Asset Purchase Agreement and operating a newly formed opera company in New York City.

27.     It is commonplace for prospective purchasers to demand bidding incentives such as breakup fees before such purchasers make an offer that the debtor can present to the bankruptcy court.  As noted by the court in *In re 995 Fifth Avenue Assocs L.P.*, 96 B.R. 24, 26 (Bankr. S.D.N.Y. 1989), "[b]reakup fees and other strategies may 'be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking.'"  *Id.* (quoting *Samjens Partners I v. Burlington Industries, Inc.*, 663 F.Supp. 614, 624 (S.D.N.Y. 1987)).  In *995 Fifth Avenue*, the bankruptcy court specifically rejected the notion that a breakup fee be limited to the amount expended by the prospective purchaser.  96 B.R. at 29.  Any other potential purchaser bidding for the Acquired Assets will have the benefit of the work and resources previously invested by Purchaser.

28.     Historically, bankruptcy courts approve bidding incentives under the "business judgment rule."  *See*, *e.g.*, *The Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49. (2d Cir. 1993) (stating that a court should "assess the merits of fairness of business decisions only 'when a transaction is one involving a predominantly interested board with financial interests in the transaction adverse to the corporation.'") (citing *AC Acquisition Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 111 (Del. Ch. 1986)).

29.     The purpose of the Bid Protections is (a) to reimburse Buyer for certain of the expenses it has incurred and will continue incur in connection with the proposed transaction (including attorneys' fees); and (b) to compensate Buyer for the substantial time and effort it has expended to date and it will continue to expend as a stalking horse for competing bids. The Bid Protections have been negotiated at arm's length between the Debtor and Buyer, and reflect an appropriate exercise of the Debtor's business judgment.

30.     Courts have considered three questions when assessing proposals for bid protections: whether (a) the relationship of the parties who negotiated the protections tainted by self-dealing or manipulation; (b) the protections hamper, rather than encourage, bidding; and (c) the amount of the protections is unreasonable relative to the proposed purchase price. *Integrated Resources, Inc.*, 147 B.R. at 657; *In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989). As set forth above, notwithstanding Mr. Niederhoffer's prior service on the Debtor's Board, the Asset Purchase Agreement was negotiated at arm's-length. The Bid Protections are not designed to hamper bidding. Indeed, the proposed amounts of the Breakup Fee ($10,000) and Expense Reimbursement ($20,000) are reasonable when compared to the purchase price of $510,000, plus the assumption of the Assumed Liabilities. Furthermore, given that the Debtor began receiving expressions of interest approximately one year ago, one of which was submitted by Buyer, it is reasonable that Buyer's interest in the Acquired Assets be protected. For all of these reasons, the Debtor believes the Bid Protections are reasonable and appropriate.

31.     The proposed Bidding Procedures also include a requirement that the purchase price of any initial competing bid exceed the Purchase Price by at least $30,000. The purpose of the minimum overbid amount is to protect the Debtor from the additional costs involved with entering into a transaction with a party other than Buyer and will enhance the value of such competing bid for the benefit of the Debtor's estate. *See, e.g., In re Colony Hill Assocs.*, 111 F.3d 269, 271 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's

-18-

initial offer of $7.5 million by at least $650,000 or 8.6%); *In re Tempo Technology Corp.*, 202
B.R. 363, 369-370 (D. Del. 1996) (requiring minimum overbids of $1.4 million in cash where
original purchase price was $150,000 cash plus $3 million in stock of the purchaser and
$500,000 of assumed liabilities); *In re Wintex, Inc.*, 158 B.R. 540, 543 (D. Mass. 1992) ("Debtor
may avoid the increased costs and complexity associated with considering additional bids for
sale of debtor's property unless the additional bids are high enough to justify their pursuit. The
10% increase requirement is one example of a reasonable litmus test.").

32.     The Debtor submits that the Bid Protections provide a fair and reasonable
means of insuring that the Acquired Assets are sold for the highest and best offer attainable, and
requests that such procedures should be approved by this Court.

**B.     The Sale is Within the Debtor's Sound Business Judgment and Should be Approved
Pursuant to Section 363 of the Bankruptcy Code.**

33.     Section 363 of the Bankruptcy Code provides that a debtor-in-possession,
"after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,
property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although section 363 does not articulate a
standard for authorizing the sale or disposition of a debtor's assets, courts in the Second Circuit
have found that the decision to sell assets outside the ordinary course of business should be based
upon the sound business judgment of the debtor and, where that judgment has a reasonable basis,
a court ordinarily should defer to that judgment in determining whether to approve a proposed
transaction. *See In re Chrysler LLC*, 405 B.R. 84, 95-96 (Bankr. S.D.N.Y. 2009); *see In re
Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Comm. Of Equity Security Holders v.
Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Global Crossing Ltd.*, 295 B.R. 726, 742
(Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678-79 (Bankr. S.D.N.Y.
1989); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville
Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable
basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),
courts will generally not entertain objections to the debtor's conduct.").

34.     As long as a valid business justification exists – as it does under the present circumstances – the decision to sell estate property is entitled to a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *In re Integrated Res., Inc.*, at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  This presumption results in courts giving substantial deference to the business decisions of debtors.  *See In re Global Crossing, Ltd.*, 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw.")

35.     As part of this analysis, courts may also consider (a) whether fair and reasonable consideration is provided, (b) whether the transaction has been proposed and negotiated in good faith, and (c) whether reasonable notice has been provided.  *See In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998); *see also In re Nicole Energy Servs., Inc*., 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008) (citations omitted); 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev. 2009) ("It is now generally accepted that section 363 allows such sales [of substantial portions of the debtor's assets] in chapter 11, as long as the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable.").

36.     These factors are satisfied in this case.  The Debtor received several expressions of interest for its assets and has conducted a thorough review of all such proposals over the past twelve months.  The Debtor engaged in extensive negotiations with Buyer, which negotiations culminated in the terms of the Asset Purchase Agreement.  Accordingly, the Debtor is satisfied that the purchase price set forth in the Asset Purchase Agreement is a fair market

price for the Acquired Assets. Moreover, the proposed sale is designed to maximize the value received for the Acquired Assets. The process proposed by the Debtor allows for an auction process, while providing any prospective bidders with ample time and information to submit a bid.

37.    Second, the transaction is proposed in good faith. As set forth above, Mr. Niederhoffer, a former member of the Debtor's Board, is an officer and director of Buyer and serves as chairman of Buyer's board. Consistent with governing law, Mr. Niederhoffer did not participate in the Board's deliberations nor the Board's vote with respect to the proposed sale while he was a member of Debtor's Board of Directors. Notwithstanding Mr. Niederhoffer's prior service on the Debtor's Board, the Asset Purchase Agreement was negotiated at arm's-length. Both the Debtor and Buyer were represented by sophisticated counsel with extensive experience in similar transactions. Importantly, the sale of the Acquired Assets to Buyer, whose mission is similar to that of the Debtor, will ensure that the Debtor's intellectual property and other assets, including proceeds of any sales of the inventory that was donated by the Debtor's patrons, will continue the Debtor's mission in the future.

38.    Third, as discussed above, reasonable notice of the sale will be provided in accordance with Bankruptcy Rules 2002 and 6004, and the SDNY Sale Guidelines.

39.    For the foregoing reasons, the Debtor submits that the sale of the Acquired Assets should be approved pursuant to section 363 of the Bankruptcy Code.

**C.    The Sale Free and Clear of Liens, Claims and Encumbrances Is Authorized By Section 363(f) of the Bankruptcy Code.**

40.    Section 363(f) of the Bankruptcy Code authorizes a debtor in possession to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

41.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of the Claims.  *See, e.g., Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.),* 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where ...a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met."); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) ("[Section 363(f)] is written in the disjunctive, not the conjunctive. Therefore, if any of the five conditions of § 363(f) are met, the Trustee has the authority to conduct the sale free and clear of all liens."); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").  Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

42.    The Debtor does not believe that there are any valid liens on the Acquired Assets.  To the extent any valid liens exist, the Debtor submits that the sale of the Acquired Assets free and clear of such liens is authorized pursuant to section 363(f)(5) of the Bankruptcy Code.

43.     The purpose of an order purporting to authorize the transfer of the Acquired Assets free and clear of all Claims would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against Buyer arising from the Debtor's pre-sale conduct. Under section 363(f) of the Bankruptcy Code, Buyer is entitled to know that the Acquired Assets are not affected by any Claims that will be asserted against Buyer after the proposed transaction is completed.

44.     For the foregoing reasons and subject to the assumption of the Assumed Liabilities, the Debtor submits that the sale of the Acquired Assets free and clear of all Claims is authorized by section 363(f) of the Bankruptcy Code.

**D.     Buyer Should Be Afforded All Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser.**

45.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, No. 92 CIV. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 at 147); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant

to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

46.     The selection of Buyer and the execution of the Asset Purchase Agreement were the product of extensive arm's-length, good-faith negotiations. The Debtor submits that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

47.     Section 363(n) of the Bankruptcy Code allows a trustee to avoid a section 363 sale where there has been collusion among bidders. As there is no suggestion that the marketing process that led to the Asset Purchase Agreement with Buyer was tainted by collusion, section 363(n) is inapplicable.

**E.     Consumer Privacy.**

48.     Pursuant to section 363(b)(1) of the Bankruptcy Code:

> if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—
>
> (A) such sale or such lease is consistent with such policy; or
>
> (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—
>
> (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
>
> (ii) finding that no showing was made that such sale or such lease
>
> would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

49.    The Debtor's privacy policy that was in effect on the Petition Date provides, in pertinent part, as follows:

> New York City Opera uses your name and e-mail address to fulfill your subscription, ticket, or merchandise request, and to contact you for additional information. New York City Opera collects mailing address information primarily to inform its patrons about upcoming Opera activities. We do not rent or sell our mailing lists to commercial businesses. Occasionally, we trade our mailing lists with other arts and non-profit organizations. We do not trade e-mail addresses. You may receive direct mailings or telemarketing calls from New York City Opera.

50.    As set forth in the Asset Purchase Agreement, the Debtor seeks to transfer the Lists, "subject to applicable law, Seller's existing privacy policy and such protocols and procedures as are approved by the Bankruptcy Court (after consultation with a consumer privacy ombudsman, if one is appointed pursuant to section 332 of the Bankruptcy Code)." Asset Purchase Agreement § 2.1(f). The Asset Purchase Agreement further provides that "Buyer shall be responsible for direct payment of all reasonable and necessary expenses in connection with the transfer of the Lists, including, without limitation, mailing costs, consulting costs, labor and the fees and expenses of any consumer privacy ombudsman appointed pursuant to section 332 of the Bankruptcy Code. No expense greater than $500 shall be incurred without the prior written consent of Buyer." Asset Purchase Agreement § 12.5.

51.    The proposed sale, including the transfer of the Lists, is both appropriate and necessary to preserve the value of the Debtor's estate. The Debtor submits that the Asset Purchase Agreement provides for appropriate protections in connection with the transfer of personally identifiable information, including a mechanism for ensuring the payment of any expenses that might be incurred in safeguarding such information and/or conducting an opt-out process (to the extent necessary) and paying the fees of a consumer privacy ombudsman if one is appointed. The Debtor and Buyer will confer with the United States Trustee in good faith to ascertain whether appointment of a consumer privacy ombudsman is necessary in connection with the transfer of the Lists.

**F.    The Debtor's Endowment Must Be Excluded from Any Sale Approved Pursuant to the Bidding Procedures.**

52.    Reviewing the terms of sale of the Acquired Assets on the one hand, and determining an appropriate disposition of the Debtor's Endowment on the other, requires two distinct and separate analyses.  As set forth above, when evaluating offers for the Acquired Assets, the Debtor is entitled to exercise its business judgment and the sale is simply subject to "higher or better" offers.  For the reasons set forth above, in reviewing proposals for the purchase of the Acquired Assets, the Debtor has decided to accept Buyer's offer because it not only provides a considerable financial benefit to the Debtor's estate, but also provides for the use of the Acquired Assets in a manner consistent with Debtor's non-profit mission.

53.    In contrast, the disposition of Debtor's Endowment is not subject to the same "higher or better" analysis.  Endowment funds are not "for sale" like a trademark or a thrift shop, as they are unique assets imbued with restrictions on their use and transfer under New York state law.  While some of Debtor's Endowment funds are for general operating purposes, most of them have more limited purposes, such as supporting new opera productions, opera education and audience outreach projects, and providing awards for performing artists.

54.    Directors of non-profit corporations have a fiduciary duty to consider the specific purposes of donor-restricted funds as well as the purposes of the institution when managing such assets.  *See* N.Y. Not-for-Profit Corp. Law § 552  ("Subject to the intent of a donor expressed in a gift instrument, an institution, in managing and investing an institutional fund, shall consider the purposes of the institution and the purposes of the institutional fund.")  Further, Section 513(b) of the New York Not-for-Profit Corporation Law ("**NPCL**") imposes a duty on the Board of Directors of a non-profit corporation to administer funds received for a specific purpose in a manner consistent with those restricted purposes.

55.    Section 513(b) of the NPCL provides in relevant part:

Except as may be otherwise permitted under article eight of the estates, powers and trusts law . . . , the governing board shall apply

all assets thus received to the purposes specified in the gift instrument.

N.Y. Not-for-Profit Corp. Law § 513(b). New York courts have routinely interpreted Section 513 to mean that, although a non-profit corporation holds full ownership rights in property received subject to donor restrictions, the non-profit must account for such property separately and comply with the donor restrictions, or seek relief from the restrictions through the courts. *Saint Joseph's Hosp. v. Bennett*, 281 N.Y. 115 (1939)(denying petition to use endowment principal to pay mortgage debt); *In re Friends for Long Island's Heritage*, 80 A.D.3d 223, 235, 911 N.Y.S.2d 412, 420 (App. Div. 2010) (in context of a dissolution, finding that donor-restricted assets could not be used to satisfy creditors).

56. NPCL Section 513(b) by its own terms contemplates that there may be instances when a non-profit may seek to modify donor restrictions on a particular gift. Where honoring the original intent of a donor-restricted fund is no longer practicable or possible, New York law permits a court to modify the gift restrictions through a proceeding under Article 8 of the Estates, Powers and Trusts Law ("**EPTL**"), commonly called a "cy pres" proceeding. Section 8.1-1(c)(1) of the Estates, Powers and Trusts Law permits the supreme court (in the case of charitable gifts) and the surrogate's court (in the case of charitable bequests) to modify the terms of a restricted gift in a manner that will most effectively accomplish the donor's general purposes.[4] This provision is called a *cy pres* proceeding because it is derived from the common law doctrine of *cy pres*, which can be translated from French to mean "as near as possible." [5]

---

[4] Section 8-1.1(c)(1) of the New York Estate Powers & Trusts Law provides:

The supreme court and, where the disposition is made by will, the surrogate's court in which such will is probated have jurisdiction over dispositions referred to and authorized by paragraphs (a) and (b), and whenever it appears to such court that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition, the court may, on application of the trustee or of the person having custody of the property subject to the disposition and on such notice as the court may direct, make an order or decree directing that such disposition be administered and applied *in such manner as in the judgment of the court will most effectively accomplish its general purposes*, free from any specific restriction, limitation or direction contained therein; provided, however, that any such order or

57.     EPTL Section 8-1.1(c)(1) allows a court to exercise its *cy pres* powers to modify the use of a particular gift if a three-prong test is met:

(1)     the gift or trust must be charitable in nature;

(2)     the language of the gift instrument, when read in light of all attendant circumstances, indicates that the donor demonstrated a general, rather than specific, charitable intent; and

(3)     the particular purpose for which the gift was created has failed, or has become impossible or impracticable to achieve.

*See Matter of Othmer*, 710 N.Y.S.2d 848 (Surr. Ct. 2000)(granting *cy pres* relief to nonprofit hospital to permit use of principal of endowment fund as collateral to secure financing for financial recovery plan); *In re Edward John Noble Hosp. of Gouverneur*, 959 N.Y.S.2d 623 (Sup. Ct. 2013).  If these three conditions are met, then the court has the power to reform the gift in a manner that will most effectively accomplish the donor's general purpose.  *In re Trustco Bank*, 954 N.Y.S.2d 411, 416-17 (Surr. Ct. 2012), *aff'd sub nom*, *In re Lally*, 976 N.Y.S.2d 701 (N.Y. App. Div. 2013).

58.     *Cy pres* is inherently a fact-intensive exercise.  The organization seeking *cy pre*s relief will need to make an argument, based on all of the relevant facts and circumstances, as to why the proposed modification will "*most effectively*" accomplish the donor's original purposes.  Where a nonprofit is experiencing financial distress to the point that it has either materially changed its activities or ceased operations entirely, courts have approved the transfer of a restricted fund to another nonprofit organization conducting similar activities through a *cy pres* order.  *See In re Hummel*, 805 N.Y.S.2d 236 (Sup. Ct. 2005)(where named hospital ceased providing medical services and sold its facilities, bequest should be transferred to an active, charitable hospital even if named beneficiary still retained its corporate existence and

---

decree is effective only with the consent of the creator of the disposition if he is living.  N.Y. Est. Powers & Trusts Law § 8-1.1(c)(1) (emphasis added).

[5]     The Attorney General is charged with representing the charitable beneficiaries of such funds, and is entitled to participate in the cy pres proceeding.  N.Y. Est. Powers & Trusts Law § 8-1.1(f).

had not dissolved); *Matter of Will of Coffey*, 590 N.Y.S.2d 357 (App. Div. 1992) (affirming application of *cy pres* to transfer restricted gift from bankrupt nonprofit that was no longer operating a hospital to another nonprofit that was actively running a hospital); *In the Matter of the Estate of Kraetzer*, 462 N.Y.S.2d 1009 (Surr. Ct. 1983) (determining that *cy pres* relief was appropriate where a bankrupt hospital, the intended recipient of a valid bequest, ceased its charitable operations).

59.     Over the past year, the Debtor has received numerous proposals from various entities, including from Buyer, with respect to the Endowment, and its Board is still in the process of deciding on the most appropriate disposition of these assets.  Under *cy pres* principles, assuming the prerequisites for exercising *cy pres* are met, the relevant inquiry is which successor will "most effectively accomplish" the donor's original purposes for a particular fund.  Debtor must review the purpose of each of its restricted funds and make a recommendation as to how the donor's general intent will be most effectively accomplished by transferring that fund to a particular entity.  Given the various purposes of the funds that constitute Debtor's Endowment, it may be that different successors are most appropriate for specific funds.  There is no requirement that all of the Endowment go to the same organization – indeed, a "one size fits all" approach is inconsistent with the fact-specific nature of the *cy pres* analysis.

60.     While Buyer's mission is clearly consistent with Debtor's mission as set forth in Debtor's original certificate of incorporation (indeed, Buyer's corporate purposes in its certificate of incorporation are identical to the Debtor's), there are many nonprofits in New York City who could potentially "most effectively accomplish" the donors' original purposes with respect to specific funds.  Buyer's purchase of Debtor's trademark and certain other assets is certainly a valid consideration to be taken into account as Debtor reviews the options for the Endowment; it is, however, not dispositive.  Debtor's board will have a fiduciary duty to review a range of additional considerations to "effectiveness," which may include, without limitation, an

organization's track record, financial health, management capabilities, whether an organization has successfully conducted programming on a scale or of a quality consonant with the donors' original purpose, and consistency with the core values of the original New York City Opera.

61.     Accordingly, the proposed Bidding Procedures are not appropriate for the disposition of Debtor's Endowment, which must be subject to separate proceedings and analysis.

### WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

62.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

63.     The Debtor seeks a waiver of the fourteen-day stay because the receipt of the proceeds of the sale of the Acquired Assets will provide the Debtor with critical funds to assist the Debtor in maximizing value of the estate for the benefit of creditors.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### NOTICE

64.     Notice of this Motion has been given to (i) the Office of the United States Trustee for Region 2, Attn: Susan D. Golden, Esq.; (ii) the New York State Attorney General, Attn: Rose Firestein, Esq.; (iii) counsel to the Committee; (iv) counsel to Buyer; (v) any entities known or reasonably believed to have expressed an interest in acquiring the Acquired Assets; and (vi) those parties who have filed a notice of appearance and request for service of pleadings in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

**WHEREFORE**, the Debtor respectfully requests the entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, and the Sale Order,

substantially in the form attached hereto as **Exhibit B**, granting the relief requested herein and such other and further relief as this Bankruptcy Court deems just and proper.

Dated:  December 10, 2014                  Respectfully submitted,

                                           **LOWENSTEIN SANDLER LLP**

                                            /s/  *Nicole Stefanelli*
                                           Kenneth A. Rosen
                                           Nicole Stefanelli
                                           1251 Avenue of the Americas
                                           New York, New York 10020
                                           (212) 262-6700 (Telephone)
                                           (212) 262-7402 (Facsimile)

                                           -and-

                                           65 Livingston Avenue
                                           Roseland, New Jersey 07068
                                           (973) 597-2500 (Telephone)
                                           (973) 597-2400 (Facsimile)
                                           krosen@lowenstein.com
                                           nstefanelli@lowenstein.com

                                           *Counsel to the Debtor and Debtor in Possession*