Hearing Date and Time: December 22, 2014 at 10:00 a.m. (Eastern Time)
Objection Deadline: December 18, 2014 at 3:00 p.m. (Eastern Time)

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur J. Steinberg

*Counsel for Gene Kaufman*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**NEW YORK CITY OPERA, INC.,**<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 13-13240 (SHL)** |

**OBJECTION OF GENE KAUFMAN TO DEBTOR'S MOTION
FOR ORDERS (I) APPROVING (A) BIDDING PROCEDURES, (B) CERTAIN BID
PROTECTIONS, (C) FORM AND MANNER OF SALE NOTICE, AND (D) SALE
HEARING DATE, (II) AUTHORIZING THE DEBTOR TO ENTER INTO THE
ASSIGNED CONTRACT, AND (III) AUTHORIZING THE SALE OF CERTAIN
<u>ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES</u>**

Gene Kaufman ("**Kaufman**"), a creditor and party in interest, by its attorneys King & Spalding LLP, hereby objects to the Debtor's motion ("**Motion**") for entry of orders: (i) approving (a) bidding procedures, (b) certain bid protections, (c) form and manner of sale notices, and (d) sale hearing date, (ii) authorizing the Debtor to enter into the Assigned Contract (as defined therein), and (iii) authorizing the sale of certain assets free and clear of liens, claims, and encumbrances and, in support thereof, alleges as follows:

1

**BACKGROUND TO THE MOTION**

1. At the November 25, 2014 hearing in respect of the Debtor's Fifth extension of exclusivity, the Debtor agreed (a) to hold a public auction of its assets in the Courtroom, and (b) to discuss with Kaufman the relevant dates of the auction and bid submission. The Debtor's counsel stated that she might separately request approval of bidding procedures but gave no indication what they would be.

2. Kaufman's counsel expressed concern about the timing of the submission of bids and the hearing date in view of the upcoming holiday season. He noted a concern that there may not be an "even playing field" for anyone (i.e. Kaufman) to competitively bid against the Debtor's contemplated stalking horse, and he wanted a reasonable period of time to deal with all issues related to the yet undisclosed bid.

3. Kaufman's counsel also stated that any sale should deal with the Endowment (as defined in the Motion). In particular, he noted that his bid would be higher if that was done, which obviously would inure to the benefit of the creditors. Dealing with the Endowment, sooner rather than later, would also, potentially, facilitate the ability of the bidder to re-start the opera company.

4. In prior pleadings, Kaufman noted that the Debtor depleted the Endowment by over 90%, and the Debtor's Board members had faced severe criticism for their mishandling of the Endowment. This focus by Kaufman did not "endear" him to the Board. When the Debtor decided to select a stalking horse, it chose a former Board member who had strong ties to its current Board members. It never asked Kaufman to competitively bid against the offer being made by the former Board member. It never consulted with Kaufman regarding the bid date or auction date.

## ARGUMENT

### A. The Motion Should Be Denied

5.     The Motion seeks to dramatically tilt the auction landscape in favor of their former Board member. That is improper, and necessitates the denial of the Motion. Moreover, as a result of the Debtor's glaring missteps relating to the Motion and the auction process in general, it has forfeited all deference that otherwise might be afforded to its business judgment. From this point, the Court, not the Debtor, should decide how and when the assets of this Estate should be sold.

6.     In particular, Kaufman believes the Motion must be denied for the following reasons:

(a)     **Unreasonable Break Up Fee**: In reality, the stalking horse bid by the former board member is **$10,000**. The $500,000 promissory note is signed by a shell corporation who could default at any time during the 10 year term of the note. According to the Motion, the next bid that would top the $10,000 offer, is **$70,000**. The math is as follows: (a) $10,000 break-up fee; (b) $20,000 expense reimbursement; and (c) $30,000 bidding increment. That proposal, by itself, demonstrates the Debtor's lack of good faith in conducting the auction.

Kaufman is prepared to step into the shoes of the existing stalking horse contract and waive the break-up fee and the expense reimbursement, and reduce the bidding increment from $30,000 to $5,000.

Bankruptcy courts must carefully scrutinize the use of break-up fees and topping fees. *In re Integrated Resources, Inc.*, 135 B.R. 746, 750–51 (Bankr. S.D.N.Y. 1992), *aff'd* 147 B.R. 650 (S.D.N.Y.1992), *app. dismissed*, 3 F.3d 49 (2d Cir.1993) (dismissed on jurisdictional grounds). *Integrated Resources* sets forth a three-part test: (1) Was the negotiation of the break-

3

up fee tainted by self-dealing and manipulation? (2) Does the fee discourage rather than encourage bidding? (3) Is the fee unreasonable relative to the proposed purchase price? *In re APP Plus, Inc.*, 223 B.R. 870, 874-75 (Bankr. E.D.N.Y. 1998). *See also id.* (citing *In re Hupp Industries, Inc.*, 140 B.R. 191, 196 (Bankr.N.D.Ohio 1992) (stating that the proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of all the parties in interested are protected).

Here, the negotiation of the Break-Up Fee is clearly tainted by the status of the buyer-former director, there was no bidding process employed by the Debtor, and the fee is excessive relative to the purchase price.

        (b)    **Arbitrary Reservation of Rights**.  The Debtor should not be able to reserve the right to adjust the terms of the Auction. That is a prescription for mischief.

Kaufman is concerned that there be a clear agreement to bid against, and a reasonable time to deal with any changing landscape. No side deals with the union. No side-deals for the Endowment. No soft understandings between the Board and its former member (the stalking horse bidder). Full disclosure whether any Board member will be on the Board of the proposed buyer, will be making contributions to the proposed buyer, or whether there has been any discussions on that subject.

Based on the bid that has been made, it is hard to understand what discretion the Debtor or the Committee should have to select a "higher or better offer." In this case, the only criteria should be who has bid the most money for the assets being sold.

In sum, especially in light of the Debtor's actions relating to the Motion, and the status of the bidder as a former insider, all events relating to the auction (a) should be fully and timely disclosed to bidders, and (b) played out in front of the Court.

(c) **Timing of the Auction**. Despite the promise made to him, Kaufman was not consulted about the dates of when the bids must be submitted and when the auction will take place. He believes that the dates should be pushed out by two weeks or so to accommodate for the holiday season. The Debtor should not be allowed to change those dates without the consent of Kaufman, or approval by the Court for good cause shown.

(d) **Endowment**. Kaufman will pay *more money* to the Estate for the right to recommend to the State Attorney General how the Endowment fund should be disbursed. The Estate creditors should get the benefit of that additional sum. There is no reason to leave that recommendation right with the Board. The Board has effectively squandered that right by its past mishandling of the Endowment. In any event, the primary entity that should be concerned about the use of the Endowment is the State Attorney General, who has an absolute veto right over any disbursement thereof. To be clear, Kaufman wants to bid on the right to make the recommendations of how the Endowment should be utilized. He is not seeking to compel the State to make a decision at this time. He agrees that the issue should ultimately be resolved by the State Courts.

(e) **No Consideration for Assignment and License Agreement**. Under the Assignment and License Agreement, between the Debtor and Lincoln Center for the Performing Arts, Inc., dated December 1, 2014, the Debtor has agreed, subject to Court approval, to assign and transfer certain Recordings (as defined in the agreement) and to license the use of Marks (as defined in the agreement) *without any additional consideration*. Since the Debtor Estate is getting no additional money for this transaction, it is not evident why it is included in the Sale Motion. It is a benefit to Lincoln Center only. Kaufman submits that the rights in the Recordings

5

and the Marks should be transferred to the purchaser who will pay what it believes to be the value of such rights as part of its bid for the Debtor's assets.

## CONCLUSION

WHEREFORE, it is respectfully requested that the Court enter an order denying the Motion, mandate a Court supervised auction process for the end of January 2015, and grant such other relief as the Court deems just, fair, and equitable.

Dated: New York, New York
December 18, 2014

KING & SPALDING

_/s/ Arthur J. Steinberg_
Arthur J. Steinberg
King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Email: asteinberg@kslaw.com

*Attorneys for Gene Kaufman*