Hearing Date: December 22, 2014 at 10:00 a.m. (ET)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| New York City Opera, Inc. | Case No. 13-13240 (SHL) |
| Debtor. | |

**DEBTOR'S REPLY TO THE OBJECTION OF GENE KAUFMAN TO DEBTOR'S MOTION FOR ORDERS (I) APPROVING (A) BIDDING PROCEDURES, (B) CERTAIN BID PROTECTIONS, (C) FORM AND MANNER OF SALE NOTICE, AND (D) SALE HEARING DATE, (II) AUTHORIZING THE DEBTOR TO ENTER INTO THE ASSIGNED CONTRACT, AND (III) AUTHORIZING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

New York City Opera, Inc., the above-captioned debtor and debtor in possession ("**NYC Opera**" or the "**Debtor**"), submits this reply to the objection of Gene Kaufman ("**Kaufman**") [Docket No. 219] (the "**Objection**") to the Debtor's *Motion For Orders (I) Approving (A) Bidding Procedures, (B) Certain Bid Protections, (C) Form and Manner of Sale Notice, And (D) Sale Hearing Date, (II) Authorizing the Debtor to Enter into the Assigned Contract, and (III) Authorizing the Sale of Certain Assets Free and Clear Of Liens, Claims, and Encumbrances* [Docket No. 213] (the "**Sale Motion**").[1] In support of its reply to Kaufman's Objection, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

Since the commencement of this case, the Debtor has worked tirelessly towards a resolution that would satisfy the Debtor's various creditor constituencies while fulfilling its mission and preserving the spirit of NYC Opera. As set forth in the Declaration of Andrea Nellis, filed contemporaneously herewith (the "**Nellis Declaration**"), since January 2014, the Debtor has been actively engaged in carefully vetting various proposals for the transfer of certain

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

of NYC Opera's assets and/or the continuation of NYC Opera's mission. This process has been complicated by the fact that, as explained in the Sale Motion and in the *Memorandum of Law of the Attorney General of the State of New York in Response to the Debtor's Motion for Orders (I) Approving (A) Bidding Procedures, (B) Certain Bid Protections, (C) Form and Manner of Sale Notice, and (D) Sale Hearing Date, (II) Authorizing the Debtor to Enter into the Assigned Contract, and (III) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims and Encumbrances* [Docket No. 218] (the "**AG Response**"), the legal standards for a sale of the Debtor's assets are different from those applicable to the transfer of the Endowment and virtually all of the proposals the Debtor received (not surprisingly) included a transfer of the Endowment. After careful consideration, the Debtor has agreed to accept the stalking horse bid of NYCO Renaissance LTD ("**Buyer**") for the purchase of the Debtor's thrift shop, trademark and certain additional intellectual property, subject to higher and better offers at an Auction (the "**Sale**").

In furtherance of the Sale, the Debtor filed the Sale Motion seeking, among other things, approval of Bidding Procedures and scheduling of a Sale Hearing to consider approval of the Sale following an Auction of the Acquired Assets. Although Kaufman attempts to make numerous arguments in his Objection, the overarching theme of his Objection is that Kaufman was not given a fair opportunity to participate in the sale process and that the sale process has been unfairly tilted in favor of the Debtor's former board member. Nothing could be further from the truth. As detailed in the Nellis Declaration, Kaufman was given ample opportunity to participate in the sale process. In fact, the Debtor began communicating with Kaufman more than a year ago, met with him several times and reviewed his proposals in the same manner that all proposals were reviewed. The Debtor ultimately decided that Kaufman's proposal was not viable for the reasons discussed in the Nellis Declaration and below. Furthermore, as set forth in the Sale Motion and as further detailed in the Nellis Declaration and below, the Debtor's negotiations with Buyer were entered into in good faith and, at all times, the Debtor's conflict of interest policy and governing law were adhered to with respect to Mr. Niederhoffer's role.

Accordingly, for all of the reasons set forth herein, Kaufman's Objection should be denied and the Bidding Procedures Order should be entered as proposed.

## BACKGROUND

1. On October 3, 2013 (the "**Petition Date**"), the Debtor filed a voluntary petition (the "**Chapter 11 Case**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2. The Debtor is currently operating its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On December 10, 2014, the Debtor filed the Sale Motion, thereby seeking Court approval of Bidding Procedures in connection with the Sale. On December 18, 2014, Kaufman filed the Objection.

## REPLY

4. Kaufman argues that, as a result of "glaring missteps" related to the Sale Motion and Auction, the Debtor "has forfeited all deference that otherwise might be afforded to its business judgment." Yet, Kaufman fails to provide any evidence of such "glaring missteps." In actuality, it appears that Kaufman filed this Objection (and several other unwarranted objections) because his proposal was not chosen to serve as the stalking horse bid. Regardless of Kaufman's assertion otherwise, the Debtor has not forfeited the deference afforded to its business judgment and cannot be forced to enter into a transaction with a party that has not submitted a viable proposal for the transfer of its assets.

5. As detailed in the Nellis Declaration, the Debtor met with Kaufman several times and allowed Kaufman to submit two separate proposals. The Debtor engaged with Kaufman and offered him the opportunity to clarify and strengthen each of his proposals. However, as detailed in the Nellis Declaration, there were fundamental credibility issues with both of the proposals submitted by Kaufman (among other concerns), namely that the proposals relied on the support of third parties who later notified the Debtor that their support was

misrepresented in the proposals. The Debtor is under no obligation to accept Kaufman's proposal as the stalking horse bid if, in its view (in consultation with its Board and the Special Committee authorized to review the various proposals), Kaufman's proposal simply was not meritorious.

6.      Through the Bidding Procedures proposed in the Sale Motion, Kaufman will have yet another opportunity to bid on the Debtor's assets. Kaufman should not be permitted to derail the proposed Sale to Buyer, which is the culmination of more than a year of work by all parties involved, simply because he is disappointed that his bid was not chosen as the stalking horse bid. Moreover, as set forth below, Kaufman's specific objections to the Bidding Procedures and the sale process are unfounded. Therefore, the Debtor submits that Kaufman's Objection should be denied and the Bidding Procedures Order should be entered as proposed.

A.      **The Break-Up Fee is Reasonable.**

7.      Kaufman objects to the break-up fee because "Kaufman is prepared to step into the shoes of the existing stalking horse contract and waive the break-up fee and the expense reimbursement, and reduce the bidding increment from $30,000 to $5,000." Objection at ¶ 6(a). The purpose of a break-up fee is to "compensate[] the stalking horse for the risk it shoulders in being the first bidder." *In re 310 Assoc.*, 346 F.3d 31, 34 (2d Cir. 2003); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 662 (S.D.N.Y. 1992) (break-up fee serves to "(1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders."). Kaufman's generosity in agreeing to waive the Break-Up Fee is underwhelming considering that a break-up fee is intended to prevent exactly what Kaufman proposes in his Objection, namely, submitting a nearly identical bid to that of the stalking horse bidder without compensating such bidder for its due diligence. Accordingly, this objection should be overruled.

-4-

**B.     The Debtor's Reservation of Rights to Modify Auction Procedures is Appropriate.**

8.      Kaufman's description of the Debtor's reservation of its right to modify the Bidding Procedures as "a prescription for mischief" misapprehends the rights the Debtor has reserved. The proposed Bidding Procedures provide, in pertinent part:

> Notwithstanding anything to the contrary herein, the Debtor reserves the right, in its business judgment, and in consultation with the Committee, to modify the Bidding Procedures at any time, with notice to Bidders and potential Bidders, including, without limitation, to (i) adjourn the Auction, the Sale Hearing or any of the dates set forth herein one or more times for any reason, (ii) terminate the Bidding Procedures at any time to pursue confirmation of a chapter 11 plan or an alternative restructuring strategy that maximizes value for the Debtor's estate, (iii) determine which Qualified Bid, if any, is the Successful Bid and the Alternate Bid, (iv) reject at any time, any Bid that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the proposed sale, or (c) contrary to the best interests of the Debtor, the Debtor's estate and creditors, or (v) accept as a Qualified Bidder or Qualified Bid a Bidder or Bid that does not otherwise meet the requirements set forth in the Bidding Procedures.

Sale Motion at ¶ 14(k).

9.      The Debtor did not reserve the right to enter into "side deals with the union" or transact "side-deals for the endowment,"[2] as Kaufman alleges. *See* Objection at ¶ 6(b). The Debtor has simply reserved the right to adjust the Bidding Procedures in the face of exigent circumstances to ensure that the restructuring process maximizes the value of the Debtor's assets. *See In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate."); *see also Integrated Resources,* 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy

---

[2]     As set forth more fully below, the Debtor does not have the authority to enter into a "side-deal for the [E]ndowment" because the Endowment is subject to cy pres (a public proceeding), and the New York State Attorney General is given an opportunity to be heard before the Endowment can be transferred.

-5-

law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

10.   Further, there are no "soft understandings between the Board and its former member (the stalking horse bidder)" as Kaufman asserts. *See Id.* On the contrary, the Debtor's Board considered various proposals for the Debtor's assets over the past year. After carefully evaluating the proposals, the Board determined that the proposal submitted by Buyer was the highest and best offer received for the assets that can be sold pursuant to the Bankruptcy Code. Accordingly, the Debtor filed the Sale Motion setting forth the terms of the Sale, the Bidding Procedures to be employed, and the structure of the transaction. Despite Kaufman's assertion, there is no conspiracy afoot. The Debtor has merely reserved its right to modify the Bidding Procedures as the circumstances warrant. This is customary in chapter 11 sales. *See*, *e.g.*, *In re FL Spirits, LLC*, Case No. 14-11691 (SCC) (Bankr. S.D.N.Y. Jul. 1, 2014); *In re Atari, Inc., et al.*, Case No. 13-10176 (JMP) (Jun. 14, 2013); *In re Coach AM Group Holdings Corp., et al.*, Case No. 12-10010 (KG) (Bankr. D. Del. Jan. 27, 2012); *In re BGI Liquidating Corp. f/k/a Borders Group, Inc.*, *et al.*, Case No. 11-10614 (MG) (Bankr. S.D.N.Y. Aug. 10, 2011); *In re Dana Corp., et al.*, Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Oct. 19, 2006).

11.   In addition, contrary to Kaufman's assertions otherwise, the Sale process has been entirely transparent. In fact, as noted above and in the Nellis Declaration, Kaufman has been an active participant in the proposal process and subsequent negotiations. As set forth in the Nellis Declaration, the Board was careful to make sure Mr. Niederhoffer was recused from all deliberations and voting on the Buyer's proposal once the extent of his involvement became clear. These precautions actually exceed the requirements of New York State law, which only require recusal from deliberations and voting when a director stands to financially benefit from a proposed transaction.

12.   Finally, Kaufman is concerned that "there be a clear agreement to bid against." *See* Objection at ¶ 6(b). Attached to the Sale Motion is a seventy-eight (78) page asset

purchase agreement that constitutes the agreement to bid against. Accordingly, Kaufman's objections regarding the Bidding Procedures should be overruled.

**C.     The Timing of the Auction.**

13.     Kaufman also objects to the timing of the Auction. The Debtor filed the Sale Motion on December 10, 2014. The proposed Bidding Procedures Order requests a Bid Deadline of January 8, 2015. Accordingly, potential bidders have been afforded an entire month to formulate a competing bid. Despite Kaufman's assertion otherwise, the Debtor did not promise to consult him about the dates of the auction. The *Fifth Order Extending the Debtor's Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon* entered by this Court on December 3, 2014 (the "**Fifth Exclusivity Order**") required the Debtor to file a motion to approve sale procedures and/or a motion for approval of the sale its remaining assets, subject to higher and better offers at a public auction, by no later than December 18, 2014. The Fifth Exclusivity Order further provides that "[t]he sale procedures shall be agreed to by the Committee and Mr. Kaufman, *or will be set by further order of the Court*." *See* Docket No. 211 at ¶ 4 (emphasis added). The Debtor did exactly what was prescribed by the Fifth Exclusivity Order when it filed the Sale Motion on December 10, 2014 seeking the Court's approval of the Bidding Procedures.

14.     Moreover, a request that the dates be pushed out by two weeks to accommodate the holiday season is unreasonable. The Debtor has been soliciting proposals for more than a year. Kaufman has been actively engaged in that process for more than a year. Requesting additional time at this point is merely a stall tactic and should not be countenanced by this Court. Accordingly, Kaufman's objection regarding the timing of the Auction should be overruled.

**D.     The Endowment.**

15.     Kaufman wants, as part of the Sale, "the right to recommend to the State Attorney General how the Endowment fund should be disbursed." *See* Objection at ¶ 6(d). As set forth more fully in the AG Response, the Endowment is not part of the bankruptcy estate and

cannot be included as part of the Sale. Instead, the disposition of the Debtor's Endowment must be accomplished pursuant to a *cy pres* proceeding. Accordingly, Kaufman's objection regarding the Endowment should be overruled.

16. Further, Kaufman has not – and indeed cannot – offer any support for his unique and off-base assertion that he (a private individual) should be permitted to, for a price, substitute his own judgment for that of the Debtor's Board of Directors and make a recommendation as to the appropriate recipient(s) of the Endowment. Instead, the disposition of the Debtor's Endowment must be accomplished pursuant to a *cy pres* proceeding based on the recommendations of the Debtor's duly elected Board after it has been vetted by the Attorney General. Accordingly, Kaufman's objection regarding the Endowment should be overruled.

17. Moreover, the Debtor would be remiss if it did not address Kaufman's glaring misstatements about the Board's handling of the Endowment, which are wholly unsupported by the facts. As Kaufman is well aware, there was a global financial crisis in 2008. As a result of this stock market decline, like many other well-managed non-profits, the Debtor suffered devastating losses on its endowment investments in 2008. Compounding these losses, the Debtor had a very difficult season in 2008-2009 during which the Koch Theater was under construction and the Debtor was unable to stage opera performances. This dark season caused a significant loss of the Debtor's audience and revenue streams, from which the Debtor struggled to recover. It is public record that the Debtor borrowed $24 million from its endowment (with the assent of the New York State Attorney General and the permission of the Supreme Court of the State of New York) to fund some of its accumulated deficit. As a result of the outstanding loan from its Endowment, which the Debtor was unfortunately unable to raise or earn sufficient funds to repay, the Debtor prudently preserved the remaining principal in its endowment and has restricted its draw to interest and dividends, amounting to approximately $160,000 per year, as compared to the $2 to $3 million draw it was previously able to take. Kaufman should not be permitted to use his unsupported allegations about the Debtor's supposed mismanagement to

seek to substitute his own judgment for that of the Debtor's Board and continue to delay the orderly resolution of the Debtor's Chapter 11 Case.

### E.     The Assignment and License Agreement.

18.     Finally, Kaufman objects to the Debtor's agreement with Lincoln Center (the "**Assigned Contract**") to assign the Debtor's rights in certain Recordings (as defined in the Assigned Contract) and license certain Marks (as defined in the Assigned Contract) for a limited purpose to Lincoln Center for no additional consideration. The Debtor notes that most of the Recordings covered by the Assigned Contract are several decades old, and the Debtor does not own the Recordings themselves, but rather has certain limited approval rights with respect to their distribution beyond their original purpose. As far as the Debtor knows, no market for the sale of its rights in such Recordings has been identified. Indeed, the Recordings have been sitting in the Lincoln Center archives since they were originally broadcast. In the Debtor's view, permitting Lincoln Center to use the Recordings in furtherance of its artistic and educational mission is consistent with NYC Opera's mission statement. Moreover, Buyer has agreed to the purchase of the Trademark subject to the license proposed under the Assigned Contract. Nonetheless, at the request of the Committee, the Debtor has agreed to adjourn its request for approval of the Assigned Contract until the Sale Hearing.

## CONCLUSION

19.     For all of the reasons set forth herein, Kaufman's Objection should be overruled and the Bidding Procedures Order entered, as proposed. Kaufman is free to make another bid and participate in the public Auction that is contemplated by the Sale Motion, in the same manner as all other interested parties who are required to receive and will receive notice of the Bidding Procedures.

**WHEREFORE,** the Debtor respectfully requests that this Court (i) overrule Kaufman's Objection; (ii) enter the Bidding Procedures Order as proposed; and (iii) grant the Debtor such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: December 21, 2014         **LOWENSTEIN SANDLER LLP**

/s/ *Nicole Stefanelli*
Kenneth A. Rosen
Nicole Stefanelli
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
nstefanelli@lowenstein.com

*Counsel to the Debtor and Debtor in Possession*