**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen
Nicole Stefanelli
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| New York City Opera, Inc. | Case No. 13-13240 (SHL) |
| Debtor. | |

**DECLARATION OF ANDREA SCALA NELLIS, MANAGING DIRECTOR OF
NEW YORK CITY OPERA, INC., IN FURTHER SUPPORT OF DEBTOR'S MOTION
FOR ORDERS (I) APPROVING (A) BIDDING PROCEDURES, (B) CERTAIN BID
PROTECTIONS, (C) FORM AND MANNER OF SALE NOTICE, AND (D) SALE
HEARING DATE, (II) AUTHORIZING THE DEBTOR TO ENTER INTO THE
ASSIGNED CONTRACT, AND (III) AUTHORIZING THE SALE OF CERTAIN
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

Andrea Scala Nellis, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am the Chief Executive Officer and Managing Director of New York
City Opera, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**" or "**NYC
Opera**").  I have been employed as the Debtor's Managing Director since September 6, 2011,
and began serving as Chief Executive Officer after the Debtor commenced this Chapter 11
proceeding.  In this capacity, I am familiar with the Debtor's day-to-day operations, business,

financial affairs, and books and records.  In addition, I have served as both Officer of the Debtor and as an ex-officio member of the Board of Directors, and have participated in all of the meetings and deliberations of Debtor's Board of Directors and committees thereof as described below.

2.      I submit this Declaration in further support of the *Debtor's Motion for Orders (I) Approving (A) Bidding Procedures, (B) Certain Bid Protections, (C) Form and Manner of Sale Notice, and (D) Sale Hearing Date, (II) Authorizing the Debtor to Enter Into the Assigned Contract, and (III) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, and Encumbrances* [Docket No. 213] (the "**Sale Motion**")[1] and in response to the objection of Gene Kaufman ("**Kaufman**") to the Sale Motion [Docket No. 219].

3.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtor's governance, operations and finances, materials provided by members of the Debtor's management and information I have received from the Debtor's advisors.  Any opinions asserted in this Declaration are based upon my experience and knowledge of the Debtor's governance, operations and financial condition.  I am over 18 years old and, if called upon to testify, I could and would competently testify as to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtor.

A.      **Summary of Process**

4.      Prior to the Petition Date, the Debtor's Board of Directors (the "**Board**") voted to appoint a three-person special committee (the "**Special Committee**") to represent the full Board to work with management and counsel in preparing the chapter 11 petition and supervise the winding-down of the Debtor.

5.      Shortly after the Petition Date, the Debtor began to receive expressions of interest from various parties regarding the future life of NYC Opera.  At the Special Committee's

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

direction, the Debtor's counsel and financial advisors made themselves available to any and all interested parties who reached out to the Debtor.   Any interested party who signed a confidentiality agreement with the Debtor was provided with detailed information about NYC Opera's operations and assets.

6.    Throughout the past year, the Special Committee has met frequently to discuss every serious proposal for NYC Opera's assets that has come in.   When a proposal merited further exploration, the Special Committee has directed management and the Debtor's advisors to follow up and seek additional information to allow for a fuller vetting.   The Special Committee has brought what it determined to be the most viable proposals to the full Board for discussion, feedback, and additional direction.   Early on in this process, in order to ensure that all serious inquiries could be properly vetted and received equal treatment, the Debtor requested that interested parties submit written proposals in mid-January 2014 (the "**Initial Submission Deadline**").

7.    Prior to the Initial Submission Deadline, Kaufman contacted the Debtor and requested a meeting to discuss the parameters of a proposal.   Accordingly, on December 20, 2013, the Debtor and its advisors met with Kaufman.   On January 3, 2014, the Debtor received an information request from Kaufman.   From January 3, 2014 to January 8, 2014, the Debtor worked with Kaufman to provide him with extensive information to aid in making his proposal.

**B.    The Initial Kaufman Proposal**

8.    On January 10, 2014, Kaufman submitted his initial proposal (the "**Initial Kaufman Proposal**").   The Initial Kaufman Proposal proposed a revitalization of NYC Opera with Mr. Kaufman – an architect, opera lover and supporter with no professional experience in this arena -- stepping in to serve as President.   Perhaps to compensate for his lack of operational experience, the Initial Kaufman Proposal indicated that Opera America, a highly respected, non-profit membership organization that services and promotes opera in North America, would act as

organizational and financial consultant in connection with the proposed new operating structure, and noted that all financial modeling had been developed by Opera America.

9.    The Initial Kaufman Proposal, when compared with the other proposals submitted, had several weaknesses from a financial, structural and credibility point of view.  For example, the proposal lacked a specific fundraising plan (other than Kaufman's representation that he would personally fund the first season of the new company) as well as an operations budget.  Additionally, the Initial Kaufman Proposal failed to clearly address the treatment of the Debtor's Endowment, whether it contemplated any payment to NYC Opera's creditors and wavered between positioning itself as a reorganization or an asset transfer.

10.    Perhaps most significantly, although the Initial Kaufman Proposal relied heavily on Opera America's involvement and professional expertise, it became clear that Kaufman had overstated Opera America's commitment to the proposal.  On January 17, 2014, the Debtor received a letter from Opera America stating that the Initial Kaufman Proposal represented Opera America "in a matter that is not consistent with [its] understanding of [its] relationship with Mr. Kaufman and his firm."  A copy of the Opera America letter is attached hereto as **Exhibit A**.

11.    In its letter, Opera America essentially disavowed all aspects of the Initial Kaufman Proposal, noting that while it had served as a source of general information about the opera industry, it had not agreed to serve as an ongoing "collaborator" with Kaufman on his proposed new structure. Opera America stated that Kaufman had made significant adjustments to the financial data Opera America had provided to him, noting that Kaufman's labor projections did not include prevailing union wages, and that it had not had any input on Kaufman's production and special event schedule and related cost projections.

12.    On the same date, Kaufman submitted a letter of clarification in connection with the Initial Kaufman Proposal, confirming Opera America's position and clarifying the funding and management structure of his proposal.  Kaufman added that he

intended to use the administrative staff and infrastructure of his architectural firm to support the new company, and committed not to "raid" the Endowment for the first three seasons.

## C.    January 2014 Board Meeting

13.    On January 22, 2014, the Board held a meeting to, among other things, evaluate the proposals that had been submitted, including the Initial Kaufman Proposal.  Prior to the evaluation of the proposals at the January 22, 2014 Board meeting, the chairman of the Board requested that Board members disclose any conflicts of interest in connection with the proposals.  At that time, Roy G. Niederhoffer ("**Niederhoffer**") advised the Board that Michael Capasso ("**Capasso**") had met with him regarding one of the proposals being presented, but stated that he had no financial interest in or benefit from the proposal.

14.    At the conclusion of the January 22, 2014 Board meeting, the Board did not reach a decision as to whether any of the proposals would be accepted.  However, the Board directed the Special Committee and management to further explore certain of the proposals by sending follow-up requests to the relevant interested parties.  At that time, the Board determined that it did not wish to further pursue the Initial Kaufman Proposal in light of its shortcomings, and therefore it did not direct the Debtor to request any additional information from Kaufman.  The Chairman of the Board also added two additional Board members to the Special Committee, including Niederhoffer.

## D.    Process Since January 2014

15.    Following the conclusion of the January 22, 2014 meeting, the Debtor and its advisors, in consultation with the Special Committee, further explored certain of the proposals and communicated with those interested parties.

16.    In February 2014, the Special Committee and its advisors held extensive in person meetings with representatives of several of the leading proposals to further understand their plans and request additional information.  The Special Committee also considered additional proposals and expressions of interest it had received since the January Board meeting.

17.    On May 15, 2014, the Special Committee met again to evaluate the proposals that it was exploring further, including additional information received from certain interested parties.

18.    On May 20, 2014, the Debtor held a Board meeting to, among other things, evaluate the proposals that were being further explored by the Special Committee.  The Special Committee met immediately prior to full Board meeting to discuss its views of the various proposals.  Because it had become clear that Niederhoffer had decided to provide significant financial support to Capasso's proposal and would be serving on the Board of the new non-profit corporation (NYCO Renaissance, LTD.) set up in connection with this particular proposal, Niederhoffer was not included in that Special Committee meeting in keeping with the Debtor's Conflict of Interest Policy.

19.    At the May 20, 2014 Board meeting, the Special Committee presented its findings with respect to the proposals the Board has directed it to pursue further and reported on the new proposals and expressions of interest received since the January Board meeting.  The Board also discussed the considerations regarding the transfer of the Debtor's Endowment in light of the fact that numerous proposals requested a transfer of the Endowment.  At the conclusion of the May 20, 2014 Board meeting, the Board did not reach a decision as to whether any of the proposals would be accepted. However, the Board requested that the Special Committee make a recommendation regarding the proposals at the next Board meeting.

20.    Subsequent to the May 20, 2014Board meeting, and prior to any further deliberations by the Special Committee on the pending proposals, Neiderhoffer stepped down from the Special Committee.

21.    On June 30, 3014, the Debtor filed the *Debtor's Third Motion for Entry of an Order Extending the Debtor's Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon* [Docket No. 171] (the "**Third Exclusivity Motion**").  On July 7, 2014, Kaufman filed an objection to the Third Exclusivity Motion, along with a cross-motion for the appointment of a chapter 11 trustee [Docket No. 174].  Kaufman's cross-motion asserted that the

Debtor had failed to negotiate with Kaufman and therefore the Board had failed to "pull the trigger" on any sale proposal.

22.     Because the Debtor had already expended significant efforts on the proposals it considered most promising and the Special Committee was preparing to make a recommendation to the full Board by the end of the summer, the Debtor concluded it was important to retain exclusivity to give the process additional time.  Therefore, Debtor consulted with Kaufman's attorney and agreed to a resolution of the Third Exclusivity Motion.  Specifically, despite the fact that the Board had felt Kaufman's Initial Proposal was not worth pursuing further, the Debtor agreed "(a) to timely provide [Kaufman] with the information it requests so that [Kaufman] can finalize its bid for the Debtor's business, (b) to meet with [Kaufman] to discuss its bid for the Debtor's business, and (c) that [Kaufman] will be given the opportunity to make a "higher or better" bid, in the event the Debtor seeks to transfer its business (either through a plan or asset sale) to a third party, other than [Kaufman]." *See Consent Order Further Extending the Debtor's Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon* [Docket No. 185], entered on July 16, 2014.

23.     Between July 14, 2014 and July 20, 2014, the Debtor worked with Kaufman and his counsel to provide him with information he requested in order to finalize and refine his proposal.  On July 21, 2014, the Debtor and its advisors met with Kaufman and his counsel via conference call to provide Kaufman with additional information.

24.     The Special Committee held another meeting on July 9, 2014 to discuss and review the proposals, as well as Kaufman's objection.

**E.     The Updated Kaufman Proposal**

25.     On August 14, 2014, Kaufman submitted an updated proposal (the "**Updated Kaufman Proposal**"), which was significantly different from the Initial Kaufman Proposal.  The Updated Kaufman Proposal proposed a joint venture combining the Debtor and Glimmerglass Festival.  Specifically, the Updated Kaufman Proposal provides, in relevant part:

[W]e propose a New York State Opera ("NYSO"), combining New York City Opera and Glimmerglass into a more powerful whole.

The current artistic and general director of Glimmerglass would also assume that role at NYCO, based upon her enormous success. The Glimmerglass staff, already in place and highly capable, will assume those same roles at NYCO. Thus NYCO will be fully functional on day one. Furthermore, Glimmerglass entire summer 2014 season, with its world famous singers, conductors and directors, can be brought to New York City this coming 2014-2015 season, as it would be impossible to create any new content for at least a year if not more. The 2015 Glimmerglass summer productions, already announced, cast and in the planning phase, can be mounted in NYC in spring or fall of 2015. Effectively, by combining a summer company with a traditional season company will create a year round company having a summer home in Cooperstown and mounting a full fall through spring season in NYC. This will also create major efficiencies, with 12 months of productions with one staff, cheaper overhead in Cooperstown, merged marketing, and shared production costs. Glimmerglass, though the stronger company, will gain the prestige and historical associations of NYCO.

26.     On August 23, 2014, the Debtor sent Kaufman's counsel an extensive list of follow-up questions regarding the Updated Kaufman Proposal and provided substantive feedback on what the Debtor was looking for in Kaufman's responses.  Among other things, the Debtor requested written evidence of Glimmerglass Festival's support for the Updated Kaufman Proposal.

27.     The Updated Kaufman Proposal shared many of the flaws of the Initial Kaufman Proposal.  For example, the Updated Kaufman Proposal wavered between whether it contemplated areorganization or an asset sale, and included financial projections that the Debtor's management and advisors determined to be unrealistic upon closer review.  Once again, Kaufman relied on an affiliation with a well-respected, non-profit professional company experienced with producing opera (Glimmerglass) to provide credibility and substance to his proposal.  However, on August 28, 2014, the Debtor received a letter from Glimmerglass Festival stating that "the Board [of Glimmerglass Festival] has not participated in the preparation

of the [Updated] Kaufman Proposal, has not authorized it, and takes no responsibility for it." A copy of the Glimmerglass Festival letter is attached hereto as **Exhibit B**

**F.      Process Following the Submission of the Updated Kaufman Proposal**

28.     On September 4, 2014, the Debtor and its advisors met with Kaufman and his counsel via conference call to discuss the Updated Kaufman Proposal.

29.     On September 8, 2014, September 16, 2014 and September 19, 2014, the Special Committee met (in person and via conference call) to further evaluate the proposals in order to reach a recommendation to be presented to the Board.  The Special Committee carefully reviewed the Updated Kaufman Proposal, as well as the answers Kaufman had provided in response to the Debtor's follow-up questions, and discussed its merits relative to the other proposals under consideration.

30.     On September 22, 2014, the Board held a meeting to, among other things, evaluate and vote on the recommendation of the Special Committee.  At the conclusion of the September 22, 2014 Board meeting, the Board voted to accept the proposal by NYCO Renaissance LTD (a 501(c)(3) entity led by Capasso and Niederhoffer) ( "**Buyer**") for the purchase of the Debtor's thrift shop, trademark and certain additional intellectual property, subject to higher and better offers.  The Board decided to hold off on any final decisions with respect to the Debtor's Endowment.  Niederhoffer was not present for the Board's deliberations or vote at the September 22, 2014 Board meeting, and was only invited into the meeting to be informed of the Board's decision.

31.     Niederhoffer subsequently resigned from the NYC Opera Board.  Based on the Board's decision at its September 22, 2014 meeting, the Debtor, in consultation with the Special Committee, negotiated the terms of the Asset Purchase Agreement that was submitted with the Sale Motion.  Both the Debtor and Buyer were represented by counsel during such negotiations.

32.     While extensive negotiations were ongoing with respect to the Asset Purchase Agreement, the Debtor sought to further extend exclusivity so that it could complete the negotiations without the risk of a competing plan being filed.  Accordingly, on October 28, 2014, the Debtor filed the *Debtor's Fifth Motion for Entry of an Order Extending the Debtor's Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon* [Docket No. 201] (the "**Fifth Exclusivity Motion**").  On November 12, 2014, Kaufman filed an objection to the Fifth Exclusivity Motion, along with a cross-motion to compel the Debtor to sell its assets in a Court-supervised auction [Docket No. 204].  Kaufman's cross-motion asserted that the Debtor had failed to negotiate with Kaufman and therefore the Board had failed to "pull the trigger" on any sale proposal.  Once again, in his objection, Kaufman asserted that the Debtor's Board should not be permitted to remain in control of the process.

33.     Following a hearing on the Fifth Exclusivity Motion, the Court granted the requested extension of exclusivity and entered the *Fifth Order Extending the Debtor's Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon* on December 3, 2014 (the "**Fifth Exclusivity Order**").  The Fifth Exclusivity Order required the Debtor to file a motion to approve sale procedures and/or a motion for approval of the sale its remaining assets, subject to higher and better offers at a public auction, by no later than December 18, 2014.  The Fifth Exclusivity Order further provides that "[t]he sale procedures shall be agreed to by the Committee and Mr. Kaufman, *or will be set by further order of the Court*."  *See* Docket No. 211 at ¶ 4 (emphasis added).

34.     The Debtor filed the Sale Motion on December 10, 2014 seeking the Court's approval of the Bidding Procedures.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  December 21, 2014                    /s/ *Andrea Scala Nellis*
                                             Andrea Scala Nellis, Managing Director