DUANE MORRIS LLP
1540 Broadway
New York, NY 10036
(212) 692-1000
Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.
Evangelos Michailidis, Esq.

[REDACTED VERSION]

*Counsel to NYCO Renaissance, Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| **New York City Opera, Inc.,** | Case No. 13-13240 |
| Debtor. | |

**NYCO RENAISSANCE, LTD.'S RESPONSE TO THE STATEMENT OF
NEW VISION FOR NYC OPERA, INC. WITH RESPECT TO
NYC OPERA INC.'S NOTICE TO WITHDRAW ITS SALE MOTION**

NYCO Renaissance, Ltd. ("**NYCO Renaissance**") by and through its counsel, submits this Response to the *Statement of New Vision for NYC Opera, Inc. With Respect to NYC Opera, Inc.'s Notice to Withdraw Its Sale Motion*, July 13, 2015 (No. 273) ("**New Vision Statement**"), and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      Gene Kaufman ("**Kaufman**"), the Chairman of New Vision for NYC Opera, Inc. ("**New Vision**"), is a spurned bidder.

2.      In the aftermath of his defeat to NYCO Renaissance at the January 20, 2015 auction (the "**Auction**"), Kaufman launched a relentless litigation and public relations campaign against the Chapter 11 debtor herein, New York City Opera, Inc. ("**NYCO**" or the "**Debtor**") and NYCO Renaissance alleging all sorts of unfounded and utterly unsubstantiated improprieties in the bidding and selection process.

3.      Now that news of significant bequests has changed NYCO's direction in this matter from a sale to a reorganization, Kaufman alleges in his New Vision Statement that NYCO's reason for withdrawing the Sale Motion is "contrived" because discovery has allegedly revealed "new" evidence that the sale process was unlawful.

4.      Specifically, the New Vision Statement alleges that Mr. Roy Niederhoffer ("**Niederhoffer**"), a highly regarded businessman, philanthropist and Chairman of NYCO Renaissance: (i) kept his affiliation with Mr. Michael Capasso ("**Capasso**") and NYCO Renaissance a secret from the NYCO board to advance his own plan to have NYCO Renaissance selected by NYCO as the winning bidder; (ii) improperly communicated with Mr. Elliot Slade ("**Slade**"), a member of the board and special committee of NYCO, to influence NYCO's conduct at the Auction and for special guidance as to how to bid at the Auction; (iii) improperly obtained and circulated confidential documents submitted by New Vision to the Debtor; and (iv) caused Capasso and others to improperly "ghost-write" for Slade NYCO's special committee's analysis of which bid made at the Auction was the highest and best bid.

5.      As discussed in greater detail below, each of these allegations is false or deceiving.  Kaufman has presented a very skewed and incomplete picture of what transpired in the selection process in order to mislead this Court into believing that something untoward has occurred, when in fact, nothing could be further from the truth.

6.      Additionally, the New Vision Statement completely ignores the extensive discovery conducted by Kaufman, which discovery clearly demonstrates the real reason Kaufman's bid was rejected – he and his ill-conceived plans (he submitted three (3) different plans to NYCO between January 2014 and January 2015) to restore the opera all lacked credibility in the eyes of NYCO's entire board. Further, Kaufman was unable to overcome these credibility concerns by simply bidding $250,000 in cash higher than NYCO Renaissance at the Auction.

7.      Ultimately, Kaufman's allegations that NYCO's stated reason for withdrawing the Sale Motion amount to nothing more than the ramblings and distortions of a disfavored bidder seeking to improve his situation through false allegations and litigation. Sadly, his tactics have prevented this cherished not-for-profit Debtor from emerging from these proceedings to the detriment of musicians, employees, benefactors and the entire opera world.

8.      As the New York Attorney General's Statement points out[1], the basis for withdrawing from a sale and pursuing exclusively a plan to reorganize and continue the charitable activities of NYCO under the name "New York City Opera, Inc." is quite simple and reasonable. It gives the reorganized opera company the best chance of receiving substantial bequests and avoiding possibly multiple state court proceedings regarding the distribution of certain testamentary gifts. This would put the new opera company, whether it is being run by NYCO Renaissance, Kaufman or someone else, in the best position to continue the mission statement of NYCO when the bankruptcy concludes.

---

[1] On August 13, 2015, the Office of the Attorney General filed its *Statement of the New York Attorney General Relating to the Upcoming Settlement Discussions and Consent Order Regarding Sale Motion* (No. 282).

9.    That Kaufman would attempt to twist and distort these clear facts as part of his ongoing campaign to manufacture supposed bad conduct on the part of NYCO Renaissance and hold NYCO hostage in these proceedings, is yet another example of his shameless and selfish behavior.

## ARGUMENT

### I.    NYCO Did Not Select Kaufman's Plans Because He and His Plans Lacked Credibility

10.    Kaufman alleges that NYCO "totally ignore[d]" his plan in favor of the NYCO Renaissance plan and never fairly engaged him, suggesting that the selection process was biased from the outset. *See New Vision Statement* at ¶¶ 49-50 (No. 277). This is false.

11.    The evidence demonstrates that NYCO carefully considered each of Mr. Kaufman's three (3) plans (along with a number of others), and rejected them because of serious deficiencies and credibility concerns.

#### *The First Kaufman Plan*

12.    Mr. Kauffman submitted his initial proposal on January 10, 2014 (the "**First Kaufman Plan**").

13.    The First Kaufman Plan was for a revitalized opera with Kaufman – an architect, supposed opera lover and alleged supporter with absolutely no professional experience in the arena – stepping in to serve as president.

14.    To compensate for his obvious lack of any relevant operational experience, his initial proposal indicated that Opera America, a highly respected, non-profit membership organization that services and promotes opera in North America, ██████████████

██████████████████████████████████

██████████████████████. *Decl. of Andrea S. Nellis In Further*

*Supp. of Debtor's Motion for Orders (I) Approving (A) Bidding Procedures, (B) Certain Bid*

*Protections, (C) Form and Manner of Sale Notice, and (D) Sale Hearing Date, (II) Authorizing*

*the Debtor to Enter into the Assigned Contract, and (III) Authorizing the Sale of Certain Assets*

*Free and Clear of Liens, Claims, and Encumbrances* at ¶ 8, Dec. 21, 2014 (No. 225) (**"Nellis**

**Declaration**").

15.    According to Andrea S. Nellis, the Chief Executive Officer and Managing

Director of NYCO, the initial proposal, "when compared with other proposals submitted, had

several weaknesses from a financial, structural and credibility point of view.



." *Id.* at ¶ 9.

16.

17.    Furthermore, and perhaps most significantly, Kaufman seriously misrepresented

Opera America's commitment to his proposal.

18.    On January 17, 2014, NYCO received a letter from Opera America stating that

the Kaufman's proposal represented Opera America "in a manner that is not consistent with [its]

understanding of [its] relationship with Mr. Kaufman and his firm." A copy of the letter is

attached hereto as **Exhibit A.**

19.    In its letter, Opera America essentially disavowed all aspect of the First Kaufman

Plan, noting that while it had served as a source of general information about the opera industry,

it had not agreed to serve as an ongoing collaborator with Kaufman on his proposed new

structure. *Id.*

20.     Not surprisingly, ███████████████████, on January 22, 2014, the

NYCO board decided that it did not wish to further pursue the First Kaufman Plan. *See Nellis*

*Declaration* at ¶ 14 (No. 225).

*The Second Kaufman Plan*

21.     In order to resolve an objection filed by Kaufman on July 7, 2014 (No. 174),

NYCO agreed to provide Kaufman with another opportunity to submit a proposal.  As a part of

this resolution, NYCO agreed to timely provide Kaufman with any information he requested so

that he could submit his bid, to meet with Kaufman to discuss his bid and to give Kaufman the

opportunity to make a "higher or better" bid for NYCO's assets. *See Consent Order Further*

*Extending the Debtor's Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes*

*Thereon*, July 16, 2014 (No. 185).

22.     Accordingly, on July 21, 2014, NYCO and its advisors met with Kaufman and his

counsel *via* conference call to provide Kaufman with additional information.  *See Nelllis*

*Declaration* at ¶ 23 (No. 225).

23.     On August 14, 2014, Kaufman submitted his second proposal (the "**Second**

**Kaufman Plan**").

24.     The Second Kaufman Plan proposed a joint venture combining NYCO and

Glimmerglass, another well respected non-profit professional opera company.

25.     ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████

26.    ████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████

27.    On August 23, 2014, NYCO sent Kaufman's counsel an extensive list of follow-up questions regarding the Second Kaufman Plan and provided substantive feedback on what NYCO was looking for in Kaufman's responses. *Id.* at ¶ 26. ███████████████

█████████████████████████████████████████████████

28.    On August 28, 2014, NYCO received a letter from Glimmerglass stating that the "Board of [Glimmerglass] has not participated in the preparation of the [Second Kaufman Plan], has not authorized it, and takes no responsibility for it." A copy of this letter is attached as **Exhibit B**.

29.    █████████████████████████████████████████

████

30.    Not surprisingly, NYCO again rejected the Second Kaufman Plan for many of the same reasons it rejected the First Kaufman Plan.

31.    On September 22, 2014, approximately seven (7) months after NYCO Renaissance submitted its proposal, the NYCO board decided to accept the proposal of NYCO Renaissance to purchase NYCO's thrift shop, trademark and certain additional intellectual property, subject to higher and better offers.

*The Third Kaufman Plan*

32.    On January 20, 2015, **after the close of the Auction**, Kaufman emailed Ms. Nellis his latest plan (the "**Third Kaufman Plan**"). A copy of the email chain is attached as

**Exhibit 39** to the New Vision Statement; an excerpt of that exhibit with the relevant email is attached hereto as **Exhibit C**.

33.    Even though the Third Kaufman Plan plan was untimely as it should have been submitted as a part of his bid by no later than 11 a.m. on January 8, 2015 (*See Debtor's Motion for Orders (I) Approving (A) Bidding Procedures, (B) Certain Bid Protections, (C) Form and Manner of Sale Notice, and (D) Sale Hearing Date, (II) Authorizing the Debtor to Enter into the Assigned Contract, and (III) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, and Encumbrances, Section D(f), Dec. 10, 2014 (No. 213)*), NYCO nevertheless reviewed it carefully.

34.    Slade, a member of the board and special committee, had the considerable task of reviewing the untimely submitted Third Kaufman Plan late that evening.

35.    At 2:35 a.m. on the morning of January 21, 2015, Slade sent an email to other members of the NYCO board and special committee entitled "Analysis of NYCOR and Kaufman Proposals." A copy of this analysis is attached as **Exhibit D**.

36.    According to Slade, there were several deficiencies and concerns with the Third Kaufman Plan, many of which were present in the First Kaufman Plan and the Second Kaufman Plan:

   a.    Kaufman had not yet formed a 501(c)(3);

   b.    Kaufman provided a long list of purported advisors but provided no indication about what role they would play in the organization or whether they would be making any financial commitments to the organization;

   c.    The plan provided no details about a management team and named no artistic director or experienced producer;

   d.    The plan was basically silent on his plans for the unions;

    e.      The plan provided no details about an opera education program;

    f.      The plan provided for a rehearsal space outside of Manhattan, which would be extremely inconvenient for performers;

    g.      Kaufman provided no evidence of any fund raising efforts to date;

    h.      The plan estimated an unrealistic marketing budget of $100,000;

    i.      Kaufman assumed 75% ticket sales, which was unrealistic based on NYCO's experience; and

    j.      Kaufman envisioned using the Hammerstein Ballroom, which did not seem like an ideal venue, considering its lacks an orchestra pit.

*See* **Exhibit D**.

37.     After conducting his side by side analysis of the Third Kaufman Plan and the NYCO Renaissance proposal, Slade concluded:

> It is like night and day when you view them side by side. In my opinion, it is no contest that the [NYCO Renaissance] plan is more well thought out, more detailed, and more likely to succeed. [NYCO Renaissance]'s proposal has been fully vetted by the committee and its advisors. *Id.*

38.     Therefore, for Kaufman to now suggest to this Court that he was ignored in the selection process is more than disingenuous, it is demonstrably false.

39.     The impact of Kaufman's prior interactions with NYCO and its board cannot be underestimated as they, understandably, created an enormous credibility concern for NYCO which contributed to NYCO's decision to select NYCO Renaissance as the winning bidder. As Ms. Nellis testified at her deposition:

> We didn't feel that we could consider Kaufman's proposal because of the credibility issues. ███████████████

██████████████████████████████████████

An excerpted copy of Ms. Nellis Deposition Transcript is attached as **Exhibit E**.

Nellis Dep. Tr. at 199:3-19.

## II.    Niederhoffer's Affiliation With NYCO Renaissance Was Not A Secret

40.    Kaufman alleges that Niederhoffer concealed his affiliation with Capasso from
the NYCO board to "secretly advance his own plan." This is likewise false.

41.    On December 6, 2013, more than one (1) year before the Auction, Niederhoffer
wrote to the Debtor's board informing them that he had been meeting with Capasso and stating
that "he has presented me with an ambitious, detailed yet seemingly highly viable plan to take
NYCO out of bankruptcy..." A copy of this email is attached as **Exhibit F**.

42.    On December 18, 2013, Duane Morris, counsel to NYCO Renaissance, sent an
email to NYCO's counsel with the following statement: "As you know, we represent Capasso
who is working with Roy Niederhoffer in connection with a potential reorg business plan..." A
copy of this email is attached as **Exhibit G**.

43.    On January 26, 2014, Niederhoffer sent an email to Mr. Chuck Wall ("**Wall**"), a
NYCO board member, stating the following: "Chuck, if you let me, I will save it. I've got the
resources – I can fund singlehandedly the entire Season 1 of a Michael [Capasso] sized proposal
– and I promise you that even if I have to do what you did and more, a revived company with me
involved will never fail again." A copy of these emails is attached as **Exhibit H**.

44.    On March 19, 2014, Niederhoffer emailed Mr. John Biggs and Mr. Martin
Oppenheimer, both members of the NYCO board, stating: "As you know, I have made a
significant pledge of financial support for this proposal, and is my hope that you will join us to

hear more about it, perhaps speak to Michael [Capasso] about the plan, and hopefully throw

your hat in the ring along with me in pledging support of this plan to restore NYCO to its

rightful place at the forefront of the opera world. Of course, this event is just an introduction so

come and enjoy the music!" A copy of these emails is attached as **Exhibit I.**

45.    On March 20, 2014, Niederhoffer sent the same email to Slade and Wall. Both

Slade and Wall are members of the NYCO board. A copy of these emails is attached as **Exhibit
J.**

46.    On April 11, 2014, Niederhoffer sent Slade an email stating: "…I have made a $1

million pledge of financial support;" "I hope to see you on April 28 to hear more about [the

plan], speak to Michael [Capasso], me and members of our production and operations team about

the plan…" A copy of this email is attached as **Exhibit K.**

47.    On May 15, 2014, Duane Morris sent an email to NYCO's counsel with the

following statement: "Currently we have Roy Niederhoffer's pledge of $1 million…;" "Roy is

on the Board [of NYCO Renaissance]" A copy of this email is attached as **Exhibit L.**

48.    All of the aforementioned communications with NYCO and its board members

occurred many months in advance of the completion of the NYCO Renaissance asset purchase

agreement in December 2014 and the Auction in January 2015.

49.    Clearly, Niederhoffer was not keeping his affiliation with NYCO Renaissance and

Capasso a secret from the NYCO board. On the contrary, Niederhoffer made his affiliation with

NYCO Renaissance well known to the NYCO board and special committee members.

**III.    Niederhoffer's Communications With Slade Were Not Improper**

50.    Neiderhoffer did communicate with Slade on the day of the Auction.

51.    However, Kauffman's assertion that such communications were improper is entirely conclusory and unsupported. Just because Kaufman says the communications were improper does not make it so.

52.    In reality, there were no prohibitions against such communications at the Auction. Indeed, it is quite common and not at all unusual for competing bidders at or following an auction to advocate for their respective bids.

53.    In fact, Kaufman sent a communication to Ms. Nellis at the conclusion of the Auction attaching an entirely new proposal. *See* **Exhibit C**. Notwithstanding the bidding procedures required all bids to be shared with counsel for NYCO Renaissance by the January 8th bid deadline, Kaufman did not share his proposal then or afterwards with NYCO Renaissance. Clearly, this communication with Ms. Nellis was intended by Kaufman to further advocate his position - *ex parte* - that his bid was higher and better than NYCO Renaissance's bid.

54.    Kaufman also alleges that the email communications attached to the New Vision Statement between Slade and Niederhoffer (**Exhibits 36-38**) assured Niederhoffer that NYCO Renaissance was going to win the Auction. To the contrary, these emails demonstrate that NYCO was giving serious consideration to Kaufman's various proposals, and that Mr. Niederhoffer was in no way reassured by Slade's emails. *See* **Exhibit 36** (Niederhoffer writes to Slade "I can't believe after being put through the ringer for a year someone is taking Kaufman seriously given his inexperience and behavior."); **Exhibit 37** (Niederhoffer writes to Slade "We bid 1,25 cash. They bid 1.5 cash. We are now in your hands to assess the merits."); **Exhibit 38** (Niederhoffer writes to Slade "The Board needs to exercise its business judgment. I have spent half a million and a year along with our team getting to this point. To pick a plan that is completely unvetted from a guy like Kaufman would be risky if not foolhardy, in my view.").

55.    Niederhoffer's emails to Slade express doubt and concern, not reassurance that NYCO Renaissance would win the Auction. Most important, Slade's emails reflect that the decision to select NYCO Renaissance as the winning bid was a product of deliberation and careful consideration.

## IV.    Kaufman Was Not Entitled To Withhold His Bid From NYCO Renaissance

56.    Kaufman also alleges that Niederhoffer improperly obtained his proposal from Slade. Kaufman had unilaterally designated his proposal as "CONFIDENTIAL, ATTORNEYS' EYES ONLY, NOT TO BE DISTRIBUTED."

57.    However, pursuant to the bidding procedures approved by this Court, Kaufman was required to submit his bid to, among others, <u>counsel for NYCO Renaissance by 11:00 a.m. on January 8, 2015</u>. Thus, Kaufman had no expectation of confidentiality under the clear terms of this Order. Of course, Kaufman did not comply with the bidding procedures. His proposal was untimely because it was not submitted to NYCO until January 20, 2015 (after the Auction), and it was withheld from NYCO Renaissance altogether.

58.    Kaufman argues that his proposal (which he calls a "mission statement" and a "book" rather than his plan or proposal) was not a part of the terms of the Auction. However, each bidder's proposal was a critical part of the Auction.

59.    Indeed, without a proposal, it would have been impossible for NYCO to assess which bid was "better." Time and again, the Debtor's counsel made clear to this Court and all interested parties that this case was not simply about dollars and cents, but rather would turn largely upon the Debtor's mission statement and whether a buyer or plan sponsor could continue that statement in the future.

60.    Kaufman had a copy of NYCO Renaissance's proposal.

61.    Additionally, Kaufman's attorneys' eyes only designation was waived once he produced a copy of his proposal to Ms. Nellis, who is not an attorney.

**V.    Slade Provided An Independent Analysis Of The Third Kaufman Plan**

62.    Kaufman further alleges that Niederhoffer and Capasso prepared the analysis Slade shared with the special committee. Again, Kaufman's allegations are false and misleading.

63.    In support of his argument, Kaufman attaches an email from Capasso to Slade on **January 21, 2015 at 10:00:42 a.m.**, which includes a spreadsheet prepared by Capasso comparing plans. *See* New Vision Statement, **Exhibit 43**.

64.    However, Kaufman overlooks the fact that Slade provided an independent analysis to special committee members on **January 21, 2015 at 2:38:07 AM, more than 7 hours prior to the analysis Capasso provided to Slade**. *See* **Exhibit D**.

65.    Furthermore, Kaufman alleges that the analysis is biased, but points to nothing in either Slade's or Capasso's analysis that is inaccurate. This is because, in asking for Capasso's assistance to prepare a side by side analysis of the plans to supplement and further refine his independent analysis, Slade asked Capasso to be "**agnostic and fact based.**" *See* **Exhibit 43**. (emphasis added).

## CONCLUSION

It is beyond doubt that the New Vision Statement is yet another attempt by Kaufman to delay and derail the Debtor's efforts to emerge from these proceedings. This Court should not sanction Kaufman's continued destructive and selfish behavior. His conduct to date has already caused much damage and hardship to this not-for-profit company. The time has come to move forward and permit NYCO to get back into the business of producing opera.

Accordingly, NYCO Renaissance respectfully requests that the Court deny the relief requested by New Vision in the New Vision Statement.

Dated: New York, New York
      October 6, 2015

DUANE MORRIS LLP

By: _____
    Gerard S. Catalanello, Esq.
    James J. Vincequerra, Esq.
    Evangelos Michailidis, Esq.
1540 Broadway
New York, NY 10036
(212) 692-1000

*Counsel to NYCO Renaissance, Ltd.*