**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | : |
|  | : |
| New York City Opera, Inc., | : Case No. 13-13240 (SHL) |
|  | : |
| Debtor. | : Chapter 11 |
|  | : |
|  | : |

**JOINT DISCLOSURE STATEMENT FOR COMPETING CHAPTER 11
PLANS OF REORGANIZATION FOR NEW YORK CITY OPERA, INC.**

---

| **IMPORTANT DATES** |  |
|---|---|
| Date by which Objections to Confirmation of a Competing Plan Must be Filed and Served | TBD ___, 2015 |
| Date by which Ballots Must be Received | TBD ___, 2015 |
| Hearing on Approval of Joint Disclosure Statement | TBD ___, 2015 |
| Hearing on Approval of Confirmation of Competing Plans | TBD ___, 2015 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ......................................................................................................1

    A.    Overview of Chapter 11 ...................................................................2

    B.    Parties Entitled to Vote on the Competing Plans........................2

    C.    Voting Procedures, Ballots and the Voting Deadline ................3

    D.    Combined Disclosure Statement and Confirmation Hearing...................4

II. BACKGROUND TO THE CHAPTER 11 CASE .....................................................4

    A.    Summary of the Debtor's Business.................................................5

    B.    The Debtor's Mission.......................................................................5

    C.    Sources of Income............................................................................5

        1.    Endowment ..........................................................................5

        2.    Gifts.......................................................................................5

        3.    Earned Income .....................................................................6

III. THE CHAPTER 11 CASE ....................................................................................6

    A.    Events Leading to Bankruptcy.......................................................6

    B.    Commencement and Initial Stages of the Chapter 11 Case ...................7

    C.    Employee Benefits/ Union Contributions ..................................7

    D.    Pre-Paid Tickets ...............................................................................8

    E.    PBGC Liabilities ..............................................................................8

    F.    Appointment of the Creditors' Committee .............................8

    G.    Meeting of Creditors .......................................................................8

    H.    The Debtor's Financial History Since the Petition Date..........................8

    I.    Bar Date ..............................................................................................8

    J.    Exclusivity ..........................................................................................9

DMSLIBRARY01\22371\237001\27366888.v2-10/19/15

K.    The Debtor's Sale Process ................................................................9

IV. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ....................11

A.    The Confirmation Hearing ...............................................................11

B.    Confirmation Standards ..................................................................11

C.    Financial Feasibility .......................................................................12

D.    Liquidation Analysis ......................................................................12

E.    "Best Interests of Creditors" Test ...................................................12

F.    Acceptance by Impaired Classes ....................................................13

G.    Confirmation Without Acceptance by All Impaired Classes................13

1.    No Unfair Discrimination ......................................................14

2.    Fair and Equitable Test .........................................................14

V. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ...........14

A.    Certain Considerations ...................................................................14

B.    Liquidation Under Chapter 7 ..........................................................14

VI. VOTING PROCEDURES ................................................................................15

VII. UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ....................16

VIII. CONCLUSION AND RECOMMENDATION ...................................................17

DMSLIBRARY01\22371\237001\27366888.v2-10/19/15

**EXHIBIT A**: Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and Official Committee of Unsecured Creditors for New York City Opera, Inc. and Summary Thereof

**EXHIBIT B**: Chapter 11 Plan of Reorganization of New Vision for NYC Opera, Inc. and Summary Thereof

# I.

## INTRODUCTION

New York City Opera, Inc. (the "**Debtor**" or "**NYC Opera**") is a New York not-for-profit corporation that is exempt from federal income taxation under the Internal Revenue Code.

On October 3, 2013 (the "**Petition Date**"), the Debtor filed a petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), thereby commencing its bankruptcy case (the "**Chapter 11 Case**"). The Debtor is a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in this Chapter 11 Case.

As more fully discussed below, the Debtor initially pursued a plan of reorganization, then decided to sell substantially all of its assets in lieu of a plan, and, then, after conducting and concluding a Court held auction (the "**Auction**"), withdrew its Sale Motion. The Debtor's exclusive period to file a reorganization plan has expired. Two proponents (collectively, the "**Proponents**"), who were also the only two participants at the Auction, have each proposed a plan (each a "**Competing Plan**" and, collectively, the "**Competing Plans**") for reorganizing the Debtor. They are:

1.   Chapter 11 Plan of Reorganization of Gene Kaufman and New Vision for NYC Opera, Inc. for New York City Opera, Inc. (the "**New Vision Plan**").

2.   Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and the Official Committee of Unsecured Creditors for New York City Opera, Inc. (the "**Joint NYCOR/Committee Plan**"); and

This disclosure statement (the "**Joint Disclosure Statement**") is being filed pursuant to section 1125 of the Bankruptcy Code. The purpose of this Joint Disclosure Statement is to provide you with background information concerning (i) the Debtor, and its operations and structure, (ii) events leading up to the Chapter 11 Case, and (iii) significant events that have occurred since the Petition Date. This Joint Disclosure Statement also contains information regarding the solicitation of votes for the Competing Plans. It does not contain information that is by nature specific to the individual Competing Plans.

Attached to the Joint Disclosure Statement as **Exhibits "A" and "B"** respectively, are copies and summaries of each of (i) the Joint NYCOR/Committee Plan, and (ii) the New Vision Plan (each a "**Plan Summary**" and, together, "**Plan Summaries**"). Each Plan Summary sets forth information that is specific to each Competing Plan concerning, among other things: (a) the terms, provisions and implications of each Competing Plan, and (b) the holders of claims against and interests in the Debtor, and their rights under the applicable Competing Plan.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THE JOINT DISCLOSURE STATEMENT AND EACH OF THE COMPETING PLANS IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT ANY COMPETING PLAN.

In voting on any of the Competing Plans, holders of claims should not rely on any information relating to the Debtor other than that which is contained in the Joint Disclosure Statement, the Competing Plans, the respective Plan Summaries, and all exhibits and appendices hereto and thereto. The information contained in the Joint Disclosure Statement is included herein for purposes of soliciting acceptances and confirmation of the Competing Plans, and may not be relied upon for any other purpose.

A.    *Overview of Chapter 11*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is allowed to reorganize for the benefit of itself, its creditors and its equity interest holders, if any.[1] In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprised of all of the legal and equitable interests of the debtor as of the date of commencement. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession. The Bankruptcy Code also provides debtors an exclusive opportunity to propose a reorganization plan, but, at the same time contemplates reorganization plans being proposed by creditors or third parties in the event the debtor is unable to confirm or propose a plan during its period of exclusivity.[2]

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Section 1125 of the Bankruptcy Code requires that a disclosure statement be prepared and approved by the court for distribution to creditors and holders of equity interest before a plan of reorganization is confirmed. In order to meet the requirements of the Bankruptcy Code, a disclosure statement must contain information of a kind, and in sufficient detail, to enable a hypothetical reasonable creditor to make an informed judgment regarding whether to accept or reject the chapter 11 plan. This Joint Disclosure Statement as well each Plan Summary are being submitted in support of the respective Competing Plans and in accordance with the requirements of section 1125 of the Bankruptcy Code, as noted more fully below.

While more than one Competing Plan has been proposed in this case, only one plan of reorganization will ultimately be confirmed by the Bankruptcy Court and become effective.

B.    *Parties Entitled to Vote on the Competing Plans*

Pursuant to the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors whose claims are not "impaired" by the plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote. Creditors whose claims are impaired by a plan, but who will receive no distribution under the plan, also are not

---

[1] Since the Debtor is a not-for-profit corporation, there are no equity interest holders.

[2] The Debtor's exclusivity to file a Plan has expired.

2

entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. Only creditors whose interests will be impaired by a plan (an "**Impaired Class**") but who are expected to receive a distribution under the plan, are entitled to vote to either accept or reject the plan.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code, an Impaired Class of claims has accepted a plan if the holders of at least two-thirds in dollar amount and more than one-half in number (of claimants) of the allowed claims in such class actually voting have voted to accept the plan. All votes on the plan will be tabulated for the purpose of determining whether the plan satisfies sections 1129(a)(10) and 1129(a)(8) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance by an Impaired Class of claims. Section 1129(a)(8) is satisfied if all Impaired Classes vote in favor of a plan. However, pursuant to section 1129(b) a plan can still be confirmed, even if the requirement under 1129(a)(8) is not met. The proponents of each Competing Plan may seek confirmation of a Competing Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting class of claims. The proponents of each Competing Plan also reserve the right to modify a Competing Plan.

Please refer to the Plan Summaries for information regarding the parties in interest that are entitled to vote on each Competing Plan. You may be entitled to vote on multiple Competing Plans.

C.      *Voting Procedures, Ballots and the Voting Deadline*

Those holders of claims entitled to vote on a Competing Plan will receive the following documentation (the "**Solicitation Package**"):

1.      A Bankruptcy Court Order, among other things, approving solicitation of votes and setting the procedures for voting on the Competing Plans (the "**Solicitation Order**");

2.      The Joint Disclosure Statement, each Plan Summary, and the respective Competing Plans;

3.      A notice of the hearing to consider approval of the Joint Disclosure Statement and confirmation of the Competing Plans; and

4.      A ballot to be completed by creditors who are entitled to vote on each Competing Plan.

After carefully reviewing the materials in the Solicitation Package, please indicate your acceptance or rejection of each Competing Plan on which you are entitled to vote. You may choose to *accept* any or all of the Competing Plans, *reject* any or all of the Competing Plans, or *abstain* from voting on some or all of the Competing Plans. If you vote to accept more than one Competing Plan, you will be required to identify on the ballot which plan you **prefer** (*i.e.*, list your preference in numerical order).

3

**BALLOTS CAST BY HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY _____, 2015 at 5:00 p.m. (the "VOTING DEADLINE").**

**THE BALLOTS SHOULD BE RETURNED TO BOTH COUNSEL FOR THE COMMITTEE, AND COUNSEL FOR NEW VISION, AT THE ADDRESSES SET FORTH BELOW.**

**FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL COUNSEL FOR THE COMMITTEE, OR COUNSEL FOR NEW VISION.**

**TO BE COUNTED, THE BALLOTS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE VOTING DEADLINE. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE VOTING PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE VI OF THIS JOINT DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.**

D.    *Combined Disclosure Statement and Confirmation Hearing*

Unless as may otherwise be ordered by the Court, section 1125 of the Bankruptcy Code requires, among other things, approval of a disclosure statement having "adequate information" (as defined in section 1125(a)) prior to the solicitation of acceptances or rejections of a proposed plan. By order of the Bankruptcy Court dated _____ __, 2015, and pursuant to, among other things, section 105(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017, the Bankruptcy Court authorized the solicitation of acceptances and rejections of the Competing Plans. The Bankruptcy Court has scheduled a  hearing to consider approval of confirmation of the Competing Plans (the "**Confirmation Hearing**"). The Confirmation Hearing will take place on _____, 2015 at ____ a.m. (EST) before the Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, Room 701, One Bowling Green, New York, New York.

**PLEASE BE ADVISED THAT THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS JOINT DISCLOSURE STATEMENT.** Assuming that the requisite acceptances for any or all of the Competing Plans are obtained, the Bankruptcy Court will then entertain confirmation of any or all of the Competing Plans at the Confirmation Hearing.

**II.**

**BACKGROUND TO THE CHAPTER 11 CASE**

The following is a general description of the Debtor and its history prior to commencement of this Chapter 11 Case. The information noted below consists of information and statements (or summaries thereof) contained in documents and case filings made by or on behalf of the Debtor and/or its professionals in the Chapter 11 Case. In particular, much of the information noted below was contained in the Declaration of George Steel, General Manager and

Artistic Director of New York City Opera, Inc. In Support of Chapter 11 Petition and First Day Motions [Doc. No. 2], filed in the case on October 3, 2013.

### A.    Summary of the Debtor's Business

The Debtor is a New York not-for-profit corporation exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code.

The Debtor produced opera, providing contemporary and classical performances, in New York City. Historically, the Debtor performed at Lincoln Center and in the more recent years before the bankruptcy, at Brooklyn Academy of Music ("**BAM**"), New York City Center, and other theaters in New York City. The Debtor also provided educational programming for children in New York City and New Jersey.

The Debtor has not produced any opera or performed any educational programming since the Petition Date.

The Debtor also operates City Opera Thrift Shop located at 222 East 23rd Street, New York, New York 10010. The proceeds from the thrift shop supported the creation and design of costumes for productions.

### B.    The Debtor's Mission

The Debtor's mission, while it was operational, was to inspire audiences with innovative and theatrically compelling opera, to nurture the work of American artists and young singers, and to attract new audiences The Debtor introduced young singers, brought the public new works and classics, acted as a champion for American composers and performers, and ensured that New Yorkers could experience the live art of opera.

### C.    Sources of Income

#### 1.    Endowment

Prior to the Petition Date, the Debtor's operations had been funded in part through an endowment (the "**Endowment**"), which consisted of nine individual funds established for a variety of purposes, and which totaled approximately $55 million several years ago, $9 million in 2011, and $5 million in 2012. In 2008-2009, the Debtor withdrew $24 million from the Endowment (with the assent of the New York State Attorney General and the permission of the Supreme Court of the State of New York) to fund some of its accumulated deficit. The current principal amount of the Endowment is approximately $4.8 million.

#### 2.    Gifts

In addition to the endowment, the Debtor also relied on gifts by individuals, corporations and foundations. Throughout its history, the Debtor has benefitted greatly from the charitable giving of its supporters, patrons and sponsors, who have given generously both during their lifetimes and by way of charitable bequests. At present, the Debtor is aware of four (4) charitable bequests (the "**Pending Bequests**") made for its benefit by supporters of the Debtor who passed

5

prior to or subsequent to the Petition Date.  The Debtor and counsel for the Committee have been in discussions with individuals responsible for the Pending Bequests and the Offices of the New York State Attorney General and, as a result, the Debtor and the Committee have a reasonable expectation that the Pending Bequests will be received by the post-confirmation Debtor (the "**Reorganized Debtor**") within twelve (12) to twenty-four (24) months after the effective date of a chapter 11 plan.  The Pending Bequests total approximately $7,612,500.  The majority of that amount, approximately $6,412,500, is in the form of unrestricted gifts which the Reorganized Debtor may use in its discretion upon receipt.  Approximately $500,000 of the Pending Bequests was specifically designated to be used for new productions of opera.  Approximately $700,000.00 of the Pending Bequests was given to establish an endowment fund in the name of the giving decedent to be used exclusively for the purchase of costumes and stage sets.

While the Debtor and the Committee believe, after consultations with the various representatives of the estates responsible for the Pending Bequests, that there is a reasonable likelihood that the Reorganized Debtor will get the benefit of the Pending Bequests as set forth above, the Debtor and the Committee cannot rule out the possibility that the Reorganized Debtor's entitlement to any or all of the Pending Bequests will be challenged by the executors, trustees, or beneficiaries of the various estates, or other interested parties.  Any such challenges could delay or prevent the Reorganized Debtor's receipt of any or all of the Pending Bequests.

### 3.   Earned Income

The Debtor also earned income from ticket sales and fees from performances.  For fiscal year ending 2012, the Debtor's total gross income derived from performances was $2,352,019.

## III.

## THE CHAPTER 11 CASE

The following is a general summary of the Debtor's Chapter 11 Case, including the events leading up to the chapter 11 filing, certain matters addressed during the Chapter 11 Case, and the Debtor's restructuring initiatives since the Petition Date.  The information noted below was obtained from documents and case filings made by or on behalf of the Debtor and/or its professionals in the Chapter 11 Case.

### A.   Events Leading to Bankruptcy

The Debtor contends that its financial troubles stem from various factors including a long-term structural deficit that arose in 2003, significant investment losses on its endowment in 2008, and subsequent withdrawals from those funds, a troubled economy, decreased donations, and increasing pension obligations.

Specifically, the Debtor believes that declines in earned income were the result of opera-specific challenges as well as national trends: an increasingly crowded entertainment market (including competition with the Metropolitan Opera), the general reduction in arts education, a nationwide decrease in arts journalism and the representation of art music and opera on public television and radio, and many other factors.  Accordingly, NYC Opera pursued a policy in the

6

mid-2000s of increasing the number of performances of standard repertoire ("warhorses") in the hope that this would reduce costs and increase audiences. Instead, the annual deficit grew from $3.1 million in 2005 to $12.5 in 2008.

To bring down costs, NYC Opera's 2008 turnaround budget condensed the season to only five productions, as compared to the customary sixteen productions during its seasons a decade ago. However, the deficits were not eliminated. Further, in 2008-2009 the Koch Theater, where the Debtor performed its productions, was under construction and the Debtor was unable to stage opera performances and hence earn income from performances.

The Debtor withdrew $24 million from its Endowment to fund some of its accumulated deficit. More recently, the Debtor restricted its draw from the Endowment to interest and dividends, amounting to approximately $160,000 per year, as compared to the $2 million to $3 million draw it previously took. The Debtor also contends that it suffered a $14 million loss on its Endowment investments due to the stock market decline in 2008.

The Debtor has also noted that in recent years it received less charitable contributions, fewer donations from some of NYC Opera's long-time foundation donors, and reduced cultural funding by the Debtor's other important foundations.

In light of its considerable decrease in income, the Debtor undertook a major restructuring, including (i) leaving the Koch Theater at Lincoln Center to perform in less expensive opera houses throughout the city, including its original home of New York City Center and BAM; (ii) scaling back on administrative staff and office and occupancy costs ; and (iii) negotiating new labor contracts with the orchestra and chorus to allow for continuing reduction of artistic overhead costs. The Debtor asserts that the restructuring generated negative publicity, which also contributed to the reduction of the donor base.

Finally, the Debtor launched an emergency campaign in September of 2013 to raise $7 million in order to keep its doors open. The Debtor turned to Kickstarter, a website that provides tools to raise funds for creative projects *via* crowd funding, raising $286,440 by the end of the 30-day campaign, which was far less than what was needed.

B.      *Commencement and Initial Stages of the Chapter 11 Case*

When the Debtor's out-of-court restructuring efforts did not bring the results it had hoped for, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing this Chapter 11 Case. On the Petition Date, the Debtor also filed a number of First Day Motions with the Bankruptcy Court. The Bankruptcy Court permitted the Debtor to continue using its existing cash management system; but did not authorize the Debtor to pay employee severance and other compensation or refund pre-paid tickets.

C.      *Employee Benefits/ Union Contributions*

Prior to the Petition Date, the Debtor paid employee wages and salaries as well as other forms of compensation to its employees, many of whom are organized through various unions. As of the Petition Date, the Debtor had significantly reduced its work staff. By motion filed

7

October 3, 2013, the Debtor sought authorization to pay prepetition accrued and unpaid wages, commissions, salaries, severance and vacation obligations. The Bankruptcy Court did not approve the Debtor's motion to pay wages. A number of the employees, as well as various unions on behalf of the employees, have filed claims against the Debtor on account of, among other things, wages, severance, contributions and other compensation. Consequently, the Debtor has outstanding employee related obligations.

D.    Pre-Paid Tickets

Prior to the Petition Date, the Debtor sold subscription packages and individual tickets to performances, the majority of which were paid in advance. In the event a performance was cancelled, the Debtor offered refunds. In light of the Debtor's financial distress, it cancelled all of the productions for which tickets had been sold. The Debtor's motion to refund tickets for cancelled performances was denied. Certain of the subscribers donated the amount of their pre-paid tickets to the Debtor.

E.    PBGC Liabilities

The Debtor maintained and administered the Retirement Plan for Salaried Employees of New York City Opera (the "**Retirement Plan**"), which was established effective July 1, 2010, and is covered by Title IV of ERISA. The Pension Benefit Guaranty Corporation (the "**PBGC**") administers the pension insurance program with respect to the Retirement Plan. The PBGC has filed proofs of claims against the Debtor in unliquidated amounts with respect to the Retirement Plan.

F.    Appointment of the Creditors' Committee

On October 23, 2013, the U.S. Trustee appointed a three (3) member Committee pursuant to section 1102 of the Bankruptcy Code, consisting of New York City Ballet, Inc., American Federation of Musicians and Employers' Pension Fund and American Guild of Musical Artists [Dkt. No. 39]. The Committee then retained as its counsel, Klestadt Winters Jureller Southard & Stevens, LLP., which retention was approved by order dated December 9, 2013 [Dkt. No. 78].

G.    Meeting of Creditors

The first meeting of creditors (pursuant to section 341 of the Bankruptcy Code) was held on November 13, 2013 at the Office of the U.S. Trustee at 80 Broad St., New York, NY.

H.    The Debtor's Financial History Since the Petition Date

Since the Petition Date, the Debtor has filed monthly operating reports that summarize the Debtor's cash receipts and disbursements. As described in the monthly operating report filed on September 25, 2015, the Debtor's cash on hand as of August 15, 2015 is $208,542.65.

I.    Bar Date

By order dated February 5, 2014, the Bankruptcy Court established the bar date of March 17, 2014, as the last date for filing proofs of claims.

8

J.    *Exclusivity*

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptances of a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief under Chapter 11. If the debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the date on which the debtor filed for voluntary relief to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan. A bankruptcy court may extend these periods in favor of a debtor upon request of a party in interest and "for cause."

The Debtor requested and received a number of extensions of its exclusive period to file and solicit acceptances of a plan. On December 3, 2014, the Bankruptcy Court granted the Debtor's final extension of exclusivity through December 29, 2014. As of December 29, 2014, the Debtor had not filed a plan or disclosure statement and its period of exclusivity expired. As a result, creditors and parties in interest have since that date been able to file plans and disclosure statements for consideration by the Bankruptcy Court.

K.    *The Debtor's Sale Process*

On November 6, 2013, in preparation of liquidating its business, the Debtor filed a motion seeking authority to sell certain personal property, including props, costumes, set inventory, machinery, etc., that was used in the Debtor's business (the "**De Minimis Assets**") [Dkt. No. 47]. The Bankruptcy Court authorized the sale of the De Minimis Assets on November 19, 2013 [Dkt. No. 64].

Subsequently, the Debtor began consideration of proposals from various parties for the reorganization of its remaining business and assets. As part of that process, a special committee was appointed by the Debtor's board of directors to vet and evaluate proposals made to the Debtor, including a proposal from Gene Kaufman ("**Kaufman**") and NYCO Renaissance, Ltd. ("**NYCO Renaissance**"). The Chairman of the Board of NYCO Renaissance was a Board member of the Debtor until November 2014 (and had been a Board member during the Debtor's spiral towards bankruptcy). That individual sought and obtained a seat on the Special Committee to analyze the proposals made to the Debtor, including the NYCO Renaissance bid that he was providing financing for. Following the analysis and consideration of all proposals received (including modifications made to said proposals), the Debtor shifted from a reorganization plan process to selling its intellectual property and thrift store pursuant to Section 363 of the Bankruptcy Code. The Debtor accepted a proposal submitted by NYCO Renaissance for a cash purchase price of $10,000, plus a $500,000 NYCO Renaissance unsecured note of to be paid over a number of years. (the "**NYCO Renaissance APA**"). NYCO Renaissance was selected as the stalking horse bidder without discussing with Kaufman whether he would purchase assets under Section 363, instead of a plan. On December 10, 2014, the Debtor filed a Motion seeking an order (i) approving bidding procedures, certain bid protections and form and manner of sale notice; (ii) authorizing the Debtor to enter into contract with NYCO Renaissance as the stalking horse bidder; and (iii) authorizing the sale of assets pursuant to the Auction (the "**Sale Motion**") [Dkt. No. 213]. Kaufman filed an objection to the Sale Motion on December 18, 2014. At a hearing held on December 22, 2014, the parties reached an agreement for modified bidding and

9

sale procedures, which were approved by a December 22, 2014 order of the Bankruptcy Court (the "**Bidding Procedures Order**") [Dkt. No. 228].   Other than NYCO Renaissance, Kaufman was the only other party who submitted a competing bid by the bid deadline, through an entity now known as New Vision for NYC Opera, Inc. ("**New Vision**"). Kaufman's bid was in accordance with the Bidding Procedures; it was exactly the same as NYCO Renaissance's bid, with the only change being that Kaufman offered five times as much cash as NYCO Renaissance ($50,000).

On January 20, 2015, the Auction was held in the Bankruptcy Court to consider the two bids – one submitted by NYCO Renaissance and the other submitted by New Vision.   At the Auction, the Debtor and the Committee said that Kaufman would have to exceed the NYCO Renaissance bid by $200,000 in order to be "higher and better". Following the conclusion of a lengthy bidding process conducted in front of the Bankruptcy Court, Kaufman's bid was exactly the same as NYCO Renaissance's bid, except it exceeded the NYCO Renaissance cash bid by $250,000. The Auction was concluded. Thereafter, the Debtor selected NYCO Renaissance's bid, as the highest and best offer for the Debtor's assets. Kaufman contested the Debtor's determination that NYCO Renaissance's bid was the highest and best bid. Thereafter, the parties engaged in extensive discovery in preparation for a contested hearing to approve the sale of the assets. While the parties were preparing for an evidentiary hearing on the contested Sale Motion, a motion was filed by the executors of the estate of Pierre DeMenasce on April 6, 2015 [Dkt. No. 253], seeking relief from the automatic stay to permit a state court to decide questions regarding the validity, construction and effect of provisions of Mr. DeMenasce's Will, including the Debtor's entitlement to a sizable bequest (the "**DeMenasce Motion**").

After the filing of the DeMenasce Motion, the Debtor decided that it would withdraw the Sale Motion. In this regard, on July 13, 2015, the Debtor filed a notice seeking withdrawal of the Sale Motion [Dkt. No. 273].   Kaufman filed a pleading with respect to the Debtor's decision to withdraw the Sale Motion on July 22, 2014. Thereafter, NYCO Renaissance filed its Response to the New Vision Statement ("**NYCOR Reply**"), and the Debtor also filed a reply to the New Vision Statement. Kaufman believes that the NYCOR Reply distorts what occurred. Among other things, the NYCOR Reply (a) ignores that the Debtor, and presumably Neiderhoffer (since he was a Board member during this relevant time) was always aware of, or should have been aware of, the DeMenasce bequest, including the amount thereof and, therefore, the reason given by the Debtor to abandon the Sale Motion because it first became aware of the magnitude of the DeMenasce bequest when the DeMenasce Motion was filed is suspect; (b) the Auction was based solely on the NYCO Renaissance APA—plan proposals given in connection with a plan solicitation process, since abandoned, were not relevant; (c) Kaufman's January 2015 business plan was given to the Committee to garner their support for him becoming the Baseline Bidder— it was never part of the Auction process; (d) there was nothing proper about Neiderhoffer seeking to become a member of the Special Committee while he had committed to fund a substantial portion of the NYCO Renaissance plan proposal; (e) there was nothing proper about Neiderhoffer texting a member of the Debtor's Board during the Auction and then seeking to solicit from the Board member, and then obtaining Kaufman's business plan; and (f) there was nothing proper about Neiderhoffer's associates analyzing Kaufman's business plan for the Special Committee. Kaufman believes these are all issues which affect NYCO Renaissance's good faith, and that creditors should consider such facts, in comparing the Competing Plans.

10

On August 5, 2015, the Bankruptcy Court entered a consent order, whereby the Sale Motion was adjourned indefinitely to allow interested parties, including NYCO Renaissance and New Vision, to propose a Chapter 11 plan of reorganization (the "**Consent Order**") [Dkt. No. 281]. The dates set forth in the Consent Order were further amended, with the most recent amendment approved by order dated September 28, 2015 [Dkt. No. 292]. On September 9, 2015, the Bankruptcy Court conducted an *in camera* settlement conference for the purpose of exploring a resolution of the disputes between and among the Debtor, NYCO Renaissance, New Vision and the Committee. The settlement conference did not produce an agreement among the parties.

## IV.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

### A.    *The Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing to consider confirmation of a plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation. The Confirmation Hearing has been scheduled by the Bankruptcy Court for _____, 2015, at __:__ _.m. EST.

### B.    *Confirmation Standards*

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether a Competing Plan satisfies the requirements of section 1129 of the Bankruptcy Code, which includes a consideration of whether:

A Competing Plan complies with all applicable provisions of the Bankruptcy Code.

The proponents of each Completing Plan complied with the applicable provisions of the Bankruptcy Code.

A Competing Plan has been proposed in good faith and not by any means forbidden by law.

Each holder of an Impaired Claim has accepted the Competing Plan or will receive or retain under the Competing Plan on account of such claim property of a value as of the effective date of the Competing Plan that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.[3]

---

[3]    Note that there are no holders of equity interests in the Debtor and no equity interests to be eliminated as part of a plan.

DMSLIBRARY01\22371\237001\27366888.v2-10/19/15

Except to the extent that a holder of a particular claim will agree to a different treatment of its claim, the Competing Plan provides that: (i) holders of administrative claims will receive on account of such claims cash equal to the allowed amount of such claim on the effective date of the Plan, or as soon thereafter as is reasonably practicable; and (ii) holders of priority claims will receive on account of such claims such treatment permissible under section 1129 of the Bankruptcy Code.

Each class of claims that is entitled to vote on the Competing Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of such voting class of claims pursuant to section 1129(b) of the Bankruptcy Code.

At least one class of Impaired Claims has accepted a Competing Plan, determined without including any acceptance of the Competing Plan by any Insider holding a claim in that class.

Confirmation of the Competing Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Competing Plan,

C.    Financial Feasibility

The Bankruptcy Code permits a chapter 11 plan to be confirmed only if it is not likely to be followed by liquidation or the need for further financial reorganization, other than as provided in such plan and meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.

D.    Liquidation Analysis

Generally speaking, a reorganization plan is likely to produce a greater recovery for creditors than would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code. Prior to moving forward with the Competing Plans, the Debtor sought to sell substantially all of its assets (other than the endowment). Under the proposed sales, the net proceeds would have been in the range of $1,250,000 - $1,500,000. The Competing Plans offer the same general cash amount to creditors. Importantly, however, the Competing Plans offer a note to creditors which represents a significant enhanced recovery to creditors.

E.    "Best Interests of Creditors" Test

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests of creditors" test, the Bankruptcy Court must find (subject to certain exceptions) that the Competing Plan provides, with respect to each Impaired Class, that each holder of an allowed claim in such Impaired Class has accepted the Competing Plan, or will receive or retain under the Competing Plan property or distributions of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what holders of allowed claims in each Impaired Class would receive if the Debtor's Chapter 11

12

Case were converted to a liquidation case under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the Debtor's assets into Cash. The Debtor's "liquidation value" would consist primarily of the following: (i) unencumbered and unrestricted Cash held by the Debtor at the time of the conversion to a chapter 7 case; and (ii) the proceeds resulting from the chapter 7 trustee's sale of the Debtor's remaining unencumbered and unrestricted assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional administrative claims incurred during the chapter 7 case.

The Bankruptcy Court then must compare the value of the distributions to creditors from the proceeds of the hypothetical chapter 7 liquidation of the Debtor (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the holders of allowed claims under the Plan. It is possible that in a chapter 7 liquidation, claims may not be classified in the same manner as set forth in the Competing Plans. In a hypothetical chapter 7 liquidation of the Debtor's assets, the rule of absolute priority of distribution would apply, i.e., no junior Creditor would receive any distribution until payment in full of all senior Creditors.

F.    *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation under § 1129(a), that (except as described in the following section of this Disclosure Statement) each class of claims or equity or membership interests that is "impaired" under a plan, accept the plan. A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity or membership interest entitles the holder of such claim or equity or membership interest; (ii) cures any default and reinstates the original terms of such obligation; or (iii) provides that, on the Effective Date, the holder of such claim or equity or membership interest receives cash equal to the allowed amount of that claim or, with respect to any equity or membership interest, any fixed liquidation preference to which the holder of such equity or membership interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

G.    *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding the rejection (or conclusively presumed rejection) of the plan by an impaired class, such plan can still be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate

13

unfairly" and is "fair and equitable" with respect to each class of claims or equity or membership interests that is impaired under, and has not accepted, the plan.

### 1.   No Unfair Discrimination

This test applies to classes of claims or equity or membership interests that are of equal "priority" but which are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.   Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity or membership interests in such class.

## V.

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

### A.   Certain Considerations

Both confirmation and consummation of any Competing Plan are subject to a number of material risks. Specifically, if the standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm a Competing Plan even if holders of claims accept the Competing Plan. There can be no assurance that the Bankruptcy Court will deem any Competing Plan suitable. In the event that a plan of reorganization is not confirmed or the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the proponents of the Competing Plans believe that such action will cause the Debtor to incur substantial expenses and will otherwise only negatively affect creditors' interest in the Debtor.

### B.   Liquidation Under Chapter 7

If no plan can be Confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of the creditors and the Debtor's liquidation analysis is set forth in Article IV herein, entitled "Statutory Requirements for Confirmation of the Plan."

DMSLIBRARY01\22371\237001\27366888.v2-10/19/15

# VI.

## VOTING PROCEDURES

On __, 2015, the Bankruptcy Court entered the Solicitation Order approving solicitation and setting the procedures for voting to accept or reject a Competing Plan.  In addition to approving the solicitation procedures, the Solicitation Order established certain dates and deadlines, including the voting deadline, the date for a combined hearing for approval of the confirmation of the Competing Plans, and the deadline for parties to object to same.  The Solicitation Order also approved the forms of ballots and certain confirmation-related notices that, together with the Joint Disclosure Statement, Plan Summaries and the respective Competing Plans, comprise the Solicitation Package.  The Solicitation Order should be read in conjunction with this Article VI.

Holders of claims are encouraged to review the Solicitation Order, the relevant provisions of the Bankruptcy Code, and to consult their own advisors.

Any holder whose claim is impaired under the Competing Plan is entitled to vote if either (i) the claim has been listed in the Schedules (and the claim is not scheduled as disputed, contingent, or unliquidated), or (ii) the holder has filed a Proof of Claim on or before the Bar Date.

You must refer to each Competing Plan to determine the treatment of your claim under each Competing Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not solicited or made in good faith or in accordance with the provisions of the Bankruptcy Code.

IT IS IMPORTANT THAT YOU TIMELY EXERCISE YOUR RIGHT TO VOTE TO ACCEPT OR REJECT EACH COMPETING PLAN.  All known holders of claims who are entitled to vote on a Competing Plan have been sent a ballot together with this Joint Disclosure Statement and the respective Plan Summaries.  Such holders should read the ballot carefully and follow the instructions contained therein.  If you receive a ballot and are entitled to vote, please use only the ballot that accompanies this Joint Disclosure Statement.

All holders of claims (or their authorized representatives) entitled to vote must: (i) carefully review and complete the ballot; (ii) execute the ballot; and (iii) return it to the address indicated on the ballot by the deadline for the ballot to be considered.

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY COUNSEL FOR THE COMMITTEE AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M. EST, ON ___2015.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE INDIVIDUALS LISTED BELOW.  ANY BALLOT THAT IS EXECUTED AND SUBMITTED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

DMSLIBRARY01\22371\237001\27366888.v2-10/19/15

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT COUNSEL FOR THE COMMITTEE OR COUNSEL FOR NEW VISION.

Additional copies of this Joint Disclosure Statement are available upon request at the addresses set forth below.

## VII.

## UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, ESTATE, GIFT, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER EACH COMPETING PLAN. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

**IRS CIRCULAR 230 DISCLOSURE**:   TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS JOINT DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE.   TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.   EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments of interest and dividends.   The Reorganized Debtor will comply with all applicable reporting requirements of the Internal Revenue Code.   In general, information reporting requirements may apply to distributions or payments under a Competing Plan.   Additionally, under the backup withholding rules, a holder of a claim may be subject to backup withholding with respect to distributions or payments made pursuant to each Competing Plan unless that holder complies with the applicable requirements of the backup withholding rules and:  (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided, however*, that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of

certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by a Competing Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## VIII.

## CONCLUSION AND RECOMMENDATION

Please refer to each Competing Plan and the respective Plan Summaries for the plan proponents' views regarding the implications and consequences of confirmation of their respective Competing Plans.

Dated: October 5, 2015

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**                              **DUANE MORRIS LLP**
570 Seventh Avenue, 17th Floor                         1540 Broadway
New York, New York 10018                               New York, New York 10036-4086
Telephone:    (212) 972-3000                           Telephone:    (212) 692-1000
Facsimile:    (212) 972-2245                           Facsimile:    (212) 692-1020
Sean C. Southard, Esq.                                 Gerard S. Catalanello, Esq.
Maeghan J. McLoughlin, Esq.                            James J. Vincequerra, Esq.
ssouthard@klestadt.com                                 gcatalanello@duanemorris.com
mmcloughlin@klestadt.com                               jvincequerra@duanemorris.com


*Counsel to Official Committee of*                     *Counsel to NYCO Renaissance, Ltd.*
*Unsecured Creditors*

**KING & SPALDING**
1185 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222
Arthur J. Steinberg
Jennifer A. Asher
asteinberg@kslaw.com
jasher@kslaw.com

*Counsel to New Vision for NYC Opera, Inc.*