# <u>EXHIBIT B</u>

Chapter 11 Plan of Reorganization of New Vision for NYC Opera, Inc.
and Summary Thereof

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| New York City Opera, Inc., | : | Case No. 13-13240 (SHL) |
| | : | |
| Debtor. | : | Chapter 11 |
| | : | |
| | : | |

---

## SUMMARY OF CHAPTER 11 PLAN OF REORGANIZATION
## OF NEW VISION FOR NYC OPERA, INC.

---

Dated: October 19, 2015

**KING & SPALDING**
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur J. Steinberg
Jennifer A. Asher

*Counsel to New Vision for NYC Opera, Inc., Plan Sponsor*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. COMPARISON OF THE NEW VISION PLAN
WITH THE NYCO RENAISSANCE PLAN. ........................................................2

   A. Superior Creditor Recoveries ...........................................................................2

   B. More Likely to Succeed ......................................................................................2

III. OVERVIEW OF THE NEW VISION PLAN ......................................................3

   A. Purpose and Effect of the New Vision Plan ....................................................3

   B. Summary of Treatment of Claims and Projected Recoveries .......................5

IV. THE REORGANIZED DEBTOR'S BUSINESS PLAN AND VALUATION ...................6

   A. The Reorganized Debtor's Business Plan and Commitment to Debtor's
Mission ...................................................................................................................6

      1. Commitment to the Debtor's Artistic Philosophy ...................................6

      2. Opera Education ..........................................................................................6

      3. Business Plan ................................................................................................8

   B. Management of the Reorganized Debtor .......................................................12

   C. Feasibility of the New Vision Plan ..................................................................14

      1. Claims Estimates .......................................................................................14

      2. Plan and Operations Funding ..................................................................15

V. SUMMARY OF THE NEW VISION PLAN ......................................................16

   A. Administrative and Priority Claims ...............................................................16

      1. Administrative Claims ..............................................................................16

      2. Priority Tax Claims ...................................................................................17

   B. Classification and Treatment of Claims .........................................................17

1. Summary ...................................................................................................17

2. Class 1 – Other Priority Claims -Severance/Wage Claims .................17

3. Class 2 – Secured Claims ......................................................................18

4. Class 3 – PBGC Claims .........................................................................18

5. Class 4 – General Unsecured Claims ....................................................18

6. Class 5 – Unsecured Convenience Claims ............................................19

7. Class 6 – Deposit Claims .......................................................................19

C. Liquidation Analysis and Plan Confirmation Requirements .......................19

D. Means for Implementation of the New Vision Plan ......................................20

1. Corporate Existence ...............................................................................20

2. Restructuring Transactions ...................................................................20

3. Corporate Action ...................................................................................20

4. Effectuating Documents; Further Transactions ..................................21

5. New Board Representation ....................................................................21

6. Vesting of Assets in the Reorganized Debtor ......................................22

E. Committee ........................................................................................................22

F. Provisions Governing Distributions ..............................................................22

G. Disputed Claim Reserve .................................................................................22

1. Establishment of Disputed Claim Reserve ..........................................22

2. Maintenance of Disputed Claim Reserve .............................................22

H. Quarterly Distributions ..................................................................................23

I. Delivery of Distributions ................................................................................23

J. Disputed Claims .............................................................................................23

K. Objection Deadline .........................................................................................24

L. Treatment of Executory Contracts and Unexpired Leases ..........................24

    1.  **Assumption and Rejection of Executory Contracts and Unexpired Leases**.........24

    2.  **Claims Based on Rejection of Executory Contracts or Unexpired Leases**...........25

    3.  **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**.............................................................................................................25

  **M. Discharge, Release, Injunction and Related Provisions** ....................................26

    1.  **Discharge of Claims and Termination of Interests**...............................26

    2.  **Releases**...............................................................................................26

    3.  **Exculpation**...........................................................................................27

    4.  **Preservation of Rights of Action**.........................................................28

    5.  **Release and Injunction** .........................................................................28

    6.  **Releases of Liens**..................................................................................29

  **N. Retention of Jurisdiction** ..................................................................................29

**VI. VOTING PROCEDURES** ........................................................................................29

**VII. MISCELLANEOUS PLAN PROVISIONS**.............................................................30

**VIII. PLAN SUPPLEMENT**...........................................................................................31

**IX. CONCLUSION AND RECOMMENDATION** ..........................................................31

**EXHIBIT 1:** The New Vision Plan

**EXHIBIT 2:** Reorganized Debtor's Projections

**EXHIBIT 3:** Liquidation Analysis

## I.

## INTRODUCTION

On October 19, 2015, New Vision for NYC Opera, Inc. (the "**Plan Sponsor**") proposed a reorganization plan (the "**New Vision Plan**") for debtor New York City Opera, Inc. (the "**Debtor**" or "**NYCO**"). Under the terms of the New Vision Plan, the Debtor will emerge from bankruptcy revitalized and well- positioned to continue providing a world-class opera experience in the New York market. A copy of the New Vision Plan is attached to this Plan Summary as **Exhibit "1"**.

The purpose of this New Vision Plan Summary is to describe the New Vision Plan, compare it to the competing plan filed by NYCO Renaissance Ltd. ("**NYCO Renaissance**"), and to provide certain information regarding the feasibility and implementation of the New Vision Plan to creditors who will have the right to vote on the New Vision Plan so that they can make an informed decision in doing so.

PLEASE READ THIS NEW VISION PLAN SUMMARY, AND THE PLAN ANNEXED HERETO, IN ITS ENTIRETY. THE PLAN IS CONTROLLING AND BINDING UPON CONFIRMATION. ACCORDINGLY, IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY, THE TERMS OF THE PLAN WILL CONTROL.

**THE PLAN SPONSOR BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE NEW VISION PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND CREDITORS. THE PLAN SPONSOR RECOMMENDS THAT CREDITORS VOTE TO APPROVE AND SUPPORT THE NEW VISION PLAN.**

Unless otherwise defined herein, all defined terms used in this summary shall have the same meanings ascribed to them in the New Vision Plan.

If you have any questions about this New Vision Plan Summary and the annexed New Vision Plan, please contact: Arthur J. Steinberg, Esq., King & Spalding, LLP, 1185 Avenue of the Americas, New York, New York 10036, telephone (212) 556-2196 or *via* email to asteinberg@kslaw.com.

1

## II.

## COMPARISON OF THE NEW VISION PLAN
## WITH THE NYCO RENAISSANCE PLAN.

New Vision for NYC Opera, Inc. ("**New Vision**") Plan offers a superior recovery for creditors. New Vision also believes it offers a better chance for the reorganized New York City Opera ("**NYCO**") to succeed.

### A.    *Superior Creditor Recoveries*

Under the New Vision Plan, Class 3 (the Pension Benefit Guaranty Corp. ("**PBGC**")) will receive a $350,000 note, **which is $100,000 more** than what is offered under the NYCO Renaissance Plan.

Under the New Vision Plan, Class 4 (**General Unsecured Creditors**) will receive a $1.5 million note, **which is $350,000 more** than what is offered under the NYCO Renaissance Plan.

Under the New Vision Plan, Class 5 (**Unsecured Convenience Creditors**) will receive 60%  of their claims. This allows the small creditor to get **a substantially enhanced recovery, at a much earlier date,** than what is offered under the NYCO Renaissance Plan.

Under the New Vision Plan, Class 6 (**Deposit Creditors**) will receive 100% of their priority claim. This allows the traditional supporters of NYCO to get **a substantially enhanced recovery, at a much earlier date,** than what is offered under the NYCO Renaissance Plan.

New Vision is negotiating with the **Unions** to provide them with an **enhanced recovery** to what is offered under the NYCO Renaissance Plan.

### B.    *More Likely to Succeed*

Under the New Vision Plan, Robert Lyall will be the General Artistic Director. He has had a successful track record running mid-size opera companies, and his leadership will be of immense value to the reorganized entity. New Vision encourages you to review Mr. Lyall's background, as set forth in this Plan Summary, and contrast it to the background of NYCO Renaissance's chosen General Artistic Director (Michael Capasso who used to run DiCapo Opera, no longer in business).

The New Vision Plan intends on using New York City Center as its primary venue. New Vision believes this is a better choice than NYCO Renaissance's choice of the Rose Theater, given City Center's greater seating capacity, and prior relationship with the New York City Opera.

New Vision's Plan envisions Gene Kaufman contributing up to $2 million of his personal funds, plus services provided by his business (at no cost) to support the reorganized entity. This level of commitment is consistent with the dedication shown by him in his philanthropic effort to revitalize the New York City Opera. New Vision encourages you to contrast this level of commitment to that offered by the leaders of NYCO Renaissance. What is more, Mr. Kaufman

2

offers a "fresh face" with new ideas as contrasted with NYCO Renaissance,  who has ties (through its Chairman of the Board) with the Debtor's failed operations. Mr. Kaufman has been a member of the Glimmerglass Opera board for a number of years and he will bring that experience with him as chairman of the revitalized New York City Opera.

New Vision's Plan provides for more measured growth as contrasted to the aggressive NYCO Renaissance approach. Simply put, New Vision believes it is important that NYCO be re-established with a solid foundation before it tries to do too many things.

Finally, this Plan Summary provides more detail than the NYCO Renaissance Plan Summary in many important areas such as setting forth specific planned operas with detailed budgets.

**III.**

**OVERVIEW OF THE NEW VISION PLAN**

A.    *Purpose and Effect of the New Vision Plan*

New Vision for has developed a reorganization plan for New York City Opera ("**NYCO**") that will allow NYCO to emerge from these bankruptcy proceedings and continue its mission of providing the public access to opera productions at affordable prices and also educating the public about opera.  New Vision's productions will be done in a cost effective manner and will be of a realistic size to allow the viability of NYCO for generations to come.

New Vision's objective is to reinstate NYCO as a vital mid-sized company resting comfortably between the Metropolitan Opera and the area's numerous smaller but inventive "boutique" opera companies that offer alternative styles of production and repertory. New Vision will respect that which appeals to the long-time patrons of opera while vigorously working to attract new audiences both young and old to experience the magic and majesty of our art form. The focus of NYCO will be on artistic excellence, versatility, and a sense of adventure.

Fundamental to the success of the Reorganized Debtor, or to any opera company, is the choice of a General and Artistic Director. Mr. Robert Lyall, the current head of New Orleans Opera for 17 years, and former head of three other opera companies and two orchestras, will serve as the new General and Artistic Director of the Reorganized Debtor. Mr. Lyall's experience and his success in both the artistic and administrative arenas provide the necessary balance and comprehensive capability that spells the difference between success and failure.

An artistic priority will be to recapture that important institutional role by making our offerings a professional platform for young American artists of exemplary talent while at the same time presenting a roster of highly-experienced, distinguished performers recognized for acclaimed interpretations of the traditional repertory that will constitute a substantial part of NYCO's regular offerings.

New Vision has affirmed its commitment to the Debtor's mission to expand opera's audience through educational outreach.    The Reorganized Debtor's educational components will include both public Adult Education and Student Education.    The educational programs propose a major collaborative partnership with Purchase College, SUNY, and will include work towards new, integrated offerings including Certificates, Artist Diplomas, and other adult education opportunities.    Additionally, masterclasses will be hosted by area universities and conservatories and feature distinguished artists involved in the NYCO productions.

Moreover, New Vision is developing relationships with Purchase College, SUNY for a Young Artists Program. This program is envisioned to be jointly offered with Purchase College through participation in NYCO-sponsored one year work-study programs leading to professional certification (e.g. certificate, artist diploma, etc.) for the participants in New York City Opera's dual-focused Young Artists Program. The potential for collaboration with the School of the Arts falls into two categories: *Opera Performance Studies* and *Technical Theatre Studies.*

Upon confirmation of the New Vision Plan, the Reorganized Debtor proposes to produce its first fully staged production at the New York City Center ("**City Center**"), the previous home of the Debtor.    City Center's midtown location, rich history and past connections with NYCO make it the ideal theater venue for the Reorganized Debtor to re-open.

City Center's Mainstage proscenium theater provides a uniquely intimate theatrical setting for audiences, and can accommodate a maximum seating capacity of 2,257. The theater's facilities include, among other things, state-of-the-art sound system, assisted listening for hearing enhancement or simultaneous translation and orchestra pit can accommodate up to 45 musicians. The Reorganized Debtor's programming at City Center aims to consist of exciting and commercially viable titles selected to attract both veteran operagoers and newcomers to the art form. In its first full season (Fall 2016-Spring 2017), the Reorganized Debtor will present 23 performances, including four large-scale operas at City Center.

With an initial approximate $6.7 million, a fundraising requirement of only $2.2 million and a dynamic, lean, entrepreneurial structure, the Reorganized Debtor intends to expand in measured steps, increasing the number of productions and performances in each subsequent season.

The proposed marketing focus and theme will be "Great Opera, at Great Prices". Presenting operas the audience knows in productions that they can read about when considering whether to purchase tickets, will give the Reorganized Debtor the opportunity to be identified with "Great Operas." The intention is to pair "Great Operas" with "Great Prices". Further, the company will employ contemporary marketing techniques such as social media and corporate and social partnerships to build new audiences while re-engaging NYCO's historic core audience. The company will maintain its mission as the "People's Opera" and continue its tradition of affordable ticket pricing. Continuing Debtor's long tradition of community outreach, a broad slate of educational programming will return.

The Plan Sponsor intends to achieve these goals by enabling the Debtor to emerge from bankruptcy through the New Vision Plan. In that regard, the New Vision Plan provides for the contribution of all of the assets of New Vision to the Reorganized Debtor, the vesting of all of

the assets of the Debtor's estate in the Reorganized Debtor, the payment of Cash on account of Allowed Administrative and Priority Claims, the issuance of two promissory notes by the Reorganized Debtor, one for the benefit of the PBGC and one for the benefit of the class of general unsecured creditors, and the restructuring of certain obligations of the Debtor to creditors. Among other things, the contribution of Cash and other assets of New Vision to the Reorganized Debtor will enable the Reorganized Debtor to finance distributions contemplated by the New Vision Plan and allow it to continue to operate the Debtor's business post- confirmation consistent with its mission.

The Plan Sponsor believes that the New Vision Plan is the prime option for continuing the Debtor's mission because it maximizes recoveries for Holders of Allowed Claims. The Plan Sponsor believes that any alternative to confirmation of the New Vision Plan, such as a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, a proposed sale of substantially all of the Debtor's assets, or attempts by other parties to confirm competing plans, would result in significant delay, litigation, additional costs, and, ultimately, would lower the recoveries for all Holders of Allowed Claims.

B.    *Summary of Treatment of Claims and Projected Recoveries*

The following table summarizes (i) the treatment of Claims under the New Vision Plan, (ii) the estimated Allowed Claims, and (iii) the estimated ranges of recoveries. As the Debtor is a not-for-profit corporation there are no holders of interest in the Debtor. As such, there is no class of membership interests. The ranges of recoveries listed below are based on various assumptions, including (but not limited to) assumptions regarding the total amount of the Allowed Claims. The summary below is for illustrative purposes only and is subject to the more detailed and complete description contained in Article II and Article III of the New Vision Plan.

| Class | Claim/ Interest | Plan Treatment | Range of Estimated Claims/ Interests | Projected Recovery Under the Plan |
|-------|-----------------|----------------|--------------------------------------|-----------------------------------|
| N/A | Administrative Claims | Paid in full in Cash | $110,000-$222,723 | 100% |
| N/A | Priority Tax Claims | Paid in full in Cash | $0 | 100% |
| 1 | Priority Claims – Severance/Wages | Paid in full in Cash | $209,419-$1,179,222 | 100% |
| 2 | Secured Claims | Paid in full in Cash | $0 | 100% |
| 3 | PBGC Claims | Pro Rata Share of New Vision Cash (to be shared with Class 4) after all cash payments to other Classes are made | approximately $3,997,389 (settlement amount) | 8.7 to 12% |
| 4 | General Unsecured Claims | Pro Rata Share of New Vision Cash (to be shared with Class 3) after all cash payments to other Classes | $21,051,315-$25,415,119 | 7% to 11% |

| | | | | |
|---|---|---|---|---|
| | | are made | | |
| 5 | Unsecured Convenience Claims | Paid 60% of Claim | approximately $20,000 to $40,000 | 60% |
| 6 | Deposit Claims | Paid in full in Cash | approximately $300,000 on account of ticket payments | 100% |

# IV.

## THE REORGANIZED DEBTOR'S BUSINESS PLAN AND VALUATION

A.    *The Reorganized Debtor's Business Plan and Commitment to Debtor's Mission*

1.    *Commitment to the Debtor's Artistic Philosophy*

Central to our effort is to provide the modern audience with the benefits and joys of opera education by offering a comprehensive program for students and adults that will raise awareness and intensify their appreciation in order to enhance the value and impact of the "operatic experience." Critical to the future success of a reorganized New York City Opera is a specific and clearly-focused artistic vision that is attainable within available financial means. A vibrant artistic vision for the Reorganized Debtor will focus on a balanced approach to repertory planning that can reestablish the unique identity and role of the opera company in the cultural fabric of New York City. The storied history of NYCO is well known, especially as an organization that helped launch the careers of a substantial number of significant artists. An artistic priority will be to recapture that important institutional role by making our offerings a professional platform for young American artists of exemplary talent while at the same time presenting a roster of highly-experienced, distinguished performers recognized for acclaimed interpretations of the traditional repertory that will constitute a substantial part of NYCO's regular offerings. In pursuit of this goal, NYCO will build toward stable and sustainable future seasons that focus on presenting excellent productions of the core repertory, realized with both traditional and reexamined interpretations, but also by drawing upon the vast richness and remarkable variety of contemporary opera—especially American works.

2.    *Opera Education*

Education has played an important role in the activities of the NYCO and it will be our commitment to continue this tradition as a vital part of the company's mission. New Vision is developing relationships with Purchase College, SUNY for a Young Artists Program. This program is envisioned to be jointly offered with Purchase College through participation in NYCO-sponsored one year work-study programs leading to professional certification (e.g. certificate, artist diploma, etc.) for the participants in New York City Opera's dual-focused Young Artists Program. The potential for collaboration with the School of the Arts falls into two categories: *Opera Performance Studies* and *Technical Theatre Studies.*

The educational components of the Reorganized Debtor will include both public Adult Education and Student Education. Adult Education will include special social and instructional activities including "Roundtables" and "Nuts and Bolts" presentations.

- "Roundtables" will feature an interactive discussion in which the principal cast members and the music and stage directors explore and present the multifaceted aspects of developing and interpreting the opera. Cast members will talk about their role and the musical and theatrical challenges that they face in bringing their interpretation to life while the larger theatrical concepts are discussed by the Music Director and the Stage Director. Lively question and answer sessions with the audience will be a regular part of the Roundtable.

- "Nuts and Bolts" presentations will be presented as a pre-performance activity held in the performance space shortly before the beginning of the opera. A specialist (musicologist, conductor, director, or historian) usually offers a short analysis of the history and style of the work being presented, with a particular focus on any unique aspects of the specific production that the audience is about to experience.

Student Education will involve "Opera in the Classroom" and "The Classroom in the Opera."

- "Opera in the Classroom" offerings will center on two types of activities, "Informances," which are performance discussions featuring one or more artists and an accompanist. This format offers an interactive discussion of singing techniques, musical styles, and aspects of career development in the field of opera and musical theater. A second form of in-class offering is the presentation of shortened, simply-produced children's fantasy classics like Hansel and Gretel which also feature the use of modest sets and colorful costumes. These productions are appropriate for younger audiences.

- "The Classroom in the Opera" is certainly the most complete educational experience for student groups. It involves attending a full dress rehearsal of the opera as an institutional activity of the participating schools. Clearly, to experience opera which displays the full production values with the use of sets, costumes, lighting, orchestra, chorus, and a professional cast presenting the complete drama is the ultimate and most complete educational experience for student groups.

Masterclasses will be hosted by area universities and conservatories and feature distinguished artists involved in the NYCO productions. The audience and participants are generally drawn from the voice students of the host institution and the events are presented as a part of their curriculum. An alternate approach is to offer masterclasses in venues which allow the public to attend. Master teachers can be members of the casts of NYCO or can feature celebrity artists who are sharing their experience and technical knowledge with developing artists drawn from a wide array of area institutions or organizations.

The potential for collaboration with the School of the Arts falls into two categories: *Opera Performance Studies* and *Technical Theatre Studies*:

1. *Opera Performance Studies*: The Conservatory of Music in the School of the Arts has a well-developed tradition and reputation for training fine young singers for careers in Opera Performance. A partnership with NYCO would involve the typical young-artist program training found in professional Opera companies, and could be augmented by studies such as: Lied and Art Song Literature; Diction and Language Study; Bel Canto Repertoire Seminar; Opera Performance Practice; Teaching Techniques for Voice; Teaching Techniques for Stage; Mozart and Da Ponte Operas; and many other possible coursework, or individually-directed studies projects, as designed and approved by the School of the Arts and NYCO.

2. *Theatre Design/Technical Studies*: The Conservatory of Theatre Arts in the School of the Arts has an international reputation for the excellence of its Theatre Design and Technology programs. As an important extension of the NYCO Young Artist Program, we hope to enhance our educational opportunities with studies in the specifics of the opera production that could also lead to professional certification. Exceptionally gifted young artists/designers will be able to pursue advanced training in Scenic Design, Costume Design, Sound Design, and Lighting Design. This aspect of the NYCO Young Artists Program would be for individuals who have completed graduate studies in technical theatre or have a significant amount of formal training and professional experience that can be applied to actual production projects with the New York City Opera.

In the future, the Debtor's highly successful *Opera is Elementary* program will be reinstated, once again bringing high-quality opera performances to New York City schools. In addition to introducing opera to New York's schoolchildren, the Reorganized Debtor will emphasize its role in engaging its audiences by providing informative events for patrons to help them understand the art form in greater depth and more fully appreciate performances. Finally, a commitment to having many low-priced tickets available for each performance will make first-rate opera available to a new generation of audiences.

3.   Business Plan

The Reorganized Debtor's business plan (the "**Business Plan**") calls for a $6.7 million budget in the 2016-17 season. The projections for the Reorganized Debtor attached hereto as **Exhibit "2"** (the "**Reorganized Debtor's Projections**").

In order to focus on quality productions, two important limitations must be respected. One is to present rather than produce the first several seasons by presenting productions already judged an artistic success and box office favorite in other locations. This will ensure to the maximum extent possible the suitably and successful reception of those productions on a NYC stage.  The second is to limit the number of productions. By selecting some of the productions around the world and bringing them to a NYC stage, we expect good advance ticket sales from a public properly apprised of the merits of a production and favorable reviews from critics and audiences. Therefore, we have canvassed the entire world for productions that will excite New York audiences and critics alike, and which have a sharp profile conducive to getting a

production sponsor and other consequential donations. This effort was built on two essential criteria: first, that the opera had to be a proven audience favorite, and second, that the production had to be an artistic success that would be exciting to a New York audience. Accordingly, the seasons have been designed with this as the focus.

*Programming*: The tentative proposed opera production schedule is as follows:

2016-2017 Productions
- Bizet: Carmen
- Leoncavallo: Pagliacci and Orff: Carmina Burana
- Previn: A Streetcar Named Desire
- Mozart: The Marriage of Figaro

2017-2018 Productions
- Mozart: The Magic Flute
- Puts: Silent Night
- Verdi: Macbeth
- Puccini: Tosca

2018-2019 Productions
- Verdi: Aida
- Puccini: Madama Butterfly
- Clearfield: Mila
- Gounod: Faust

*Venue*: City Center is the proposed home for New Vision.  City Center's Mainstage proscenium theater provides a uniquely intimate theatrical setting for audiences, and can accommodate a maximum seating capacity of 2,257. The seating breakdown is as follows:

| Section | Seating Total |
|---------|---------------|
| Orchestra AA-CC | 71 |
| Orchestra | 608 |
| Grand Tier | 209 |
| Mezzanine | 617 |
| Balcony | 752 |

The theater's facilities include:
- Mainstage: 45' wide x 43' deep, plus wings and fly space
- State-of-the-art sound system with recorded playback
- Assisted Listening for hearing enhancement or simultaneous translation
- Closed circuit video systems
- Extensive stage lighting and dimmer systems, including three spotlights and moving lights
- Full complement of black velour stage draperies, backdrops, scrims and cycloramas
- Complete fly system rigging of 90 counterweighted lines
- Orchestra pit can accommodate up to 45 musicians
- Dressing rooms for 80+ people

- Convenient telephone and internet hookup
- Box office services plus phone/mail/fax tickets processing plus online ticketing

The proposed terms of agreement with City Center are accounted for in proposed operating budgets.

*Orchestra*: The NYCO Orchestra has survived as an independent group after the closing of NYCO, and it is proposed to resume activities as the orchestra for the opera productions of New Vision. The proposed agreement terms are more favorable than those that the Local 802 AFM negotiated last year as written in the Memorandum of Agreement dated April 15, 2014. The proposed agreement recognizes the prior labor history and operating agreements between the orchestra and NYCO, including the shift a few years ago from salary to per service wages. The proposed agreement covers a five year term for performance wages, rehearsal wages, minimums, seniority, cartage, health care, sick pay, pension, severance, media, "most favored nations" and non-economic issues. The proposed terms of agreement are accounted for in proposed operating budgets.

*Chorus*: Choruses for the productions based upon the specific personnel demands of each, will be chosen and it is proposed that they will be seated with AGMA union members under a proposed labor agreement to be approved by AGMA. Per the proposed agreement, AGMA will receive parity and the same terms as Local 802 AFM. The proposed terms of agreement terms are accounted for in proposed operating budgets.

*Singers*: New Vision believes that the casting of the lead roles is critical to the success of NYCO going forward. Historically, NYCO has featured young singers, many without prior major careers, with the hope of discovering new stars.

In today's environment, with the ready availability of HD broadcasts by the Met featuring many of the world's greatest singers, and with three dark seasons at NYCO, we believe it is important to RAISE the profile and the quality of the lead singers from NYCO's most recent seasons.

Soloists will include established, distinguished singers whose professional credits and reviews are unquestionably superb.  Mr. Lyall has worked with many world renowned singers, many of whom are on the present Metropolitan Opera roster. His excellent working relationships can be a crucial factor in getting the participation of singers who are in demand around the world.

*Marketing*:  Opera is expensive to produce and expensive to attend, and to a certain extent audiences will pay a premium for it over other art forms. But most people have budgets, and the cost of producing opera, if borne exclusively or primarily by ticket sales will put the cost of tickets out of reach. The ticket cost should be reasonably competitive with other options a potential audience has, which include not only other opera, but also theater, ballet and other dance, classical and other music, other arts, and various other options such as dinner and/or the movies.

New Vision will employ a Marketing Department which will begin marketing initiatives in 2015.  The marketing budget allocates $275,000 for media buys for the first year, with annual

percentage increases thereafter. The Marketing Department will be led by a Marketing Director who will spearhead a NYC sensitive marketing campaign and oversee all marketing initiatives and activities. The Marketing Director will be supported by adequate administrative and support staff to fulfill the functions of the Marketing Department.

The Marketing Department will help to rebuild the NYCO brand and achieve targeted sales projections. It will pursue new media and traditional media marketing initiatives including marketing via Facebook, Twitter and other new media initiatives as well as traditional magazine and newspaper publications. It will liaise with NYCO's former subscribers and reunite them with the re-commissioned NYCO.

The Marketing Department will publicize the renowned opera luminaires that will be performing NYCO's productions. The Marketing Department will manage box office sales and coordinate subscription ticket sales as well as individual sales. It will also coordinate corporate ticket sales and sponsorships.

*Public Relations*: NYCO will employ a Public Relations Department. NYCO's Marketing Director will oversee the Public Relations Department. The Public Relations Department will be supported by adequate administrative and support staff to fulfill the functions of the department. NYCO's Public Relations Department will educate the public about NYCO's reorganization and enable the restoration of public trust in NYCO. It will promote NYCO's identity as the "People's Opera" and convey NYCO's Opera Education Mission. It will work with New York City Department of Cultural Affairs and Arts Council and other civic groups to publicize NYCO. These efforts in turn will support NYCO's marketing initiatives. The Public Relations Department will support the Marketing Department's publicizing of the renowned opera luminaires that will be performing NYCO's productions.

*Budget*: The proposed production budget for each of the first three seasons is approximately $5.25 million per year, which covers 4 operas per season with 4 performances each and additionally 2 operas presented as in-concert productions with 2 performances each, 2 orchestral showcase concerts with one performance each and one gala fundraising concert. Extrapolations are made for seasons four and five to convey budgeting for a five year period. The proposed budgets for the first three seasons are based on production specific criteria for the identified opera productions for those seasons. The budgets reflect proposed agreements with Local 802 AFM (the musicians' union), AGMA (the singers', stage managers' and dance union), and City Center (venue). The production budgets have been developed by Mr. Lyall based upon his collective experience and based on discussions with singers, production companies and other relevant participants. The budgets are in-line with recent "Level 2" Opera Companies. The budgets are attached as **Exhibit "2"**.

*Income and Ticket Prices*: New Vision will offer seats at affordable prices. In order to obtain the largest possible audience with the widest demographics, the projected ticket prices for opera performances and gala concerts will have approximately one –third of the seats priced at $50, one-third of the seats priced at $100 and the remaining one-third priced between $175 and $250, with an the average price of approximately $100. Approximately 752 Balcony Seats per performance (34% of the total seats) will be sold for $50, another 617 Mezzanine Seats per performance (27% of the total seats) sold for $100, 209 Grand Tier Seats per performance (9%

of total performance) sold for $175, 608 Orchestra Seats (27% of the total seats) sold for $150 and the remaining 71 Orchestra AA-CC seats (3% of seats) sold for $250. The projected ticket prices for in-concert productions and orchestral showcase concerts will range from $25 to $200.

Accordingly, the ticket prices would allow NYCO to be accessible and continue its tradition as the People's Opera. The sliding scale of ticket prices would also allow ticket receipts to generate enough revenue to support a significant portion of the Opera's operating costs. The lower tiered tickets prices will foster a much larger audience in the initial years, projected as 60% of the total seats, which is critical to the long term success of opera in general and to NYCO specifically, given the documented shrinking and aging overall opera audience.

At these prices, we expect to sell 75% of the house, garnering approximately $734,000 per opera for 4 shows, $241,000 for 2 orchestral showcase concerts, $482,000 for 4 in-concert productions and $183,000 for an annual gala concert, with an approximate total revenue of and $3.84 million for each of the first three seasons.

These ticket prices and ticket revenue projections are in-line with "Level 2" Opera Companies. The income projections are attached as **Exhibit "2"**.

*Required Fundraising*: In the first year, individual donations, board contributions, corporate donations and grants are projected to raise nearly $2 million, and that number is projected to increase to nearly $2.88 million by the third year. These numbers are in-line with "Level 2" Opera Companies.

*Committed Funds*: Subject to acceptance of New Vision's plan, Mr. Gene Kaufman intends to personally fund up to $2 million for the first two years, as well as subsidize the administrative and overhead costs with free office space, etc.

*NYCO Endowment Restricted Fund and Bequests*: The major asset of NYCO is the endowment and restricted funds donated to it and limited to the performance of opera. It is currently proposed that the endowment principal should remain as an endowment and not used to fund operations, nor to pay creditors. No endowment principal is figured into any budgets for the first five years. Bequests will be used as intended, to fund opera productions.

B.    *Management of the Reorganized Debtor*

NYCO has been one of the top opera companies in the US for seven decades. For many years it operated successfully, both artistically and financially. The intellectual property, the corporate structure, the bylaws and the history all still exist. There is no need and no desire to act as if all these need to be reinvented.

NYCO will continue to operate as a 501(c)(3) tax exempt organization. This will allow tax deductible status for all contributions to NYCO which will incentivize gifting. NYCO will have a General and Artistic Director, an advisory group, a corporate board, executive leadership, and essential artistic and administrative staff. The board will be composed of members with a strong financial background and acumen. The formation of the budget will be a collaborative

effort of the General and Artistic Director with the board, with strict controls over the allocation of funds and artistic choices that have financial commitments attached to them.

Gene Kaufman will be the Chairman of the New Board of the Reorganized Debtor. He is a long-time supporter of the Debtor and noted arts philanthropist. Mr. Kaufman has served on the board for Glimmerglass Opera and has funded and led the prodigious effort to put the New Vision Plan in place.  He is fully committed to employing his resources and contacts to assure the success of this plan and he serves as the initial Board Chair. Kaufman and the New Board will provide strong financial and strategic governance as the company begins its full production schedule.

The General and Artistic Director of Reorganized Debtor will be Robert Lyall, the current head of New Orleans Opera for 17 years, and former head of three other opera companies and two orchestras will serve as the new General and Artistic Director of NYCO. Lyall has extensive experience running opera companies and symphony orchestras:

New Orleans Opera-17 years
Grand Rapids Opera—26 years
Knoxville Opera—17 years
Mississippi Opera—3 years
Victoria Symphony—16 years
Oak Ridge Symphony–11 years

Mr. Lyall has been selected for this critical role given his proven track record as the General and Artistic Director of an opera company of a similar financial scale as NYCO (with an annual budget between $3 million and $10 million). His ideal qualifications include experience in running one or more opera companies, in running at least one opera company for an extended period of time with a proven track record of balancing budgets, succeeding in fundraising, and displaying substantial experience in attracting top quality artists to create a history of mounting artistically successful productions.

Mr. Lyall's prodigious accomplishments speak for themselves, but also directly address point by point all of the most consequential objectives in the selection process. His experience and his success in both the artistic and administrative arenas provide the necessary balance and comprehensive capability that spells the difference between success and failure. Working in New Orleans, one of the nation's great cities but one where opera needed to prove its relevance to being heard, plus having accomplished that for nearly two continuous decades while presenting critically and audience acclaimed opera with fiscal years ending in the black, Mr. Lyall exemplifies the role.

The choice of a General and Artistic Director is fundamental to the success of NYCO, or to any opera company.

It is anticipated that an employment agreement between the Reorganized Debtor and Lyall will be finalized and become effective on the Effective Date of the New Vision Plan. A number of additional business leaders and philanthropists have committed to joining the Board, providing the Reorganized Debtor with a broad base of leadership and financial support.

*Artistic Advisors*: An artistic advisory board is envisioned to bring some remarkable people into the effort of running NYCO, and to give their insight a direct input into the process. This group is still in formation, and will continue to evolve and grow with the company, but already has a strong list of major contributors who have expressed their interest in playing this role. The role of the artistic advisory board will complement that of the board of directors.

*Board of Directors*: The Board of Directors is invariably the financial backbone of an arts institution. The board for the reorganized NYCO will include a selected group from the artistic advisors and a selected group of financially powerful people with philanthropic experience. Given the nascent status of this endeavor, this group is currently envisioned as closely connected individuals centered around New York City Real Estate.

*Finance Committee*: The Reorganized Debtor intends to establish and maintain a finance committee (the "**Finance Committee**"). As discussed more fully below in Article IV.D.6, the Finance Committee will help develop and approve the annual budget and monitor the ongoing financial results of the Reorganized Debtor through detailed data and reports. Further, a strong financial overseer will be engaged with arts experience to ensure (and reassure donors) that funds will be spent appropriately and thoughtfully and to provide the New Board and management with clear and accurate financial data. These position will afford a sense of security and trust to the donor base. Any additional senior management of the Reorganized Debtor, as well as a copy of Lyall's proposed employment agreement, will be disclosed in the Plan Supplement prior to the Confirmation Date.

C.      *Feasibility of the New Vision Plan*

1.      *Claims Estimates*

The total amount of Claims listed on the Debtor's Schedules were as follows: (i) no secured claims; (ii) unsecured priority claims on account of wages, salaries, commissions and severance in the approximate amount of $25,913.54; (iii) unsecured liabilities on account of pension fund and health union contributions in the approximate amount of $237,476.28, of which an unknown amount was identified as entitled to priority; (iv) unsecured priority liabilities on account of prepaid ticket purchases in the approximate amount of $289,022; and (v) unsecured claims in the approximate amount of $3,362,715.54.

With respect to unsecured priority claims, certain of the Debtor's employees, as well as unions on behalf of employees, filed proofs of claim for, among other things, wages, severance, contributions and other compensation on a priority basis. As summarized below in Article IV, under the New Vision Plan, these claims are treated as Other Priority Claims – Severance/Wage Claims in Class 1.

Although to date no Secured Claims have been filed, the New Vision Plan classifies any such Claims in Class 2.

The PBGC, which administers the pension insurance program under Title IV of ERISA, has filed proofs of claim against the Debtor in an unliquidated amount. The Plan Sponsor believes the PBGC will settle its claims as summarized below in Article IV, which gives the

PBGC an allowed general unsecured claim in the approximate amount of $3,997,389 payable by the PBGC Note and its Pro Rata portion of New Vision Cash after other cash payments under the Plan are made. The PBGC's Allowed Claim is classified in Class 3 in the New Vision Plan.

Early in the Chapter 11 Case, the Court denied the Debtor's request to refund prepaid tickets – claims for which were initially scheduled by the Debtor as being entitled to priority. The funds from prepaid tickets totals approximately $323,000 (less amounts donated back to the Debtor); the Claims for prepaid tickets are treated as Deposit Claims in Class 6 under the New Vision Plan."

Additionally, Class 5 under the Plan is for Unsecured Convenience Class of Claims less than $2,000. The estimated amount of such claims is $20,000 to $40,000.

The American Federation of Musicians and Employers' Pension Fund filed a proof of claim on account of withdrawal liability under a pension fund in excess of $17,647,298. This claim in addition to other general unsecured claims, including claims relating to among others, executory contracts, are treated in the New Vision Plan as General Unsecured Claims in Class 4.

The Plan Sponsor believes that certain claims, or portions thereof, may be reduced, disallowed and/or reclassified.

### 2.    Plan and Operations Funding

As of August 2015, the Debtor had approximately $208,000 of Cash on hand. On the Effective Date, New Vision will contribute $1,250,000 in Cash to the Reorganized Debtor. Based on the Plan Sponsor's estimates of Allowed Claims, it is anticipated by the Plan Sponsor that the Debtor's Cash on hand, together with the contribution from New Vision, will enable the Reorganized Debtor to fund distributions required to be made under the New Vision Plan.

The Reorganized Debtor will issue two non-interest bearing promissory notes payable for a total aggregate value of $1,850,000 payable over five (5) years. The first of the notes, the PBGC Note, will be in the face amount of $350,000 and payable to PBGC. The second note, the GUC Note, will be in the face amount of $1,500,000 and payable to the holders of Class 4 Claims. Copies of the forms of the PBGC Note and the GUC Note shall be included in the Plan Supplement. The Reorganized Debtor's obligation to make any payments under the GUC Note will be conditioned upon the Reorganized Debtor obtaining at least $6,412,500 of the Pending Bequests. The Pending Bequests are described more fully in Article II of the Joint Disclosure Statement and directly below herein.

The Plan Sponsor anticipates that the Reorganized Debtor will be able to meet its obligations under the GUC Note and PBGC Note because, as set forth above and indicated by the Reorganized Debtor's Projections, among other things, New Vision has devoted a substantial amount of time toward, among other things, creating, developing and producing a number of planned performances which it believes will be successful and contribute to the Reorganized Debtor's income following the Effective Date of the New Vision Plan. In addition, a broad fundraising model involving the New Board, corporations, high-net-worth donors, foundations, government, and individuals will ensure a strong foundation for the company as it expands in

measured steps. The Reorganized Debtor will also develop additional sources of earned income so as to augment annual fundraising requirements even as the company expands.

The New Board will carefully monitor results before approving any budget expansion. Alliances and renewed relationships with major artists and stakeholders are important facets of New Vision. The combination of strong artistic principles, decades of experience, sound business practices, and an inclusive operating plan will ensure artistic excellence and financial sustainability and allow New Vision, once again "The People's Opera," to provide compelling, world-class productions at affordable prices to a broad and growing audience. Moreover, it will present more first-rate operas at a far lower cost and fundraising requirement than in prior years.

Additionally, as noted in the Joint Disclosure Statement, prior to the Petition Date, the Debtor's operations had been funded in part through the Endowment, the current principal amount of which is approximately $4.8 million. The Reorganized Debtor intends to draw on only the investment income (interest and dividends) of the Endowment, thereby preserving and ultimately restoring the principal thereof.

As also noted in the Joint Disclosure Statement, the Reorganized Debtor may receive Pending Bequests within twelve to twenty-four (12-24) months after the Effective Date of the New Vision Plan that would assist the Reorganized Debtor in operating after the Effective Date. Of the total approximate amount ($7,612,500) of the Pending Bequests, approximately $6,412,500 is in the form of unrestricted gifts which the Reorganized Debtor may, in its discretion, use upon receipt. Approximately $500,000 of the Pending Bequests may be used for new productions of opera, and approximately $700,000 of the Pending Bequests may be used to establish an endowment fund in the name of the decedent to be used exclusively to purchase costumes and stage sets.

Accordingly, the Plan Sponsor believes that the Reorganized Debtor will be able to meet its obligations under the New Vision Plan and to maintain sufficient liquidity and capital resources to conduct its business after emerging from chapter 11 to fully satisfy the feasibility standard of section 1129(a)(11).

**V.**

**SUMMARY OF THE NEW VISION PLAN**

A.    *Administrative and Priority Claims*

1.    *Administrative Claims*

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Debtor or the Reorganized Debtor, as applicable, shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Administrative Claim becomes Allowed. The Plan Sponsor estimates that the Allowed Administrative Claims will be in the range of $110,000 to $222,723.

2.      *Priority Tax Claims*

The Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Priority Tax Claim becomes Allowed. The Plan Sponsor does not anticipate that there will be any Allowed Priority Tax Claims. The Plan Sponsor reserves the right to pay Allowed Priority Tax Claims in accordance with Section 507(a)(9)(c) of the Bankruptcy Code.

B.      *Classification and Treatment of Claims*

1.      *Summary*

The New Vision Plan constitutes a chapter 11 plan of reorganization for the Debtor. Except for Administrative Claims and Priority Tax Claims, all Claims against the Debtor are placed in Classes. As there are no membership interests in the Debtor, there is no class of "interests." In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified as described above. The table in Article III of the New Vision Plan classifies Claims against the Debtor for all purposes, including voting, confirmation and distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The classification and treatment of classified Claims are summarized as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims – Severance/Wage | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | PBGC Claims | Impaired | Yes |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | Unsecured Convenience Claims | Impaired | Yes |
| 6 | Deposit Claims | Unimpaired | No (deemed to accept) |

2.      <u>*Class 1 – Other Priority Claims -Severance/Wage Claims*</u>

(a)      *Classification:* Class 1 consists of the Severance/Wage Claims.

(b)      *Treatment:* Except to the extent that the Holders of Claims in Class 1 agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the Severance/ Wage Claims, the Severance/ Wage Claims shall be paid in full in Cash on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Severance/W age Claim becomes Allowed. The Plan Sponsor estimates that the Allowed Severance/Wage Claims will be in the range of $209,419 to $1,179,222.

(c)      *Impairment and Voting:* Class 1 is unimpaired by the New Vision Plan. The Holders of Claims in Class 1 are presumed to accept and therefore are not entitled to vote to accept or reject the New Vision Plan.

3.    *Class 2 – Secured Claims*

(a)    *Classification:* Class 2 consists of Secured Claims.

(b)    *Treatment:* Except to the extent that a holder of an Allowed Secured Claim and the Plan Sponsor agrees to a different treatment, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, (i) each Allowed Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim shall receive Cash in an amount equal to such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) each Holder of an Allowed Secured Claim shall receive the collateral securing its Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable. The Plan Sponsor does not anticipate that there will be any Allowed Class 2 Claims.

(c)    *Impairment and Voting:* Class 2 is unimpaired by the New Vision Plan. The Holders of any Allowed Secured Claims are presumed to accept and therefore are not entitled to vote to accept or reject the New Vision Plan.

4.    *Class 3 – PBGC Claims*

(a)    *Classification:* Class 3 consists of the PBGC Claims.

(b)    *Treatment:* The PBGC and the Plan Sponsor has agreed that, in full satisfaction, discharge, settlement, release, and compromise of and in exchange for the PBGC Claims, the PBGC Claims shall be Allowed in the total approximate amount of $3,997,389, and the PBGC shall receive on the Initial Distribution Date, or as soon as practicable thereafter, (i) its Pro Rata Distribution of the New Vision Cash (to be shared with Class 4 creditors), after all cash payments under the Plan are made and (ii) the PBGC Note. The PBGC Claims are being treated separately from other Claims due to special circumstances and the hybrid nature of the PBGC Claims.

(c)    *Impairment and Voting:* Class 3 is impaired by the New Vision Plan. The PBGC is entitled to vote to accept or reject the New Vision Plan.

5.    *Class 4 – General Unsecured Claims*

(a)    *Classification:* Class 4 consists of all General Unsecured Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, discharge, settlement, release, and compromise of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive on the Initial Distribution Date, or as soon as practicable thereafter, its Pro Rata Distribution of the New Vision Cash (to be shared with Class 3 creditors), after all cash payments under the Plan are made and (ii) the GUC Note. The Plan Sponsor estimates that the Allowed Class 4 Claims will be in the range of $21,051,315 to $25,415,119.

18

        (c)     *Impairment and Voting:* Class 4 is impaired by the New Vision Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the New Vision Plan.

       6.      <u>*Class 5 – Unsecured Convenience Claims*</u>

        (a)     *Classification:* Class 5 consists of the Unsecured Convenience Claims.

        (b)     *Treatment:* In full satisfaction, discharge, settlement, release, and compromise of and in exchange for the Unsecured Convenience Claims, the Unsecured Convenience Claims shall be Allowed in the approximate amount of sixty percent (60%) of each individual claim. The Plan Sponsor believes that there will be approximately $20,000 to $40,000 of claims in this Class.

        (c)     *Impairment and Voting:*  Class 5 is impaired by the Plan.  The Unsecured Convenience Claimants are entitled to vote to accept or reject the Plan.

       7.      <u>*Class 6 – Deposit Claims*</u>

        (a)     *Classification:* Class 6 consists of the Deposit Claims.

        (b)     *Treatment:* In full satisfaction, discharge, settlement, release, and compromise of and in exchange for the Deposit Claims, the Deposit Claims shall be paid in full in Cash on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Deposit Claim becomes Allowed. The Plan Sponsor estimates that the Allowed Deposit Claims will be approximately $325,000 (less amount already contributed back to the Debtor).

        (c)     *Impairment and Voting:*  Class 6 are unimpaired by the Plan. and are not entitled to vote to accept or reject the Plan.

The Reorganized Debtor reserves its right to dispute the validity of any Claim, other than the Allowed PBGC Claim, whether or not objected to prior to the Effective Date.

      C.     *Liquidation Analysis and Plan Confirmation Requirements*

      As summarized above, pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in Classes 3, 4 and 5 are impaired and thus must accept the New Vision Plan for the New Vision Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the New Vision Plan "discriminates unfairly" with respect to such Classes, as both standards are described in the Joint Disclosure Statement.

      As is noted in the Joint Disclosure Statement, the Debtor's sale process produced an aggregate offer from New Vision of $1,500,000. Based on that amount, together with the Debtor's available Cash of approximately $208,000, the Plan Sponsor believes that the value of distributions in a hypothetical chapter 7 liquidation, if any, would be at most $1,708,000, which is less than the value of distributions available under the New Vision Plan. As discussed above and indicated in the Liquidation Analysis attached at **<u>Exhibit "3"</u>**. The PBGC Note and the GUC

Note would not be available in a liquidation scenario. Therefore, the Plan Sponsor believes that the New Vision Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

To the extent that Classes 3, 4, and 5 vote to reject the New Vision Plan, the Plan Sponsor reserves the right to (a) seek confirmation of the New Vision Plan under section 1129(b) of the Bankruptcy Code, and/or (b) modify the New Vision Plan.

It is important to note that prior to confirmation, the Committee reserves the right to withdraw as joint proponent of the NYCO Renaissance Plan and support this Plan in the event that the Committee, in the reasonable exercise of its fiduciary responsibilities, should determine that this plan of reorganization is more advantageous for creditors of the Debtor.

The Plan Sponsor does not believe that the Plan discriminates unfairly against any impaired Class of Claims. The Plan Sponsor believes that the New Vision Plan and the treatment of all Classes of Claims under the New Vision Plan satisfy the requirements for nonconsensual confirmation of the New Vision Plan.

D.    *Means for Implementation of the New Vision Plan*

1.    *Corporate Existence*

The Reorganized Debtor shall continue to exist after the Effective Date as a not-for-profit corporate entity with all the powers of a corporation pursuant to the applicable laws of New York and pursuant to the corporate documents in effect prior to the Effective Date, as same may be amended, modified or revised by the Plan Sponsor to effectuate the transactions contemplated by the New Vision Plan.

2.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate this Plan including: (1) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the New Vision Plan; (2) the filing of appropriate corporate governance documents, including but not limited to, any new or amended or modified documents contained in the Plan Supplement with the appropriate governmental authorities pursuant to applicable law; and (3) all other actions that the Reorganized Debtor determines are necessary or appropriate.

3.    *Corporate Action*

Each of the matters provided for by the New Vision Plan (including the Plan Supplement) involving the Reorganized Debtor's corporate structure, financing or related actions to be taken by or required of the Debtor or Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the New Vision Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified as of the Effective Date in all respects without any requirement of further action by holders of Claims, the directors of the

Debtor or any other entity. The Reorganized Debtor shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and conditions of the New Vision Plan.

### 4.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor, and the officers of the Reorganized Debtor and members of the New Board, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the New Vision Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the New Vision Plan.

### 5.    *New Board Representation*

Robert Lyall shall be the initial General and Artistic Director of the Reorganized Debtor. Kaufman shall be the initial Chair of the New Board. Other members of the New Board shall be disclosed in the Plan Supplement Management/Corporate Governance

New Vision's management will be led by Mr. Lyall as General and Artistic Director. A nationwide search will be undertaken for the position of Executive Director. and other key positions including: Development Director, Marketing Director, Production Director, Technical Director, Business Manager, and Box Office Manager. Salaries for these management positions are accounted for in proposed budgets. The names and qualifications of other persons who will act as senior management of the Reorganized Debtor as of the Effective Date shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code. The New Board will act to carefully protect accumulated assets and the Endowment and, to the extent received, the Pending Bequests, and ensure that current income is managed properly. The New Board has the principal responsibility for fulfillment of the organization's mission and the legal/fiduciary accountability for its operations.

As part of this process, the New Board will develop and approve the annual budget, and monitor the ongoing financial results of the Reorganized Debtor. Monthly financial reports ("**MFRs**") will be provided to the Board members. The New Board will also engage an annual audit by an independent certified public accountant or accounting firm. All Board members will receive the audit report prior to the meeting at which it is to be discussed.

Additionally, for so long as the PBGC Note and the GUC Note remain outstanding, copies of all MFRs will also be delivered on a monthly basis to (a) a responsible person designated by the Committee prior to the Effective Date, and (b) the Office of the New York Attorney General (Charities Bureau).

As set forth above, the Reorganized Debtor shall maintain the Debtor's existing mission and historical practice in order to meet the needs of the various constituencies as determined by the New Board.

6.      *Vesting of Assets in the Reorganized Debtor*

On the Effective Date, New Vision will be dissolved and its assets will be distributed to the Reorganized Debtor in accordance with its Certificate of Incorporation, Delaware law and the requirements of the Internal Revenue Code. Except as otherwise provided in the New Vision Plan or in any agreement, instrument or other document relating thereto, on and after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Estate and any property acquired by the Debtor or Reorganized Debtor, including, but not limited to, the assets of New Vision, pursuant hereto shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be provided in the New Vision Plan or the Confirmation Order, on and after the Effective Date, the Reorganized Debtor may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.      *Committee*

As of the Effective Date, the Committee shall dissolve, its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case and the retention and employment of the Professionals retained by the Committee shall terminate as of the Effective Date, provided, however, that the Committee shall continue to exist, and its Professionals shall be retained, after such date solely with respect to the review, objection and prosecution of applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.

F.      *Provisions Governing Distributions*

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the New Vision Plan.

G.      *Disputed Claim Reserve*

1.      *Establishment of Disputed Claim Reserve*

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the New Vision Plan, the Reorganized Debtor shall establish a separate Disputed Claim Reserve for Disputed Claims that may be entitled to a Distribution under the New Vision Plan, which Disputed Claim Reserve shall be administered by the Reorganized Debtor. The Reorganized Debtor shall reserve Distributions, as applicable to each Disputed Claim, sufficient to provide Holders of Disputed Claims the treatment such Holders would be entitled to receive under the New Vision Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court).

2.      *Maintenance of Disputed Claim Reserve*

The Reorganized Debtor shall hold Distributions in the Disputed Claim Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed. The Reorganized

Debtor shall, in its sole discretion, make such Distributions, as provided herein, as such Disputed Claims are resolved by a Final Order, and such Distributions will be distributable in respect of such Disputed Claims as such Distributions would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

H.      *Quarterly Distributions*

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the New Vision Plan on such date. Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtor as applicable, in the Disputed Claim Reserve pursuant to the New Vision Plan and Distributed on the first Quarterly Distribution Date after such Claim is Allowed.

I.      *Delivery of Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Reorganized Debtor at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim Filed by such Holder, or (ii) the last known address of such Holder if no Proof of Claim is filed.

If any Distribution is returned as undeliverable, the Reorganized Debtor may, in its discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Reorganized Debtor deems appropriate. Amounts in respect of any undeliverable Distributions made by the Reorganized Debtor shall be returned to, and held in trust by, the Reorganized Debtor until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and as is set forth in the New Vision Plan.

Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically canceled, discharged and forever barred. Except as otherwise provided herein, all funds or other property that vests or revests in the Reorganized Debtor pursuant to this Article shall be distributed by the Reorganized Debtor in accordance with the provisions of the New Vision Plan.

J.      *Disputed Claims*

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtor, in its discretion, make, file, prosecute, settle, compromise, withdraw or resolve in any manner, objections to Claims.

K.    *Objection Deadline*

All objections to Disputed Claims shall be filed and served upon the Holders of each such Claim on or before the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

Except as otherwise agreed, any and all Proofs of Claim filed after the applicable deadline shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

L.    *Treatment of Executory Contracts and Unexpired Leases*

The Bankruptcy Code permits debtors to "assume" or "reject" executory contracts. The Debtor will exercise those rights under the terms of the New Vision Plan.

1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

The Debtor was a party to a number of collective bargaining agreements ("**CBAs**") with various unions. In connection with certain of the CBAs, the Debtor was required to maintain certain defined benefit pension plans. A number of the collective bargaining agreements have expired. New Vision is in the process of negotiating agreements with Associated Musicians of Greater New York, Local 802 and American Federations of Musicians. With respect to any other CBAs that have not yet expired, New Vision intends to seek in good faith to amend or modify such agreements and cause the Reorganized Debtor to assume the CBAs as so revised.

Executory contracts and unexpired leases that are listed in the Plan Supplement as executory contracts or unexpired leases to be assumed shall be deemed assumed by the Debtor as of the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Executory contracts and unexpired leases that have not expired by their own terms on or prior to the Effective Date, which the Debtor has not assumed or rejected during the pendency of the Chapter 11 Case, which are not listed in the Plan Supplement as executory contracts or unexpired leases to be assumed, and that are not the subject of a motion to assume pending as of the Effective Date, shall be deemed rejected by the Debtor on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any objections to the proposed assumption or rejection of a contract must be filed by no later than the applicable date set forth in the Solicitation Order. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or rejection of any executory contract or unexpired lease will be deemed to have consented to such treatment.

2.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

To the extent an executory contract or lease is rejected by the Debtor, the Debtor's contract counterparty may suffer damages, and may be able to assert a Claim against the estate for such damages.

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII of the New Vision Plan, must be filed and served no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease for which Proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the New Vision Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the New Vision Plan and shall be subject to the provisions of the New Vision Plan.

3.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any provisions or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to the New Vision Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by a waiver of Cure, payable by the Reorganized Debtor and agreed upon between the Plan Sponsor and applicable counterparty. Except with respect to executory contracts or unexpired leases in which the Plan Sponsor and the applicable counterparties have stipulated in writing to payment of Cure, the following procedures shall be established pursuant to the New Vision Plan for determining Cure with respect to the Assumed Contracts:

(a)      the Plan Sponsor will cause the Cure Schedule Notice to be served on the non-debtor parties to the Assumed Contracts by the applicable date set forth in the Solicitation Order. Among other things, the Cure Schedule Notice shall set forth the Proposed Cure Amount;

(b)      the non-debtor parties to the Assumed Contracts shall have until the applicable date set forth in the Solicitation Order to file and serve the Cure Schedule Objection; provided, however, that if the Plan Sponsor amends the Cure Schedule Notice or any related pleading that lists the Assumed Contracts to add a contract or lease or to reduce the Proposed Cure Amounts, except where such reduction was based upon the mutual agreement of the parties, the non-debtor party thereto shall have until the applicable date set forth in the Solicitation Order to object thereto or to propose an alternative Cure;

(c)      if a Cure Schedule Objection is timely filed and the parties are unable to settle such Cure Schedule Objection, the Bankruptcy Court shall determine the amount of any Cure or objection to assumption at a hearing to be held at the time of the Confirmation Hearing or such other hearing date to which the parties may mutually agree.

(d)      In the event that no Cure Schedule Objection is timely filed with respect to an Assumed Contract, the counterparty to such Assumed Contract shall be deemed to have consented to the assumption of the Assumed Contract and the Proposed Cure Amount and

shall be forever enjoined and barred from seeking any additional amount(s) on account of the Cure under section 365 of the Bankruptcy Code or otherwise from the Debtor, its estate, and/or the Reorganized Debtor. In addition, if no timely Cure Schedule Objection is filed with respect to an Assumed Contract, upon the Effective Date of the New Vision Plan, the Reorganized Debtor shall enjoy all of the rights and benefits under the Assumed Contract without the necessity of obtaining any party's written consent to the Reorganized Debtor's assumption of the Assumed Contract, and such counterparty shall be deemed to have waived any right to object, consent, condition or otherwise restrict the Reorganized Debtor's assumption of the Assumed Contract.

Assumption of any executory contract or unexpired lease pursuant to the New Vision Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.

M.    *Discharge, Release, Injunction and Related Provisions*

1.    *Discharge of Claims and Termination of Interests*

The Bankruptcy Code provides a debtor with a "discharge" upon confirmation of a chapter 11 plan. Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the New Vision Plan, the distributions, rights, and treatment that are provided in the New Vision Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, and rights against the Debtor, Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the New Vision Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts, in each case whether or not: (i) a Proof of Claim based upon such Claim, debt or right, is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has accepted the New Vision Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in the New Vision Plan.

2.    *Releases*

In addition to the discharge granted to the Debtor, the New Vision Plan contemplates releases being granted in favor of certain non-debtor third parties.

Specifically, and notwithstanding anything contained in the New Vision Plan to the contrary, on the Effective Date and effective as of the Effective Date, the Debtor on behalf of itself and the Estate, for the good and valuable consideration provided by each of the Releasees,

hereby provides a full release to the Releasees from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor or the Reorganized Debtor would have been legally entitled to assert or that any Holder of a Claim against the Debtor or other Entity would have been legally entitled to assert for or on behalf of the Debtor, the Reorganized Debtor or the Estate and further including those in any way related to the Chapter 11 Case or the New Vision Plan; *provided, however,* that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence or willful misconduct.

In addition, and notwithstanding anything contained in the New Vision Plan to the contrary, on the Effective Date, the Plan Sponsor and each other Holder of a Claim against the Debtor who votes in favor of the New Vision Plan pursuant to section 1126(f) of the Bankruptcy Code, in consideration of the obligations provided under the Plan and for other good and valuable consideration provided by the Debtor and the Plan Sponsor, hereby provides a full release to the Releasees (and each such person or party so released shall be deemed released by each such Holder) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Releasees, the Chapter 11 Case or the New Vision Plan; *provided, however,* that the foregoing provisions shall have no effect on the liability of the Releasees or any of their Representatives that results from any act or omission that is determined in a Final Order to be solely due to such person's or party's own gross negligence or willful misconduct.

3.    *Exculpation*

Separate and apart from the releases noted above, the New Vision Plan contemplates that certain non-debtor third parties will be exculpated from liability for any claims asserted against them arising out of the Chapter 11 Case.

Specifically, the New Vision Plan provides that Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the New Vision Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the New Vision Plan or any other act taken after the Petition Date or omitted to be taken in connection with or in contemplation of the transactions occurring in the Chapter 11 Case; *provided, however,* that the foregoing provisions shall have no effect on the liability of any Exculpated

27

Party that results from any act or omission that is determined in a Final Order to be solely due to such Exculpated Party's own gross negligence or willful misconduct.

### 4.    Preservation of Rights of Action

Except as otherwise provided in the New Vision Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest upon the Effective Date in the Reorganized Debtor; and the Reorganized Debtor shall have all rights to pursue such Causes of Action.

### 5.    Release and Injunction

**Except as otherwise expressly provided for in the New Vision Plan or in obligations issued pursuant to the New Vision Plan from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Reorganized Debtor, the Releasees, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released, exculpated, or to be exculpated, pursuant to the New Vision Plan or the Confirmation Order.**

**Except as otherwise expressly provided for in the New Vision Plan or in obligations issued pursuant to the New Vision Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, or their successors and assigns and their assets and properties, any other Claims based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.**

**Except as otherwise expressly provided for in the New Vision Plan or in obligations issued pursuant to the Plan, the rights afforded in the New Vision Plan and the treatment of all Claims in the Plan shall be in exchange for and in complete satisfaction of Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or the Reorganized Debtor or any of their assets or properties. On the Effective Date, all such Claims against the Debtor shall be satisfied and released in full.**

**Except as otherwise expressly provided for in the New Vision Plan or in obligations issued pursuant to the New Vision Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim against in the Debtor that is satisfied and released hereby, from:**

      i.      commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor their successors and assigns and their assets and properties;

      ii.      enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, the Reorganized Debtor their successors and assigns and their assets and properties;

iii.　　　creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Reorganized Debtor or the property or Estate of the Debtor or the Reorganized Debtor;

iv.　　　asserting any right of setoff or subrogation of any kind against any obligation due from the Debtor or against the property or Estate of the Debtor or the Reorganized Debtor, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed Proof of Claim; or

v.　　　commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim against the Debtor or Cause of Action that is released or settled hereunder.

### 6.　Releases of Liens

Except as otherwise provided in the New Vision Plan or in any contract, instrument, release or other agreement or document created pursuant to the New Vision Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Reorganized Debtor.

### N.　Retention of Jurisdiction

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Reorganized Debtor and the New Vision Plan as is legally permissible and as set forth in Article X of the Plan.

## VI.

## VOTING PROCEDURES

On [    ], 2015, the Bankruptcy Court entered the Solicitation Order approving the solicitation of acceptances and rejections of the New Vision Plan notwithstanding the lack of approval of the Joint Disclosure Statement. In connection therewith, the Bankruptcy Court has scheduled a combined hearing to consider approval of the Joint Disclosure Statement, and pursuant to Section 1128(a) of the Bankruptcy Code, confirmation of the Competing Plans. Holders of Claims are encouraged to review the Solicitation Order, the relevant provisions of the Bankruptcy Code, and to consult their own advisors. The overall voting procedures are more fully described in the Joint Disclosure Statement.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE PLAN SPONSOR OR THE DEBTOR AS SET FORTH BELOW IN ARTICLE VI.

Of the classes of Claims at issue in the New Vision Plan, Classes 1, 2 and 6 are "Unimpaired" under the New Vision Plan, meaning that the New Vision Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims are conclusively presumed to accept the New Vision Plan. Accordingly, Holders of Claims in Classes 1, 2 and 6 are not entitled to vote on the New Vision Plan, and the vote of such Holders of Claims shall not be solicited.

Classes 3, 4, 5 and 6 are "Impaired" under the New Vision Plan and are either entitled to vote on, or conclusively presumed to reject, the New Vision Plan. Only Holders of Claims in Class 3, 4, 5 and 6 are entitled to vote to either accept or reject the New Vision Plan. There are no Holders of membership interests in the Debtor as the Debtor is a not-for-profit corporation.

Instructions for completing the ballot included in the Solicitation Package are set forth in Article VI of the Joint Disclosure Statement.

There are no Holders of interests in the Debtor.

## VII.

## MISCELLANEOUS PLAN PROVISIONS

Any pleading, notice or other document required by the New Vision Plan to be served on or delivered to the Plan Sponsor shall be sent by first class U.S. mail, postage prepaid as follows:

To the Plan Sponsor:

**KING & SPALDING**
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facisimile: (212) 556-2222
Arthur J. Steinberg, Esq.
Jennifer A. Asher, Esq.
asteinberg@kslaw.com
jasher@kslaw.com

*New Vision for NYC Opera, Inc.*

# VIII.

## PLAN SUPPLEMENT

The Plan Supplement will be filed with the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline. The Plan Supplement shall include forms of the documents relating to the New Vision Plan. The Plan Sponsor reserves the right to modify and supplement the Plan Supplement through and including the Confirmation Date.

# IX.

## CONCLUSION AND RECOMMENDATION

The Plan Sponsor believes the New Vision Plan is in the best interests of all Holders of Claims. The Plan Sponsor urges all Holders of Claims entitled to vote to accept the New Vision Plan and to evidence such acceptance by returning their Ballots, as applicable, so they will be received by the Voting Deadline.

Dated: October 19, 2015

**KING & SPALDING**
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facisimile: (212) 556-2222
Arthur J. Steinberg, Esq.
Jennifer A. Asher, Esq.
asteinberg@kslaw.com
jasher@kslaw.com

*New Vision for NYC Opera, Inc., Plan Sponsor*

## EXHIBIT 1

**The New Vision Plan**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : |
| | : |
| New York City Opera, Inc., | : Case No. 13-13240 (SHL) |
| | : |
| Debtor. | : Chapter 11 |
| | : |
| | : |

## CHAPTER 11 PLAN OF REORGANIZATION OF
## NEW VISION FOR NYC OPERA, INC.

Dated: October 19, 2015

**KING & SPALDING**
1185 Avenue of the Americas
New York, New York 10036
Telephone:     (212) 556-2100
Facsimile:      (212) 556-2222
Arthur J. Steinberg
Jennifer A. Asher

*Counsel to New Vision for NYC Opera, Inc.,*
*Plan Sponsor*

## TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS ...............................................................................1

    A.    Defined Terms.............................................................................1

    B.    Exhibits ......................................................................................6

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS ....................6

    A.    Administrative Claims ................................................................6

    B.    Priority Tax Claims ....................................................................6

    C.    Payment of Statutory Fees .........................................................7

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND
    MEMBERSHIP INTERESTS .......................................................7

    A.    Summary ....................................................................................7

    B.    Classification and Treatment of Claims .....................................7

        1.    Class 1—Other Priority Claims – Severance/ Wage Claims .......7

        2.    Class 2—Secured Claims ...........................................................8

        3.    Class 3—PBGC Claims .............................................................8

        4.    Class 4—General Unsecured Claims ..........................................8

        5.    Class 5 – Unsecured Convenience Claims ..................................9

        6.    Class 6 –  Deposit Claims ..........................................................9

    C.    Acceptance or Rejection of the Plan..........................................9

        1.    Acceptance by an impaired Class ..............................................9

        2.    Presumed Acceptance of the Plan..............................................9

        3.    Voting Class .............................................................................10

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.......................10

    A.    Funding for the Plan.................................................................10

i

B.    Corporate Existence ...................................................................................10

C.    New Board Representation ..........................................................................10

D.    Restructuring Transactions .........................................................................10

E.    Corporate Action.........................................................................................11

F.    Effectuating Documents; Further Transactions ..........................................11

G.    Exemption from Certain Transfer Taxes and Recording Fees.....................11

H.    Management/Corporate Governance ...........................................................12

I.    Committee ...................................................................................................12

J.    Vesting of Assets in the Reorganized Debtor .............................................12

ARTICLE V. PROVISIONS GOVERNING DISTRIBUTIONS ....................................13

A.    Initial Distribution Date .............................................................................13

B.    Disputed Claim Reserve .............................................................................13

      1.    Establishment of Disputed Claim Reserve ..................................13

      2.    Maintenance of Disputed Claim Reserve....................................13

C.    Quarterly Distributions ..............................................................................13

D.    Delivery of Distributions ...........................................................................13

      1.    General Provisions; Undeliverable Distributions .......................13

E.    Manner of Cash Payments Under the Plan .................................................14

F.    Limitations on Funding of Disputed Claim Reserve ...................................14

G.    Compliance with Tax Requirements...........................................................14

H.    Setoff and Recoupment...............................................................................14

ARTICLE VI. DISPUTED CLAIMS ...........................................................................15

A.    No Distribution Pending Allowance ...........................................................15

B.    Resolution of Disputed Claims ..................................................................15

C.    Objection Deadline .....................................................................................15

D.     Disallowance of Claims ................................................................. 15

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ........................................................................................ 15

A.     Assumption and Rejection of Executory Contracts and Unexpired Leases .......... 15

B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ............ 16

C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ......... 16

D.     Reservation of Rights ..................................................................... 17

ARTICLE VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND
OCCURRENCE OF THE EFFECTIVE DATE ..................................... 18

A.     Conditions to Confirmation: ............................................................. 18

B.     Conditions Precedent to the Effective Date ......................................... 18

C.     Waiver of Conditions Precedent ...................................................... 18

ARTICLE IX. DISCHARGE, RELEASE, INJUNCTIVE AND RELATED
PROVISIONS ............................................................................... 18

A.     Discharge of Claims ...................................................................... 18

B.     Releases ..................................................................................... 19

C.     Exculpation ................................................................................. 20

D.     Preservation of Rights of Action ...................................................... 20

        1.     Vesting of Causes of Action ................................................. 20

        2.     Preservation of All Causes of Action Not Expressly Settled or
Released ........................................................................... 20

E.     Release and Injunction ................................................................... 21

F.     Releases of Liens ......................................................................... 22

ARTICLE X. RETENTION OF JURISDICTION ................................................ 22

ARTICLE XI. MISCELLANEOUS PROVISIONS ............................................... 24

A.     Modification of Plan ...................................................................... 24

B.     Revocation of Plan ....................................................................... 24

C.    Successors and Assigns ............................................................................24

D.    Governing Law ..........................................................................................24

E.    Reservation of Rights ................................................................................24

F.    Section 1146 Exemption ............................................................................25

G.    Section 1125(e) Good Faith Compliance ..................................................25

H.    Further Assurances ....................................................................................25

I.    Service of Documents ................................................................................25

J.    Filing of Additional Documents ...............................................................26

iv

Pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, New Vision for NYC Opera, Inc., hereby proposes the following plan of reorganization for New York City Opera, Inc., debtor and debtor-in-possession.

# ARTICLE I.

# DEFINED TERMS

A.    *Defined Terms*

Unless context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Administrative Claims*" means Claims that have been timely filed for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930.

2.    "*Administrative Claims Bar Date*" means sixty (60) days after the Effective Date.

3.    "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in its schedules of liabilities as other than disputed, contingent or unliquidated, and no Proof of Claim has been timely filed, unless the Debtor or other parties-in-interest have filed an objection to such Claim by the Claims Objection Bar Date; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of the amount and nature of a Claim executed prior to the Effective Date and approved by the Bankruptcy Court; or (ii) in any stipulation with the Reorganized Debtor of the amount and nature of a Claim executed on or after the Effective Date; (d) a Claim that is Allowed pursuant to the terms hereof; or (e) a Claim as to which a Proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Bar Date.

4.    "*Assumed Contract*" means any executory contract or unexpired lease assumed by the Reorganized Debtor in accordance with Article VII of the Plan.

5.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor, the Reorganized Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

6.    "*Bankruptcy Code*" means title 11 of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 et seq. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code, together with all amendments and modifications thereto that may be applicable to the Chapter 11 Case.

1

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Case and as amended from time to time.

9.      "*Business Plan*" means the Reorganized Debtor's business plan as described in Article III of the Summary of Chapter 11 Plan of Reorganization of New Vision. for New York City Opera, Inc.

10.      "*Cash*" means legal tender of the United States of America.

11.      "*Cause(s) of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including, without limitation, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of the Debtor, the Reorganized Debtor and/or the Estate that are or may be pending on the Effective Date against any Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

12.      "*Chapter 11 Case*" means the bankruptcy case commenced when the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date, which is being administered under case number 13-13240 in the Bankruptcy Court.

13.      "*Claim*" means a "claim" (as that term is defined in section 101(5) of the Bankruptcy Code) against the Debtor.

14.      "*Claims Objection Bar Date*" means the bar date for objecting to Claims against the Debtor, which shall be six (6) months after the Effective Date; provided, however, that the Reorganized Debtor may seek extensions of this date from the Bankruptcy Court for cause shown.

15.      "*Class*" means a category of Holders of Claims as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

16.      "*Committee*" means the Official Committee of Unsecured Creditors for the Chapter 11 Case appointed pursuant to section 1102 of the Bankruptcy Code, on October 23, 2013.

17.      "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

2

18. "*Confirmation Hearing*" means the   hearing before the Bankruptcy Court to determine whether the   Plan will be confirmed pursuant to sections 1129(a) and 1129(b) of the Bankruptcy Code.

19. "*Confirmation Order*" means the order of the Bankruptcy Court in form and substance acceptable to the Plan Sponsor confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

20. "*Cure*" means the payment of Cash by the Reorganized Debtor, or the distribution of other property (as the Plan Sponsor or the Reorganized Debtor and the counterparty to the executory contract or unexpired lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default under an executory contract or unexpired lease of the Debtor and (b) permit the Reorganized Debtor to assume such executory contract or unexpired lease under sections 365 and 1123 of the Bankruptcy Code.

21. "*Cure Schedule Notice*" means a schedule of all amounts due under the Assumed Contracts.

22. "*Cure Schedule Objection*" means an objection to the Cure Schedule Notice, including (a) to the Proposed Cure Amount listed by the Plan Sponsor and any alternative Cure amounts that the objecting party may want to propose, and/or (b) to the proposed assumption of the Assumed Contracts under the Plan.

23. "*Debtor*" means New York City Opera, Inc., a New York not-for-profit corporation, prior to the Effective Date.

24. "*Deposit Claims*" means any Allowed Claim that satisfies 11 U.S.C. § 507(a)(7).

25. "*Disputed Claim*" means any Claim, or any portion thereof, that is not yet an Allowed Claim.

26. "*Disputed Claim Reserve*" means the reserve fund created pursuant to Article VI of the Plan.

27. "*Distributions*" means the distributions of Cash to be made by the Reorganized Debtor or a designee in accordance with the Plan.

28. "*Effective Date*" means the date that is the first business day after : (a) the Confirmation Order is a Final Order, provided no stay is in effect; and (b) all conditions specified in Article VIII have been satisfied or waived.

29. "*Endowment*" means the nine individual funds established prior to the Petition Date which funded, in part, the Debtor's operations.

30. "*Entity*" means an "entity" as that term is defined in section 101(15) of the Bankruptcy Code.

DMSLIBRARY01\22371\237001\27366885.v1-10/19/15

31.    "*Estate*" means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

32.    "*Exculpated Parties*" means, collectively, (i) the Committee and the individual members thereof acting in their capacity as Committee members, as well as its attorneys, agents, professionals and representatives, and (ii) the Debtor, and its officers, directors, attorneys, agents, professionals and representative, and (iii) New Vision and its officers, directors, attorneys, agents, professionals and representatives, including Gene Kaufman.

33.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for a writ of certiorari or move for reargument or rehearing has expired and no such appeal, petition, or motion has been timely filed, or as to which any appeal, petition, or motion that has been filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or has otherwise been dismissed.

34.    "*General Unsecured Claims*" means Claims against the Debtor that are not Secured Claims, Administrative Claims, Priority Claims, or Unsecured Convenience Claims.

35.    "*GUC Note*" means the note issued by the Reorganized Debtor in the face amount of $1,500,000 and payable to the holders of Class 4 Allowed Claims for the benefit of non-PBGC creditors and non-Unsecured Convenience Claims, payments under which note shall be conditioned upon the Reorganized Debtor receiving at least $6,412,500 of the Pending Bequests. The form of the GUC Note shall be included in the Plan Supplement.

36.    "*Holder*" means any Entity holding a Claim against the Debtor.

37.    "*Initial Distribution Date*" means the date on which the Reorganized Debtor shall make its initial Distribution, which shall be a date selected by the Reorganized Debtor as soon as reasonably practicable after the Claims Objection Bar Date.

38.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

39.    "*New Board*" means the board of directors of the Reorganized Debtor.

40.    "*New Vision*" means New Vision of NYC Opera, Inc.

41.    "*New Vision Cash*" shall have the meaning set forth in Article IV.

42.    "*PBGC*" means the Pension Benefit Guaranty Corporation.

43.    "*PBGC Claims*" means the Proofs of Claim filed by the PBGC.

44.    "*PBGC Note*" means the promissory note to be issued by Reorganized Debtor in the face amount of $350,000 and payable to the PBGC. The form of the PBGC Note shall be included in the Plan Supplement.

4

45.    "*Pending Bequests*" means charitable bequests made for Debtor's benefit by supporters of the Debtor who passed prior to the Petition Date or during the pendency of the Chapter 11 Case, described more fully in the Joint Disclosure Statement.

46.    "*Petition Date*" means October 3, 2013.

47.    "*Plan*" means this plan under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or herewith, as the case may be, and the Plan Supplement, which is incorporated herein by reference.

48.    "*Plan Sponsor*" means New Vision.

49.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan which shall be filed no later than seven (7) days prior to the Voting Deadline (i.e., ___, 2015).

50.    "*Priority Claims*" means Allowed Claims entitled to priority under section 507(a) of the Bankruptcy Code.

51.    "*Priority Tax Claims*" means Allowed Priority Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code.

52.    "*Pro Rata*" means the ratio of the amount of an individual Claim in any particular Class of Claims to the aggregate amount of all Claims in such Class that have not yet been disallowed.

53.    "*Proof of Claim*" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

54.    "*Proposed Cure Amount*" means the amount proposed by the Reorganized Debtor in the Cure Schedule Notice as necessary to cure any defaults under the Assumed Contracts.

55.    "*Quarterly Distribution Date*" means the first business day after the end of each quarterly calendar period.

56.    "*Releasees*" means, collectively, (i) the Committee and the individual members thereof acting in their capacity as Committee members, as well as its attorneys, agents, professionals and representatives, (ii) New Vision and its officers, directors, attorneys, agents, professionals and representatives, and (iii) the Debtor, and its officers, directors, attorneys, agents, professionals and representatives.

57.    "*Reorganized Debtor*" means the Debtor or any successor thereto, by merger, affiliation, consolidation or otherwise, on or after the Effective Date.

58.    "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs, as may be amended from time to time, filed with the Bankruptcy Court by the Debtor pursuant to section 521 of the Bankruptcy Code.

59.    "*Secured*" means when referring to an Allowed Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

60.    "*Severance/ Wage Claims*" means Allowed Priority Claims entitled to priority under sections 507(a)(4) and 507(a)(5).

61.    "*Solicitation Order*" means the order of the Bankruptcy Court, which among other things, approved the solicitation of acceptances and rejections of the Plan, and scheduled a hearing to consider approval of the confirmation of competing plans.

62.    "*Unsecured Convenience Claims*" means those Allowed General Unsecured Claims of $2,000 or less.

63.    "*Voting Deadline*" means the date established by the Bankruptcy Court for casting ballots concerning confirmation of the Plan.

B.    *Exhibits*

The Plan Supplement may include, among other things: (i) a list of executory contracts to be assumed; (ii) the amended and restated corporate documents; (iii) the identity and background information of the members of the New Board; and (iv) the form of the GUC Note and the PBGC Note.  The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court.  Holders of Claims may also obtain a copy of the Plan Supplement, once filed, by calling or by a written request sent the Plan Sponsor whose information is set forth below in Article XI.I.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Debtor or the Reorganized Debtor, as applicable, shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Administrative Claim becomes Allowed.

B.    *Priority Tax Claims*

In accordance with Bankruptcy Code section 1123(a)(1), Priority Tax Claims have not been classified and are treated as described in this Article II. Unless otherwise agreed by the Holder of an Allowed Priority Tax Claim, the Debtor or the Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax

Claim in Cash, on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Priority Tax Claim becomes Allowed. The Plan Sponsor reserves the right to pay Allowed Priority Tax Claims in accordance with Section 507(a)(9)(c) of the Bankruptcy Code.

C.    *Payment of Statutory Fees*

All fees payable pursuant to Article 1930 of title 28 of the United States Code assessed against the Debtor's estate shall be paid in full by the Reorganized Debtor as they become due and owing.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS
## AND MEMBERSHIP INTERESTS

A.    *Summary*

1.    This Plan constitutes a chapter 11 plan for the Debtor. Except for Administrative Claims and Priority Tax Claims, all Claims against the Debtor are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan Sponsor has not classified Administrative Claims and Priority Tax Claims, as described in Article II.

2.    Because there are no interests in the Debtor, the Plan Sponsor has not classified membership interests in the Debtor.

3.    The table in Article III.A.4 below summarizes the classification of Claims against the Debtor for all purposes under this Plan, including voting, confirmation and Distributions.

4.    Summary of Classification and Treatment of Classified Claims

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims – Severance/ Wages | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | PBGC Claims | Impaired | Yes |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | Unsecured Convenience Claims | Impaired | Yes |
| 6 | Deposit Claims | Unimpaired | No |

B.    *Classification and Treatment of Claims*

1.    <u>*Class 1—Other Priority Claims – Severance/ Wage Claims*</u>

(a)    *Classification*: Class 1 consists of Severance/ Wage Claims

(b)    *Treatment*: Except to the extent that the Holders of Claims in Class 1 agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release

7

and discharge of the Severance/ Wage Claims, the Severance/ Wage Claims shall be paid in full in Cash on or as soon as practicable after the later of: (i) the Effective Date; and (ii) the date such Allowed Severance/Wage Claim becomes Allowed.

(c)    *Impairment and Voting*:  Class 1 is unimpaired by the Plan.  The Holders of Claims in Class 1 are presumed to accept and therefore are not entitled to vote to accept or reject the Plan.

2.    *Class 2—Secured Claims*

(a)    *Classification*: Class 2 consists of Secured Claims.

(b)    *Treatment*: Except to the extent that a holder of an Allowed Secured Claim and the Plan Sponsor agrees to a different treatment, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, (i) each Allowed Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim shall receive Cash in an amount equal to such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) each Holder of an Allowed Secured Claim shall receive the collateral securing its Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

(c)    *Impairment and Voting*: Class 2 is unimpaired by the Plan.  The Holders of Secured Claims are presumed to accept and therefore are not entitled to vote to accept or reject the Plan.

3.    *Class 3—PBGC Claims*

(a)    *Classification:* Class 3 consists of the PBGC Claims.

(b)    *Treatment:* In full satisfaction, discharge, settlement, release, and compromise of and in exchange for the PBGC Claims, the PBGC Claims shall be Allowed in the approximate amount of $3,997,389, and the PBGC shall receive on the Initial Distribution Date, or as soon as practicable thereafter, (i) its Pro Rata Distribution of the balance of the New Vision Cash, to be shared Pro Rata with the Holders of General Unsecured Claims. after all other Cash payments are made on or before the Initial Distribution Date, pursuant to the Plan, and (ii) the PBGC Note.

(c)    *Impairment and Voting:*  Class 3 is impaired by the Plan.  The PBGC is entitled to vote to accept or reject the Plan.

4.    *Class 4—General Unsecured Claims*

(a)    *Classification*: Class 4 consists of all General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, discharge, settlement,

8

release, and compromise of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive on the Initial Distribution Date, or as soon as practicable thereafter, its Pro Rata Share of Distribution of (i) balance of the New Vision Cash, to be shared Pro Rata with the PBGC, after all other Cash payments are made on or before the Initial Distribution Date, pursuant to the Plan, and (ii) proceeds of the GUC Note. The Reorganized Debtor reserves its right to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(c)    *Impairment and Voting*: Class 4 is impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

5.    *Class 5 – Unsecured Convenience Claims*

(a)    *Classification:* Class 5 consists of the Unsecured Convenience Claims.

(b)    *Treatment:* In full satisfaction, discharge, settlement, release, and compromise of and in exchange for the Unsecured Convenience Claims, each Holder of an Allowed Unsecured Convenience Claim shall receive on the Initial Distribution Date, or as soon as practicable thereafter, sixty percent (60%) of each individual Allowed Unsecured Convenience Claim.

(c)    *Impairment and Voting:* Class 5 is impaired by the Plan. The Unsecured Convenience Claimants are entitled to vote to accept or reject the Plan.

6.    *Class 6 – Deposit Claims*

(a)    *Classification:* Class 6 consists of the Deposit Claims.

(b)    *Treatment:* In full satisfaction, discharge, settlement, release, and compromise of and in exchange for the Deposit Claims, the Deposit Claims shall be paid in full in Cash on or as soon as practicable after the later of: (i) the Effective Date; and (ii) the date such Allowed Deposit Claim becomes Allowed.

(c)    *Impairment and Voting:* Class 6 is unimpaired by the Plan. Holders of Deposit Claims are presumed to accept and therefore are not entitled to vote to accept or reject the Plan.

C.    *Acceptance or Rejection of the Plan*

1.    Acceptance by an impaired Class. In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

2.    Presumed Acceptance of the Plan. Classes 1, 2 and 6 are unimpaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

9

      3.     <u>Voting Class</u>.  Classes 3, 4 and 5 are impaired under this Plan and are entitled to vote to accept or reject this Plan.

# ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Funding for the Plan*

The Plan will be funded from Cash on hand of the Reorganized Debtor in the approximate amount of $208,000, the Cash the Reorganized Debtor derives from New Vision in the amount of $1,250,000 ("**New Vision Cash**"), the PBGC Note in the amount of $350,000, the GUC Note in the amount of $1,500,000, the Endowment in the approximate principal amount of $4.8 million, and the Pending Bequests.

B.    *Corporate Existence*

Except as otherwise provided in the Plan or Plan Supplement, the Reorganized Debtor shall continue to exist after the Effective Date as a not-for-profit corporate entity with all the powers of a corporation pursuant to the applicable laws of New York and pursuant to the corporate documents in effect prior to the Effective Date, as same may be amended, modified or revised by the Plan Sponsor to effectuate the transactions contemplated by the Plan.

C.    *New Board Representation*

      1.     On the Effective Date, the New Board shall be deemed appointed.

      2.     Robert Lyall shall be the initial General Director of the Reorganized Debtor.

      3.     Gene Kaufman shall be the Chair of the New Board.

      4.     The member(s) of the New Board shall be disclosed in the Plan Supplement prior to the Confirmation Date in accordance with section 1129(a)(5) of the Bankruptcy Code.

      5.     The New Board shall be responsible for all activities of the Reorganized Debtor and shall oversee the administration and implementation of the Plan.

D.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (2) the filing of appropriate corporate governance documents, including but not limited to, any new, amended or modified documents contained in the Plan Supplement with the appropriate governmental authorities pursuant to applicable law; and (3) all other actions that the Reorganized Debtor determines are necessary or appropriate.

E.      *Corporate Action*

Each of the matters provided for by the Plan (including the Plan Supplement) involving the corporate structure of the Reorganized Debtor or corporate, financing or related actions to be taken by or required of the Debtor or Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified as of the Effective Date in all respects without any requirement of further action by holders of Claims, the directors of the Debtor or any other entity.  The Reorganized Debtor shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.

F.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor, and the officers of the Reorganized Debtor and members of the New Board thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

G.      *Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

DMSLIBRARY01\22371\237001\27366885.v1-10/19/15

H.      *Management/Corporate Governance*

The names and qualifications of persons that will act as  senior management of the Debtor as of the Effective Date shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code.

The New Board will act to carefully protect accumulated assets and the Endowment and, to the extent received, the Pending Bequests, and ensure that current income is managed properly.  The New Board has the principal responsibility for fulfillment of the organization's mission and the legal/fiduciary accountability for its operations.

As part of this process, the New Board will develop and approve the annual budget, and monitor the ongoing financial results of the Reorganized Debtor.  Monthly financial reports ("**MFRs**") will be provided to members of the Board.  The New Board will also engage an annual audit by an independent certified public accountant or accounting firm.  All Board members will receive the audit report prior to the meeting at which it is to be discussed.

Additionally, for so long as the PBGC Note and the GUC Note remain outstanding, copies of all MFRs will also be delivered on a monthly basis to (a) a responsible person designated by the Committee prior to the Effective Date, and (b) the Office of the New York Attorney General (Charities Bureau).

The Reorganized Debtor shall maintain the Debtor's existing mission and historical practice in order to meet the needs of the various constituencies as determined by the New Board.

I.      *Committee*

As of the Effective Date, the Committee shall dissolve, its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case, and the retention and employment of the professionals retained by the Committee shall terminate as of the Effective Date, *provided*, *however*, that the Committee shall exist, and its professionals shall be retained, after such date solely with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.

J.      *Vesting of Assets in the Reorganized Debtor*

On the Effective Date, New Vision will be dissolved and its assets will be distributed to the Reorganized Debtor in accordance with its Certificate of Incorporation, Delaware law and the requirements of the Internal Revenue Code. Except as otherwise provided in this Plan or in any agreement, instrument or other document relating thereto, on and after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Estate (including Avoidance Actions) and any property acquired by the Debtor pursuant hereto shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be provided in this Plan or the Confirmation Order, on and after the Effective Date, the Reorganized Debtor may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

# ARTICLE V.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Initial Distribution Date*

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan.

B.    *Disputed Claim Reserve*

1.    Establishment of Disputed Claim Reserve

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Reorganized Debtor shall establish a separate Disputed Claim Reserve for Disputed Claims, which Disputed Claim Reserve shall be administered by the Reorganized Debtor.   The Reorganized Debtor shall reserve Distributions sufficient to provide Holders of Disputed Claims the treatment such Holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court).

2.    Maintenance of Disputed Claim Reserve

The Reorganized Debtor shall hold Distributions in the Disputed Claim Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed.  The Reorganized Debtor shall, in its sole discretion, make such Distributions (net of any expenses, including any taxes relating thereto), as provided herein, as such Disputed Claims are resolved by a Final Order, and such Distributions will be distributable in respect of such Disputed Claims as such Distributions would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

C.    *Quarterly Distributions*

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan on such date.   Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtor as applicable, in the Disputed Claim Reserve pursuant to Article V.B.2 and Distributed on the first Quarterly Distribution Date after such Claim is Allowed.

D.    *Delivery of Distributions*

1.    General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Reorganized Debtor

Distributions to Holders of Allowed Claims will be made at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of

13

Claim filed by such Holder or (ii) the last known address of such Holder if no Proof of Claim is filed. Neither the Debtor, the Reorganized Debtor or their respective professionals shall incur any liability whatsoever on account of any Distributions under this Plan except for gross negligence, willful misconduct or fraud.

If any Distribution is returned as undeliverable, the Reorganized Debtor may, in its discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Reorganized Debtor deems appropriate. Amounts in respect of any undeliverable Distributions made by the Reorganized Debtor shall be returned to, and held in trust by, the Reorganized Debtor until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and as is set forth in the Plan.

Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically canceled, discharged and forever barred. Except as otherwise provided herein, all funds or other property that vests or revests in the Reorganized Debtor pursuant to this Article shall be distributed by the Reorganized Debtor in accordance with the provisions of the Plan.

E.     *Manner of Cash Payments Under the Plan*

Cash payments made pursuant to the Plan shall be in United States dollars.

F.     *Limitations on Funding of Disputed Claim Reserve*

Except as expressly set forth herein, neither the Debtor nor the Reorganized Debtor shall have any duty to fund the Disputed Claim Reserve.

G.     *Compliance with Tax Requirements*

In connection with making Distributions under the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Reorganized Debtor may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Reorganized Debtor to the appropriate authority. If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.D.

H.     *Setoff and Recoupment*

The Reorganized Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or

14

defenses of any nature whatsoever that the Debtor, the Estate or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor of any Claim or right of setoff or recoupment that any of them may have against the Holder of any Claim.

## ARTICLE VI.

## DISPUTED CLAIMS

A.     *No Distribution Pending Allowance*

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties and subject to the establishment of the Disputed Claim Reserve, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as provided in Article V.

B.     *Resolution of Disputed Claims*

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtor shall, in its discretion, make, file, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims.

C.     *Objection Deadline*

All objections to Disputed Claims shall be filed and served upon the Holders of each such Claim on or before the Claims Objection Bar Date, unless otherwise ordered by Bankruptcy Court after notice and a hearing.

D.     *Disallowance of Claims*

Except as otherwise agreed, any and all Proofs of Claim filed after the applicable deadline shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.     The Debtor was a party to a number of collective bargaining agreements ("**CBAs**") with various unions.  In connection with certain of the CBAs, the Debtor was required to maintain certain defined benefit pension plans.   A number of the collective bargaining agreements have expired.  New Vision intends to reach an agreement with Associated Musicians of Greater New York, Local 802, American Federations of Musicians, and American Guild of Musical Artists, and has commenced negotiations with these unions with respect to new agreements, or amendments or modifications to existing agreements.  With respect to any other

15

CBAs that have not yet expired, New Vision intends to seek in good faith to amend or modify such agreements and cause the Reorganized Debtor to assume the CBAs as so revised.

2.        Executory contracts and unexpired leases that are listed in the Plan Supplement as executory contracts or unexpired leases to be assumed shall be deemed assumed by the Debtor as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

3.        Executory contracts and unexpired leases that have not expired by their own terms on or prior to the Effective Date, which the Debtor has not assumed or rejected during the pendency of the Chapter 11 Case, which are not listed in the Plan Supplement as executory contracts or unexpired leases to be assumed, and that are not the subject of a motion to assume pending as of the Effective Date, shall be deemed rejected by the Debtor on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions or rejections, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

4.        Any objections to the proposed assumption or rejection of a contract must be filed by the applicable date established in the Solicitation Order.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or rejection of any executory contract or unexpired lease will be deemed to have consented to such treatment.

B.        *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed and served no later than thirty (30) days after the Effective Date.   Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A for which Proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III.

C.        *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any provisions or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by a waiver of Cure, payable by the Reorganized Debtor and agreed upon between the Reorganized Debtor and the applicable counterparty.  Except with respect to executory contracts or unexpired leases in which the Reorganized Debtor and the applicable counterparties have stipulated in writing to payment of Cure, the following procedures shall be established for determining Cure with respect to the Assumed Contracts:

16

1.      the Debtor will cause the Cure Schedule Notice to be served on the non-debtor parties to the Assumed Contracts by the applicable date set forth in the Solicitation Order. Among other things, the Cure Schedule Notice shall set forth the Proposed Cure Amount;

2.      the non-debtor parties to the Assumed Contracts shall have until the applicable date set forth in the Solicitation Order to file and serve the Cure Schedule Objection; provided, however, that if the Plan Sponsor amends the Cure Schedule Notice or any related pleading that lists the Assumed Contracts to add a contract or lease or to reduce the Proposed Cure Amounts, except where such reduction was based upon the mutual agreement of the parties, the non-debtor party thereto shall have until the applicable date set forth in the Solicitation Order to object thereto or to propose an alternative Cure;

3.      if a Cure Schedule Objection is timely filed and the parties are unable to settle such Cure Schedule Objection, the Bankruptcy Court shall determine the amount of any Cure or objection to assumption at a hearing to be held at the time of the Confirmation Hearing or such other hearing date to which the parties may mutually agree.

4.      In the event that no Cure Schedule Objection is timely filed with respect to an Assumed Contract, the counterparty to such Assumed Contract shall be deemed to have consented to the assumption of the Assumed Contract and the Proposed Cure Amount and shall be forever enjoined and barred from seeking any additional amount(s) on account of the Cure under section 365 of the Bankruptcy Code or otherwise from the Debtor, its estate, and/or the Reorganized Debtor. In addition, if no timely Cure Schedule Objection is filed with respect to an Assumed Contract, upon the Effective Date of the Plan, the Reorganized Debtor shall enjoy all of the rights and benefits under the Assumed Contract without the necessity of obtaining any party's written consent to the Reorganized Debtor's assumption of the Assumed Contract, and such counterparty shall be deemed to have waived any right to object, consent, condition or otherwise restrict the Reorganized Debtor's assumption of the Assumed Contract.

Assumption of any executory contract or unexpired lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.

D.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

17

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO CONFIRMATION AND OCCURRENCE OF THE EFFECTIVE DATE

A.    *Conditions to Confirmation:*

The following are conditions precedent to confirmation that must be satisfied or waived in accordance with Article VIII.C:

1.    The Bankruptcy Court shall have approved the Disclosure Statement.

2.    All objections to confirmation of the Plan have either been withdrawn, resolved or overruled.

3.    The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed.

B.    *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article VIII.C:

1.    Entry of the Confirmation Order, which shall become a Final Order, containing findings of fact and conclusions of law satisfactory to the Plan Sponsor.

C.    *Waiver of Conditions Precedent*

The Plan Sponsor may waive the occurrence of or modify any condition precedent in this Article VIII. Any such waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. The failure of the Plan Sponsor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE IX.

## DISCHARGE, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

A.    *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtor, Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that

18

arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such Claim, debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring,  except as otherwise expressly provided herein.

B.    *Releases*

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, the Debtor on behalf of itself and the Estate, for the good and valuable consideration provided by each of the Releasees, hereby provides a full release to the Releasees (and each such Releasee so released shall be deemed released by the Debtor) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor or Reorganized Debtor would have been legally entitled to assert or that any Holder of a Claim against the Debtor or other Entity would have been legally entitled to assert for or on behalf of the Debtor, the Reorganized Debtor or the Estate and further including those in any way related to the Chapter 11 Case or the Plan; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence  or willful  misconduct.

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, the Plan Sponsor and each other Holder of a Claim against the Debtor who votes in favor of the Plan, in consideration of the obligations provided under the Plan and for other good and valuable consideration provided by the Debtor and the Plan Sponsor, hereby provides a full release to the Releasees (and each such person or party so released shall be deemed released by each such Holder) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Releasees, the Chapter 11 Case or the Plan, *provided, however*, that the foregoing provisions shall have no effect on the liability of the Releasees or any of their Representatives that results from any act or omission that is determined in a Final Order to be solely due to such person's or party's own gross negligence or willful misconduct.

DMSLIBRARY01\22371\237001\27366885.v1-10/19/15

C.      *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken after the Petition Date or omitted to be taken in connection with or in contemplation of the transactions occurring in the Chapter 11 Case; *provided, however,* that the foregoing provisions shall have no effect on the liability of any Exculpated Party that results from any act or omission that is determined in a Final Order to be solely due to such Exculpated Party's own gross negligence or willful misconduct.

D.      *Preservation of Rights of Action*

1.      Vesting of Causes of Action

(a)      Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest upon the Effective Date in the Reorganized Debtor.

(b)      Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtor shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action, in accordance with the terms of the Plan and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case.  Without limiting the generality of the foregoing, upon the Effective Date, the Reorganized Debtor shall be deemed substituted for the Debtor in any pending adversary proceedings to which the Debtor is a party.

2.      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Reorganized Debtor expressly reserves such Cause of Action for later adjudication by the Reorganized Debtor (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtor or Reorganized Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor or Reorganized Debtor at this time or facts or circumstances which may change or be different from those the Debtor or Reorganized Debtor now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan

20

(including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B and C) or any other Final Order (including the Confirmation Order). In addition, the Reorganized Debtor expressly reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

E.     *Release and Injunction*

1.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Reorganized Debtor, the Releasees, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released, exculpated, or to be exculpated, pursuant to the Plan or the Confirmation Order.

2.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, or their successors and assigns and their assets and properties, any other Claims based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

3.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, the rights afforded in the Plan and the treatment of all Claims in the Plan shall be in exchange for and in complete satisfaction of Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or Reorganized Debtor or any of their assets or properties. On the Effective Date, all such Claims against the Debtor shall be satisfied and released in full.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PARTIES AND ENTITIES ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, ON ACCOUNT OF ANY CLAIM AGAINST THE DEBTOR THAT IS SATISFIED AND RELEASED HEREBY, FROM:

(a)      COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR THEIR SUCCESSORS AND ASSIGNS AND THEIR ASSETS AND PROPERTIES;

(b)      ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, THE REORGANIZED DEBTOR THEIR SUCCESSORS AND ASSIGNS AND THEIR ASSETS AND PROPERTIES;

21

(c)    CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR THE PROPERTY OR ESTATE OF THE DEBTOR OR REORGANIZED DEBTOR;

(d)    ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR AGAINST THE PROPERTY OR ESTATE OF THE DEBTOR OR REORGANIZED DEBTOR, EXCEPT TO THE EXTENT A RIGHT TO SETOFF OR SUBROGATION IS ASSERTED WITH RESPECT TO A TIMELY FILED PROOF OF CLAIM; OR

(e)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND IN RESPECT OF ANY CLAIM AGAINST THE DEBTOR OR CAUSE OF ACTION THAT IS RELEASED OR SETTLED HEREUNDER.

F.    *Releases of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Reorganized Debtor.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Reorganized Debtor and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which the Debtor or Reorganized Debtor, as applicable, is party or with respect to which the Debtor or Reorganized Debtor, as applicable, may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XI.A adding executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

22

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, provided, however, that the Reorganized Debtor shall reserve the right to commence actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Joint Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article IX;

10.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.      enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.      resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

13.      enter an order and/or the decree contemplated in section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 concluding the Chapter 11 Case.

DMSLIBRARY01\22371\237001\27366885.v1-10/19/15

## ARTICLE XI.

### MISCELLANEOUS PROVISIONS

A.    *Modification of Plan*

Subject to the limitations contained in the Plan: (1) the Plan Sponsor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Plan Sponsor, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

B.    *Revocation of Plan*

The Plan Sponsor reserves the right to withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Plan Sponsor withdraws the Plan, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission of any sort by the Debtor or any other Entity.

C.    *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

D.    *Governing Law*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

E.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the occurrence of the Effective Date. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Plan Sponsor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (i) the Debtor with respect to the Holders of Claims or other parties-in-interest; or (ii) any Holder of a Claim or other party-in-interest prior to the Effective Date.

24

F.    *Section 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

G.    *Section 1125(e) Good Faith Compliance*

The Plan Sponsor, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

H.    *Further Assurances*

The Debtor, the Reorganized Debtor, all Holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

I.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by first class U.S. mail, postage prepaid as follows:

To the Plan Sponsor:

**KING & SPALDING**
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur J. Steinberg, Esq.
Jennifer A. Asher, Esq.
asteinberg@kslaw.com
jasher@kslaw.com

*New Vision for NYC Opera, Inc.*

25

J.      *Filing of Additional Documents*

On or before the Effective Date, the Plan Sponsor or Reorganized Debtor, as applicable, may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.


Dated: October 19, 2015

**KING & SPALDING**
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facisimile: (212) 556-2222
Arthur J. Steinberg, Esq.
Jennifer A. Asher, Esq.
asteinberg@kslaw.com
jasher@kslaw.com

*New Vision for NYC Opera, Inc., Plan Sponsor*

26

# Exhibit 2

Reorganized Debtor's Projections

13-13240-shl   Doc 303-1   Filed 10/19/15   Entered 10/19/15 17:03:42   Exhibit B -
Chapter 11 Plan of Reorganization or a New Vision for NY Opera   Inc. f   Pg 70 of 73

10/19/2015



## Unrestricted Earned Revenue

Variables: # of Seats | Price Per Regular Opera Tickets | Price Showcase and In Concert | % of Capacity Sold

**2016-2017 Season columns (as of 10/19/15):** Carmen | Pagliacci/Carmina | Street Car | Marriage of Figaro | Showcase Concert | In Concert Production | Gala Fundraising Concert | 16-17 TOTALS

| production / Venue - City Center | # Seats | Reg $ | Show $ | % Cap | Carmen | Pagliacci/Carmina | Street Car | Marriage of Figaro | Showcase Concert | In Concert Production | Gala Fundraising Concert | 16-17 TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Orchestra AA-CC | 71 | $250 | $200 | 75% | $13,313 | $13,313 | $13,313 | $13,313 | $10,650 | $10,650 | $13,313 | $87,863 |
| Orchestra | 608 | $150 | $125 | 75% | $68,400 | $68,400 | $68,400 | $68,400 | $57,000 | $57,000 | $68,400 | $456,000 |
| Grand Tier | 209 | $175 | $100 | 75% | $27,431 | $27,431 | $27,431 | $27,431 | $15,675 | $15,675 | $27,431 | $168,506 |
| Mezzanine | 617 | $100 | $50 | 75% | $46,275 | $46,275 | $46,275 | $46,275 | $23,138 | $23,138 | $46,275 | $277,650 |
| Balcony | 752 | $50 | $25 | 75% | $28,200 | $28,200 | $28,200 | $28,200 | $14,100 | $14,100 | $28,200 | $169,200 |
| Total Per Performance | 2257 | | | 1693 | $183,619 | $183,619 | $183,619 | $183,619 | $120,563 | $120,563 | $183,619 | $1,159,219 |
| Number of Performances | | | | | 4 | 4 | 4 | 4 | 2 | 4 | 1 | 23 |
| Income Per Production | | | | | $734,475 | $734,475 | $734,475 | $734,475 | $241,125 | $482,250 | $183,619 | $3,844,894 |

**2017-2018 Season:** Magic Flute/Berlin | Silent Night | Macbeth | Tosca | Showcase Concerts | In Concert Productions | Gala Fundraising Concert | 17-18 TOTALS — **2018-2019 Season:** Aida | Madama Butterfly | Mila | Faust | Showcase Concerts | In Concert Production | Gala Fundraising Concert | 18-19 TOTALS — plus 19-20 TOTALS / 20-21 TOTALS

| production | Magic Flute/Berlin | Silent Night | Macbeth | Tosca | Showcase | In Concert | Gala | 17-18 TOTALS | Aida | Madama Butterfly | Mila | Faust | Showcase | In Concert | Gala | 18-19 TOTALS | 19-20 TOTALS | 20-21 TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Orchestra AA-CC | $13,313 | $13,313 | $13,313 | $13,313 | $10,650 | $10,650 | $13,313 | $87,863 | $13,313 | $13,313 | $13,313 | $13,313 | $10,650 | $10,650 | $13,313 | $87,863 | $95,770 | $103,678 |
| Orchestra | $68,400 | $68,400 | $68,400 | $68,400 | $57,000 | $57,000 | $68,400 | $456,000 | $68,400 | $68,400 | $68,400 | $68,400 | $57,000 | $57,000 | $68,400 | $456,000 | $497,040 | $538,080 |
| Grand Tier | $27,431 | $27,431 | $27,431 | $27,431 | $15,675 | $15,675 | $27,431 | $168,506 | $27,431 | $27,431 | $27,431 | $27,431 | $15,675 | $15,675 | $27,431 | $168,506 | $183,672 | $198,837 |
| Mezzanine | $46,275 | $46,275 | $46,275 | $46,275 | $23,138 | $23,138 | $46,275 | $277,650 | $46,275 | $46,275 | $46,275 | $46,275 | $23,138 | $23,138 | $46,275 | $277,650 | $302,639 | $327,627 |
| Balcony | $28,200 | $28,200 | $28,200 | $28,200 | $14,100 | $14,100 | $28,200 | $169,200 | $28,200 | $28,200 | $28,200 | $28,200 | $14,100 | $14,100 | $28,200 | $169,200 | $184,428 | $199,656 |
| Total Per Performance | $183,619 | $183,619 | $183,619 | $183,619 | $120,563 | $120,563 | $183,619 | $1,159,219 | $183,619 | $183,619 | $183,619 | $183,619 | $120,563 | $120,563 | $183,619 | $1,159,219 | $1,263,548 | $1,367,878 |
| Number of Performances | 4 | 4 | 4 | 4 | 2 | 4 | 1 | 23 | 4 | 4 | 4 | 4 | 2 | 4 | 1 | 23 | | |
| Income Per Production | $734,475 | $734,475 | $734,475 | $734,475 | $241,125 | $482,250 | $183,619 | $3,844,894 | $734,475 | $734,475 | $734,475 | $734,475 | $241,125 | $482,250 | $183,619 | $3,844,894 | $4,190,934 | $4,945,302 |

## Unrestricted Contribution Revenue

| | 16-17 TOTALS | 17-18 TOTALS | 18-19 TOTALS | 19-20 TOTALS | 20-21 TOTALS |
|---|---|---|---|---|---|
| Individual | $700,000 | $800,000 | $880,000 | $1,056,000 | $1,267,200 |
| Board | $500,000 | $575,000 | $650,000 | $780,000 | $936,000 |
| Corporate | $150,000 | $250,000 | $250,000 | $420,000 | $504,000 |
| Foundation | $350,000 | $375,000 | $500,000 | $600,000 | $720,000 |
| Endowment Support | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 |
| Bequest Funds | $650,559 | $333,078 | $138,135 | $0 | |
| Other Private Support | $300,000 | $400,000 | $500,000 | $600,000 | $720,000 |
| | $2,850,559 | $2,933,078 | $3,218,135 | $3,656,000 | $4,347,200 |
| **Total Operating Revenue** | $6,695,453 | $6,777,972 | $7,063,029 | $7,846,934.19 | $9,292,502.34 |

## Expenses

**2016-2017 Season**

| | Carmen | Pagliacci/Carmina | Street Car | Marriage of Figaro | Showcase Concert | In Concert Production | Gala Concert | 16-17 TOTALS |
|---|---|---|---|---|---|---|---|---|
| Artist Fees** (4 shows - Productions, 2 Shows - Concerts) | $93,200 | $80,000 | $91,400 | $95,200 | | $120,000 | $50,000 | $529,800 |
| PerDiem | $16,500 | $16,500 | $9,900 | $16,500 | | $5,000 | $5,000 | $69,400 |
| **Total Artists** | $109,700 | $80,000 | $91,400 | $95,200 | $95,200 | $95,200 | $95,200 | $661,900 |
| Artist Housing # days | $16,500 | $16,500 | $9,900 | $16,500 | | $5,000 | | $64,400 |
| Airline Transportation (# x 500) | $2,500 | $1,500 | $2,500 | $3,000 | | | $2,000 | $11,000 |
| Local Transportation (# Artists x Amount) | $1,000 | $1,000 | $1,000 | $1,000 | | | | $4,000 |
| **Total Artist Housing & Travel** | $20,000 | $19,000 | $13,400 | $20,000 | | $7,000 | | $79,400 |
| Choreographer | $2,000 | $10,000 | | $0 | | | | $12,000 |
| Dancers | $4,800 | $50,000 | | $0 | | | | $54,800 |
| **Total Ballet** | $6,800 | $60,000 | | $0 | | | | $66,800 |
| Number of Person Orchestra | 55 | 55 | 55 | 55 | 55 | 65 | 55 | 415 |
| Orchestra Pay | $94,433 | $94,433 | $94,433 | $94,433 | $85,149 | $136,757 | $85,149 | $684,786 |
| Orchestra Pension | $9,443 | $9,443 | $9,443 | $9,443 | $8,515 | $13,676 | $8,515 | $68,479 |
| Orchestra Health Care | $13,736 | $13,736 | $13,736 | $13,736 | $9,119 | $19,110 | $11,473 | $97,000 |
| Cartage | $3,096 | $3,096 | $3,096 | $3,096 | $2,752 | $4,128 | $2,752 | $22,016 |
| Orchestra | $120,708 | $120,708 | $120,708 | $120,708 | $107,888 | $173,671 | $107,888 | $872,281 |
| Number of Chorus Members Per Opera | 40 | 48 | | 24 | | 40 | | 152 |
| Chorus Pay | $127,160 | $127,160 | | $76,296 | | $127,160 | | $457,776 |
| Chorus Pension | $12,716 | $12,716 | | $7,629 | | $12,716 | | $45,777 |
| Chorus Health Care | $16,480 | $16,480 | | $9,888 | | $16,480 | | $59,328 |
| Children's Chorus | $2,000 | $2,000 | | $2,000 | | | | $6,000 |
| **Total Chorus Salaries** | $158,356 | $158,356 | | $93,813 | | $158,356 | | $568,881 |
| Conductor Fee | $12,000 | $12,000 | $12,000 | $12,000 | | | | $48,000 |
| Conductor Housing and travel | | | | $5,000 | | | | $5,000 |
| **Total Conductor** | $14,500 | $12,000 | $12,000 | $14,500 | | | | $53,000 |
| Musical Instr. Rental hpchd/org | $250 | $250 | $250 | $800 | | | | $1,550 |
| Instr. Move & Tune | $250 | $250 | $250 | $200 | | | | $950 |
| **Total Musical Instr. Rental** | $500 | $500 | $500 | $1,000 | | | | $2,500 |
| Music Rental (Orch/Prep) | $1,000 | $2,500 | $1,800 | $1,000 | | $1,500 | | $9,800 |
| Music Copies (Chorus) | $0 | $10,000 | $16,000 | | | | | $26,000 |
| Production Royalties | $0 | | | | | | | $0 |
| **Total Music Rent & Arrange & Royalties** | $1,000 | $12,500 | $17,800 | $1,000 | | $1,500 | | $35,800 |

**2017-2018 Season**

| | Magic Flute/Berlin | Silent Night | Macbeth | Tosca | Showcase Concert | In Concert Production | Gala Concert | 17-18 TOTALS |
|---|---|---|---|---|---|---|---|---|
| Artist Fees** | $124,000 | $142,000 | $90,000 | $124,000 | | $120,000 | $50,000 | $650,000 |
| PerDiem | $17,500 | $17,000 | $17,000 | $15,000 | | $5,000 | $2,000 | $73,500 |
| **Total Artists** | $141,500 | $159,000 | $107,000 | $139,000 | | $125,000 | $52,000 | $723,500 |
| Artist Housing # days | $17,000 | $17,000 | $17,000 | $12,000 | | $5,000 | | $68,000 |
| Airline Transportation | $2,500 | $2,500 | $2,500 | $3,500 | | $2,000 | | $11,000 |
| Local Transportation | $1,000 | $1,000 | $1,000 | $1,000 | | | | $4,000 |
| **Total Artist Housing & Travel** | $20,500 | $20,500 | $20,500 | $14,500 | | $7,000 | | $83,000 |
| Choreographer | | | | | | | | $0 |
| Dancers | | | | | | | | $0 |
| **Total Ballet** | | | | | | | | $0 |
| Number of Person Orchestra | 55 | 55 | 55 | 55 | | 65 | 55 | 415 |
| Orchestra Pay | $98,670 | $98,670 | $98,670 | $98,670 | | $143,520 | $89,700 | $717,600 |
| Orchestra Pension | $9,867 | $9,867 | $9,867 | $9,867 | | $14,352 | $8,970 | $71,760 |
| Orchestra Health Care | $13,736 | $13,736 | $13,736 | $13,736 | | $19,110 | $11,473 | $97,000 |
| Cartage | $3,096 | $3,096 | $3,096 | $3,096 | | $4,128 | $2,752 | $22,016 |
| Orchestra | $125,369 | $125,369 | $125,369 | $125,369 | | $181,110 | $112,895 | $908,376 |
| Number of Chorus Members Per Opera | 28 | 24 | 40 | 36 | | 40 | | 168 |
| Chorus Pay | $94,024 | $80,592 | $134,320 | $120,888 | | $134,320 | | $564,144 |
| Chorus Pension | $9,402 | $8,059 | $13,432 | $12,089 | | $13,432 | | $56,414 |
| Chorus Health Care | $11,536 | $9,888 | $16,480 | $14,772 | | $16,480 | | $69,156 |
| Children's Chorus | | | $2,000 | | | | | $2,000 |
| **Total Chorus Salaries** | $114,962 | $98,539 | $164,232 | $149,749 | | $164,232 | | $691,714 |
| Conductor Fee | $12,000 | $12,000 | $12,000 | $12,000 | | | | $48,000 |
| Conductor Housing and travel | | $5,000 | | | | | | $5,000 |
| **Total Conductor** | $14,500 | $12,000 | $12,000 | $14,500 | | | | $53,000 |
| Musical Instr. Rental hpchd/org | $250 | $500 | $250 | $500 | | | | $1,500 |
| Instr. Move & Tune | $250 | $500 | $250 | $500 | | | | $1,500 |
| **Total Musical Instr. Rental** | $500 | $1,000 | $500 | $1,000 | | | | $3,000 |
| Music Rental (Orch/Prep) | $3,000 | $2,000 | $1,000 | $1,000 | | $1,500 | | $10,500 |
| Music Copies (Chorus) | | | | | | | | $0 |
| Production Royalties | $105,000 | $40,000 | | | | | | $145,000 |
| **Total Music Rent & Arrange & Royalties** | $108,000 | $42,000 | $1,000 | $1,000 | | $1,500 | | $155,500 |

**2018-2019 Season**

| | Aida | Madama Butterfly | Mila | Faust | Showcase Concerts | In Concert Production | Gala Concert | 18-19 TOTALS | 19-20 TOTALS | 20-21 TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| Artist Fees** | $124,000 | $102,000 | $120,000 | $114,000 | | $120,000 | $50,000 | $460,000 | $501,400 | $542,800 |
| PerDiem | $18,000 | $14,000 | $18,000 | $15,000 | | $5,000 | $2,000 | $65,800 | $70,850 | $76,700 |
| **Total Artists** | $142,000 | $116,000 | $138,000 | $129,000 | | $125,000 | $52,000 | $702,000 | $765,180 | $828,360 |
| Artist Housing # days | $16,000 | $14,000 | $18,000 | $16,000 | | $5,000 | | $66,000 | $71,940 | $77,880 |
| Airline Transportation | $2,500 | $2,500 | $3,000 | $2,500 | | $2,000 | | $11,000 | $11,445 | $11,990 |
| Local Transportation | $1,000 | $1,000 | $1,000 | $1,000 | | | | $4,000 | $4,000 | $4,720 |
| **Total Artist Housing & Travel** | $21,500 | $17,500 | $22,000 | $19,500 | | $7,000 | | $87,500 | $95,375 | $103,250 |
| Choreographer | $4,000 | | $5,000 | | | | | $9,000 | $9,810 | $10,620 |
| Dancers | $10,000 | | $10,000 | | | | | $20,000 | $21,800 | $23,600 |
| **Total Ballet** | $14,000 | | $15,000 | $15,000 | | $15,000 | | $74,000 | $80,660 | $87,320 |
| Number of Person Orchestra | 55 | 55 | 55 | 55 | | 65 | 65 | 415 | 452 | 490 |
| Orchestra Pay | $102,901 | $102,901 | $102,901 | $102,901 | | $150,275 | $94,247 | $411,602 | $448,647 | $485,691 |
| Orchestra Pension | $10,291 | $10,291 | $10,291 | $10,291 | | $15,027 | $9,425 | $41,163 | $44,867 | $48,572 |
| Orchestra Health Care | $13,736 | $13,736 | $13,736 | $13,736 | | $19,110 | $11,473 | $59,890 | $59,890 | $64,835 |
| Cartage | $3,096 | $3,096 | $3,096 | $3,096 | | $4,128 | $2,752 | $12,384 | $13,499 | $14,613 |
| Orchestra | $130,024 | $130,024 | $130,024 | $130,024 | | $188,540 | $117,897 | $944,428 | $1,029,426 | $1,114,425 |
| Number of Chorus Members Per Opera | 80 | 36 | 24 | 40 | | 40 | | 220 | 240 | 260 |
| Chorus Pay | $282,960 | $127,332 | $84,888 | $141,480 | | $141,480 | | $636,660 | $693,959 | $751,259 |
| Chorus Pension | $28,296 | $12,733 | $8,488 | $14,148 | | $14,148 | | $63,665 | $69,395 | $75,125 |
| Chorus Health Care | $32,960 | $14,832 | $8,488 | $16,480 | | $16,480 | | $74,160 | $80,834 | $87,509 |
| Children's Chorus | $2,000 | | | | | | | $2,000 | | |
| **Total Chorus Salaries** | $344,216 | $154,897 | $103,264 | $172,108 | | $172,108 | | $946,593 | $1,031,787 | $1,116,980 |
| Conductor Fee | $12,000 | $12,000 | $12,000 | $12,000 | | | | $48,000 | $52,320 | $56,640 |
| Conductor Housing and travel | | | $5,000 | | | | | $5,000 | $5,450 | $5,900 |
| **Total Conductor** | $12,000 | $12,000 | $14,500 | $12,000 | | | | $50,500 | $55,045 | $59,590 |
| Musical Instr. Rental hpchd/org | $500 | $1,500 | $250 | $250 | | | | $2,500 | $2,725 | $2,950 |
| Instr. Move & Tune | $1,000 | $500 | $250 | $250 | | | | $1,500 | $1,635 | $1,770 |
| **Total Musical Instr. Rental** | $1,000 | $2,000 | $500 | $500 | | | | $4,000 | $4,360 | $4,720 |
| Music Rental (Orch/Prep) | $1,000 | $1,000 | $1,000 | $1,000 | | $1,500 | | $7,500 | $8,175 | $8,850 |
| Music Copies (Chorus) | | | | | | | | $0 | | |
| Production Royalties | | $60,000 | | | | | | $60,000 | $65,400 | $70,800 |
| **Total Music Rent & Arrange & Royalties** | $1,000 | $61,000 | $1,000 | $1,000 | | $1,500 | | $67,500 | $73,575 | $79,650 |

13-13240-shl   Doc 303-1   Filed 10/19/15   Entered 10/19/15 17:03:42   Exhibit B - Chapter 11 Plan of Reorganization of New Vision for NY Opera   Inc. f   Pg 71 of 73

10/19/15



| | 2016 - 2017 Season | | | | | | | | 2017 - 2018 Season | | | | | | | | 2018 - 2019 Season | | | | | | | | | |
| --- | Carmen | Pagliacci / Carmina | Street Car | Marriage of Figaro | Showcase Concert | In Concert Production | Gala Concert | 16-17 TOTALS | Magic Flute / Berlin | Silent Night | Macbeth | Tosca | Showcase Concert | In Concert Production | Gala Concert | 17-18 TOTALS | Aida | Madama Butterfly | Mills | Faust | Showcase Concert | In Concert Production | Gala Concert | 18-19 TOTALS | 19-20 TOTALS | 20-21 TOTALS |
| Rehearsal Accompanist Fee | $4,500 | $4,500 | $4,500 | $4,500 | | | | $18,000 | $4,500 | $4,500 | $4,500 | $4,500 | | | | $18,000 | $4,500 | $4,500 | $4,500 | $4,500 | | | | $18,000 | $19,620 | $21,240 |
| Accompanist Housing | | | | | | | | $0 | | | | | | | | $0 | | | | | | | | $0 | $0 | $0 |
| Accompanist Local Travel | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Accompanist Air Travel | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Accompanist P/R Taxes | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| **Total Accompanist** | $4,500 | $4,500 | $4,500 | $4,500 | $0 | $0 | $0 | $18,000 | $4,500 | $4,500 | $4,500 | $4,500 | $0 | $0 | $0 | $18,000 | $4,500 | $4,500 | $4,500 | $4,500 | $0 | $0 | $0 | $18,000 | $19,620 | $21,240 |
| Super Captain | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | | | |
| Super Fees ($25 x performances) | $500 | $500 | $500 | $500 | | | | $2,000 | $600 | $600 | $600 | $600 | | | | $2,400 | $650 | $650 | $650 | $650 | | | | $2,600 | $2,834 | $3,068 |
| Super Payroll Taxes | | | | | | | | $0 | | | | | | | | $0 | | | | | | | | | | |
| **Total Supers** | $500 | $500 | $500 | $500 | $0 | $0 | $0 | $2,000 | $600 | $600 | $600 | $600 | $0 | $0 | $0 | $2,400 | $650 | $650 | $650 | $650 | $0 | $0 | $0 | $2,600 | $2,834 | $3,068 |
| Stage Director Fee | $12,000 | $12,000 | $12,000 | $12,000 | | $5,000 | | $53,000 | $12,000 | $12,000 | $12,000 | $12,000 | | $5,000 | | $53,000 | $12,000 | $12,000 | $12,000 | $12,000 | | $5,000 | | $48,000 | $52,320 | $56,640 |
| Director Housing | $0 | $3,300 | $3,300 | $3,300 | | | | $9,900 | $3,300 | $3,300 | $3,300 | $3,300 | | | | $13,200 | $3,500 | $3,500 | $3,500 | $3,500 | | | | $14,000 | $15,260 | $16,520 |
| Director Air Travel | $0 | $600 | $600 | $600 | | | | $1,800 | $600 | $600 | $600 | $600 | | | | $2,400 | $600 | $600 | $600 | $600 | | | | $2,400 | $2,616 | $2,832 |
| Director Local Trans. | $300 | $200 | $200 | $200 | | | | $900 | $200 | $200 | $200 | $200 | | | | $800 | $200 | $200 | $200 | $200 | | | | $800 | $872 | $944 |
| Director Per Diem | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Dir H & T Totals: | $300 | $4,100 | $4,100 | $4,100 | | | | $12,600 | $4,100 | $4,100 | $4,100 | $4,100 | | | | $16,400 | $4,300 | $4,300 | $4,300 | $4,300 | | | | $17,200 | $18,748 | $20,296 |
| **Total Stage Director** | $12,300 | $16,100 | $16,100 | $16,100 | $0 | $5,000 | $0 | $65,600 | $16,100 | $16,100 | $16,100 | $16,100 | $0 | $5,000 | $0 | $69,400 | $16,300 | $16,300 | $16,300 | $16,300 | $0 | $5,000 | $0 | $70,200 | $76,518 | $82,836 |
| Supertitles Prompter | $1,000 | $1,000 | $1,000 | $1,000 | | $2,000 | | $6,000 | $1,200 | $1,200 | $1,200 | $1,200 | | $2,000 | | $6,800 | $1,400 | $1,400 | $1,400 | $1,400 | | $2,000 | | $5,600 | $6,104 | $6,608 |
| Supertitles Rental | $500 | $500 | $500 | $500 | | $1,500 | | $3,500 | $600 | $600 | $600 | $600 | | $1,500 | | $3,900 | $600 | $600 | $600 | $600 | | $1,500 | | $2,400 | $2,616 | $2,832 |
| Supertitles Drayage / Printing | | | | | | | | $0 | | | | | | | | $0 | | | | | | | | $0 | | |
| **Total Supertitles** | $1,500 | $1,500 | $1,500 | $1,500 | $0 | $3,500 | $0 | $9,500 | $1,800 | $1,800 | $1,800 | $1,800 | $0 | $3,500 | $0 | $10,700 | $2,000 | $2,000 | $2,000 | $2,000 | $0 | $3,500 | $0 | $11,500 | $12,535 | $13,570 |
| Stage Manager Fee ($1,795.19/week x 3 weeks) | $5,386 | $5,386 | $5,386 | $5,386 | | $1,500 | | $23,042 | $5,386 | $5,386 | $5,386 | $5,386 | | $1,500 | | $23,042 | $5,386 | $5,386 | $5,386 | $5,386 | | $1,500 | | $23,042 | $25,116 | $27,190 |
| Asst. Stg. Mgr. #1 Fee ($1,346.25 x 3 weeks) | $4,039 | $4,039 | $4,039 | $4,039 | | | | $16,155 | $4,039 | $4,039 | $4,039 | $4,039 | | | | $16,155 | $4,039 | $4,039 | $4,039 | $4,039 | | | | $16,155 | $17,609 | $19,063 |
| Asst. Stg. Mgr. #2 Fee ($1,077.11 x 3 weeks) | $3,231 | $3,231 | $3,231 | $3,231 | | | | $12,925 | $3,231 | $3,231 | $3,231 | $3,231 | | | | $12,925 | $3,231 | $3,231 | $3,231 | $3,231 | | | | $12,925 | $14,089 | $15,252 |
| Stg. Mgr. Per Diem** | | | | | | | | $0 | | | | | | | | $0 | | | | | | | | $0 | | |
| Stg. Mgr. Pension Benefit | $300 | $300 | $300 | $300 | | | | $1,200 | $300 | $300 | $300 | $300 | | | | $1,200 | $300 | $300 | $300 | $300 | | | | $1,200 | $1,308 | $1,416 |
| Stage Mgr. Housing | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Stage mgr. Local Travel | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Stage Managers Travel | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| **Total Stage Mgr. & Assts. Expense** | $12,956 | $12,956 | $12,956 | $12,956 | $0 | $1,500 | $0 | $53,323 | $12,956 | $12,956 | $12,956 | $12,956 | $0 | $1,500 | $0 | $53,323 | $12,956 | $12,956 | $12,956 | $12,956 | $0 | $1,500 | $0 | $53,323 | $58,122 | $62,921 |
| Stagehands Salary | $152,935 | $152,935 | $152,935 | $152,935 | | | | $611,740 | $152,935 | $152,935 | $152,935 | $152,935 | | | | $611,740 | $152,935 | $152,935 | $152,935 | $152,935 | | | | $611,740 | $666,797 | $721,853 |
| Teamsters | $10,879 | $10,879 | $10,879 | $10,879 | | | | $43,516 | $10,879 | $10,879 | $10,879 | $10,879 | | | | $43,516 | $10,879 | $10,879 | $10,879 | $10,879 | | | | $43,516 | $47,432 | $51,348 |
| **Total Stagehand Salary** | $163,814 | $163,814 | $163,814 | $163,814 | $0 | $0 | $0 | $655,256 | $163,814 | $163,814 | $163,814 | $163,814 | $0 | $0 | $0 | $655,256 | $163,814 | $163,814 | $163,814 | $163,814 | $0 | $0 | $0 | $655,256 | $714,229 | $773,202 |
| **Stagehands Taxes and Benefits** | $77,330 | $77,330 | $77,330 | $77,330 | $77,330 | $77,330 | $77,330 | $541,313 | $77,330 | $77,330 | $77,330 | $77,330 | $77,330 | $77,330 | $77,330 | $541,313 | $77,330 | $77,330 | $77,330 | $77,330 | | | | $309,322 | $337,161 | $365,000 |
| Scenery Drayage | $3,000 | $4,000 | $7,000 | $6,000 | | | | $20,000 | $6,000 | $4,000 | $7,000 | $7,000 | | | | $24,000 | $8,000 | $5,000 | $5,000 | $7,000 | | | | $25,000 | $27,250 | $29,500 |
| Local Drayage | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Scenic Designer/Tech Cood | $1,500 | $1,500 | $1,500 | $1,500 | | | | $6,000 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Scenic Design / Tech Co H & T | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Scenery Construction Labor | $0 | $0 | $10,000 | $0 | | | | $10,000 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Scenic Des/Tech Cood Pension | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Rental Sets Deposit | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Scenery Royalty | $0 | $0 | $1,500 | $0 | | | | $1,500 | $3,000 | $4,500 | $0 | $0 | | | | $7,500 | $0 | $0 | $0 | $0 | | | | $7,500 | | |
| Scenery Rental | $67,100 | $67,100 | $20,000 | $15,000 | | | | $169,200 | $30,000 | $45,000 | $30,000 | $30,000 | | | | $135,000 | $67,000 | $45,000 | $0 | $63,000 | | | | $175,000 | $190,750 | $206,500 |
| Scenery Construction P/R Taxes | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $70,000 | $0 | | | | $70,000 | $76,300 | $82,600 |
| Scenery Construction Benefits | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Scenic Supplies/Materials | | | | | | | | | $6,000 | | | | | | | $6,000 | | | | | | | | | | |
| **Total Scenery** | $71,600 | $72,600 | $40,000 | $70,000 | $70,000 | $70,000 | $70,000 | $464,200 | $45,000 | $53,500 | $37,000 | $37,000 | $0 | $0 | $0 | $172,500 | $75,000 | $50,000 | $75,000 | $70,000 | $0 | $0 | $0 | $270,000 | $294,300 | $318,000 |
| **Props Materials / Purchase** | $750 | $750 | $2,000 | $750 | $750 | $750 | $750 | $6,500 | $750 | $750 | $2,000 | $750 | $750 | $750 | $750 | $6,500 | $750 | $750 | $2,000 | $2,000 | | | | $5,500 | $5,995 | $6,490 |


13-13240-shl   Doc 303-1   Filed 10/19/15   Entered 10/19/15 17:03:42   Exhibit B - Chapter 11 Plan of Reorganization of New Vision for NY Opera   Inc. f   Pg 72 of 73

10/19/2015

| | 2016 - 2017 Season | | | | | | | 16-17 TOTALS | 2017 - 2018 Season | | | | | | | 17-18 TOTALS | 2018 - 2019 Season | | | | | | | 18-19 TOTALS | 19-20 TOTALS | 20-21 TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Carmen | Pagliacci / Carmina | Street Car | Marriage of Figaro | Showcase Concert | In Concert Production | Gala Concert | | Magic Flute / Berlin | Silent Night | Macbeth | Tosca | Showcase Concert | In Concert Production | Gala Concert | | Aida | Madama Butterfly | Mila | Faust | Showcase Concert | In Concert Production | Gala Concert | | | |
| Lighting Rental | $4,000 | $4,000 | $4,000 | $4,000 | | | | $16,000 | $15,000 | $8,000 | $8,000 | $8,000 | | | | $39,000 | $8,500 | $8,500 | $10,000 | $15,000 | | | | $42,000 | $45,780 | $49,560 |
| Lighting Supplies | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Sound Equip Rental/Supplies | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Lighting Designer | $5,000 | $5,000 | $5,000 | $5,000 | | | | $20,000 | $5,000 | $5,000 | $5,000 | $5,000 | | | | $20,000 | $6,000 | $6,000 | $6,000 | $6,000 | | | | $24,000 | $26,160 | $28,320 |
| Asst. Lighting Designer | $2,500 | $2,500 | $2,500 | $2,500 | | | | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 | | | | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 | | | | $10,000 | $10,900 | $11,800 |
| ALD payroll tax | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Lighting Des.Housing (10daysX150) | $1,500 | $1,500 | $1,500 | $1,500 | | | | $6,000 | $1,500 | $1,500 | $1,500 | $1,500 | | | | $6,000 | $1,500 | $1,500 | $1,500 | $1,500 | | | | $6,000 | $6,540 | $7,080 |
| Lighting Des. Local / Air Travel | $500 | $500 | $500 | $500 | | | | $2,000 | $500 | $500 | $500 | $500 | | | | $2,000 | $500 | $500 | $500 | $500 | | | | $2,000 | $2,180 | $2,360 |
| Lighting Des. Pension | $500 | $500 | $500 | $500 | | | | $2,000 | $600 | $600 | $600 | $600 | | | | $2,400 | $750 | $750 | $750 | $750 | | | | $3,000 | $3,270 | $3,540 |
| Total Lighting (Design / Equipment) | $14,000 | $14,000 | $14,000 | $14,000 | $0 | $0 | $0 | $56,000 | $25,100 | $18,100 | $18,100 | $18,100 | $0 | $0 | $0 | $79,400 | $19,750 | $19,750 | $21,250 | $26,250 | $0 | $0 | $0 | $87,000 | $94,830 | $102,660 |
| Wig/Makeup Artists | $4,000 | $4,000 | $4,000 | $4,000 | | | | $16,000 | $5,000 | $5,000 | $5,000 | $5,000 | | | | $20,000 | $5,500 | $5,500 | $5,500 | $5,500 | | | | $22,000 | $23,980 | $25,960 |
| Wig/Makeup Assistants () | $8,000 | $8,000 | $8,000 | $8,000 | | | | $32,000 | $9,000 | $9,000 | $9,000 | $9,000 | | | | $36,000 | $10,500 | $10,500 | $10,500 | $10,500 | | | | $42,000 | $45,780 | $49,560 |
| Wig/Makeup Payroll Taxes | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Wig/Makeup Supplies | $500 | $500 | $500 | $500 | | | | $2,000 | $500 | $500 | $500 | $500 | | | | $2,000 | $500 | $500 | $500 | $500 | | | | $2,000 | $2,180 | $2,360 |
| Wig Rental | $4,000 | $4,000 | $4,000 | $2,500 | | | | $14,500 | $6,000 | $6,000 | $6,000 | $6,000 | | | | $24,000 | $7,500 | $7,500 | $7,500 | $7,500 | | | | $30,000 | $32,700 | $35,400 |
| Total Make-up & Wigs | $16,500 | $16,500 | $16,500 | $15,000 | $0 | $0 | $0 | $64,500 | $20,500 | $20,500 | $20,500 | $20,500 | $0 | $0 | $0 | $82,000 | $24,000 | $24,000 | $24,000 | $24,000 | $0 | $0 | $0 | $96,000 | $104,640 | $113,280 |
| Costumer | $5,000 | $5,000 | $5,000 | $5,000 | | | | $20,000 | $7,500 | $7,500 | $7,500 | $7,500 | | | | $30,000 | $15,000 | $7,500 | $7,500 | $7,500 | | | | $37,500 | $40,875 | $44,250 |
| Wardrobe - Salaries | $20,000 | $20,000 | $20,000 | $20,000 | | | | $80,000 | $20,500 | $20,500 | $20,500 | $20,500 | | | | $82,000 | $45,000 | $22,500 | $22,500 | $22,500 | | | | $112,500 | $122,625 | $132,750 |
| Total Wardrobe | $25,000 | $25,000 | $25,000 | $25,000 | $0 | $0 | $0 | $100,000 | $28,000 | $28,000 | $28,000 | $28,000 | $0 | $0 | $0 | $112,000 | $60,000 | $30,000 | $30,000 | $30,000 | $0 | $0 | $0 | $150,000 | $163,500 | $177,000 |
| Costumes Rental/construction | $20,000 | $20,000 | $12,000 | $16,000 | | | | $68,000 | $21,000 | $21,000 | $21,000 | $21,000 | | | | $84,000 | $60,000 | $23,000 | $8,200 | $47,500 | | | | $138,700 | $151,183 | $163,666 |
| Costumes Drayage | $1,000 | $1,000 | $1,000 | $1,000 | | | | $4,000 | $1,000 | $1,000 | $1,000 | $1,000 | | | | $4,000 | $2,500 | $2,500 | $2,000 | $2,500 | | | | $9,500 | $10,355 | $11,210 |
| Costume Supplies | $2,000 | $2,000 | $2,000 | $2,000 | | | | $8,000 | $2,000 | $2,000 | $2,000 | $2,000 | | | | $8,000 | $3,000 | $3,000 | $2,000 | $3,000 | | | | $14,000 | $15,260 | $16,520 |
| Costume Cleaning | $2,000 | $1,000 | $1,000 | $1,000 | | | | $4,000 | $1,000 | $1,000 | $1,000 | $1,000 | | | | $4,000 | $2,000 | $2,000 | $1,000 | $2,500 | | | | $6,500 | $7,087 | $7,670 |
| Total Costumes | $24,000 | $24,000 | $16,000 | $20,000 | $0 | $0 | $0 | $84,000 | $25,000 | $25,000 | $25,000 | $25,000 | $0 | $0 | $0 | $100,000 | $67,500 | $28,000 | $13,200 | $60,000 | $0 | $0 | $0 | $168,700 | $183,883 | $199,066 |
| City Center | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Theater Rental (1 week rehearsal, 1 week of performances) | $78,000 | $78,000 | $78,000 | $78,000 | $38,000 | $38,000 | | $388,000 | $78,000 | $78,000 | $78,000 | $78,000 | $38,000 | $38,000 | | $388,000 | $78,000 | $78,000 | $78,000 | $78,000 | $38,000 | $38,000 | | $388,000 | $422,920 | $457,840 |
| Front of the House Staff Package | $40,500 | $40,500 | $40,500 | $40,500 | $20,000 | $20,000 | | $202,000 | $40,500 | $40,500 | $40,500 | $40,500 | $20,000 | $20,000 | | $202,000 | $40,500 | $40,500 | $40,500 | $40,500 | $20,000 | $20,000 | | $202,000 | $220,180 | $238,360 |
| Theater Ticket Fee | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | $0 | $0 | $0 | $0 |
| Total Theater Rent | $118,500 | $118,500 | $118,500 | $118,500 | $58,000 | $58,000 | $0 | $590,000 | $118,500 | $118,500 | $118,500 | $118,500 | $58,000 | $58,000 | $0 | $590,000 | $118,500 | $118,500 | $118,500 | $118,500 | $58,000 | $58,000 | $0 | $590,000 | $643,100 | $696,200 |
| Off Site Rehearsal Space | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Reh. Space (Mus/Staging)** | $10,000 | $10,000 | $10,000 | $10,000 | | | | $40,000 | $10,000 | $10,000 | $10,000 | $10,000 | | | | $40,000 | $10,000 | $10,000 | $10,000 | $10,000 | | | | $40,000 | $43,600 | $47,200 |
| Reh. Space (Orchestra) | $2,500 | $2,500 | $2,500 | $2,500 | | | | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 | | | | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 | | | | $10,000 | $10,900 | $11,800 |
| Security at Rehearsal Space | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 | $0 |
| Total Rehearsal Space | $12,500 | $12,500 | $12,500 | $12,500 | $0 | $0 | $0 | $50,000 | $12,500 | $12,500 | $12,500 | $12,500 | $0 | $0 | $0 | $50,000 | $12,500 | $12,500 | $12,500 | $12,500 | $0 | $0 | $0 | $50,000 | $54,500 | $59,000 |
| Insurance - W/C | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $21,000 | $3,000 | $3,000 | $3,000 | $3,000 | | | | $12,000 | $3,000 | $3,000 | $3,000 | $3,000 | | | | $12,000 | $13,080 | $14,160 |
| Postage/Printing | $100 | $100 | $100 | $100 | | | | $400 | $100 | $100 | $100 | $100 | | | | $400 | $100 | $100 | $100 | $100 | | | | $400 | $436 | $472 |
| Vehicle Fuel | $100 | $100 | $100 | $100 | | | | $400 | $100 | $100 | $100 | $100 | | | | $400 | $100 | $100 | $100 | $100 | | | | $400 | $436 | $472 |
| Rehearsal Supplies | $200 | $200 | $200 | $200 | | | | $800 | $200 | $200 | $200 | $200 | | | | $800 | $200 | $200 | $200 | $200 | | | | $800 | $872 | $944 |
| Stage Management Supplies | $100 | $100 | $100 | $100 | | | | $400 | $100 | $100 | $100 | $100 | | | | $400 | $100 | $100 | $100 | $100 | | | | $400 | $436 | $472 |
| Misc Production costs | $500 | $500 | $500 | $500 | $0 | $0 | $0 | $2,000 | $500 | $500 | $500 | $500 | $0 | $0 | $0 | $2,000 | $500 | $500 | $500 | $500 | $0 | $0 | $0 | $2,000 | $2,180 | $2,360 |
| Auditions | $250 | $250 | $250 | $250 | | | | $1,000 | $250 | $250 | $250 | $250 | | | | $1,000 | $250 | $250 | $250 | $250 | | | | $1,000 | $1,090 | $1,180 |
| Other / Miscellaneous | $300 | $300 | $300 | $300 | | | | $1,200 | $300 | $300 | $300 | $300 | | | | $1,200 | $300 | $300 | $300 | $300 | | | | $1,200 | $1,308 | $1,416 |
| TOTAL Adjusted Production Budget | $991,364 | $1,027,664 | $781,058 | $902,721 | $413,169 | $654,308 | $355,669 | $5,125,953 | $1,081,832 | $1,016,408 | $973,351 | $986,618 | $249,975 | $624,422 | $244,475 | $5,177,082 | $1,325,340 | $998,521 | $1,047,338 | $1,103,982 | $191,897 | $576,648 | $186,397 | $5,430,121 | $5,918,832 | $6,386,303 |

### Administration and Operating Expenses

| | 2016 - 2017 Season | | 2017 - 2018 Season | | 2018 - 2019 Season | | 2019 -2020 | 2020-2021 |
|---|---|---|---|---|---|---|---|---|
| Salaries | | $850,000 | | $867,000 | | $884,340 | $902,026.80 | $920,067 |
| Benefits | | $144,500 | | $147,390 | | $150,338 | $153,344.56 | $156,411 |
| Media Purchase | | $275,000 | | $280,500 | | $286,110 | $291,832.20 | $297,669 |
| Rent | | $108,000 | | $110,160 | | $112,363 | $114,610.46 | $116,903 |
| Overhead | | $72,000 | | $73,440 | | $74,909 | $76,406.98 | $77,935 |
| Miscellaneous | | $120,000 | | $122,400 | | $124,848 | $127,344.96 | $129,892 |
| Total Administration and Operations | | $1,569,500 | | $1,600,890 | | $1,632,908 | $1,665,566 | $1,698,877 |
| Projected Gain/Loss | | ($0) | | $0 | | ($0) | $262,536.34 | $1,207,322.29 |

# EXHIBIT 3

# Liquidation Analysis

**The Liquidation Analysis pursuant to the New Vision Plan is the same as the Liquidation Analysis attached to the NYCO Renaissance Plan (Exhibit 3); except that, under the New Vision Plan, creditors are generally receiving a greater recovery, so the negative impact by a conversion to Chapter 7 is even greater for the  New Vision plan.**