## EXHIBIT A

**First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and
Official Committee of Unsecured Creditors for New York City Opera, Inc.
and Summary Thereof**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| New York City Opera, Inc., | : | Case No. 13-13240 (SHL) |
| | : | |
| Debtor. | : | Chapter 11 |
| | : | |
| | : | |

---

### SUMMARY OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NYCO RENAISSANCE LTD. AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR NEW YORK CITY OPERA, INC.

---

Dated: December 2, 2015

**DUANE MORRIS LLP**
1540 Broadway
New York, New York 10036-4086
Telephone:     (212) 692-1000
Facsimile:     (212) 692-1020
Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.

*Counsel to NYCO Renaissance, Ltd.,*
*Plan Co-Sponsor*

**KLESTADT WINTERS JURELLER**
**SOUTHARD STEVENS, LLP**
200 West 41st street, 17th Floor
New York,  New York 10036-7203
Telephone:     (212) 972-3000
Facsimile:     (212) 972-2245
Sean C. Southard, Esq.
Maeghan J. McLoughlin, Esq.

*Counsel to Official Committee of*
*Unsecured Creditors, Plan Co-Sponsor*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................................1

II. OVERVIEW OF THE PLAN ...............................................................................................1

    A.    Purpose and Effect of the Plan.............................................................................1

    B.    Summary of Treatment of Claims and Projected Recoveries ..................................3

III. THE REORGANIZED DEBTOR'S BUSINESS PLAN AND VALUATION ......................4

    A.    The Reorganized Debtor's Business Plan and Commitment to Debtor's
        Mission..................................................................................................................4

        1.    Commitment to the Debtor's Artistic Philosophy .......................................4

        2.    Opera Education..........................................................................................5

        3.    Business Plan .............................................................................................6

    B.    Management of the Reorganized Debtor ................................................................7

    C.    Feasibility of the Plan ...........................................................................................8

        1.    Claims Estimates........................................................................................8

        2.    Plan and Operations Funding....................................................................10

IV. SUMMARY OF THE PLAN ..............................................................................................12

    A.    Administrative and Priority Claims .....................................................................12

        1.    Administrative Claims ..............................................................................12

        2.    Priority Tax Claims...................................................................................13

    B.    Classification and Treatment of Claims................................................................13

        1.    Summary ..................................................................................................13

        2.    <u>Class 1 – Other Priority Claims –Severance/Wage Claims</u> ......................13

            (a)    Classification...............................................................................13

            (b)    Treatment ....................................................................................13

            (c)    Impairment and Voting ................................................................13

i

3. Class 2 –Secured Claims ................................................................ 14

    (a) Classification .......................................................................... 14

    (b) Treatment ............................................................................... 14

    (c) Impairment and Voting ........................................................... 14

4. Class 3— PBGC Claims ................................................................ 14

    (a) Classification .......................................................................... 14

    (b) Treatment ............................................................................... 14

    (c) Impairment and Voting ........................................................... 14

5. Class 4 – General Unsecured Claims .............................................. 14

    (a) Classification .......................................................................... 14

    (b) Treatment ............................................................................... 14

    (c) Impairment and Voting ........................................................... 15

5. Class 5 – Unsecured Convenience Claims ...................................... 14

    (a) Classification .......................................................................... 14

    (b) Treatment ............................................................................... 14

    (c) Impairment and Voting ........................................................... 15

6. Class 6 – Deposit Claims ............................................................... 14

    (a) Classification .......................................................................... 14

    (b) Treatment ............................................................................... 14

    (c) Impairment and Voting ........................................................... 15

C. Liquidation Analysis and Plan Confirmation Requirements ................................. 15

D. Means for Implementation of the Plan ................................................................... 16

1. Corporate Existence ...................................................................... 16

2. Restructuring Transactions ............................................................ 17

3. Corporate Action ........................................................................... 17

ii

4.   Effectuating Documents; Further Transactions .........................................17

5.   New Board Representation .........................................................................17

6.   Management/Corporate Governance ..........................................................17

7.   Vesting of Assets in the Reorganized Debtor ............................................19

E.   Committee ..............................................................................................................19

F.   Provisions Governing Distributions.......................................................................19

G.   Disputed Claim Reserve ........................................................................................19

1.   Establishment of Disputed Claim Reserve ................................................19

2.   Maintenance of Disputed Claim Reserve ..................................................20

H.   Quarterly Distributions ..........................................................................................20

I.   Delivery of Distributions .......................................................................................20

J.   Disputed Claims......................................................................................................21

K.   Objection Deadline .................................................................................................21

L.   Treatment of Executory Contracts and Unexpired Leases .....................................21

1.   Assumption and Rejection of Executory Contracts and Unexpired
     Leases.........................................................................................................21

2.   Claims Based on Rejection of Executory Contracts or Unexpired
     Leases.........................................................................................................22

M.   Discharge, Release, Injunction and Related Provisions..........................................22

1.   Discharge of Claims and Termination of Interests ....................................22

2.   Releases......................................................................................................23

3.   Exculpation ................................................................................................23

4.   Preservation of Rights of Action...............................................................24

5.   Release and Injunction...............................................................................24

6.   Special Provision Regarding the Pension Plan ..........................................25

7.   Releases of Liens .......................................................................................25

iii

N.    Retention of Jurisdiction ........................................................................................25

V. VOTING PROCEDURES ........................................................................................26

VI. MISCELLANEOUS PLAN PROVISIONS ............................................................26

VII. PLAN SUPPLEMENT ............................................................................................27

VIII. CONCLUSION AND RECOMMENDATION ......................................................28

DM3\3651348.2

**EXHIBIT 1:**  The Plan

**EXHIBIT 2:**  Reorganized Debtor's Projections

**EXHIBIT 3:**  Liquidation Analysis

# I.

## INTRODUCTION

On December 2, 2015, NYCO Renaissance, Ltd. ("**NYCO Renaissance**") and the Official Committee of Unsecured Creditors appointed in debtor New York City Opera, Inc.'s bankruptcy case (the "**Committee**," and together with NYCO Renaissance, the "**Plan Sponsors**") proposed, as the Plan Sponsors, the first amended plan of reorganization (the "**Plan**") for debtor New York City Opera, Inc. (the "**Debtor**" or "**NYCO**"). Under the terms of the Plan, the Debtor will emerge from bankruptcy revitalized and well-positioned to continue providing a world-class opera experience. A copy of the Plan is attached to this Plan Summary as **Exhibit "1"**.

The purpose of this Plan Summary is to describe the Plan and to provide certain information regarding the feasibility and implementation of the Plan to creditors who will have the right to vote on the Plan so that they can make an informed decision in doing so.

PLEASE READ THIS PLAN SUMMARY, AND THE PLAN ANNEXED HERETO, IN ITS ENTIRETY. THE PLAN IS CONTROLLING AND BINDING UPON CONFIRMATION. ACCORDINGLY, IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY, THE TERMS OF THE PLAN WILL CONTROL.

**THE PLAN SPONSORS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND CREDITORS. THE PLAN SPONSORS RECOMMEND THAT CREDITORS VOTE TO APPROVE AND SUPPORT THE PLAN.**

Unless otherwise defined herein, all defined terms used in this summary shall have the same meanings ascribed to them in the Plan.

If you have any questions about this Plan Summary and the annexed Plan, please contact: Gerard S. Catalanello, Esq., Duane Morris, LLP, 1540 Broadway, New York, New York 10036-4086, telephone (212) 692-1037 or *via* email to gcatalanello@duanemorris.com; or Sean Southard, Esq., Klestadt Winters Jureller Southard Stevens LLP, 200 West 41st Street, 17th Floor, New York, New York 10036-7203, telephone (212) 679-5320 or *via* email to ssouthard@klestadt.com.

# II.

## OVERVIEW OF THE PLAN

### A.    *Purpose and Effect of the Plan*

NYCO Renaissance is a fully recognized, not-for-profit company dedicated to restoring New York City Opera to its original founding mission and its important place in the cultural fabric of Manhattan and the international opera landscape. Over the past year, utilizing a streamlined administration with strong oversight from an engaged and enthusiastic board of

DM3\3651348.2

experienced philanthropists and business leaders, NYCO Renaissance has made great strides toward reviving New York City Opera on a solid financial footing.

Indeed, NYCO Renaissance's inaugural performance was a tremendously successful Gala Concert in March 2015, celebrating the life and career of New York City Opera's long-time General Director, Maestro Julius Rudel. The Gala was produced in association with the Rudel family and featured many of City Opera's most notable alumni including Plácido Domingo, Frederica von Stade, and Christine Goerke.

NYCO Renaissance has already affirmed its commitment to the Debtor's mission to expand opera's audience through educational outreach. Utilizing an agreement with IACE (Italian American Committee on Education) that has been transferred from Dicapo Opera Theater to NYCO Renaissance, hundreds of New York City's Italian language students were introduced to opera through a fully staged, narrated production of Rossini's *La Cenerentola* in May 2015. In addition to the performances for IACE's students, a special encore presentation for neighborhood families brought awareness of City Opera's eagerly anticipated revival to Upper East Side children and their parents.

Over the past year, Mr. Michael Capasso ("**Capasso**") and Mr. Roy Niederhoffer ("**Niederhoffer**"), General Director and Chairman of the board of NYCO Renaissance, respectively, have hosted numerous cultivation events in the homes of board members, and other venues to introduce opera to new supporters who may be intimidated by opera or have never even attended an opera. Small groups of singers, many of whom are NYCO alumni, have performed at these intimate and accessible gatherings which have introduced NYCO Renaissance and raised awareness of the Debtor's impending revival.

Further, since May of 2015 NYCO Renaissance has been presenting an abbreviated version of George Bizet's *Carmen*. After the NYCO Renaissance production premiered at a convention in Las Vegas it had 14 additional performances across the country and in Canada and toured Europe in June 2015. The success of this production has introduced NYCO Renaissance's vision to hundreds of potential donors and engaged five additional board members.

Upon confirmation of the Plan, the Reorganized Debtor intends to produce its first fully staged production at Lincoln Center in early 2016. The Reorganized Debtor will present performances in the Fredrick P. Rose Hall at Jazz at Lincoln Center, a cost-effective venue that is perfectly suited to opera in its moderate size, up-to-date technology and superb acoustics.

The Reorganized Debtor's programming at Lincoln Center aims to consist of exciting and commercially viable titles selected to attract both veteran operagoers and newcomers to the art form. In early 2016, the Reorganized Debtor's programming is slated to include two large-scale productions at the Rose Theater. In addition, a concurrent season of smaller-scale chamber and "niche" repertoire as well as the Reorganized Debtor's groundbreaking VOX festival will be presented at the Theater at St. Jean's (a 200-seat jewel box on the Upper East Side). This dual-venue plan will enable the company to appeal to the broadest possible audience and patron base. In its first full season (Fall 2016-Spring 2017), the Reorganized Debtor will present 36 performances, consisting of four large-scale operas at Lincoln Center as well as two smaller-scale operas at the Theater at St. Jean's. In future seasons, the Reorganized Debtor may explore

2

presenting small-scale contemporary and Baroque offerings in novel or unconventional venues such as the Culture Shed (projected opening 2017), Pier55 (opening 2018), and other indoor or outdoor venues.

With an initial $5.5 million budget (less than half of the Debtor's 2012-2013 budget), a fundraising requirement of only $3.3 million (one third of the Debtor's 2012-13 budget) and a dynamic, lean, entrepreneurial structure, the Reorganized Debtor intends to expand in measured steps, increasing the number of productions and performances in each subsequent season.

Further, the company will employ contemporary marketing techniques such as social media and corporate and social partnerships to build new audiences while re-engaging NYCO's historic core audience. The company will maintain its mission as the "People's Opera" and continue its tradition of affordable ticket pricing.  Continuing the Debtor's long tradition of community outreach, a broad slate of educational programming will return.

The Plan Sponsors intend to achieve these goals by enabling the Debtor to emerge from bankruptcy through the Plan. In that regard, the Plan provides for the dissolution of NYCO Renaissance, the contribution of all of the assets of NYCO Renaissance to the Reorganized Debtor, the vesting of all of the assets of the Debtor's estate in the Reorganized Debtor, the payment of Cash on account of Allowed Administrative and Priority Claims, the issuance of two promissory notes by the Reorganized Debtor, one for the benefit of the PBGC and one for the benefit of the class of general unsecured creditors, and the restructuring of certain obligations of the Debtor to creditors. Among other things, the contribution of Cash and other  assets of NYCO Renaissance to the Reorganized Debtor will enable the Reorganized Debtor to finance distributions contemplated by the Plan and allow it to continue to operate the Debtor's business post-confirmation consistent with its mission.

The Plan Sponsors believe that the Plan is the prime option for continuing the Debtor's mission because it maximizes recoveries for Holders of Allowed Claims.  The Plan Sponsors believe that any alternative to confirmation of the Plan, such as a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, a proposed sale of substantially all of the Debtor's assets, or attempts by other parties to confirm competing plans, would result in significant delay, litigation, additional costs, and, ultimately, would lower the recoveries for all Holders of Allowed Claims.

*IN ADDITION, GIVEN THAT THE COMMITTEE IS ONE OF THE PLAN SPONSORS, THE COMMITTEE SUPPORTS THE PLAN AND RECOMMENDS THAT, IF YOU ARE ENTITLED TO DO SO, YOU VOTE TO ACCEPT THE PLAN.*

B.    *Summary of Treatment of Claims and Projected Recoveries*

The following table summarizes (i) the treatment of Claims under the Plan, (ii) the estimated Allowed Claims, and (iii) the estimated ranges of recoveries.  As the Debtor is a not-for-profit corporation there are no holders of interest in the Debtor.  As such, there is no class of membership interests.  The ranges of recoveries listed below are based on various assumptions, including (but not limited to) assumptions regarding the total amount of the Allowed Claims.

3

The summary below is for illustrative purposes only and is subject to the more detailed and complete description contained in Article II and Article III of the Plan.

| Class | Claim/ Interest | Plan Treatment | Range of Estimated Claims/ Interests | Projected Recovery Under the Plan |
|---|---|---|---|---|
| N/A | Administrative Claims (including the NV Substantial Contribution Claim) | Paid in full in Cash | $410,000-$522,723 | 100% |
| N/A | Priority Tax Claims | Paid in full in Cash | $0 | 100% |
| 1 | Other Priority Claims – Severance/ Wages | Paid in full in Cash | $209,419-$1,179,222 | 100% |
| 2 | Secured Claims | Paid in full in Cash | $0 | 100% |
| 3 | PBGC Claims | Pro Rata Share of estate assets (other than the $1.585 million GUC Note) + all payments on account of the $340,000 PBGC Note | $4,616,067 | 5.49% to 9.49% |
| 4 | General Unsecured Claims | Pro Rata Share of estate assets + all payments on account of the $1.585 million GUC Note | $20,742,293-$25,086,097 | 4.44% to 9.76% |
| 5 | Unsecured Convenience Claims | Paid 60% of Claim | approximately $20,000 to $40,000 | 60% |
| 6 | Deposit Claims | Paid in full in Cash | approximately $289,022 | 100% |

## III.

## THE REORGANIZED DEBTOR'S BUSINESS PLAN AND VALUATION

A.    *The Reorganized Debtor's Business Plan and Commitment to Debtor's Mission*

1.    *Commitment to the Debtor's Artistic Philosophy*

Historically, the Debtor has been in the vanguard of operatic production style and innovative programming. The company's legacy of producing contemporary works, regional and world premieres, rediscovered masterpieces, and works from the musical theater canon is central to its unique identity. The Reorganized Debtor's repertoire plan continues that tradition.

DM3\3651348.2

While staying at the artistic forefront is a top priority for the Reorganized Debtor, the importance of producing appealing works from the standard repertoire will not be overlooked by the Reorganized Debtor's management team. Many audience members desire to see the staples of the repertoire presented in a straightforward manner. The Reorganized Debtor, as it re-engages and cultivates its audience, will not ignore the wishes of these patrons. It recognizes its responsibility to advance the progress of opera as an art form, but also to sustain its cherished, centuries-old artistic heritage. It will choose repertoire and productions with the goal of striking a balance between innovation and preservation.

The Reorganized Debtor will focus on engaging its audiences with  compelling performances at the highest artistic standard. Moreover, a strong focus on the opera "experience" – making a night at the opera unique, informative, exciting, and fulfilling – will involve  not just the productions themselves, but also their associated educational events, on-line materials, pre- and post-opera events, and a full use of the exciting new venue at Columbus Circle.

Engaging a greater segment of New York's culturally diverse community is a central tenet of the Reorganized Debtor's mission. To further that goal, the Reorganized Debtor will commence a multi-season, Spanish-language opera and zarzuela series. In this series the Reorganized Debtor will present theatrical works of the Spanish Baroque, Romantic-era zarzuelas, and contemporary operas of Latino composers. These productions will appeal to historic patrons who have always looked to City Opera for innovative and unusual programming, while also welcoming an under-represented segment of our community to participate in its cultural life.

An integral part of the Debtor's programming since 1999, the annual VOX, Contemporary Opera Lab series will resume its mission to develop and workshop new operas from emerging composers, allowing them to hear their works performed and giving them exposure to the New York audience. The Reorganized Debtor includes a co-operative effort with American Opera Projects, a leader in this field, to expand and facilitate this mission.

Reflecting NYCO's mandate as "The People's Opera," tickets will be priced affordably. All performances will include a limited number of $20 tickets. Performances of large-scale productions will have ticket prices ranging from $50 to $150. Small-scale productions will have a top ticket price of $50 with a select number of "premium" tickets at $100. If corporate sponsorship can be found, as it was during 2007 and during the recent $20 ticket initiative, the Reorganized Debtor will utilize it to make its productions as accessible as possible to audiences of all ages and income levels.

2.    *Opera Education*

NYCO Renaissance is already continuing the Debtor's long tradition of opera education outreach in New York City. Several performances for New York City school children have already taken place, and an additional seven thousand students will be introduced to opera in the 2016-17 Season alone.  At each performance, children learn about the fundamentals of opera through selected scenes, performed with sets, costumes, and piano accompaniment. Performers for the Reorganized Debtor's outreach programs will be selected from its co-operation with Martina Arroyo's Prelude to Performance® program, providing the Reorganized Debtor with

5

inspirational education leaders from diverse backgrounds. In addition, an existing partnership between Capasso and IACE (Italian American Committee on Education) has been transferred to NYCO Renaissance. This program is financially self-sustaining and will be expanded in future seasons.

An additional partnership with The Harmony Program, a nonprofit organization that brings intensive after-school music programs to communities with limited access to instrumental music education, will expose hundreds of classical instrumental music students to opera and the opera orchestra, building on that organization's existing partnership with the NY Philharmonic and other New York City orchestras.

In the future, the Debtor's highly successful *Opera is Elementary* program will be reinstated, once again bringing high-quality opera performances to New York City schools. In addition to introducing opera to New York's schoolchildren, the Reorganized Debtor will emphasize its role in engaging its audiences by providing informative events for patrons to help them understand the art form in greater depth and more fully appreciate performances. Finally, a commitment to having many low-priced and student tickets available for each performance will make first-rate opera available to a new generation of audiences.

3.      Business Plan

The Reorganized Debtor's  business plan (the "**Business Plan**") calls for a $5.5 million budget in the 2016-17 season.  As indicated in the projections for the Reorganized Debtor attached hereto as **Exhibit "2"** (the "**Reorganized Debtor's Projections**"), the Reorganized Debtor intends to expand in measured steps, increasing the number of productions and performances each subsequent season. However, expansion will be predicated on first reaching financial milestones and securing funding, in order to avoid the risk of over-rapid expansion.

Strong attention will be paid to budgetary concerns and operating within a conservative infrastructure. The Reorganized Debtor, similar to NYCO Renaissance, will adopt a "small and lean" approach to staffing and overhead. Whenever possible, outside contractors and consultants will be engaged on an as-needed basis. Negotiations with Local 802, American Federation of Musicians and Employers (Local 802) have already taken place and that NYCO Renaissance has obtained a memorandum of agreement for a five-year contract that is within the proposed budget. Further, NYCO Renaissance has had, or is in negotiations with other unions, including American Guild of Musical Artists (AGMA) and the United Scenic Artists, Local USA 829 for new collective bargaining agreements or amendments/modifications to the Debtor's existing agreements to ensure a viable reorganized business for the foreseeable future.

Further, the Reorganized Debtor will establish its home in the modern, state-of-the-art Rose Theater in the Time Warner Center.  A permanent, consistent home is essential for the identity of the company and the profile of Lincoln Center is invaluable for its reputation. The Time Warner Center at Columbus Circle is centrally located, convenient for NYCO's historical core audience, and replete with dining, entertainment, and shopping options.

To be competitive in today's increasingly crowded marketplace, targeted marketing utilizing web, Facebook, Twitter, and YouTube campaigns is mandatory. The Reorganized

DM3\3651348.2

Debtor will emphasize the use of social media, corporate partnerships, and co-marketing arrangements with groups that cater to younger audiences, to create excitement around its productions. It will also maximize the access, guidance, recognition and intimacy desired by patrons, who have demonstrated their commitment to the art form and are willing to donate generously to receive these benefits. NYCO Renaissance has contracted Situation Interactive, an industry leader in the field of marketing theater, arts, and cultural institutions, to oversee the company's web and social media presence and already has a fully operational website, Twitter feed, and a Facebook page with thousands of followers.

Under the Plan, the Reorganized Debtor will take advantage of several innovative methods to increase earned income, develop new audiences, and reduce operating costs. The Reorganized Debtor will cultivate additional sources of earned income far more aggressively than in the past. Although opera is the most expensive of the performing arts, it is possible to garner revenue from sources other than ticket sales. NYCO Renaissance has had extensive discussions with leading media consultants who confirm that the City Opera brand retains significant value. The Reorganized Debtor will exploit the myriad licensing opportunities currently available to fully realize the brand's potential value.

Other sources of income are available as indicated in the Reorganized Debtor's Projections. For the past 35 years, The New York City Opera Thrift Shop has reliably provided significant earned income for the company. NYCO Renaissance has already negotiated a new five-year lease for its location and, it is anticipated that the new lease will become effective on or about the Effective Date of the Plan.

Partnering with others also provides unique opportunities for income and growth, while at the same time reducing exposure to expenses. Indeed, in recent years, opera companies of various sizes across the country have increasingly sought partnerships for co-productions. Production costs continue to increase and income, both earned and contributed, has not kept pace. As such, companies have turned to co-productions to evenly distribute and amortize costs. This model has often proved successful and has forever changed the way companies approach production. NYCO Renaissance already has been approached to participate in co-productions with well-established companies across the country. These opportunities will not only allow the company to limit operating costs, but will spread its reputation across the country.

In the future, opportunities to tour profitably in locales that are hungry for high-quality "direct from New York" productions such as Korea, China, and the Middle East will be explored. New venues like Oman's Royal Opera House, Muscat and the upcoming Dubai Opera House are all hungry for quality programming, providing the Reorganized Debtor with an opportunity for an international presence.

### B.    Management of the Reorganized Debtor

Niederhoffer will be the Chairman of the New Board of the Reorganized Debtor. He is a long-time Board Member of the Debtor and noted arts philanthropist. He has made a large leadership gift in order to launch NYCO Renaissance and in turn the Reorganized Debtor. Niederhoffer is fully committed to employing his resources and contacts to assure the success of

DM3\3651348.2

this plan and he serves as the initial Board Chair.  Niederhoffer and the New Board will provide strong financial and strategic governance as the company begins its full production schedule.

The initial General Director of Reorganized Debtor will be Capasso, who founded and has led the Dicapo Opera Theatre since 1981, and has presented hundreds of fully-staged operatic productions. Capasso's decades of practical opera production experience will allow a more efficient operation that maintains top-quality production values. It is anticipated that an employment agreement between the Reorganized Debtor and Capasso will be finalized and become effective on the Effective Date of the Plan.

The President of the New Board, Mr. Jeffrey Laikind ("**Laikind**"), is the founder of Prudential Securities Asset Management, and a noted philanthropist. Laikind has a long association with the Debtor, having created OPERATHON, the first on-air fundraising program for an arts institution in New York City, for the benefit of the New York City Opera. Laikind was also responsible for three years of live New York City Opera broadcasts, sponsored by Pioneer Electronics.

A number of additional business leaders and philanthropists have committed to joining the Board, providing the Reorganized Debtor with a broad base of leadership and financial support.

Any additional senior management of the Reorganized Debtor, will be disclosed in the Plan Supplement prior to the Disclosure and Confirmation Date in accordance with section 1129(a)(5) of the Bankruptcy Code.

The Reorganized Debtor intends to establish and maintain a finance committee (the "**Finance Committee**").  As discussed more fully below in Article IV.D.6, the Finance Committee will help develop and approve the annual budget and monitor the ongoing financial results of the Reorganized Debtor through detailed data and reports.  Further, a strong financial overseer will be engaged with arts experience to ensure (and reassure donors) that funds will be spent appropriately and thoughtfully and to provide the New Board and management with clear and accurate financial data.  This position will afford a sense of security and trust to the donor base.

C.    *Feasibility of the Plan*

1.    *Claims Estimates*

The total amount of Claims listed on the Debtor's Schedules were as follows:  (i) no secured claims; (ii) unsecured priority claims on account of wages, salaries, commissions and severance in the approximate amount of $25,913.54; (iii) unsecured liabilities on account of pension fund and health union contributions in the approximate amount of $237,476.28, of which an unknown amount was identified as entitled to priority; (iv) unsecured priority liabilities on account of prepaid ticket purchases in the approximate amount of $289,022; and (v) unsecured claims in the approximate amount of $3,362,715.54.

With respect to unsecured priority claims, certain of the Debtor's employees, as well as unions on behalf of employees, filed proofs of claim for, among other things, wages, severance,

contributions and other compensation on a priority basis. As summarized below in Article IV, under the Plan, these claims are treated as Other Priority Claims – Severance/Wage Claims in Class 1.

Although to date no Secured Claims have been filed, the Plan classifies any such Claims in Class 2.

The PBGC is a wholly owned United States government corporation, and an agency of the United States, that administers the defined benefit pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461, (2012, Supp. I 2013). When a pension plan covered by Title IV terminates with insufficient assets to pay promised benefits, PBGC generally becomes trustee of the pension plan, supplements the terminated plan's assets with its insurance funds, and, subject to certain statutory limitations, pays to the plan's participants their benefits. *See* 29 U.S.C. §§ 1321-1322, 1342, 1361. The Debtor maintained and administered the Pension Plan. The PBGC filed proofs of claims against the Debtor in unliquidated amounts. The Pension Plan has been terminated and trusteed by PBGC. PBGC intends to file amended claims against the Debtor for (1) unfunded benefit liabilities of the Pension Plan pursuant to 29 U.S.C. § 1362, in the amount of $3,674,889; (2) unpaid minimum funding contributions pursuant to 26 U.S.C. §§ 412, 430 in the amount of $618,678; and (3) statutory premiums pursuant to 29 U.S.C. § 1306 in the amount of $322,500.

The Plan Sponsors have negotiated a settlement with the PBGC, as summarized below in Article IV, regarding the Debtor's liability under the Pension Plan which gives the PBGC an allowed general unsecured claim in the amount of $4,616,067 and provides for the consensual treatment of such Allowed Claim by the Plan. The PBGC's Allowed Claim is classified in Class 3 in the Plan.

The American Federation of Musicians and Employers' Pension Fund also filed a proof of claim on account of withdrawal liability under a pension fund in excess of $17,647,298. This claim, in addition to other general unsecured claims, including claims relating to among others, executory contracts, is treated in the Plan as General Unsecured Claims in Class 4.

Additionally, the Plan Proponents estimate liability in the amount of $20,000 to $40,000 for Allowed General Unsecured Claims of $2,000 or less. These claims are treated as an impaired Class 5 – Unsecured Convenience Claims – under the Plan.

Finally, early in the Chapter 11 Case, the Court denied the Debtor's request to refund prepaid tickets - claims for which were initially scheduled by the Debtor as being entitled to priority. Nevertheless, the claims for prepaid ticket purchases are treated as an unimpaired Class 6 under the Plan and will be paid in full.

The Plan Sponsors believe that certain claims, or portions thereof, may be reduced, disallowed and/or reclassified.

9

2.      *Plan and Operations Funding*

As of August 2015, the Debtor had approximately $208,000 of Cash on hand.  On the Effective Date, NYCO Renaissance, through a pledge by Niederhoffer, is to contribute $1,250,000 in Cash to the Reorganized Debtor.  Based on the Plan Sponsors' estimates of Allowed Claims and on the Liquidation Analysis attached hereto as **Exhibit "3"**, it is anticipated by the Plan Sponsors that the Debtor's Cash on hand, together with the contribution from NYCO Renaissance, will enable the Reorganized Debtor to fund distributions required to be made under the Plan.

The Reorganized Debtor will issue two non-interest bearing promissory notes payable for a total aggregate value of $1,925,000 payable over four (4) years. The first note, the PBGC Note, will be in the face amount of $340,000 and payable to the PBGC.  The second note, the GUC Note, will be in the face amount of $1,585,000 and payable to the holders of Class 4 Claims. Copies of the forms of the PBGC Note and the GUC Note shall be included in the Plan Supplement.  The Reorganized Debtor's obligation to make any payments under the GUC Note will be conditioned upon the Reorganized Debtor obtaining at least $5,000,000 of the Pending Bequests.  The Pending Bequests are described more fully in Article II of the Disclosure Statement and directly below herein.

The Plan Sponsors anticipate that the Reorganized Debtor will be able to meet its obligations under the GUC Note and PBGC Note because, as set forth above and indicated by the Reorganized Debtor's Projections, among other things, NYCO Renaissance has devoted a substantial amount of time over the past year toward, among other things, creating, developing and producing a number of planned performances which it believes will be successful and contribute to the Reorganized Debtor's income following the Effective Date of the Plan.

The assumptions that underpin the projected earned revenue from ticket sales for the Reorganized Debtor are as follows:

Large Scale Production: **$76,050** Income each performance

| **Large Scale Productions** | | |
|---|---|---|
| **Ticket Income** | | |
| Quantity of Seats | Rate/ticket | |
| 50 | - | - |
| 100 | 20 | 2,000 |
| 500 | 150 | 75,000 |
| 250 | 100 | 25,000 |
| 200 | 75 | 15,000 |
| | | |
| Projected Sales per performanc | | 117,000 |
| | | |
| 65% Sales per performance | | 76,050 |

10

Small Scale Production: **$6,675** Income each performance

| Small Scale Productions | | |
|---|---|---|
| **Ticket Income** | | |
| Quantity of Seats | Rate/ticket | |
| 20 | - | - |
| 25 | 20 | 500 |
| 150 | 50 | 7,500 |
| 9 | 100 | 900 |
| | | |
| Projected Sales/performance | | 8,900 |
| | | |
| 75% Sales/performance | | 6,675 |

VOX Production: **$3,750** Income each performance

| Small Scale Productions | | VOX |
|---|---|---|
| **Ticket Income** | | |
| Quantity of Seats | Rate/ticket | |
| 20 | - | - |
| 25 | 20 | 300 |
| 150 | 50 | 3,750 |
| 9 | 100 | 450 |
| | | |
| Projected Sales/performance | | 4,500 |
| | | |
| 75% Sales/performance | | 3,375 |

Opera for Kids: $26,850 Income each production

| Opera for Kids | | Single Production |
|---|---|---|
| **Number of Productions** | | 1 |
| | | |
| **Ticket Income** | | |
| Tickets | Rate/ticket | |
| IACE | | |
| 1400 | 15 | 21,000 |
| Public | | |
| 390 | 15 | 5,850 |
| | | |
| Sales (full run) | | 26,850 |

In addition to the revenue from performances, a broad fundraising model involving the New Board, corporations, high-net-worth donors, foundations, government, and individuals will ensure a strong foundation for the company as it expands in measured steps. The Reorganized Debtor will also develop additional sources of earned income so as to augment annual fundraising requirements even as the company expands.

11

The New Board will carefully monitor results before approving any budget expansion. Alliances and renewed relationships with major artists and stakeholders are important facets of NYCO Renaissance. Alliances are already in place with groups such as American Opera Projects, and the Martina Arroyo Foundation, and NYCO Renaissance has received letters of support from notables such as Plácido Domingo, Hal Prince and Renata Scotto. To date, NYCO Renaissance has received in excess of $2.5 million in pledges of financial support. The combination of strong artistic principles, decades of experience, sound business practices, and an inclusive operating plan will ensure artistic excellence and financial sustainability and allow NYCO Renaissance, once again "The People's Opera," to provide compelling, world-class productions at affordable prices to a broad and growing audience. Moreover, it will present more first-rate operas at a far lower cost and fundraising requirement than in prior years.

A copy of the Reorganized Debtor's Projections for the period from the Effective Date through the fourth (4th) anniversary thereof is annexed hereto as **Exhibit "2"**.

Additionally, as noted in the Disclosure Statement, prior to the Petition Date, the Debtor's operations had been funded in part through the Endowment, the current principal amount of which is approximately $4.8 million. The Reorganized Debtor intends to draw on only the investment income (interest and dividends) of the Endowment, thereby preserving and ultimately restoring the principal thereof.

As also noted in the Disclosure Statement, the Reorganized Debtor may receive Pending Bequests within twelve to twenty-four (12-24) months after the Effective Date of the Plan that would assist the Reorganized Debtor in operating after the Effective Date. Of the total approximate amount ($8,112,500) of the Pending Bequests, approximately $6,912,500 is in the form of unrestricted gifts which the Reorganized Debtor may, in its discretion, use upon receipt. Approximately $500,000 of the Pending Bequests may be used for new productions of opera, and approximately $700,000 of the Pending Bequests may be used to establish an endowment fund in the name of the decedent to be used exclusively to purchase costumes and stage sets. The Reorganized Debtor will use any restricted funds only in a manner as intended by the donor.

Accordingly, the Plan Sponsors believe that the Reorganized Debtor will be able to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business after emerging from chapter 11 to fully satisfy the feasibility standard of section 1129(a)(11).

## IV.

## SUMMARY OF THE PLAN

A.    *Administrative and Priority Claims*

1.    *Administrative Claims*

Subject to the provisions of sections 328, 330(a), 331, 503 and 507(a)(2) of the Bankruptcy Code, the Debtor or the Reorganized Debtor, as applicable, shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date

such Allowed Administrative Claim becomes Allowed. The Plan Sponsors estimate that the
Allowed Administrative Claims will be in the range of $410,000 to $522,723.

> ### 2.    *Priority Tax Claims*

The Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the full
unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the
later of: (a) the Effective Date; and (b) the date such Allowed Priority Tax Claim becomes
Allowed.  The Plan Sponsors do not anticipate that there will be any Allowed Priority Tax
Claims.

> ### B.    *Classification and Treatment of Claims*

> ### 1.    *Summary*

The Plan constitutes a chapter 11 plan of reorganization for the Debtor.  Except for
Administrative Claims and Priority Tax Claims, all Claims against the Debtor are placed in
Classes.  As there are no membership interests in the Debtor, there is no class of "interests."  In
accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority
Tax Claims are not classified as described above. The table in Article III of the Plan classifies
Claims against the Debtor for all purposes, including voting, confirmation and distribution under
the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.   The
classification and treatment of classified Claims are summarized as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims – Severance/ Wage | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | PBGC Claims | Impaired | Yes |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | Unsecured Convenience Claims | Impaired | Yes |
| 6 | Deposit Claims | Unimpaired | No (deemed to accept) |

> ### 2.    *Class 1 – Other Priority Claims –Severance/Wage Claims*

> (a)    *Classification*:  Class 1 consists of the Severance/Wage Claims.

> (b)    *Treatment*:   Except to the extent that the Holders of Claims in
Class 1 agree to a less favorable treatment, in exchange for full and final satisfaction, settlement,
release and discharge of the Severance/ Wage Claims, the Severance/ Wage Claims shall be paid
in full in Cash on or as soon as practicable after the later of: (a) the Effective Date; and (b) the
date such Allowed Severance/Wage Claim becomes Allowed.  The Plan Sponsors estimate that
the Allowed Severance/Wage Claims will be in the range of $209,419 to $1,179,222.

> (c)    *Impairment and Voting*: Class 1 is unimpaired by the Plan.  The
Holders of Claims in Class 1 are presumed to accept and therefore are not entitled to vote to
accept or reject the Plan.

13

3.     _Class 2 –Secured Claims_

(a)     *Classification:* Class 2 consists of Secured Claims.

(b)     *Treatment:* Except to the extent that a holder of an Allowed Secured Claim and the Plan Sponsors agree to a different treatment, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, (i) each Allowed Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim shall receive Cash in an amount equal to such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) each Holder of an Allowed Secured Claim shall receive the collateral securing its Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable. The Plan Sponsors do not anticipate that there will be any Allowed Class 2 Claims.

(c)     *Impairment and Voting:* Class 2 is unimpaired by the Plan. The Holders of any Allowed Secured Claims are presumed to accept and therefore are not entitled to vote to accept or reject the Plan.

4.     _Class 3— PBGC Claims_

(a)     *Classification:* Class 3 consists of the PBGC Claims.

(b)     *Treatment*: The PBGC and the Plan Sponsors have agreed that, in full satisfaction, discharge, settlement, release, and compromise of and in exchange for the PBGC Claims, the PBGC Claims shall be Allowed in the total amount of $4,616,067, and the PBGC shall receive on the Initial Distribution Date, or as soon as practicable thereafter, (i) its Pro Rata Distribution of the assets of the Debtor's Estate (other than the proceeds of the GUC Note), and (ii) the PBGC Note. The PBGC Claims are being treated separately from other Claims due to special circumstances and the hybrid nature of the PBGC Claims.

(c)     *Impairment and Voting:* Class 3 is impaired by the Plan. The PBGC is entitled to vote to accept or reject the Plan.

5.     _Class 4 – General Unsecured Claims_

(a)     *Classification*: Class 4 consists of all General Unsecured Claims.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, discharge, settlement, release, and compromise of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive on the Initial Distribution Date, or as soon as practicable thereafter, its Pro Rata Distribution of (i) the assets of the Debtor's Estate, and (ii) the proceeds of the GUC Note. The Plan Sponsors estimate that the Allowed Class 4 Claims will be in the range of $20,742,293 to $25,086,097.

DM3\3651348.2

(c)    *Impairment and Voting*:  Class 4 is impaired by the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

6.    <u>*Class 5 – Unsecured Convenience Claims*</u>

(a)    *Classification*:   Class 5 consists of all Unsecured Convenience Claims.

(b)    *Treatment*:  In full satisfaction, discharge, settlement, release, and compromise of and in exchange for the Unsecured Convenience Claims, each Holder of an Allowed Unsecured Convenience Claim shall receive on the Initial Distribution Date, or as soon as practicable thereafter, sixty percent (60%) of each individual Allowed Unsecured Convenience Claim.

(c)    *Impairment and Voting:*  Class 5 is impaired by the Plan.  Each Holder of an Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

7.    <u>*Class 6 – Deposit Claims*</u>

(a)    *Classification*:  Class 6 consists of all Claims held on account of prepaid ticket purchases.

(b)    *Treatment*:  Except to the extent that the Holders of Claims in Class 5 agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the Deposit Claims, the Deposit Claims shall be paid in full in Cash on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Deposit Claim becomes Allowed.  The Plan Sponsors estimate that the Deposit Claims will be approximately $289,022.

(c)    *Impairment and Voting*: Class 6 is unimpaired by the Plan.  The Holders of Claims in Class 6 are presumed to accept and therefore are not entitled to vote to accept or reject the Plan

The Reorganized Debtor reserves its right to dispute the validity of any Claim, other than the Allowed PBGC Claim, whether or not objected to prior to the Effective Date.

C.    *Liquidation Analysis and Plan Confirmation Requirements*

As summarized above, pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in Classes 3, 4 and 5 are impaired and thus must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described in the Disclosure Statement.

As is noted in the Disclosure Statement, the Debtor's sale process produced an aggregate offer from NYCO Renaissance of $1,250,000 that was accepted by the Debtor as the highest and best offer.  Based on that amount, together with the Debtor's available Cash of approximately $208,000, the Plan Sponsors believe that the value of distributions in a hypothetical chapter 7

15

liquidation, if any, would be at most $1,458,000, which is less than the value of distributions available under the Plan. As discussed above and indicated in the Liquidation Analysis attached at **Exhibit "3"**, the settlement of the PBGC Claims, the Unsecured Convenience Claims and Deposit Claims, and their separate treatment from the General Unsecured Claims is available under the Plan, and not under a liquidation scenario. Likewise, the PBGC Note and the GUC Note would also not be available in a liquidation scenario. Indeed, the distributions to Classes 3 (PBGC Claims), 4 (General Unsecured Claims), 5 (Unsecured Convenience Claims) and 6 (Deposit Claims), which would not be treated separately and would jointly share in any assets of the Debtor's Estate, would be at most 3.27%, which is less than the value of distributions to such Holders under the Plan. Therefore, the Plan Sponsors believe that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code. Even using the value of the bid submitted by New Vision of $1,500,000 (which was not accepted by the Debtor as the highest and best bid), the liquidation analysis does not change in any material manner.

To the extent that Classes 3, 4 and 5 vote to reject the Plan, the Plan Sponsors reserve the right to (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, and/or (b) modify the Plan.

Notwithstanding anything to the contrary contained herein, prior to confirmation of the Plan, the Committee reserves the right to withdraw as joint proponent of this Plan and support an alternative plan of reorganization in the event that the Committee, in the reasonable exercise of its fiduciary responsibilities, should determine that a superior plan of reorganization is more advantageous for creditors of the Debtor.

The Plan Sponsors do not believe that the Plan discriminates unfairly against any impaired Class of Claims. The Plan Sponsors believe that the Plan and the treatment of all Classes of Claims under the Plan satisfy the requirements for nonconsensual confirmation of the Plan.

D.   *Means for Implementation of the Plan*

1.   *Corporate Existence*

The Reorganized Debtor shall continue to exist after the Effective Date as a not-for-profit corporate entity with all the powers of a corporation pursuant to the applicable laws of New York and pursuant to the corporate documents in effect prior to the Effective Date, as same may be amended, modified or revised by the Plan Sponsors to effectuate the transactions contemplated by the Plan. In this regard, the Reorganized Debtor anticipates that it will adopt (to the extent not already in existence), amend or modify some or all of the following corporate documents, including the Certificate of Incorporation; By-Laws; Code of Conduct and Ethics; Conflict of Interest Policy; Board Member Evaluation Policy Statement; Gift Acceptance Policy; Investment Policy for all Institutional Funds; Investment Policy for Endowment Funds; Complaint Procedures for Accounting and Auditing Matters; Recommended Record Retention Guidelines; Whistleblower Policy; and Board Committee Charters for any Board Committees that currently exist or that may be formed, including an executive and Finance Committee to effectuate the transactions contemplated by the Plan as well as to bring the Reorganized Debtor's corporate

16

documents into compliance with the New York's Nonprofit Revitalization Act of 2013. All material amended or modified corporate documents will be included in the Plan Supplement.

2.       *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (2) the filing of appropriate corporate governance documents, including but not limited to, any new or amended or modified documents contained in the Plan Supplement with the appropriate governmental authorities pursuant to applicable law; and (3) all other actions that the Reorganized Debtor determines are necessary or appropriate.

3.       *Corporate Action*

Each of the matters provided for by the Plan (including the Plan Supplement) involving the Reorganized Debtor's corporate structure, financing or related actions to be taken by or required of the Debtor or Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified as of the Effective Date in all respects without any requirement of further action by holders of Claims, the directors of the Debtor or any other entity.  The Reorganized Debtor shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.

4.       *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor, and the officers of the Reorganized Debtor and members of the New Board, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

5.       *New Board Representation*

Capasso shall be the initial General Director of the Reorganized Debtor.  Niederhoffer shall be the initial Chair of the New Board.  The remainder of the members of the New Board shall be disclosed in the Plan Supplement prior to the Disclosure and Confirmation Date in accordance with section 1129(a)(5) of the Bankruptcy Code.

6.       *Management/Corporate Governance*

Laikind shall be the initial President of the Reorganized Debtor.  The names and qualifications of any other persons who will act as officers/ senior management of the Reorganized Debtor as of the Effective Date shall be disclosed in the Plan Supplement in

17

accordance with section 1129(a)(5) of the Bankruptcy Code. The Reorganized Debtor's officers and other senior management, including Capasso, shall serve in accordance with any employment agreement that may be entered into with the Reorganized Debtor and applicable nonbankruptcy law.

The New Board will act to carefully protect accumulated assets and the Endowment and, to the extent received, the Pending Bequests, and ensure that current income is managed properly, acting as trustees in the literal and legal sense of the term. Regardless of the degree of authority delegated to staff, committees, or affiliates, the New Board, and therefore the individual trustees, is ultimately accountable. The New Board has the principal responsibility for fulfillment of the organization's mission and the legal/fiduciary accountability for its operations. Members of the New Board are expected to act responsibly and in good faith, and with the basic interests of the company as the foremost objective.

As part of this process, the New Board will develop and approve the annual budget, and meticulously monitor the ongoing financial results of the Reorganized Debtor. To do so, the New Board will engage management and staff to produce accurate and timely financial reports on a regular basis. All New Board members will receive quarterly balance sheets with a consolidated accounting of all assets and current liabilities. Reports will also include statements of income and expenses, at a level of detail that clarifies the attribution of revenues and costs to various programs, and these reports also include clear analyses of ticket sales, fundraising results, deviations from projections, etc. Monthly financial reports ("**MFRs**") will be provided to the treasurer and members of the finance and executive committees. New Board members are expected to understand and comment on these reports, and are encouraged to suggest improvements in the formats and presentations of financial reports. The New Board will also engage an annual audit by an independent certified public accountant or accounting firm. The Finance Committee will be created on the Effective Date to work with the auditor during and after this process, and all New Board members will receive the audit report prior to the meeting at which it is to be discussed.

Additionally, for so long as the PBGC Note and the GUC Note remain outstanding, copies of all MFRs will also be delivered on a monthly basis to (a) a responsible person designated by the Committee prior to the Effective Date (and disclosed in the Plan Supplement), and (b) the Office of the New York Attorney General (Charities Bureau). Further, the Finance Committee so established by the Reorganized Debtor shall make itself available for a standing conference call with such recipients on a quarterly basis in order to answer questions or discuss issues or matters related to the MFRs. The following protocol shall be included in an amendment to the By-Laws and the Finance Committee Charter of the Reorganized Debtor described above.

The New Board will monitor current and proposed programs and services to ensure that they are consistent with the organization's stated mission and purposes. Given limited resources and unlimited demands on them, the New Board will assist the General Director in deciding among competing priorities. Recognizing the close ties between financial and programming decisions, the impact of programming choices on fundraising, audience attendance and earned income, and the impact of both of these on unearned income from funders, financial and programmatic decisions are not made independently of each other. The New Board intends to

DM3\3651348.2

strike a balance between its responsibility to ensure quality, cost-effective programs and services, and the staff's responsibility to creatively initiate and conduct them. Candor, openness and explicit job descriptions help negotiate an accommodation satisfactory to everyone.

As set forth above, the Reorganized Debtor shall maintain the Debtor's existing mission and historical practice in order to meet the needs of the various constituencies as determined by the New Board.

### 7. *Vesting of Assets in the Reorganized Debtor*

On the Effective Date, NYCO Renaissance will be dissolved and its assets will be distributed to the Reorganized Debtor in accordance with its Certificate of Incorporation, Delaware law and the requirements of the Internal Revenue Code. Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on and after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Estate and any property acquired by the Debtor or Reorganized Debtor, including, but not limited to, the assets of NYCO Renaissance, pursuant hereto shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances; provided however, that nothing in the Plan shall release or terminate any restrictions donors imposed on the Endowment, any use-restricted funds or the Pending Bequests. Except as may be provided in the Plan or the Disclosure and Confirmation Order, on and after the Effective Date, the Reorganized Debtor may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### E. *Committee*

As of the Effective Date, the Committee shall dissolve, its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case and the retention and employment of the Professionals retained by the Committee shall terminate as of the Effective Date, provided, however, that the Committee shall continue to exist, and its Professionals shall be retained, after such date solely with respect to the review, objection and prosecution of applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.

### F. *Provisions Governing Distributions*

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan.

### G. *Disputed Claim Reserve*

#### 1. *Establishment of Disputed Claim Reserve*

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Reorganized Debtor shall establish a separate Disputed Claim Reserve for Disputed Claims that may be entitled to a Distribution under the Plan, which Disputed Claim Reserve shall be administered by the Reorganized Debtor. The Reorganized

19

Debtor shall reserve Distributions, as applicable to each Disputed Claim, sufficient to provide Holders of Disputed Claims the treatment such Holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court).

2.    *Maintenance of Disputed Claim Reserve*

The Reorganized Debtor shall hold Distributions in the Disputed Claim Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed.  The Reorganized Debtor shall, in its sole discretion, make such Distributions, as provided herein, as such Disputed Claims are resolved by a Final Order, and such Distributions will be distributable in respect of such Disputed Claims as such Distributions would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

H.    *Quarterly Distributions*

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan on such date.  Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtor as applicable, in the Disputed Claim Reserve pursuant to the Plan and Distributed on the first Quarterly Distribution Date after such Claim is Allowed.

I.    *Delivery of Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Reorganized Debtor at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim Filed by such Holder, or (ii) the last known address of such Holder if no Proof of Claim is filed.

If any Distribution is returned as undeliverable, the Reorganized Debtor may, in its discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Reorganized Debtor deems appropriate. Amounts in respect of any undeliverable Distributions made by the Reorganized Debtor shall be returned to, and held in trust by, the Reorganized Debtor until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and as is set forth in the Plan.  Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically canceled, discharged and forever barred.  Except as otherwise provided herein, all funds or other property that vests or revests in the Reorganized Debtor pursuant to this Article shall be distributed by the Reorganized Debtor in accordance with the provisions of the Plan.

J.      *Disputed Claims*

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtor, in its discretion, make, file, prosecute, settle, compromise, withdraw or resolve in any manner, objections to Claims.

K.      *Objection Deadline*

All objections to Disputed Claims shall be filed and served upon the Holders of each such Claim on or before the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

Except as otherwise agreed, any and all Proofs of Claim filed after the applicable deadline shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Disclosure and Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

L.      *Treatment of Executory Contracts and Unexpired Leases*

The Bankruptcy Code permits debtors to "assume" or "reject" executory contracts. The Debtor will exercise those rights under the terms of the Plan.

1.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

(a)      The Debtor was a party to a number of collective bargaining agreements ("**CBAs**") with various unions. In connection with certain of the CBAs, the Debtor was required to maintain certain defined benefit pension plans. A number of the collective bargaining agreements have expired. NYCO Renaissance has reached an agreement in principle with Associated Musicians of Greater New York, Local 802, American Federations of Musicians and has commenced negotiations with certain unions with respect to new agreements, or amendments or modifications to existing agreements. With respect to any other CBAs that have not yet expired, NYCO Renaissance intends to seek in good faith to amend or modify such agreements and cause the Reorganized Debtor to assume the CBAs as so revised.

(b)      Executory contracts and unexpired leases that are listed in the Plan Supplement as executory contracts or unexpired leases to be assumed shall be deemed assumed by the Debtor as of the Effective Date, and the entry of the Disclosure and Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(c)      Executory contracts and unexpired leases that have not expired by their own terms on or prior to the Effective Date, which the Debtor has not assumed or rejected during the pendency of the Chapter 11 Case, which are not listed in the Plan Supplement as executory contracts or unexpired leases to be assumed, and that are not the subject of a motion to assume pending as of the Effective Date, shall be deemed rejected by the Debtor on the Effective Date. The entry of the Disclosure and Confirmation Order by the Bankruptcy Court shall

21

constitute approval of any such rejections, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(d)    Any objections to the proposed assumption or rejection of a contract must be filed by no later than the applicable date set forth in the Solicitation Order.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or rejection of any executory contract or unexpired lease will be deemed to have consented to such treatment.

2.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

To the extent an executory contract or lease is rejected by the Debtor, the Debtor's contract counterparty may suffer damages, and may be able to assert a Claim against the estate for such damages.

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII of the Plan, must be filed and served no later than thirty (30) days after the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease for which Proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the Plan.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of the Plan.

M.    *Discharge, Release, Injunction and Related Provisions*

1.    *Discharge of Claims and Termination of Interests*

The Bankruptcy Code provides a debtor with a "discharge" upon confirmation of a chapter 11 plan.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, and rights against the Debtor, Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts, in each case whether or not:  (i) a Proof of Claim based upon such Claim, debt or right, is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has accepted the Plan.  The Disclosure and Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

22

2.      *Releases*

In addition to the discharge granted to the Debtor, the Plan contemplates releases being granted in favor of certain non-debtor third parties.

Specifically, and notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, the Debtor on behalf of itself and the Estate, for the good and valuable consideration provided by each of the Releasees, hereby provides a full release to the Releasees from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor or the Reorganized Debtor would have been legally entitled to assert or that any Holder of a Claim against the Debtor or other Entity would have been legally entitled to assert for or on behalf of the Debtor, the Reorganized Debtor or the Estate and further including those in any way related to the Chapter 11 Case or the Plan; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence or willful misconduct.

In addition, and notwithstanding anything contained in the Plan to the contrary, on the Effective Date, each Holder of a Claim against the Debtor who votes in favor of the Plan pursuant to section 1126(f) of the Bankruptcy Code, in consideration of the obligations provided under the Plan and for other good and valuable consideration provided by the Debtor and the Plan Sponsors, hereby provides a full release to the Releasees (and each such person or party so released shall be deemed released by each such Holder) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Releasees, the Chapter 11 Case or the Plan; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence or willful misconduct.

3.      *Exculpation*

Separate and apart from the releases noted above, the Plan contemplates that certain non-debtor third parties will be exculpated from liability for any claims asserted against them arising out of the Chapter 11 Case.

Specifically, the Plan provides that Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to,

23

formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken after the Petition Date or omitted to be taken in connection with or in contemplation of the transactions occurring in the Chapter 11 Case; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Exculpated Party that results from any act or omission that is determined in a Final Order to be solely due to such Exculpated Party's own gross negligence or willful misconduct.

    4.  *Preservation of Rights of Action*

   Except as otherwise provided in the Plan or Disclosure and Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest upon the Effective Date in the Reorganized Debtor; and the Reorganized Debtor shall have all rights to pursue such Causes of Action.

    5.  *Release and Injunction*

   **Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Reorganized Debtor, the Releasees, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released, exculpated, or to be exculpated, pursuant to the Plan or the Disclosure and Confirmation Order.**

   **Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, or their successors and assigns and their assets and properties, any other Claims based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.**

   **Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, the rights afforded in the Plan and the treatment of all Claims in the Plan shall be in exchange for and in complete satisfaction of Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or the Reorganized Debtor or any of their assets or properties.  On the Effective Date, all such Claims against the Debtor shall be satisfied and released in full.**

   **Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim against or interest in the Debtor that is satisfied and released hereby, from:**

DM3\3651348.2

    i.      **commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor their successors and assigns and their assets and properties;**

    ii.     **enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, the Reorganized Debtor their successors and assigns and their assets and properties;**

    iii.    **creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Reorganized Debtor or the property or Estate of the Debtor or the Reorganized Debtor;**

    iv.    **asserting any right of setoff or subrogation of any kind against any obligation due from the Debtor or against the property or Estate of the Debtor or the Reorganized Debtor, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed Proof of Claim; or**

    v.     **commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim against the Debtor or Cause of Action that is released or settled hereunder.**

      6.     *Special Provision Regarding the Pension Plan*

Nothing in the Debtor's bankruptcy proceeding, the Bankruptcy Code (and section 1141 thereof), the Disclosure and Confirmation Order or the Plan (including Article IX) shall in any way be construed to discharge, release, limit, or relieve any party for fiduciary breach related to the Pension Plan. The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Disclosure and Confirmation Order, Bankruptcy Code, or any other document filed in the Debtor's bankruptcy case.

      7.     *Releases of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Reorganized Debtor.

      N.     *Retention of Jurisdiction*

Notwithstanding entry of the Disclosure and Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Reorganized Debtor and the Plan as is legally permissible and as set forth in Article X of the Plan.

## V.

## VOTING PROCEDURES

The Bankruptcy Court entered the Solicitation Order approving the solicitation of acceptances and rejections of the Plan notwithstanding the lack of approval of the Disclosure Statement.  In connection therewith, the Bankruptcy Court has scheduled a combined hearing to consider approval of the Disclosure Statement, and pursuant to Section 1128(a) of the Bankruptcy Code, confirmation of the Competing Plans.  Holders of Claims are encouraged to review the Solicitation Order, the relevant provisions of the Bankruptcy Code, and to consult their own advisors.  The overall voting procedures are more fully described in the Disclosure Statement.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE PLAN SPONSORS OR THE DEBTOR AS SET FORTH BELOW IN ARTICLE VI.

Of the classes of Claims at issue in the Plan, Classes 1, 2 and 6 are "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered.  As a result, Holders of such Claims are conclusively presumed to accept the Plan.  Accordingly, Holders of Claims in Classes 1, 2 and 6 are not entitled to vote on the Plan, and the vote of such Holders of Claims shall not be solicited.

Classes 3, 4 and 5 are "Impaired" under the Plan and are either entitled to vote on, or conclusively presumed to reject, the Plan.  Only Holders of Claims in Class 3, 4 and 5 are entitled to vote to either accept or reject the Plan. There are no Holders of membership interests in the Debtor as the Debtor is a not-for-profit corporation.

Instructions for completing the ballot included in the Solicitation Package are set forth in Article VI of the Disclosure Statement.

There are no Holders of interests in the Debtor.

## VI.

## MISCELLANEOUS PLAN PROVISIONS

Any pleading, notice or other document required by the Plan to be served on or delivered to the Plan Sponsors and/or Debtor shall be sent by first class U.S. mail, postage prepaid as follows:

To the Plan Sponsors:

**KLESTADT WINTERS JURELLER**
**SOUTHARD STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036-7203
Telephone:(212) 972-3000
Facsimile:(212) 972-2245
Sean C. Southard, Esq.
Maeghan J. McLoughlin, Esq.
ssouthard@klestadt.com
mmcloughlin@klestadt.com

*Counsel to Official Committee*

**DUANE MORRIS LLP**

1540 Broadway
New York, New York 10036-4086
Telephone:  (212) 692-1000
Facsimile:     (212) 692-1020
Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.
gcatalanello@duanemorris.com
jvincequerra@duanemorris.com

*Counsel to NYCO Renaissance Ltd.*

To the Debtor:

**Lowenstein Sandler LLP**
Kenneth A. Rosen, Esq.
Nicole Stefanelli, Esq.
1251 Avenue of the Americas
New York, New York 10020

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
nstefanelli@lowenstein.com

# VII.

# PLAN SUPPLEMENT

The Plan Supplement will be filed with the Bankruptcy Court no later than ten (10) days prior to the Disclosure and Confirmation Hearing.  The Plan Supplement shall include forms of the documents relating to the Plan. The Plan Sponsors reserve the right to modify and supplement the Plan Supplement through and including the Disclosure and Confirmation Date.

27

# VIII.

## CONCLUSION AND RECOMMENDATION

The Plan Sponsors believe the Plan is in the best interests of all Holders of Claims. The Plan Sponsors urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots, as applicable, so they will be received by the Voting Deadline.

Dated: December 2, 2015

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS LLP**
200 West 41st Street, 17th Floor
New York, New York 10036-7203
Telephone:     (212) 972-3000
Facsimile:     (212) 972-2245
Sean C. Southard, Esq.
Maeghan J. McLoughlin, Esq.
ssouthard@klestadt.com
mmcloughlin@klestadt.com

*Counsel to Official Committee of
Unsecured Creditors, Plan Co-Sponsor*

**DUANE MORRIS LLP**

1540 Broadway
New York, New York 10036-4086
Telephone:     (212) 692-1000
Facsimile:     (212) 692-1020
Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.
gcatalanello@duanemorris.com
jvincequerra@duanemorris.com

*Counsel to NYCO Renaissance, Ltd.,
Plan Co-Sponsor*

DM3\3651348.2

# EXHIBIT 1

**The Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : |
| | : |
| New York City Opera, Inc., | : Case No. 13-13240 (SHL) |
| | : |
| Debtor. | : Chapter 11 |
| | : |
| | : |

---

### FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF NYCO RENAISSANCE LTD. AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR NEW YORK CITY OPERA, INC.

---

Dated: December 2, 2015

**DUANE MORRIS LLP**
1540 Broadway
New York, New York 10036-4086
Telephone:     (212) 692-1000
Facsimile:     (212) 692-1020
Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.

*Counsel to NYCO Renaissance, Ltd.,*
*Plan Co-Sponsor*

**KLESTADT WINTERS JURELLER**
**SOUTHARD STEVENS, LLP**
200 West 41st Street, 17th Floor
New York,  New York 10036-7203
Telephone:     (212) 972-3000
Facsimile:     (212) 972-2245
Sean C. Southard, Esq.
Maeghan J. McLoughlin, Esq.

*Counsel to Official Committee of*
*Unsecured Creditors, Plan Co-Sponsor*

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS ...................................................................................1

    A.    Defined Terms ...............................................................................1

    B.    Exhibits ..........................................................................................6

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS ....................7

    A.    Administrative Claims ................................................................7

    B.    Priority Tax Claims.....................................................................7

    C.    Payment of Statutory Fees ..........................................................7

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND
MEMBERSHIP INTERESTS ....................................................................................7

    A.    Summary .......................................................................................7

    B.    Classification and Treatment of Claims....................................8

        1.    *Class 1—Other Priority Claims – Severance/ Wage Claims*......................8

        2.    *Class 2—Secured Claims*.......................................8

        3.    *Class 3—PBGC Claims* .........................................8

        4.    *Class 4—General Unsecured Claims* .........................9

        5.    *Class 5—Unsecured Convenience Claims*..................9

        5.    *Class 6—Deposit Claims*........................................9

    C.    Acceptance or Rejection of the Plan.......................................10

        1.    Acceptance by an impaired Class ...............................10

        2.    Presumed Acceptance of the Plan ...............................10

        3.    Voting Class..............................................................10

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .......................10

    A.    Funding for the Plan................................................................10

B.    Corporate Existence ...........................................................................................10

C.    New Board Representation ...................................................................................11

D.    Restructuring Transactions ..................................................................................11

E.    Corporate Action.................................................................................................11

F.    Effectuating Documents; Further Transactions ...................................................11

G.    Exemption from Certain Transfer Taxes and Recording Fees.............................12

H.    Management/Corporate Governance ....................................................................12

I.    Committee............................................................................................................13

J.    Vesting of Assets in the Reorganized Debtor ......................................................14

ARTICLE V. PROVISIONS GOVERNING DISTRIBUTIONS .........................................14

A.    Initial Distribution Date ......................................................................................14

B.    Disputed Claim Reserve ......................................................................................14

    1.    *Establishment of Disputed Claim Reserve* .................................................14

    2.    *Maintenance of Disputed Claim Reserve* ..................................................14

C.    Quarterly Distributions ........................................................................................15

D.    Delivery of Distributions .....................................................................................15

    1.    *General Provisions; Undeliverable Distributions* ......................................15

E.    Manner of Cash Payments Under the Plan ..........................................................15

F.    Limitations on Funding of Disputed Claim Reserve ............................................16

G.    Compliance with Tax Requirements.....................................................................16

H.    Setoff and Recoupment .......................................................................................16

ARTICLE VI. DISPUTED CLAIMS ....................................................................................16

A.    No Distribution Pending Allowance ....................................................................16

B.    Resolution of Disputed Claims ............................................................................16

C.    Objection Deadline ..............................................................................................17

D.      Disallowance of Claims ...................................................................................17

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ...........................................................................................................17

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..........17

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ............18

C.      Reservation of Rights .......................................................................................18

ARTICLE VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND
        OCCURRENCE OF THE EFFECTIVE DATE .................................................18

A.      Conditions to Confirmation: .............................................................................18

B.      Conditions Precedent to the Effective Date .......................................................19

C.      Waiver of Conditions Precedent .......................................................................19

ARTICLE IX. DISCHARGE, RELEASE, INJUNCTIVE AND RELATED
        PROVISIONS ..................................................................................................19

A.      Discharge of Claims .........................................................................................19

B.      Releases ...........................................................................................................19

C.      Exculpation .....................................................................................................20

D.      Preservation of Rights of Action .......................................................................20

        1.      *Vesting of Causes of Action* ...............................................................20

        2.      *Preservation of All Causes of Action Not Expressly Settled or
                Released* ..........................................................................................21

E.      Release and Injunction .....................................................................................21

F.      Special Provision Regarding the Pension Plan ...................................................22

G.      Releases of Liens .............................................................................................23

ARTICLE X. RETENTION OF JURISDICTION ...........................................................23

ARTICLE XI. MISCELLANEOUS PROVISIONS .........................................................24

A.      Modification of Plan .........................................................................................24

B.      Revocation of Plan ...........................................................................................25

C.      Successors and Assigns...........................................................................................25

D.      Governing Law .....................................................................................................25

E.      Reservation of Rights............................................................................................25

F.      Section 1146 Exemption .......................................................................................25

G.      Section 1125(e) Good Faith Compliance...............................................................26

H.      Further Assurances................................................................................................26

I.      Service of Documents ...........................................................................................26

J.      Filing of Additional Documents ...........................................................................27

K.      Fiduciary Withdrawal Option as Plan Co-Sponsor................................................27

Pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, NYCO Renaissance, Ltd. and the Official Committee of Unsecured Creditors appointed in the Debtor's bankruptcy case hereby jointly propose the following first amended plan of reorganization for New York City Opera, Inc., debtor and debtor-in-possession.

# ARTICLE I.

# DEFINED TERMS

A.    *Defined Terms*

Unless context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Administrative Claims*" means Claims that have been timely filed for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930; including but not limited to the NV Substantial Contribution Claim.

2.    "*Administrative Claims Bar Date*" means sixty (60) days after the Effective Date.

3.    "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in its schedules of liabilities as other than disputed, contingent or unliquidated, unless a Proof of Claim has been timely filed, and as to which the Debtor or other parties-in-interest have not filed an objection by the Claims Objection Bar Date; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed:  (i) in any stipulation of the amount and nature of a Claim executed prior to the Effective Date and approved by the Bankruptcy Court; or (ii) in any stipulation with the Reorganized Debtor of the amount and nature of a Claim executed on or after the Effective Date; (d) a Claim that is Allowed pursuant to the terms hereof; or (e) a Claim as to which a Proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Bar Date.

4.    "*Assumed Contract*" means any executory contract or unexpired lease assumed by the Reorganized Debtor in accordance with Article VII of the Plan.

5.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor, the Reorganized Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

6.    "*Bankruptcy Code*" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code, together with all amendments and modifications thereto that may be applicable to the Chapter 11 Case.

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Case and as amended from time to time.

9.      "*Business Plan*" means the Reorganized Debtor's business plan as described in Article III of the Summary of First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance Ltd. and the Official Committee of Unsecured Creditors for New York City Opera, Inc.

10.     "*Cash*" means legal tender of the United States of America.

11.     "*Cause(s) of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including, without limitation, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of the Debtor, the Reorganized Debtor and/or the Estate that are or may be pending on the Effective Date against any Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

12.     "*Chapter 11 Case*" means the bankruptcy case commenced when the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date, which is being administered under case number 13-13240 in the Bankruptcy Court.

13.     "*Claim*" means a "claim" (as that term is defined in section 101(5) of the Bankruptcy Code) against the Debtor.

14.     "*Claims Objection Bar Date*" means the bar date for objecting to Claims against the Debtor, which shall be six (6) months after the Effective Date; *provided, however*, that the Reorganized Debtor may seek extensions of this date from the Bankruptcy Court for cause shown.

15.     "*Class*" means a category of Holders of Claims as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

16.     "*Committee*" means the Official Committee of Unsecured Creditors for the Chapter 11 Case appointed pursuant to section 1102 of the Bankruptcy Code, on October 23, 2013, which is also a Plan Sponsor.

17. "*Debtor*" means New York City Opera, Inc., a New York not-for-profit corporation, prior to the Effective Date.

18. "*Deposit Claims*" means any Allowed Claim that satisfies 11 U.S.C. § 507(a)(7).

19. "*Disclosure and Confirmation Date*" means the date on which the Disclosure and Confirmation Order is entered by the Bankruptcy Court.

20. "*Disclosure and Confirmation Hearing*" means the combined hearing before the Bankruptcy Court to determine whether the Disclosure Statement will be approved and the Plan will be confirmed pursuant to sections 1129(a) and 1129(b) of the Bankruptcy Code.

21. "*Disclosure and Confirmation Order*" means the order of the Bankruptcy Court in form and substance acceptable to the Plan Sponsors approving the Disclosure Statement and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

22. "*Disclosure Statement*" means the First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and Official Committee of Unsecured Creditors of New York City Opera, Inc., dated December 2, 2015, as amended from time to time, prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court in the Disclosure and Confirmation Order, as it is amended, supplemented or modified from time to time.

23. "*Disputed Claim*" means any Claim, or any portion thereof, that is not yet an Allowed Claim.

24. "*Disputed Claim Reserve*" means the reserve fund created pursuant to Article VI of the Plan.

25. "*Distributions*" means the distributions of Cash to be made by the Reorganized Debtor or a designee in accordance with the Plan.

26. "*Effective Date*" means the date that is the first business day after the entry of the Disclosure and Confirmation Order on which: (a) no stay of the Disclosure and Confirmation Order is in effect; and (b) all conditions specified in Article VIII have been satisfied or waived.

27. "*Endowment*" means the nine individual funds established prior to the Petition Date which funded, in part, Debtor's operations.

28. "*Entity*" means an "entity" as that term is defined in section 101(15) of the Bankruptcy Code.

29. "*Estate*" means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code; *provided however*, the Estate does not include the Endowment, use-restricted funds, the Pending Bequests or annuities.

30.    "*Exculpated Parties*" means, collectively, (i) the Committee and the individual members thereof acting in their capacity as Committee members, as well as its attorneys, agents, professionals and representatives, (ii) NYCO Renaissance and its officers, directors, attorneys, agents, professionals and representatives, (iii) the Debtor and its officers, directors, attorneys, agents, professionals and representatives, and (iv) New Vision and its officers, directors, attorneys, agents, professionals and representatives.

31.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for a writ of certiorari or move for reargument or rehearing has expired and no such appeal, petition, or motion has been timely filed, or as to which any appeal, petition, or motion that has been filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or has otherwise been dismissed.

32.    "*General Unsecured Claims*" means Claims against the Debtor that are not Secured Claims, Administrative Claims or Priority Claims.

33.    "*GUC Note*" means the note issued by the Reorganized Debtor in the face amount of $1,585,000 and payable to the holders of Class 4 Claims or designee of the Committee for the benefit of non-PBGC creditors, payments under which note shall be conditioned upon the Reorganized Debtor receiving at least $5,000,000 of the Pending Bequests.  The form of the GUC Note shall be included in the Plan Supplement.

34.    "*Holder*" means any Entity holding a Claim against the Debtor.

35.    "*Initial Distribution Date*" means the date on which the Reorganized Debtor shall make its initial Distribution, which shall be a date selected by the Reorganized Debtor as soon as reasonably practicable after the Claims Objection Bar Date.

36.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

37.    "*New Board*" means the board of directors of the Reorganized Debtor to be disclosed in the Plan Supplement.

38.    "*New Vision*" means New Vision for NYC Opera, Inc., a not-for-profit entity formed by Gene Kaufman.

39.    "*NV Substantial Contribution Claim*" means an Allowed Administrative Claim in the amount of $300,000 payable to New Vision pursuant to section 503(b) and entitled to priority pursuant to section 507(a)(2).  The NV Substantial Contribution Claim will be the subject of a separate motion to be filed with the Court and heard on the same day as confirmation of the Plan.

40.    "*NYCO Renaissance*" means NYCO Renaissance, Ltd.

41.    "*PBGC*" means the Pension Benefit Guaranty Corporation.

42.     "*PBGC Claims*" means the Proofs of Claim filed by the PBGC for unfunded benefit liabilities, unpaid minimum funding contributions and statutory premiums relating to the Pension Plan.

43.     "*PBGC Note*" means the promissory note to be issued by Reorganized Debtor in the face amount of $340,000 and payable to the PBGC.  The form of the PBGC Note shall be included in the Plan Supplement.

44.     "*Pending Bequests*" means charitable bequests made for Debtor's benefit by supporters of the Debtor who passed prior to the Petition Date or during the pendency of the Chapter 11 Case, described more fully in the Disclosure Statement.

45.     "*Pension Plan*" means the Retirement Plan for Salaried Employees of New York City Opera established effective July 1, 2010, maintained and administered by the Debtor, and covered by Title IV of ERISA.

46.     "*Petition Date*" means October 3, 2013.

47.     "*Plan*" means this first amended joint plan under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or herewith, as the case may be, and the Plan Supplement, which is incorporated herein by reference.

48.     "*Plan Sponsors*" means NYCO Renaissance and the Committee.

49.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan which shall be filed no later than ten (10) days prior to the Disclosure and Confirmation Hearing.

50.     "*Priority Claims*" means Claims entitled to priority under section 507(a) of the Bankruptcy Code.

51.     "*Priority Tax Claims*" means Priority Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code.

52.     "*Pro Rata*" means the ratio of the amount of an individual Claim in any particular Class of Claims to the aggregate amount of all Claims in such Class that have not yet been disallowed.

53.     "*Proof of Claim*" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

54.     "*Quarterly Distribution Date*" means the first business day after the end of each quarterly calendar period.

55.     "*Releasees*" means, collectively, (i) the Committee and the individual members thereof acting in their capacity as Committee members, as well as its attorneys, agents, professionals and representatives, (ii) NYCO Renaissance, and its officers, directors, attorneys,

agents, professionals and representatives, (iii) the Debtor, and its officers, directors, attorneys, agents, professionals and representatives, and (iv) New Vision, and its officers, directors, attorneys, agents, professionals and representatives.

56. "*Reorganized Debtor*" means the Debtor or any successor thereto, by merger, affiliation, consolidation or otherwise, on or after the Effective Date.

57. "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs, as may be amended from time to time, filed with the Bankruptcy Court by the Debtor pursuant to section 521 of the Bankruptcy Code.

58. "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

59. "*Severance/ Wage Claims*" means Priority Claims entitled to priority under sections 507(a)(4) and 507(a)(5).

60. "*Solicitation Order*" means the order of the Bankruptcy Court, which among other things, approved the solicitation of acceptances and rejections of the Plan, and scheduled a combined hearing to consider approval of the Disclosure Statement and confirmation of the plan.

61. "*Unsecured Convenience Claims*" means those Allowed General Unsecured Claims of $2,000 or less.

62. "*Voting Deadline*" means the date established by the Bankruptcy Court for casting ballots concerning confirmation of the Plan.

B.    *Exhibits*

The Plan Supplement shall be filed with the Bankruptcy Court no later than ten (10) days prior to the Disclosure and Confirmation Hearing and shall include, among other things: (i) the amended and restated corporate documents; and (ii) the identity and background information of the members of the New Board. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Holders of Claims may also obtain a copy of the Plan Supplement, once filed, by calling or by a written request sent to either of the Plan Sponsors whose information is set forth below in Article XI.I.

# ARTICLE II.

## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

Subject to the provisions of sections 328, 330(a), 331, 503 and 507(a)(2) of the Bankruptcy Code, the Debtor or the Reorganized Debtor, as applicable, shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Administrative Claim becomes Allowed.

B.    *Priority Tax Claims*

In accordance with Bankruptcy Code section 1123(a)(1), Priority Tax Claims have not been classified and are treated as described in this Article II. Unless otherwise agreed by the Holder of an Allowed Priority Tax Claim, the Debtor or the Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Priority Tax Claim becomes Allowed.

C.    *Payment of Statutory Fees*

All fees payable pursuant to Article 1930 of title 28 of the United States Code assessed against the Debtor's estate shall be paid in full by the Reorganized Debtor as they become due and owing.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS
## AND MEMBERSHIP INTERESTS

A.    *Summary*

1.    This Plan constitutes a chapter 11 plan for the Debtor.  Except for Administrative Claims and Priority Tax Claims, all Claims against the Debtor are placed in Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan Sponsors have not classified Administrative Claims and Priority Tax Claims, as described in Article II.

2.    Because there are no interests in the Debtor, the Plan Sponsors have not classified membership interests in the Debtor.

3.    The table in Article III.A.4 below summarizes the classification of Claims against the Debtor for all purposes under this Plan, including voting, confirmation and Distributions.

4.    *Summary of Classification and Treatment of Classified Claims*

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims – Severance/ Wages | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | PBGC Claims | Impaired | Yes |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | Unsecured Convenience Claims | Impaired | Yes |
| 6 | Deposit Claims | Unimpaired | No (deemed to accept) |

B.    *Classification and Treatment of Claims*

  1.    <u>*Class 1—Other Priority Claims – Severance/ Wage Claims*</u>

  (a)    *Classification*: Class 1 consists of Severance/ Wage Claims

  (b)    *Treatment*:  Except to the extent that the Holders of Claims in Class 1 agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the Severance/ Wage Claims, the Severance/ Wage Claims shall be paid in full in Cash on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Severance/ Wage Claim becomes Allowed.

  (c)    *Impairment and Voting*:  Class 1 is unimpaired by the Plan.  The Holders of Claims in Class 1 are presumed to accept and therefore are not entitled to vote to accept or reject the Plan.

  2.    <u>*Class 2—Secured Claims*</u>

  (a)    *Classification*: Class 2 consists of Secured Claims.

  (b)    *Treatment*: Except to the extent that a holder of an Allowed Secured Claim and the Plan Sponsors agree to a different treatment, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, (i) each Allowed Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim shall receive Cash in an amount equal to such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) each Holder of an Allowed Secured Claim shall receive the collateral securing its Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

  (c)    *Impairment and Voting*: Class 2 is unimpaired by the Plan.  The Holders of Secured Claims are presumed to accept and therefore are not entitled to vote to accept or reject the Plan.

  3.    <u>*Class 3—PBGC Claims*</u>

  (a)    *Classification:* Class 3 consists of the PBGC Claims.

(b)    *Treatment:* The PBGC and the Plan Sponsors have agreed that, in full satisfaction, discharge, settlement, release, and compromise of and in exchange for the PBGC Claims, the PBGC Claims shall be Allowed in the amount of $4,616,067, and the PBGC shall receive on the Initial Distribution Date, or as soon as practicable thereafter, (i) its Pro Rata Share of Distribution of the assets of the Debtor's Estate (other than the proceeds of the GUC Note), and (ii) the PBGC Note.

(c)    *Impairment and Voting:* Class 3 is impaired by the Plan.  The PBGC is entitled to vote to accept or reject the Plan.

4.    *Class 4—General Unsecured Claims*

(a)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed General  Unsecured Claim agrees to a less favorable treatment, in full satisfaction, discharge, settlement, release, and compromise of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive on the Initial Distribution Date, or as soon as practicable thereafter, its Pro Rata Share of Distribution of (i) the assets of the Debtor's Estate, and (ii) proceeds of the GUC Note.  The Reorganized Debtor reserves its right to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(c)    *Impairment and Voting*:  Class 4 is impaired by the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

6.    *Class 5—Unsecured Convenience Claims*

(a)    *Classification*:  Class 5 consists of all Unsecured Convenience Claims.

(b)    *Treatment*:  In full satisfaction, discharge, settlement, release, and compromise of and in exchange for the Unsecured Convenience Claims, each Holder of an Allowed Unsecured Convenience Claim shall receive on the Initial Distribution Date, or as soon as practicable thereafter, sixty percent (60%) of each individual Allowed Unsecured Convenience Claim.

(c)    *Impairment and Voting*:  Class 5 is impaired by the Plan.  Each Holder of an Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

7.    *Class 6—Deposit Claims*

(a)    *Classification*:  Class 6 consists of all Claims held on account of prepaid ticket purchases.

(b)    *Treatment*:  Except to the extent that the Holders of Claims in Class 6 agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the Deposit Claims, the Deposit Claims shall be paid in full in Cash on or as soon as practicable after the later of: (a) the Effective Date; and (b) the date such Allowed Deposit Claim becomes Allowed.

(c)    *Impairment and Voting*:  Class 6 is unimpaired by the Plan.  The Holders of Claims in Class 5 are presumed to accept and therefore are not entitled to vote to accept or reject the Plan.

C.    *Acceptance or Rejection of the Plan*

1.    <u>Acceptance by an impaired Class</u>.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

2.    <u>Presumed Acceptance of the Plan</u>. Classes 1, 2 and 6 are unimpaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.    <u>Voting Class</u>.  Classes 3, 4 and 5 are impaired under this Plan and are entitled to vote to accept or reject this Plan.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Funding for the Plan*

The Plan will be funded from Cash on hand of the Reorganized Debtor in the approximate amount of $208,000, the Cash the Reorganized Debtor derives from NYCO Renaissance in the amount of $1,250,000, the PBGC Note in the amount of $340,000, the GUC Note in the amount of $1,585,000, the Endowment in the approximate principal amount of $4.8 million, and the Pending Bequests.

B.    *Corporate Existence*

Except as otherwise provided in the Plan or Plan Supplement, the Reorganized Debtor shall continue to exist after the Effective Date as a not-for-profit corporate entity with all the powers of a corporation pursuant to the applicable laws of New York and pursuant to the corporate documents in effect prior to the Effective Date, as same may be amended, modified or revised by the Plan Sponsors to effectuate the transactions contemplated by the Plan.  In this regard, the Reorganized Debtor anticipates that it will adopt (to the extent not already in existence), amend or modify some or all of the following corporate documents, including the Certificate of Incorporation; By-Laws; Code of Conduct and Ethics; Conflict of Interest Policy; Board Member Evaluation Policy Statement; Gift Acceptance Policy; Investment Policy for all Institutional Funds; Investment Policy for Endowment Funds; Complaint Procedures for Accounting and Auditing Matters; Recommended Record Retention Guidelines; Whistleblower Policy; and Board Committee Charters for any Board Committees that currently exist or that may be formed, including an executive and finance committee to effectuate the transactions contemplated by the Plan as well as to bring the Reorganized Debtor's corporate documents into

compliance with the New York's Nonprofit Revitalization Act of 2013. All materially amended or modified corporate documents will be included in the Plan Supplement.

C.    *New Board Representation*

    1.    On the Effective Date, the New Board shall be deemed appointed.

    2.    Michael Capasso shall be the initial General Director of the Reorganized Debtor.

    3.    Roy Niederhoffer shall be the Chair of the New Board.

    4.    The member(s) of the New Board shall be disclosed in the Plan Supplement prior to the Disclosure and Confirmation Date in accordance with section 1129(a)(5) of the Bankruptcy Code.

    5.    The New Board shall be responsible for all activities of the Reorganized Debtor and shall oversee the administration and implementation of the Plan.

D.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (2) the filing of appropriate corporate governance documents, including but not limited to, any new, amended or modified documents contained in the Plan Supplement with the appropriate governmental authorities pursuant to applicable law; and (3) all other actions that the Reorganized Debtor determines are necessary or appropriate.

E.    *Corporate Action*

Each of the matters provided for by the Plan (including the Plan Supplement) involving the corporate structure of the Reorganized Debtor or corporate, financing or related actions to be taken by or required of the Debtor or Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified as of the Effective Date in all respects without any requirement of further action by holders of Claims, the directors of the Debtor or any other entity. The Reorganized Debtor shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.

F.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor, and the officers of the Reorganized Debtor and members of the New Board thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on

behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

G.      *Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

H.      *Management/Corporate Governance*

Jeffrey Laikind shall be the President of the Reorganized Debtor.  The names and qualifications of persons that will act as officers/ senior management of the Debtor as of the Effective Date shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code.  The Reorganized Debtor's officers and other senior management, including Capasso, shall serve in accordance with any employment agreement that may be entered into with the Reorganized Debtor and applicable nonbankruptcy law.

The New Board will act to carefully protect accumulated assets and the Endowment and, to the extent received, the Pending Bequests, and ensure that current income is managed properly, acting as trustees in the literal and legal sense of the term. The New Board will draw on only the investment income (interest and dividends) of the Endowment, thereby preserving and ultimately restoring the principal thereof.  In addition, any use-restricted funds will be applied by the New Board only in a manner as intended by the donor.  Regardless of the degree of authority delegated to staff, committees, or affiliates, the New Board, and therefore the individual trustees, is ultimately accountable.  The New Board has the principal responsibility for fulfillment of the organization's mission and the legal/fiduciary accountability for its operations.  Members of the New Board are expected to act responsibly and in good faith, and with the basic interests of the company as the foremost objective.

As part of this process, the New Board will develop and approve the annual budget, and meticulously monitor the ongoing financial results of the Reorganized Debtor.  To do so, the New Board will engage management and staff to produce accurate and timely financial reports on a regular basis.  All New Board members will receive quarterly balance sheets with a

consolidated accounting of all assets and current liabilities. Reports will also include statements of income and expenses, at a level of detail that clarifies the attribution of revenues and costs to various programs, and these reports also include clear analyses of ticket sales, fundraising results, deviations from projections, etc. Monthly financial reports ("**MFRs**") will be provided to the treasurer and members of the finance and executive committees. New Board members are expected to understand and comment on these reports, and are encouraged to suggest improvements in the formats and presentations of financial reports. The New Board will also engage an annual audit by an independent certified public accountant or accounting firm. A finance committee (the "**Finance Committee**") will be created on the Effective Date to work with the auditor during and after this process, and all New Board members will receive the audit report prior to the meeting at which it is to be discussed. The Finance Committee will also help develop and approve the annual budget and monitor the ongoing financial results of the Reorganized Debtor through detailed data and reports. Further, a strong financial overseer will be engaged with arts experience to ensure (and reassure donors) that funds will be spent appropriately and thoughtfully and to provide the New Board and management with clear and accurate financial data.

Additionally, for so long as the PBGC Note and the GUC Note remain outstanding, copies of all MFRs will also be delivered on a monthly basis to (a) a responsible person designated by the Committee prior to the Effective Date (and disclosed in the Plan Supplement), and (b) the Office of the New York Attorney General (Charities Bureau). Further, the Finance Committee so established by the Reorganized Debtor shall make itself available for a standing conference call with such recipients on a quarterly basis in order to answer questions or discuss issues or matters related to the MFRs. The following protocol shall be included in an amendment to the By-Laws and the Finance Committee Charter of the Reorganized Debtor described above.

The New Board will monitor current and proposed programs and services to ensure that they are consistent with the organization's stated mission and purposes. Given limited resources and unlimited demands on them, the New Board will assist the General Director in deciding among competing priorities. Recognizing the close ties between financial and programming decisions, the impact of programming choices on fundraising, audience attendance and earned income, and the impact of both of these on unearned income from funders, financial and programmatic decisions are not made independently of each other. The New Board intends to strike a balance between its responsibility to ensure quality, cost-effective programs and services, and the staff's responsibility to creatively initiate and conduct them. Candor, openness and explicit job descriptions help negotiate an accommodation satisfactory to everyone.

As set forth above, the Reorganized Debtor shall maintain the Debtor's existing mission and historical practice in order to meet the needs of the various constituencies as determined by the New Board.

I.    *Committee*

As of the Effective Date, the Committee shall dissolve, its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case, and the retention and employment of the professionals retained

by the Committee shall terminate as of the Effective Date, *provided*, *however*, that the Committee shall exist, and its professionals shall be retained, after such date solely with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.

J.      *Vesting of Assets in the Reorganized Debtor*

On the Effective Date, NYCO Renaissance will be dissolved and its assets will be distributed to the Reorganized Debtor in accordance with its Certificate of Incorporation, Delaware law and the requirements of the Internal Revenue Code.  Except as otherwise provided in this Plan or in any agreement, instrument or other document relating thereto, on and after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Estate (including Avoidance Actions) and any property acquired by the Debtor pursuant hereto shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances; *provided however*, that nothing in this Plan shall release or terminate any restrictions donors imposed on the Endowment, any use-restricted funds or the Pending Bequests, nor shall anything contained herein change, alter or affect any loan made from the Endowment prior to the Petition Date.  Except as may be provided in this Plan or the Disclosure and Confirmation Order, on and after the Effective Date, the Reorganized Debtor may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## ARTICLE V.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Initial Distribution Date*

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan.

B.      *Disputed Claim Reserve*

1.      *Establishment of Disputed Claim Reserve*

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Reorganized Debtor shall establish a separate Disputed Claim Reserve for Disputed Claims, which Disputed Claim Reserve shall be administered by the Reorganized Debtor.  The Reorganized Debtor shall reserve Distributions sufficient to provide Holders of Disputed Claims the treatment such Holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court).

2.      *Maintenance of Disputed Claim Reserve*

The Reorganized Debtor shall hold Distributions in the Disputed Claim Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed.  The Reorganized Debtor shall, in its sole discretion, make such Distributions (net of any expenses, including any taxes relating thereto), as provided herein, as such Disputed Claims are resolved by a Final

Order, and such Distributions will be distributable in respect of such Disputed Claims as such Distributions would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

C.    *Quarterly Distributions*

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan on such date. Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtor as applicable, in the Disputed Claim Reserve pursuant to Article V.B.2 and Distributed on the first Quarterly Distribution Date after such Claim is Allowed.

D.    *Delivery of Distributions*

1.    <u>*General Provisions; Undeliverable Distributions*</u>

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Reorganized Debtor

Distributions to Holders of Allowed Claims will be made at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim filed by such Holder or (ii) the last known address of such Holder if no Proof of Claim is filed. Neither the Debtor, the Reorganized Debtor or their respective professionals shall incur any liability whatsoever on account of any Distributions under this Plan except for gross negligence, willful misconduct or fraud.

If any Distribution is returned as undeliverable, the Reorganized Debtor may, in its discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Reorganized Debtor deems appropriate. Amounts in respect of any undeliverable Distributions made by the Reorganized Debtor shall be returned to, and held in trust by, the Reorganized Debtor until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and as is set forth in the Plan.

Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically canceled, discharged and forever barred. Except as otherwise provided herein, all funds or other property that vests or revests in the Reorganized Debtor pursuant to this Article shall be distributed by the Reorganized Debtor in accordance with the provisions of the Plan.

E.    *Manner of Cash Payments Under the Plan*

Cash payments made pursuant to the Plan shall be in United States dollars.

F.    *Limitations on Funding of Disputed Claim Reserve*

Except as expressly set forth herein, neither the Debtor nor the Reorganized Debtor shall have any duty to fund the Disputed Claim Reserve.

G.    *Compliance with Tax Requirements*

In connection with making Distributions under the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.    The Reorganized Debtor may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Reorganized Debtor to the appropriate authority.    If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.D.

H.    *Setoff and Recoupment*

The Reorganized Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor, the Estate or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor of any Claim or right of setoff or recoupment that any of them may have against the Holder of any Claim.

## ARTICLE VI.

## DISPUTED CLAIMS

A.    *No Distribution Pending Allowance*

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties and subject to the establishment of the Disputed Claim Reserve, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as provided in Article V.

B.    *Resolution of Disputed Claims*

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtor shall, in its discretion, make, file, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims.

C.      *Objection Deadline*

All objections to Disputed Claims shall be filed and served upon the Holders of each such Claim on or before the Claims Objection Bar Date, unless otherwise ordered by Bankruptcy Court after notice and a hearing.

D.      *Disallowance of Claims*

Except as otherwise agreed, any and all Proofs of Claim filed after the applicable deadline shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Disclosure and Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.      The Debtor was a party to a number of collective bargaining agreements ("**CBAs**") with various unions.  In connection with certain of the CBAs, the Debtor was required to maintain certain defined benefit pension plans.  A number of the collective bargaining agreements have expired.  NYCO Renaissance has reached an agreement in principle with Associated Musicians of Greater New York, Local 802, American Federations of Musicians and has commenced negotiations with certain unions with respect to new agreements, or amendments or modifications to existing agreements.  With respect to any other CBAs that have not yet expired, NYCO Renaissance intends to seek in good faith to amend or modify such agreements and cause the Reorganized Debtor to assume the CBAs as so revised.

2.      Executory contracts and unexpired leases that are listed in the Plan Supplement as executory contracts or unexpired leases to be assumed shall be deemed assumed by the Debtor as of immediately prior to the Effective Date, and the entry of the Disclosure and Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

3.      Executory contracts and unexpired leases that have not expired by their own terms on or prior to the Effective Date, which the Debtor has not assumed or rejected during the pendency of the Chapter 11 Case, which are not listed in the Plan Supplement as executory contracts or unexpired leases to be assumed, and that are not the subject of a motion to assume pending as of the Effective Date, shall be deemed rejected by the Debtor on the Effective Date. The entry of the Disclosure and Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions or rejections, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

4.      Any objections to the proposed assumption or rejection of a contract must be filed by the applicable date established in the Solicitation Order.  Any counterparty to an executory

contract or unexpired lease that fails to object timely to the proposed assumption or rejection of any executory contract or unexpired lease will be deemed to have consented to such treatment.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed and served no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A for which Proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III.

C.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO CONFIRMATION AND OCCURRENCE OF THE EFFECTIVE DATE

A.      *Conditions to Confirmation:*

The following are conditions precedent to confirmation that must be satisfied or waived in accordance with Article VIII.C:

1.      The Bankruptcy Court shall have approved the Disclosure Statement and the Plan as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      All objections to confirmation of the Plan have either been withdrawn, resolved or overruled.

3.      The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed.

B.       *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article VIII.C:

1.       Entry of the Disclosure and Confirmation Order containing findings of fact and conclusions of law satisfactory to the Plan Sponsors.

C.       *Waiver of Conditions Precedent*

The Plan Sponsors may waive the occurrence of or modify any condition precedent in this Article VIII.  Any such waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  The failure of the Plan Sponsors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE IX.

## DISCHARGE, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

A.       *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtor, Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such Claim, debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim has accepted the Plan.  The Disclosure and Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided herein.

B.       *Releases*

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, the Debtor on behalf of itself and the Estate, for the good and valuable consideration provided by each of the Releasees, hereby provides a full release to the Releasees (and each such Releasee so released shall be deemed released by the Debtor) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or

unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor or Reorganized Debtor would have been legally entitled to assert or that any Holder of a Claim against the Debtor or other Entity would have been legally entitled to assert for or on behalf of the Debtor, the Reorganized Debtor or the Estate and further including those in any way related to the Chapter 11 Case or the Plan; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence or willful misconduct.

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, each Holder of a Claim against the Debtor who votes in favor of the Plan, in consideration of the obligations provided under the Plan and for other good and valuable consideration provided by the Debtor and the Plan Sponsors, hereby provides a full release to the Releasees (and each such person or party so released shall be deemed released by each such Holder) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Releasees, the Chapter 11 Case or the Plan, *provided, however*, that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence or willful misconduct.

C.    *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken after the Petition Date or omitted to be taken in connection with or in contemplation of the transactions occurring in the Chapter 11 Case; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Exculpated Party that results from any act or omission that is determined in a Final Order to be solely due to such Exculpated Party's own gross negligence or willful misconduct.

D.    *Preservation of Rights of Action*

1.    <u>*Vesting of Causes of Action*</u>

(a)    Except as otherwise provided in the Plan or Disclosure and Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of

Action that the Debtor may hold against any Entity shall vest upon the Effective Date in the Reorganized Debtor.

(b)     Except as otherwise provided in the Plan or Disclosure and Confirmation Order, after the Effective Date, the Reorganized Debtor shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action, in accordance with the terms of the Plan and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case.  Without limiting the generality of the foregoing, upon the Effective Date, the Reorganized Debtor shall be deemed substituted for the Debtor in any pending adversary proceedings to which the Debtor is a party.

2.      *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Disclosure and Confirmation Order), the Reorganized Debtor expressly reserves such Cause of Action for later adjudication by the Reorganized Debtor (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtor or Reorganized Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor or Reorganized Debtor at this time or facts or circumstances which may change or be different from those the Debtor or Reorganized Debtor now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Disclosure and Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Disclosure and Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B and C) or any other Final Order (including the Disclosure and Confirmation Order).  In addition, the Reorganized Debtor expressly reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

E.      *Release and Injunction*

1.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Reorganized Debtor, the Releasees, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released, exculpated, or to be exculpated, pursuant to the Plan or the Disclosure and Confirmation Order.

2.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, or their successors and assigns and their assets and properties, any other Claims based upon any documents, instruments, or any act or

omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

3.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, the rights afforded in the Plan and the treatment of all Claims in the Plan shall be in exchange for and in complete satisfaction of Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or Reorganized Debtor or any of their assets or properties.  On the Effective Date, all such Claims against the Debtor shall be satisfied and released in full.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PARTIES AND ENTITIES ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, ON ACCOUNT OF ANY CLAIM AGAINST THE DEBTOR THAT IS SATISFIED AND RELEASED HEREBY, FROM:

(a)     COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR THEIR SUCCESSORS AND ASSIGNS AND THEIR ASSETS AND PROPERTIES;

(b)     ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, THE REORGANIZED DEBTOR THEIR SUCCESSORS AND ASSIGNS AND THEIR ASSETS AND PROPERTIES;

(c)     CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR THE PROPERTY OR ESTATE OF THE DEBTOR OR REORGANIZED DEBTOR;

(d)     ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR AGAINST THE PROPERTY OR ESTATE OF THE DEBTOR OR REORGANIZED DEBTOR, EXCEPT TO THE EXTENT A RIGHT TO SETOFF OR SUBROGATION IS ASSERTED WITH RESPECT TO A TIMELY FILED PROOF OF CLAIM; OR

(e)     COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND IN RESPECT OF ANY CLAIM AGAINST THE DEBTOR OR CAUSE OF ACTION THAT IS RELEASED OR SETTLED HEREUNDER.

F.      *Special Provision Regarding the Pension Plan*

Nothing in the Debtor's bankruptcy proceeding, the Bankruptcy Code (and section 1141 thereof), the Disclosure and Confirmation Order or the Plan (including Article IX) shall in any way be construed to discharge, release, limit, or relieve any party for fiduciary breach related to the  Pension Plan.  The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Disclosure and

Confirmation Order, Bankruptcy Code, or any other document filed in the Debtor's bankruptcy case.

G.     *Releases of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Reorganized Debtor.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding entry of the Disclosure and Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Reorganized Debtor and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2.     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.     resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which the Debtor or Reorganized Debtor, as applicable, is party or with respect to which the Debtor or Reorganized Debtor, as applicable, may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XI.A adding executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

4.     ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, *provided, however*, that the Reorganized Debtor shall reserve the right to commence actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article IX;

10.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.      enter and implement such orders as necessary or appropriate if the Disclosure and Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.      resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Disclosure and Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

13.      enter an order and/or the decree contemplated in section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 concluding the Chapter 11 Case.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

A.      *Modification of Plan*

Subject to the limitations contained in the Plan: (1) the Plan Sponsors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Disclosure and Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Disclosure and Confirmation Order, the Plan Sponsors, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

B.      *Revocation of Plan*

The Plan Sponsors reserve the right to withdraw the Plan prior to the entry of the Disclosure and Confirmation Order, and to file subsequent chapter 11 plans.  If the Plan Sponsors withdraw the Plan, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission of any sort by the Debtor or any other Entity.

C.      *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

D.      *Governing Law*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

E.      *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Disclosure and Confirmation Order and the occurrence of the Effective Date.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Plan Sponsors or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (i) the Debtor with respect to the Holders of Claims or other parties-in-interest; or (ii) any Holder of a Claim or other party-in-interest prior to the Effective Date.

F.      *Section 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Disclosure and Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

G.     *Section 1125(e) Good Faith Compliance*

Each of the Plan Sponsors, the Committee and the individual members thereof acting in their capacity as Committee members and members of NYCO Renaissance shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

H.     *Further Assurances*

The Debtor, the Reorganized Debtor, all Holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Disclosure and Confirmation Order.

I.     *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by first class U.S. mail, postage prepaid as follows:

To the Plan Sponsors:

| **KLESTADT WINTERS JURELLER SOUTHARD & STEVENS LLP** | **DUANE MORRIS LLP** |
|---|---|
| 200 West 41st Street, 17th Floor | 1540 Broadway |
| New York, New York 10036-7203 | New York, New York 10036-4086 |
| Telephone:     (212) 972-3000 | Telephone:     (212) 692-1000 |
| Facsimile:      (212) 972-2245 | Facsimile:      (212) 692-1020 |
| Sean C. Southard, Esq. | Gerard S. Catalanello, Esq. |
| Maeghan J. McLoughlin, Esq. | James J. Vincequerra, Esq. |
| ssouthard@klestadt.com | gcatalanello@duanemorris.com |
| mmcloughlin@klestadt.com | jvincequerra@duanemorris.com |
| *Counsel to Official Committee* | *Counsel to NYCO Renaissance, Ltd.* |

To the Debtor:

**Lowenstein Sandler LLP**
Kenneth A. Rosen, Esq.
Nicole Stefanelli, Esq.
1251 Avenue of the Americas
New York, New York 10020
-and-
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
nstefanelli@lowenstein.com

J.    *Filing of Additional Documents*

On or before the Effective Date, the Plan Sponsors or Reorganized Debtor, as applicable, may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

K.    *Fiduciary Withdrawal Option as Plan Co-Sponsor*

Notwithstanding anything to the contrary contained herein, prior to confirmation of the Plan, the Committee reserves the right to withdraw as joint proponent of this Plan and support an alternative plan of reorganization in the event that the Committee, in the reasonable exercise of its fiduciary responsibilities, should determine that a superior plan of reorganization is more advantageous for creditors of the Debtor.

Dated: December 2, 2015

**KLESTADT WINTERS JURELLER**
**SOUTHARD STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036-7203
Telephone:    (212) 972-3000
Facsimile:    (212) 972-2245
Sean C. Southard, Esq.
Maeghan J. McLoughlin, Esq.
ssouthard@klestadt.com
mmcloughlin@klestadt.com

*Counsel to Official Committee of*
*Unsecured Creditors, Plan Co-Sponsor*

**DUANE MORRIS LLP**

1540 Broadway
New York, New York 10036
Telephone:    (212) 692-1000
Facsimile:    (212) 692-1020
Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.
gcatalanello@duanemorris.com
jvincequerra@duanemorris.com

*Counsel to NYCO Renaissance, Ltd.,*
*Plan Co-Sponsor*

## EXHIBIT 2

### The Reorganized Debtor's Projections

**NYC Opera Renaissance**
**Year End Summary**

| | 5-Year Projection Without Pending Bequest and Endowment | | | | | 5-Year Projection With Pending Bequests and Endowment Interest Income | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Year One (Stub Period) | Year Two | Year Three | Year Four | Year Five | Year One (Stub Period) | Year Two | Year Three | Year Four |
| | Jan 2016 - June 2016 | July 2016 - June 2017 | July 2017 - June 2018 | July 2018 - June 2019 | July 2019 - June 2020 | Jan 2016 - June 2016 | July 2016 - June 2017 | July 2017 - June 2018 | July 2018 - June 2019 |
| **Public support and other income** | | | | | | | | | |
| Contributions | $ 2,498,000 * | $ 2,850,000 | $ 3,277,500 | $ 3,605,250 | 3,965,775 | $ 2,498,000 | $ 3,200,000 ** | $ 3,627,500 ** | $ 3,955,250 |
| Grants | 250,000 | 249,996 | 287,495 | 316,245 | 347,869 | 250,000 | 249,996 | 287,495 | 316,245 |
| Thrift Shop | 600,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 600,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| In-kind Donations | 36,198 | 74,568 | 85,753 | 94,329 | 103,761 | 36,198 | 74,568 | 85,753 | 94,329 |
| Endowment Interest Income | - | - | - | - | - | 75,000 | 150,000 | 150,000 | 150,000 |
| Other Income - Pending Bequests | - | - | - | - | - | - | 8,112,500 | | |
| Bequest Interest Income | - | - | - | - | - | - | 310,500 | 296,500 | 282,500 |
| Total public support and other income | 3,384,198 | 4,374,564 | 4,850,749 | 5,215,823 | 5,617,406 | 3,459,198 | 13,297,564 | 5,647,249 | 5,998,323 |
| **Performance & Special Event Income** | | | | | | | | | |
| GALA Income | 125,000 | | | | | 125,000 | | | |
| Large Scale Productions | 912,600 | 1,521,000 | 1,521,000 | 1,521,000 | 1,521,000 | 912,600 | 1,521,000 | 1,521,000 | 1,521,000 |
| Small Scale Production | 40,050 | 80,100 | 80,100 | 80,100 | 80,100 | 40,050 | 80,100 | 80,100 | 80,100 |
| VOX Production | 3,750 | 7,500 | 7,500 | 7,500 | 7,500 | 3,750 | 7,500 | 7,500 | 7,500 |
| Opera for Kids | 80,550 | 268,500 | 268,500 | 268,500 | 268,500 | 80,550 | 268,500 | 268,500 | 268,500 |
| Total Performance Income | 1,161,950 | 1,877,100 | 1,877,100 | 1,877,100 | 1,877,100 | 1,161,950 | 1,877,100 | 1,877,100 | 1,877,100 |
| **Cost of Sales** | | | | | | | | | |
| GALA Expenses | 37,500 | - | - | - | - | 37,500 | - | - | - |
| Large Scale Productions | 1,804,088 | 3,006,813 | 3,187,222 | 3,282,839 | 3,381,324 | 1,804,088 | 3,006,813 | 3,187,222 | 3,282,839 |
| Small Scale Production | 172,527 | 345,054 | 365,757 | 376,730 | 388,032 | 172,527 | 345,054 | 365,757 | 376,730 |
| VOX Production | 89,860 | 179,719 | 190,502 | 196,217 | 202,104 | 89,860 | 179,719 | 190,502 | 196,217 |
| Opera for Kids | 79,500 | 265,000 | 280,900 | 289,327 | 298,007 | 79,500 | 265,000 | 280,900 | 289,327 |
| Total Cost of Performance & Special Event | 2,183,475 | 3,796,586 | 4,024,382 | 4,145,113 | 4,269,466 | 2,183,475 | 3,796,586 | 4,024,382 | 4,145,113 |
| Net income from performance & special ev | (1,021,525) | (1,919,486) | (2,147,282) | (2,268,013) | (2,392,366) | (1,021,525) | (1,919,486) | (2,147,282) | (2,268,013) |
| **TOTAL REVENUE** | 2,362,674 | 2,455,078 | 2,703,467 | 2,947,810 | 3,225,039 | 2,437,674 | 11,378,078 | 3,499,967 | 3,730,310 |
| **Salaries and Wages** | | | | | | | | | |
| Owner's Compensation | - | - | - | - | - | - | - | - | - |
| Salaries | - | - | - | - | - | - | - | - | - |
| Full-Time Employees | 192,500 | 540,000 | 621,000 | 714,150 | 821,273 | 211,500 | 624,000 | 717,600 | 825,240 |
| Part-Time Employees | 17,500 | - | - | - | - | 17,500 | - | - | - |
| Payroll Taxes and Benefits | 71,554 | 194,862 | 224,091 | 257,705 | 296,361 | 71,554 | 197,922 | 227,610 | 261,752 |
| Total Salary and Wages | 281,554 | 734,862 | 845,091 | 971,855 | 1,117,633 | 300,554 | 821,922 | 945,210 | 1,086,992 |
| **Fixed Business Expenses** | | | | | | | | | |
| Contract Labor | 147,390 | 303,623 | 349,166 | 401,541 | 461,773 | 147,390 | 353,623 | 406,666 | 467,666 |
| Legal and Professional Fees | 25,750 | 53,045 | 61,002 | 70,152 | 80,675 | 25,750 | 53,045 | 61,002 | 70,152 |
| Office Expenses & Supplies | 3,347 | 6,895 | 7,929 | 9,118 | 10,486 | 3,347 | 6,895 | 7,929 | 9,118 |
| Rent of Equipment | 9,817 | 19,635 | 22,580 | 25,967 | 29,862 | 9,817 | 19,635 | 22,580 | 25,967 |
| Travel & Hospitality | 21,630 | 44,558 | 51,241 | 58,928 | 67,767 | 21,630 | 44,558 | 51,241 | 58,928 |
| Insurance (Liability and Property) | 5,563 | 11,459 | 13,178 | 15,154 | 17,428 | 5,563 | 11,459 | 13,178 | 15,154 |
| Advertising | 14,882 | 30,657 | 35,256 | 40,544 | 46,626 | 39,882 | 80,657 | 92,756 | 106,669 |
| Eblasts, Printing & Postage | 30,900 | 63,654 | 73,202 | 84,182 | 96,810 | 30,900 | 63,654 | 73,202 | 84,182 |
| Telephone & Internet | 3,461 | 7,129 | 8,199 | 9,428 | 10,843 | 3,461 | 7,129 | 8,199 | 9,428 |
| Dues and Subscriptions | 258 | 530 | 610 | 702 | 807 | 258 | 530 | 610 | 702 |
| Bank & Merchant Fees | 97 | 199 | 229 | 264 | 303 | 97 | 199 | 229 | 264 |
| Box Office Expenses | 5,148 | 10,605 | 12,195 | 14,025 | 16,129 | 5,148 | 10,605 | 12,195 | 14,025 |
| Miscellaneous | 18,545 | 38,203 | 43,933 | 50,523 | 58,101 | 18,545 | 38,203 | 43,933 | 50,523 |
| Donated Professional Services | - | - | - | - | - | - | - | - | - |

**NYC Opera Renaissance**
**Year End Summary**

| | 5-Year Projection Without Pending Bequest and Endowment | | | | | | 5-Year Projection With Pending Bequests and Endowment Interest Income | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year One (Stub Period) | Year Two | Year Three | Year Four | Year Five | | Year One (Stub Period) | Year Two | Year Three | Year Four |
| Donated Use of Facilities | 36,198 | 74,568 | 85,753 | 98,616 | 113,409 | | 36,198 | 74,568 | 85,753 | 98,616 |
| Thrift Shop Expenses | 500,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | | 500,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| **Total Fixed Business Expenses** | 822,985 | 1,664,760 | 1,764,474 | 1,879,145 | 2,011,017 | | 847,985 | 1,764,760 | 1,879,474 | 2,011,395 |
| Other Expenses | | | | | | | | | | |
| Plan Contribution | 1,250,000 * | - | - | - | - | | 1,250,000 | - | - | - |
| PBGC Note | | 85,000 | 85,000 | 85,000 | 85,000 | | | 85,000 | 85,000 | 85,000 |
| GUC Note | - | - | - | - | - | | | 396,250 *** | 396,250 *** | 396,250 |
| Depreciation | - | | | | | | - | - | | |
| Interest | | | | | | | | | | |
| Commercial Loan | - | - | | | | | - | - | | |
| Commercial Mortgage | - | - | | | | | - | - | | |
| Line of Credit | - | - | | | | | - | - | | |
| Credit Card Debt | - | - | | | | | - | - | | |
| Vehicle Loans | - | - | | | | | - | - | | |
| Other Bank Debt | - | - | | | | | - | - | | |
| Taxes | - | - | | | | | - | - | | |
| **Total Other Expenses** | 1,250,000 | 85,000 | 85,000 | 85,000 | 85,000 | | 1,250,000 | 481,250 | 481,250 | 481,250 |
| **Temporarily Restricted Funds** | | | | | | | - | 8,112,500 | | |
| **Net Income** | $ 8,135 | $ (29,545) | $ 8,902 | $ 11,810 | $ 11,389 | | $ 39,135 | $ 197,645 | $ 194,033 | $ 150,673 |
| **Net Assets** | $ 8,135 | $ (21,410) | $ (12,509) | $ (698) | $ 10,691 | | $ 39,135 | $ 8,349,280 | $ 8,543,312 | $ 8,693,986 |

**NOTE:**

*    Year 1 revenue includes a restricted pledge from R. Niederhoffer for $1,250,000 that will be used to fund the Plan.

**    Years 2, 3, 4 and 5 revenue includes the release from board restricted funds to make subsequent aggregate payments of $481,250.00 per year over 4 years to the PBGC on account of the PBGC Note ($340,000) and to the General Unsecured Creditors on account of the GUC Note ($1,585,000) for a t

***    Creditor Notes (PBGC Note and GUC Note) total $1.925 million paid over 4 years

## EXHIBIT 3

**Liquidation Analysis**

## Liquidation Analysis

| CLAIMS | LOW ESTIMATE OF CLAIMS | HIGH ESTIMATE OF CLAIMS | LIQUIDATION | | JOINT NYCOR/COMMITTEE PLAN | |
|---|---|---|---|---|---|---|
| | | | Max Distribution | Min Distribution | Max Distribution | Min Distribution |
| TOTAL ADMINISTRATIVE CLAIMS | $410,000.00 | $522,723.00 | 100% | 100% | 100% | 100% |
| TOTAL UNSECURED PRIORITY CLAIMS (Class 1) | $209,419.85 | $1,179,222.08 | 100% | 100% | 100% | 100% |
| PBGC CLAIMS (Class 3) | $4,616,067.00 | $4,616,067.00 | | | 9.49% | 5.49% |
| TOTAL GENERAL UNSECURED  (Class 4) | $20,742,293.40 | $25,086,097.00 | 3.27% | -0.81% | 9.76% | 4.44% |
| UNSECURED CONVENIENCE CLAIMS (Class 5) | $20,000.00 | $40,000.00 | | | 60.00% | 60.00% |
| DEPOSIT CLAIMS (Class 6) | $289,022.00 | $289,022.00 | | | 100.00% | 100.00% |

| FUNDS AVAILABLE UNDER LIQUIDATION | |
|---|---|
| Cash | $208,000.00 |
| Max Sale Proceeds | $1,250,000.00 |
| Total Available for Distribution Under Liquidation | **$1,458,000.00** |

| FUNDS AVAILABLE UNDER JOINT COMMITTEE/NYCOR PLAN | |
|---|---|
| Cash | $208,000.00 |
| Cash Contribution | $1,250,000.00 |
| **Total Cash** | **$1,458,000.00** |
| PBGC Note | $340,000.00 |
| GUC Note | $1,585,000.00 |