**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : |
| | : |
| New York City Opera, Inc., | : Case No. 13-13240 (SHL) |
| | : |
| Debtor. | : Chapter 11 |
| | : |
| | : |

---

**PLAN SUPPLEMENT TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF NYCO RENAISSANCE, LTD. AND OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR NEW YORK CITY OPERA, INC.[1]**

---

Dated: December 31, 2015

**DUANE MORRIS LLP**

1540 Broadway
New York, New York 10036-4086
Telephone:    (212) 692-1000
Facsimile:    (212) 692-1020
Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.

*Counsel to NYCO Renaissance, Ltd.,*
*Plan Co-Sponsor*

**KLESTADT WINTERS JURELLER
SOUTHARD STEVENS, LLP**

200 West 41st street, 17th Floor
New York,  New York 10036-7203
Telephone:    (212) 972-3000
Facsimile:    (212) 972-2245
Sean C. Southard, Esq.
Maeghan J. McLoughlin, Esq.

*Counsel to Official Committee of*
*Unsecured Creditors, Plan Co-Sponsor*

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and Official Committee of Unsecured Creditors for New York City Opera, Inc. (the "**Plan**").  The Plan Sponsors reserve the right to amend and supplement this Plan Supplement prior to the date of the Disclosure and Confirmation Hearing.

## TABLE OF CONTENTS

**EXHIBIT A:** Form of GUC Note

**EXHIBIT B:** Form of PBGC Note

**EXHIBIT C:** Names and Qualifications of the new NYCO Board

**EXHIBIT D:** Names and Qualifications of the new management of NYCO

**EXHIBIT E:** Drafts of Amended and Restated Corporate Documents

   1. Draft of Amended and Restated Certificate of Incorporation

   2. Draft of Amended and Restated By-Laws

   3. Draft of Conflict of Interest Policy

   4. Draft of Whistleblower Policy

**EXHIBIT F:** Name of Person Designated by the Committee to receive MFRs

**EXHIBIT G:** List of Assumed Executory Contracts/Leases

i

# EXHIBIT A

**Form of GUC Note**

DRAFT 12/31/15

# PROMISSORY NOTE

$1,585,000.00                                                         New York, New York
                                                                     February __, 2016

      **FOR VALUE RECEIVED**, New York City Opera, Inc., a New York not-for-profit corporation, with its principal offices located at 1700 Broadway, 39th Floor, New York, New York 10019 (the "**Maker**"), hereby promises to pay to the order of the holders of the General Unsecured Claims, as defined in the First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and Official Committee of Unsecured Creditors for New York City Opera, Inc. dated December 2, 2015 (the "**Plan**"), with a mailing address c/o Sean C. Southard, Esq. and Maeghan J. McLoughlin, Esq., Klestadt Winters Jureller Southard Stevens LLP, 200 West 41st street, 17th Floor, New York, New York 10036-7203 (the "**Makee**"), the principal amount of One Million Five Hundred Eighty Five Thousand Dollars ($1,585,000.00), as set forth in paragraph 1 below.  All payments of principal made hereunder will be paid by the Maker by check which shall be mailed as provided in paragraph 4 herein.  This Maker's Promissory Note (the "**Note**") is the promissory note referred to in the Plan, which Plan was confirmed by an Order of the United States Bankruptcy Court for the Southern District of New York, entered on January __, 2016.

    1.    **Payments; Prepayment.**

      (a)    Maker shall pay Makee the sum of (i) $396,250.00 on the first anniversary of the Effective Date of the Plan (as such term is defined in the Plan), and (ii) $396,250.00 on each anniversary date thereafter until such Note is paid in full.  No interest shall accrue or otherwise be due under the Note.

      (b)    All payments by Maker on account of any outstanding indebtedness, shall be made in money of the United States of America that at the time of payment is legal tender.

      (c)    The Maker shall have the right to prepay at any time and from time to time, without penalty, all or any portion of the outstanding principal of this Note, and provided that any prepayment shall be accompanied by the payment of all interest accrued on the principal sum prepaid through the date of prepayment.

      (d)    All prepayments of the outstanding principal of this Note shall be applied to installments of principal due thereunder in the inverse order of their maturity.

    2.    **Event of Default.**

      (a)    The occurrence of any of the following events shall constitute an event of default (an "Event of Default"):

      (i)    Maker's failure to pay any of the indebtedness when due in accordance with the terms hereof, and such payment remains outstanding following the expiration of ten (10) days of Maker's receipt of written notice of same from Makee; or

(ii)     Maker shall commence any case, proceeding or other action (x) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to Maker, or seeking to adjudicate Maker bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, composition or other relief with respect to Maker or Maker's debts, or (y) seeking appointment of a receiver, trustee, custodian or similar official for Maker or for all or any substantial part of Maker's creditors; or

(iii)     There shall be commenced against Maker in any case, proceeding or other action of a nature referred to in clause (ii) above which (x) results in the entry of an order for relief or any such adjudication or appointment, or (y) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or

(iv)     Maker shall take any action indicating Maker's consent to, approval of, or acquiescence in, any of the acts set forth in clauses (ii) or (iii); or

(v)     A final judgment or judgments is entered, or an order or orders of any judicial authority or governmental entity is issued against Maker which judgment(s), in the aggregate, exceeds Fifty Thousand Dollars ($50,000.00) outstanding at any one time.

(b)     Upon the occurrence of an Event of Default and upon the expiration of any applicable notice period hereunder, all of the Makee's rights and remedies provided for herein shall be cumulative and in addition to any other rights and remedies available to the Makee at law or in equity.

3.     **Remedies.**

(a)     On the occurrence of an Event of Default and upon the expiration of any applicable notice period hereunder, the entire unpaid principal balance of this Note, together with all interest accrued and unpaid thereon, shall automatically become immediately due and payable.

(b)     Maker shall reimburse Makee for all out-of pocket costs and expenses (including reasonable legal fees and expenses) incurred by it in connection with the preparation of this Note.  Maker also shall reimburse Makee for all costs and expenses incurred by it, and shall pay the reasonable fees and disbursements of counsel to Makee, in connection with the enforcement of Makee's rights hereunder, whether or not legal proceedings are initiated.

(c)     The obligations to make the payments provided for in this Note are absolute and unconditional and not subject to any defense, set-off, counterclaim, rescission, recoupment or adjustment whatsoever.  Maker hereby expressly waives demand and presentment for payment, notice of non-payment, notice of dishonor, protest, notice of protest, bringing of suit and diligence in taking any action to collect any amount called for hereunder, and shall be directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission with respect to the collection of any amount called for hereunder.

2

4.    **Notices.**  All payments, notices and other communications to be given pursuant to this Note shall be delivered as follows:

To Maker:

New York City Opera, Inc.
1700 Broadway, 39th Floor
New York, New York 10019

with a copy to:

Gerard Catalanello, Esq.
Duane Morris LLP
1540 Broadway
New York, New York 10036

To Makee:
Sean C. Southard, Esq.
Maeghan J. McLoughlin, Esq.
Klestadt Winters Jureller Southard Stevens LLP
200 West 41st street, 17th Floor
New York, New York 10036-7203

5.    **Governing Law.**

(a)    All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Note shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

(b)    The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Note or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the Southern District of New York (or, if such courts lack subject matter jurisdiction, in the Supreme Court of the State of New York located in New York County, New York), so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Note shall be deemed to have arisen from a transaction of business in the State of New York.

(c)    Each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by certified or registered mail to the address set forth in Paragraph 4 of this Note shall be effective service of process for any suit, action or other proceeding brought in any such court.

3

6.    **Headings.** The headings in this Note are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Note or any provision of this Note.

7.    **Severability.** If any term or provision of this Note is held to be invalid, illegal or unenforceable under any applicable laws in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction and, to this end, the provisions hereof are severable. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Note so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

8.    **Binding Agreement**. This Note shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and permitted assigns. This Note may not be assigned by the Maker except as provided in this Note and any such assignment in violation of this Note shall be null and void.

9.    **No Third Party Beneficiaries.** This Note is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and permitted assigns) and nothing herein, express or implied, is intended to or shall confer upon any other person, including any creditor of Makee, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Note.

10.    **Amendment**. No provision of this Note may be amended or modified except by an instrument in writing executed by the Company and the Maker.

11.    **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Note shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the Maker has executed this Note on the day and year first above written.

**Maker:**

NEW YORK CITY OPERA, INC.

By: _____

DM3\3714658.1

**<u>EXHIBIT B</u>**

**Form of PBGC Note**

DRAFT 12/31/15

# PROMISSORY NOTE

$340,000.00                                              New York, New York
                                                        February __, 2016

**FOR VALUE RECEIVED**, New York City Opera, Inc., a New York not-for-profit corporation, with its principal offices located at 1700 Broadway, 39th Floor, New York, New York 10019 (the "**Maker**"), hereby promises to pay to the order of The Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, and an agency of the United States, with its principal office located at 1200 K Street NW, Washington, DC 20005 (the "**Makee**"), the principal amount of Three Hundred and Forty Thousand Dollars ($340,000.00), as set forth in paragraph 1 below. All payments of principal made hereunder will be paid by the Maker by check which shall be mailed as provided in paragraph 4 herein. This Maker's Promissory Note (the "**Note**") is the promissory note referred to in the First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and Official Committee of Unsecured Creditors for New York City Opera, Inc. dated December 2, 2015 (the "**Plan**"), which Plan was confirmed by an Order of the United States Bankruptcy Court for the Southern District of New York, entered on January __, 2016.

1.     **Payments; Prepayment.**

(a)     Maker shall pay Makee the sum of (i) $85,000.00 on the first anniversary of the Effective Date of the Plan (as such term is defined in the Plan), and (ii) $85,000.00 on each anniversary date thereafter until such Note is paid in full. No interest shall accrue or otherwise be due under the Note.

(b)     All payments by Maker on account of any outstanding indebtedness, shall be made in money of the United States of America that at the time of payment is legal tender.

(c)     The Maker shall have the right to prepay at any time and from time to time, without penalty, all or any portion of the outstanding principal of this Note, and provided that any prepayment shall be accompanied by the payment of all interest accrued on the principal sum prepaid through the date of prepayment.

(d)     All prepayments of the outstanding principal of this Note shall be applied to installments of principal due thereunder in the inverse order of their maturity.

2.     **Event of Default.**

(a)     The occurrence of any of the following events shall constitute an event of default (an "Event of Default"):

(i)     Maker's failure to pay any of the indebtedness when due in accordance with the terms hereof, and such payment remains outstanding following the expiration of ten (10) days of Maker's receipt of written notice of same from Makee; or

(ii)     Maker shall commence any case, proceeding or other action (x) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy,

insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to Maker, or seeking to adjudicate Maker bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, composition or other relief with respect to Maker or Maker's debts, or (y) seeking appointment of a receiver, trustee, custodian or similar official for Maker or for all or any substantial part of Maker's creditors; or

(iii)    There shall be commenced against Maker in any case, proceeding or other action of a nature referred to in clause (ii) above which (x) results in the entry of an order for relief or any such adjudication or appointment, or (y) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or

(iv)    Maker shall take any action indicating Maker's consent to, approval of, or acquiescence in, any of the acts set forth in clauses (ii) or (iii); or

(v)    A final judgment or judgments is entered, or an order or orders of any judicial authority or governmental entity is issued against Maker which judgment(s), in the aggregate, exceeds Fifty Thousand Dollars ($50,000.00) outstanding at any one time.

(b)    Upon the occurrence of an Event of Default and upon the expiration of any applicable notice period hereunder, all of the Makee's rights and remedies provided for herein shall be cumulative and in addition to any other rights and remedies available to the Makee at law or in equity.

3.    **Remedies.**

(a)    On the occurrence of an Event of Default and upon the expiration of any applicable notice period hereunder, the entire unpaid principal balance of this Note, together with all interest accrued and unpaid thereon, shall automatically become immediately due and payable.

(b)    Maker shall reimburse Makee for all out-of pocket costs and expenses (including reasonable legal fees and expenses) incurred by it in connection with the preparation of this Note. Maker also shall reimburse Makee for all costs and expenses incurred by it, and shall pay the reasonable fees and disbursements of counsel to Makee, in connection with the enforcement of Makee's rights hereunder, whether or not legal proceedings are initiated.

(c)    The obligations to make the payments provided for in this Note are absolute and unconditional and not subject to any defense, set-off, counterclaim, rescission, recoupment or adjustment whatsoever. Maker hereby expressly waives demand and presentment for payment, notice of non-payment, notice of dishonor, protest, notice of protest, bringing of suit and diligence in taking any action to collect any amount called for hereunder, and shall be directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission with respect to the collection of any amount called for hereunder.

4.    **Notices.**  All payments, notices and other communications to be given pursuant to this Note shall be delivered as follows:

DM3\3714657.1

To Maker:

New York City Opera, Inc.
1700 Broadway, 39th Floor
New York, New York 10019

with a copy to:

Gerard Catalanello, Esq.
Duane Morris LLP
1540 Broadway
New York, New York 10036

To Makee:

The Pension Benefit Guaranty Corporation
1200 K Street NW
Washington, DC 20005

5.    **Governing Law.**

(a)    All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Note shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

(b)    The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Note or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the Southern District of New York (or, if such courts lack subject matter jurisdiction, in the Supreme Court of the State of New York located in New York County, New York), so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Note shall be deemed to have arisen from a transaction of business in the State of New York.

(c)    Each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by certified or registered mail to the address set forth in Paragraph 4 of this Note shall be effective service of process for any suit, action or other proceeding brought in any such court.

6.    **Headings.** The headings in this Note are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Note or any provision of this Note.

3

7.      **Severability.**  If any term or provision of this Note is held to be invalid, illegal or unenforceable under any applicable laws in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction and, to this end, the provisions hereof are severable. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Note so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

8.      **Binding Agreement**. This Note shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and permitted assigns. This Note may not be assigned by the Maker except as provided in this Note and any such assignment in violation of this Note shall be null and void.

9.      **No Third Party Beneficiaries.** This Note is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and permitted assigns) and nothing herein, express or implied, is intended to or shall confer upon any other person, including any creditor of Makee, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Note.

10.     **Amendment**. No provision of this Note may be amended or modified except by an instrument in writing executed by the Company and the Maker.

11.     **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Note shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the Maker has executed this Note on the day and year first above written.

**Maker:**

NEW YORK CITY OPERA, INC.

By: _____

DM3\3714657.1

<u>**EXHIBIT C**</u>

**Names and Qualifications of the new NYCO Board**

**Board Leadership**

### Roy Niederhoffer, *Chairman of the Board*

Roy Niederhoffer graduated *magna cum laude* from Harvard in 1987 with a degree in Computational Neuroscience. After five years at another fund, he founded the hedge fund R. G. Niederhoffer Capital Management, Inc. in 1993, and continues to serve as its President. A pioneer in multi-asset-class quantitative trading, the firm has specialized in providing positive-carry protective strategies for equity and other portfolios. His philanthropic efforts have focused on the arts and arts education. Mr. Niederhoffer serves on the Board of the Harmony Program, and has served on many other Boards over the years, including the Board of the New York City Opera pre-reorganization. In 2012, he received a New York City proclamation for leading and managing a well-publicized relief effort for victims of Hurricane Sandy which involved hundreds of people and the delivery of tons of food and supplies to affected areas of Rockaway and elsewhere. He is an accomplished classical and jazz pianist, plays violin with the Park Avenue Chamber Symphony, as well as many other instruments, and is an avid skier. He, his wife and his four children reside in New York City.

### Jeffrey Laikind, *President of the Board*

Jeffrey Laikind began his professional career at the Marine Midland Trust Company. He worked at David J. Greene, was Assistant Vice President and Portfolio Manager at A.G. Becker; Portfolio Manager, Vice President, and Shareholder at Wertheim & Company; and Managing Director in charge of Client Services at Furman Selz. In 1985 he co-founded Prudential Securities Investment Management. He has served on numerous corporate boards including Harken Energy, Hanover Direct Quadrant Romania, Hapoalim Securities, and RiverSource Funds. He obtained a B.A. from Cornell University and attended the New York University Graduate School of Business. He received his Chartered Financial Analyst degree in 1967. Mr. Laikind has a long history in the not-for-profit world. He is a former Chairman of the Executive Committee of New York City Opera, and served on the NYCO Board for 10 years. He was the creator of OPERATHON, the first on-air fundraising program for an arts institution in New York City and was responsible for three years of live New York City Opera broadcasts, sponsored by Pioneer Electronics. In 1985 he was named Captain of the team that represented the United States at the World Maccabiah games, and was named General Chairman in 1993. He founded and was Chairman of the Board of StreetSquash, an urban enrichment program recently recognized as one of the best run, not-for-profit organizations in the United States. He was elected a Trustee of Choate Rosemary Hall in 2005, and was President of the CRH Alumni Association from 2005-2009. In 2013 he received the Distinguished Service Award from Choate, and was named "Mr. Choate".

**Executive Board**

### Steve Acunto

Comm. Stefano Acunto is Chairman of CINN Group, Inc., a private company with holdings in publishing, insurance, and entertainment. He serves on several boards including U.S. RE Companies, the Insurance Federation of New York, Inc. and the Board of Directors of l'Association Internationale de Droit des Assurances representing 38 countries. As a volunteer, he has served as Chairman of the 65-year-old Italian Academy Foundation, Inc. since 1994, producer of award-winning films, opera, and classical concerts; as Chairman of the Board of La Scuola d'Italia, the K-12 Italian prep school on East 96th Street; as a Trustee of John Cabot University of Rome and of the College of Mt. Saint Vincent in Riverdale, New York and serves as Chancellor of the Consular Corps College, based in Washington. He is Hon. Vice Consul for Italy in New York, and has received the Star of Italy for his work on the earthquake relief effort and his work in cultural diplomacy. Earlier in 2014, he was among the principal sponsors of the Guggenheim retrospective on Italian Futurism, the addition of Italian subtitles at the Metropolitan Opera, and the Futurist art exhibit at the Boca Raton Museum, which featured his extensive Futurist collection. In November, he will bring the original manuscripts and breviaries of St Francis of Assisi to the UN and to other venues in the US, presented for the first time in history outside of Italy. A published author, Mr. Acunto holds B.A and M.A. degrees in classical philology from NYU.

### Eli Bar

Born and raised in Israel, Eli Bar is an officer and head of a company in the Israeli Defense Forces. He graduated from the Interdisciplinary Center in 2004 with a dual degree in finance and law and has been a member of the Israeli Bar Association for 10 years. Currently, he serves as the Head of Business Development in North America for the Elad Group, an Israeli Conglomerate. Mr. Bar's philanthropic efforts are diverse. Besides being a member of the Beverly Hills Rotary Club for the past 6 years, he is involved in supporting young artists programs, and organizations that provide hot meals to the elderly and low-income families before the high holidays. Mr. Bar is also an artist whose focus is abstract drawing.

### David Drake

David Drake is an early-stage equity expert and the founder and chairman of Victoria Global with divisions LDJ Capital, a family office and private equity advisory firm, and The Soho Loft Media Group - The Voice of Capital Formation - a global financial media company involved in Corporate Communications, Publications, and Conferences. Mr. Drake has been involved in TMT (technology, media, telecoms), realty, hospitality, clean tech, energy and impact investments for more than 20 years. He is an advocate of innovative investing in early-stage equity, capital formation policies and developments globally, and the US JOBS Act which he lobbied for in both the US Congress and the EU Commission. Because of his leading work in this space, he represented the US Commerce Department at the EU Commission in Brussels and Rome in July 2012 and was invited in May 2013 to the White House Champions of Change ceremony in Washington, D.C. He was also invited to speak at the UK Parliament during their 1st

national crowdfunding day celebration. His investment, The Soho Loft Media Group, produces and sponsors over 200 global conferences annually and his articles are syndicated in over 100 publications. One such event was April 2013 for the institutional media leader Thomson Reuters, with speakers from Nasdaq, NYSE, KKR and Carlyle Group. He advances financial innovation through his work as an international speaker and writer. He has spoken in major universities like Cambridge, NYU, Cornell, Columbia, and writes regularly for major publications like WSJ, Forbes, Huffington Post, Thomson Reuters. He is the co-author of the books *Planet Entrepreneur, Crowdfunding and Other Animals, Investors of Italy* and is the author of the upcoming books *Crowd Fund Economics, The SPPICE of Crowdfunding*, and *LIFEE: Life Instructions for Entrepreneurs and Executives*. Previously, Mr. Drake has acted as general partners in fund-of-funds, realty funds, venture capital funds, seed-funds and hedge funds. Mr. Drake's holdings have media partnership with the European Business Angel Network and Angel Capital Association of North America. He sits on 4 angel networks and has co-founded two angel networks. His focus today is to take on board advisory positions at companies, angel networks and venture funds, and to guide them on topics such as international regulations, corporate strategy and fund structures, with emphasis on the growing trend of online investment automation for retail and angel investors. Privately, Mr. Drake has hosted the Harvard Business Club of NY at his home, produced Carnegie Hall concerts and raised funds for the charities Trail Blazers and Best Buddies Carnegie Hall for many years. Today he is a board director of the UBS Charity of the Year and London-based ARCHIVE Global. Born in Sweden and fluent in six languages, Mr. Drake has an MBA in Finance and an MA in International Law and Economics from George Washington University, where he was awarded the Wallenberg Scholarship for academic merit.

**Mara Kaplan Pruzanski**

Mara Kaplan is a speech-language pathologist who specializes in early childhood speech-language communication. Ms. Kaplan earned her MS degree in Speech-Language Pathology from Hunter College. During her years as a therapist in the public schools, Ms. Kaplan worked in the model school for the ASD-Nest Program, the first school-based Autism inclusion program worldwide. During this time, Ms. Kaplan was integral in bringing classical music and arts projects to public schools, from a Suzuki violin program to live poetry presentations. Since leaving the public sector, Ms. Kaplan has worked as a private speech-language pathologist with an interdisciplinary family-focused approach addressing the needs primarily of children with autism or other communication deficits. Ms. Kaplan is a graduate of LaGuardia High School for Music & Art and the Performing Arts in voice and graduated from The University of Michigan, with a focus in musicology. She continued her commitment to music in New York through her years as a singer in the Collegiate Chorale, involvement with the Young Patrons of Lincoln Center, and The Young New Yorkers Program at the New York Philharmonic.

**David Kurtz**

David Kurtz is a composer scoring works for Film and Television. Since 1988, he has received the ASCAP Award for "Most Performed Television Background Scores" 17 times. His diversity ranges from the theme for "Charles in Charge" to "Alien Nation". He

contributed the original music for "The Big Chill". He is also been honored with nine Emmy Awards. His scores are available on many CD recordings. He is known for his many themes and logos (including Warner Bros. and SONY), and has co-composed many songs. His music is currently on the #1 and #2 top serial dramas that are watched and listened to by over 150 million people worldwide. David Kurtz earned his Master of Music (M.M.) degree in composition from Yale University. He studied with two of the most accomplished and distinguished composers of the twentieth century: Krzysztof Penderecki and Jacob Druckman. He also studied Electronic Music with Bulent Arel and Morton Subotnick. He was the recipient of the Yale Music School's first Entrepreneurial Award and was recently awarded the Alumni Award. He was also chosen to compose the music for the Gala celebrating Yale University's Tercentennial. David Kurtz currently resides in Malibu, California. He is a proud father and is very involved in the community. He has served on the Board of the Idyllwild Arts Academy and has co-chaired three of their Gala's. Mr. Kurtz also served on the Board of the Malibu Foundation for Youth and Families, and is currently a Board Member of The Yale University School of Music.

**Tiberius Vadan**

Tiberius Vadan is a partner at KPMG, one of the "Big Four" auditors and one of the largest professional services companies in the world. He is a leader in the field of Transactions and Restructuring, focusing on large and mid-size acquisitions and divestitures in both private equity and corporate environments. Having led some of the largest restructuring in the recent economic downturn, he and his team take pride in constantly seeking opportunities to build value for both their clients and their respective communities. He was introduced to opera in his native Romania by one of his mentors, a brilliant American opera student in his home town in Transylvania on a Fulbright scholarship. When he arrived in New York City in 1990 as a first-generation New Yorker, he was thrilled by the vibrancy of the city and of the artistic community that is so clearly present in all aspects of New York life. He and his wife Elena have developed a deep connection with the New York cultural scene both as patrons and as admirers. Needless to say, when Tiberius learned about the renaissance of the New York City Opera, he was thrilled to join the Board and be a part of this immense contribution to his adopted city. He and Elena are most passionate about the education component of the NYCO Renaissance plan, which reaches out to the City's youth to introduce the beauty of opera to the next generation. Tiberius has consistently sought to make a difference in both his communities and their education systems in his roles as former Board member for the Alex Fund, a nonprofit focusing on educating underprivileged children in Romania; as a contributor to Junior Achievement; YMCA; and other similar organizations. He lives in Manhattan with his wife Elena, where they enjoy the amazing city of New York on a daily basis, traveling the world, and sailing.

**Victoria Vysotina**

Dr. Vysotina is a Founder and CEO of V V Strategic Group, a boutique investment advisory firm. Previously, Dr. Vysotina was with the Rockefeller Foundation as a Managing Director and a Portfolio Manager for the $1 billion hedge fund and distressed-for-control portfolio and a co-Manager for the fixed income, portable alpha and long-only equity portfolios. Dr. Vysotina was also a member of the Investment Committee with

HSBC's Alternative Investment Group, a $40 billion+ hedge fund platform after a decade long career on Wall Street in the fixed income divisions of Merrill Lynch and Credit Suisse. Dr. Vysotina founded V V Strategic Group in 2011 to bring her institutional investment experience to family offices. Her firm's advisory services range from outsourced CIO to specific deal driven engagements. She often presents on topics of risk and portfolio management, asset allocation and direct investments at family office conferences across the country. Dr. Vysotina is a Council Member for Gerson Lehrman Group (GLG), a prominent consulting group, and a member of the Advisory Board for ClearServe, a financial technology company. Dr. Vysotina received her Ph.D. in Mathematics from Emory University. She continues to be a passionate supporter of the field and is a member of the Advisory Board for the Museum of Mathematics (MoMath) in New York.

**David Monk**
To be provided.

**Tom Percora**
To be provided.

## EXHIBIT D

### Names and Qualifications of the new management of NYCO

**Music and Administrative Staff**

**Michael Capasso,** *General Director*

Michael Capasso has produced, directed and toured opera and musical theater productions in the U.S. and abroad for over 30 years. Having studied voice at the Mannes College of Music, he began his career producing and directing while still in his late teens and early twenties. In 1981, he, along with Diane Martindale, founded New York's Dicapo Opera Theatre. In 1995, Capasso conceived and designed a permanent home and performance space for the company, repurposing the lower level of the St. Jean Baptiste Catholic Church on Manhattan's East Side, and transforming the large, unused space into a 204-seat "jewel-box" theater. Drawing on his background in construction, he was involved in every facet of the project, even personally manning heavy equipment to dig the orchestra pit. Over the 30 years of his leadership, Dicapo Opera Theater presented a diverse programming to the New York public, and, in co-operation with the Armel Festival, premiered three productions of contemporary American operas in Europe. In addition to his work with the Dicapo Opera Theatre, Mr. Capasso has directed operas at l'Opéra de Montréal; Mallorca Opera, Spain; Toledo Opera; Connecticut Opera; New Jersey State Opera; Opera Carolina; and Orlando Opera among others. Mr. Capasso founded the National Lyric Opera in 1991, a touring company that has brought fully staged operas to communities in the American Northeast that would otherwise not have the opportunity to experience live opera. In celebration of the 75th anniversary of George Gershwin's Porgy and Bess, Capasso mounted a production which began touring in the United States in February 2010. The production continues to tour and was most recently hosted in Mexico City's famed Palacio de Bellas Artes. As an author, his writing credits include: a staged adaptation of Dickens's A Christmas Carol; Opera Senza Rancor, a satire on the world of opera; Puccini's Passion, a biographical play with music on the life and career of Puccini; a new book and libretto for La Périchole; English librettos for Die Fledermaus and The Daughter of the Regiment; and a concert/lecture series for the New York Historical Society. Capasso's film on the life and career of Enrico Caruso, which he wrote and produced, aired on the A&E Network's Biography series in 1998. Other film credits include his direction of scenes from Nabucco for the feature film The Secret Lives of Dentists. Capasso is a regular participant on the popular intermission quiz of the Metropolitan Opera live broadcasts on WQXR. He has received New York City's Ellis Island Medal of Honor, The Licia Albanese-Puccini Foundation's Lifetime Achievement Award, and the Leonardo Da Vinci Award for Cultural Achievement from the Italian Heritage and Culture Committee of New York. In 2004, he was named "Man of the Year" by the Italian Welfare League and in 2009 received a Special Lifetime Achievement Award in the Arts from the Order Sons of Italy in America.

**Cori Ellison,** *Consulting Dramaturg*

Consulting Dramaturg Cori Ellison, a leading creative figure in the opera world, currently serves as Dramaturg at Glyndebourne Festival Opera and recently joined the Vocal Arts Faculty at The Juilliard School to teach the History of Singing. Active in developing new

American opera, she teaches opera dramaturgy for American Lyric Theater's Composer Librettist Development Program, and was the first dramaturg invited to participate in the Yale Institute for Music Theatre (2009). She was Dramaturg at New York City Opera from 1997-2010 and has served as production dramaturg for projects including Washington National Opera's Ring cycle, Opera Boston's The Nose, and Offenbach!!! at Bard Summerscape. She creates supertitles for opera companies across America, and helped launch Met Titles, the Met's simultaneous translation system. Her English singing translations include Hansel and Gretel (NYCO), La vestale (English National Opera) and Shostakovich's Cherry Tree Towers (Bard Summerscape). She also writes for the New York Times, and has contributed to books including The New Grove Dictionary of Opera, Metropolitan Opera Guide to Opera on Video, and The Compleat Mozart. She regularly appears on the Metropolitan Opera's radio broadcasts, teaches master classes for young singers worldwide, and has lectured at venues including the Smithsonian Institution, Carnegie Hall, Lincoln Center, and the Santa Fe, San Francisco, Cincinnati, Seattle, and Canadian operas.

**Pacien Mazzagatti,** *Music Staff*
Heralded by *Opera News* as "clearly a name to watch," conductor Pacien Mazzagatti has garnered considerable critical acclaim for his work conducting opera both in the United States and abroad. He has been the music director of the Dicapo Opera Theatre since 2009. His recent engagements have included performances at the Sarasota Opera, St. Petersburg's Mikhailovsky Theater, the Palacio de Bellas Artes in Mexico City, Moscow's International House of Music and three consecutive seasons of guest appearances at the Polish National Opera in Warsaw. His work has been favorably reviewed by the *New York Times*, *Opera News*, *Opernwelt*, *Opera Magazine UK* the *Wall Street Journal*, and many other periodicals. Mr. Mazzagatti is also an accomplished pianist and holds both a Master's degree and Doctorate from the Manhattan School of Music.

**Kristin Sampson,** *Music Staff & Artistic Administrator*
Noted for singing with "primal force and excellent control", American soprano Kristin Sampson opens the 2014-15 season as a featured artist with American Opera Projects: *Composers and the Voice program*. Next, Ms. Sampson takes on the role of the Mother in David Zuckerman's new opera in development, *Milarepa*. Other 2014-15 projects include OPERA America's: Creators in Concert featuring the music of Tobias Picker, a special guest artist recital in Scranton, PA and concerts throughout the East coast area. During the 2013-14 season Ms. Sampson joined tenor Raúl Melo in recital at Carnegie Hall's, Weill Hall and was featured in the Filmed Workshop as Wadha in *Cities of Salt*. Spring of 2014 season was highlighted by Sampson's reprisal of the role of Cio-Cio San in a touring production of *Madama Butterfly*. Ms. Sampson has performed throughout the United States with the Santa Fe Opera, Opera Orchestra of New York, Dicapo Opera Theatre, Augusta Opera, El Paso Opera and the National Lyric Opera among others, and internationally with the Opera Society of Hong Kong, Armel Opera Festival, National Theater of Szeged, Teatro Munipal de Santiago and Teatro dell'Opera di Roma.

**David Titcomb,** *Orchestra Manager*

David Titcomb has been a member of the New York City Opera Orchestra since 1986 and became the Orchestra Manager in 2001. He was an Associate Musician of the Metropolitan Orchestra from 1980–2011. In addition to his experience as an opera musician he has taught at Bennington College, Vt. (1980-1986) and the Ethical Cultural Schools, Riverdale, NY (1986–2001) and has been a guest lecturer at the Juilliard School since 2009. In 2013 he was the American Music Coordinator for Shakespeare's Globe-Broadway production of *Twelfth Night* and *Richard III*, as well as provided orchestra management for the School of American Ballet workshop productions (from 2008–present). He is the Northeast USA contractor for the Andrea Bocelli concert tours (2008–present) and is currently the Orchestra Manager of New York City Ballet (2011–present). Individual visiting touring company projects under the auspices of the Lincoln Center Festival have included: The Paris Opera Ballet–2012, the San Francisco Ballet–2006, Grendel, The Opera–2006, The Royal Ballet Covent Garden–2004 (at the MET), the La Scala Opera Ballet– 2001. Independent projects include: *I Sing Beijing*–2011 (Alice Tully Hall), the Danish Royal Ballet–2011 and in collaboration with the Collegiate Chorale–2008, The Firebrand of Florence (Alice Tully Hall), Handel's *Alceste* (The Rose Theater) and the Verdi *Requiem* (Carnegie Hall).

# EXHIBIT E

## Drafts of Amended and Restated Corporate Documents

**<u>Schedule 1</u>**

**Draft of Amended and Restated Certificate of Incorporation**

DRAFT 12/31/15

RESTATED CERTIFICATE OF INCORPORATION
OF
NEW YORK CITY OPERA, INC.

UNDER SECTION 805 OF THE
NOT-FOR-PROFIT CORPORATION LAW

The undersigned, a natural person of the age of eighteen (18) or over, does hereby certify:

FIRST: The name of the corporation is New York City Opera, Inc. (the "Corporation").

SECOND: The certificate of incorporation of the Corporation was filed with the New York Secretary of State on April 5, 1978 (the "Initial Certificate"). The Initial Certificate is amended and restated to read as set forth herein.

THIRD: The Corporation is a corporation as defined in subparagraph (a)(5) of Section 102 of the New York Not-for-Profit Corporation Law (the "NPCL") and shall be a Charitable Corporation under Section 201 of the NPCL.

FOURTH: The Corporation is formed for the following purposes:

a) to conduct activities which are exclusively charitable, literary and/or educational within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as it may be amended (the "Code");
b) to encourage the study of the art of the opera and to provide the means for popular instruction and enjoyment through the production or presentation of operatic performances;
c) to present, develop and encourage the highest excellence in the art of the opera;
d) to conduct any and all other activities as shall from time to time be found appropriate in connection with the foregoing as are lawful for New York not-for-profit corporations.

FIFTH: In furtherance of the foregoing purposes, the Corporation shall have all the general powers enumerated in Section 202 of the NPCL and such other powers as are now or hereafter permitted by law for a corporation organized for the foregoing purposes, including, without limitation, the power to solicit grants and contributions for any corporate purpose and the power to maintain a fund or funds of real and/or personal property in furtherance of such purposes.

SIXTH:  Notwithstanding any other provision of these articles, the Corporation is organized exclusively for charitable and educational purposes, and intends at all times to qualify and remain qualified as exempt from federal income tax under Section 501(c)(3) of the Code and, in connection therewith:

(a)    the Corporation shall not, directly or indirectly, engage in or include among its purposes any of the activities mentioned in subparagraphs (a) - (v) of Section 404 of the NPCL;

(b)    the Corporation is not formed for and shall not be conducted nor operated for pecuniary profit or financial gain, and no part of its assets, income or profit shall be distributed to or inure to the benefit of any private individual or individuals, provided that nothing herein shall prevent the Corporation from paying reasonable compensation to any person for services rendered to or for the Corporation in furtherance of one or more of its purposes;

(c)    no substantial part of the activities of the Corporation shall be devoted to the carrying on of propaganda or otherwise attempting to influence legislation, except to the extent permitted by the Code whether pursuant to an election under Section 501(h) or otherwise, and no part of the activities of the Corporation shall be devoted to participating or intervening in (including the publication or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office; and

(d)    the Corporation shall not carry on any other activities not permitted to be carried on (i) by a corporation exempt from federal income tax under Section 501(c)(3) of the Code (or the corresponding provision of any future U.S. Internal Revenue Law) or (ii) by a corporation contributions to which are deductible under section 170(c)(2) of the Code (or the corresponding provision of any future U.S. Internal Revenue Law).

SEVENTH: The office of the Corporation shall be located in the City of New York, County of New York, State of New York.

EIGHTH: The names and addresses of the initial Directors, each of whom is of full age, are as follows:

| Name | Address |
| --- | --- |
| Roy G.  Niederhoffer | 1700 Broadway<br>39th Floor<br>New York, NY 10019 |

DRAFT 12/31/15

Michael Capasso                           1700 Broadway
                                          39th Floor
                                          New York, NY 10019

Jeffrey Laikind                           860 5th Avenue
                                          Apt. 10F
                                          New York, NY 10065

Steve Acunto                              Hudson Cliff House
                                          131 Alta Avenue
                                          New York, NY 10705

Eli Bar                                   237 East 88th Street
                                          Apt. 101
                                          New York, NY 10128

David Drake                               One Penn Plaza
                                          49th Floor
                                          New York City, NY, 10001

Mara Kaplan Pruzanski                     421 Hudson Street
                                          Apt. 212
                                          New York, NY 10014

David Kurtz                               9301 Wilshire Blvd.
                                          Suite 202
                                          Beverly Hills, CA 90210

David Monk                                400 East 20th Street
                                          Apt. 8C
                                          New York, NY 10009

Tom Percora                               1700 Broadway
                                          39th Floor
                                          New York, NY 10019

Tiberius Vadan                            220 Park Avenue South
                                          Apt. 9D
                                          New York, NY 10013

Victoria Vysotina                         15 East 91st Street
                                          Apt. 2B
                                          New York, NY 10128

DRAFT 12/31/15

NINTH: The Secretary of State of the State of New York is hereby designated as agent of the Corporation upon whom process against the Corporation may be served.  The post office address to which the Secretary shall mail a copy of any process against the Corporation served upon him is 1700 Broadway, 39th Floor, New York, New York 10019.

TENTH: In the event of dissolution, all the remaining assets and property of the organization shall, after payment of all necessary expenses thereof, be distributed to organizations that qualify under Section 501(c)(3) of the Code, or corresponding provisions of any subsequent Federal tax laws, or to the Federal government or State or local governments for a public purpose, subject to the approval in accordance with the New York State Not for Profit Corporation Law.

IN WITNESS WHEREOF this certificate has been signed and the statements made herein affirmed as true under the penalties of perjury this _____, 2016.

_____

Roy G.  Niederhoffer
Chairman of the Board
1700 Broadway
39th Floor
New York, New York 10019

[Signature Page to the Amended and Restated Certificate of Incorporation  of New York City Opera, Inc.]

## <u>Schedule 2</u>

**Draft of Amended and Restated By-Laws**

DRAFT 12/31/15

BY-LAWS

of

<u>NEW YORK CITY OPERA, INC.</u>

As adopted _____, 2016

## NEW YORK CITY OPERA, INC.

A New York Corporation

(the "Corporation")

## BY-LAWS

———————————————

### ARTICLE I

#### MEMBERS

Section 1.1    *Members.*

The Corporation shall have no members.

### ARTICLE II

#### OFFICES

Section 2.1    *Principal Office.*

The principal office of the Corporation shall be located at 1700 Broadway, 39th Floor, in the County and State of New York. The Corporation may also have offices at such other places as the Board of Directors (the "Board") may from time to time determine.

### ARTICLE III

#### THE CORPORATION AND ARTISTIC FREEDOM

Section 3.1    *Non-Interference.*

No director of the Corporation (each a "Director") shall have, by sole reason of such position, any right to influence or affect the creative productions or artistic management of the Corporation. It is the specific intention of this article to prevent any Director from unduly exercising his or her position to circumscribe or to direct the creative work of the Corporation.

Section 3.2    *Recourse.*

If one of the senior artistic or managerial officers of the Corporation asserts that this article has been violated, he or she must raise his or her concerns with the Chairman of the Board no fewer than ten (10) days before any regular or special Board meeting, and he or she may present such views of alleged violation of this article to the Board.

Section 3.3    *Financial Responsibility.*

Nothing in this article or in these By-Laws shall be read to restrict in any manner the power of the Board to establish financial and other limitations in carrying out its responsibility to oversee the management of the Corporation.

ARTICLE IV

BOARD OF DIRECTORS

Section 4.1    <u>*Powers and Duties.*</u>

The Board shall have general power to control and manage the affairs and property of the Corporation subject to applicable law and in accordance with the purposes and limitations set forth in the Certificate of Incorporation and herein.

The Board may: (i) appoint and discharge advisors and consultants who have skills necessary or helpful to the Corporation, (ii) employ and discharge persons in furtherance of the purposes of the Corporation, and (iii) exercise any other powers necessary to manage the affairs and further the purposes of the Corporation in conformity with the Certificate of Incorporation and these By-Laws.

The Board shall: (i) direct the Chairman of the Board and Treasurer of the Corporation to present at the annual meeting of the Board a financial report, verified by the Chairman of the Board and Treasurer or a majority of the Directors, or certified by an independent public accountant or certified public accountant or a firm of such accountants selected by the Board. This report shall be filed with the records of the Corporation and a copy or abstract thereof entered in the minutes of the proceedings of the annual meeting of the Board, and (ii) select all officers for the Corporation and approve the members of any standing committee appointed by the Chairman of the Board.

Section 4.2    *Number.*

The entire Board shall consist of the number of Directors that were elected as of the most recently held election of Directors (the "Entire Board"). The number of Directors constituting the Entire Board shall be not less than three.  Subject to such minimum, the number of Directors may be increased or decreased from time to time, by resolution of the Board, but such action by the Board shall require a vote of a majority of the Entire Board and no decrease shall shorten the term of any incumbent Director.

Section 4.3      *Election and Term of Office.*

The initial Directors shall be the persons named in the Certificate of Incorporation and shall serve until the first annual meeting of the Board. The Directors shall hold office for 3 year terms; provided, however, that any Director elected to fill an unexpired term (whether resulting from the death, resignation or removal or created by an increase in the number of Directors) shall hold office until the next annual meeting at which the election of Directors is in the regular order of business and until his or her successor is elected or appointed and qualified. Directors may be elected to any number of consecutive terms. To become a Director, a person shall be nominated by a Director and elected by a plurality of the Board.

Section 4.4      *Qualification for Directors.*

Each Director shall be at least 18 years of age.

Section 4.5      *Classification of Directors.*

At the first annual meeting at which the election of Directors is in the regular order of business, the Directors shall be divided into three equal as possible classes. The term of office of the first class shall expire at the first annual meeting of the Corporation following the annual meeting at which Directors are first designated into classes. The term of office of the second class shall expire at the following annual meeting and the third class at the third annual meeting after the annual meeting at which Directors are first designated into classes. At each annual meeting after Directors are first designated into classes, Directors shall be elected for a term of three years to replace those whose terms shall expire.

Section 4.6      *Removal.*

Any Director may be removed at any time for cause by a vote of Directors then in office at a regular meeting or special meeting of the Board called for that purpose; provided that there is a quorum of not less than a majority present at such meeting; provided further that at least one week's notice of the proposed action shall have been given to the Entire Board then in office. Missing three consecutive meetings of the Board unless a majority of the Directors has excused such Director from attendance due to extreme circumstances may constitute cause.

Section 4.7      *Resignation.*

Any Director may resign from the Board at any time. Such resignation shall be made in writing, and shall take effect at the time specified therein, and if no time be specified, at the time of its receipt by the Corporation or the Chairman of the Board. The acceptance of a resignation by the Board shall not be necessary to make it effective, but no resignation shall discharge any accrued obligation or duty of a Director.

Section 4.8      *Vacancies and Newly Created Directorships.*

Any newly created Directorships and any vacancies on the Board arising at any time and from any cause may be filled at any meeting of the Board by a majority of the Directors then in office, regardless of their number. The Directors so elected shall serve until the next annual

meeting at which the election of Directors is the regular order of business and his or her successor is elected or appointed or qualified.

A vacancy in the Board shall be deemed to exist on the occurrence of any of the following: (a) the death, resignation or removal of any Director; (b) an increase in the authorized number of Directors by resolution of the Board; or (c) the failure of the Directors, at any annual or other meeting of Directors at which any one or more Directors are to be elected, to elect the full authorized number of Directors to be voted for at that meeting.

Section 4.9    *Meetings.*

Meetings of the Board may be held at any place as the Board may from time to time fix. The annual meeting of the Board shall be held at a date, time and place fixed by the Board, and at such time the Board shall receive an annual report.  Other regular meetings of the Board, if any, shall be held at a dated, time and place fixed by the Board.  Special meetings of the Board shall be held whenever called by the Chairman of the Board, the Executive Director or any Director upon written demand of not less than three Directors of the Board, in each case at such time and place as shall be fixed by the person or persons calling the meeting.

Section 4.10    *Notice of Meetings.*

Regular meetings may be held without notice of the time and place if such meetings are fixed by the Board.  Notice of the time and place of the annual meeting, each regular meeting not fixed by the Board and each special meeting of the Board shall be (i) delivered to each Director by e-mail or facsimile at least five (5) days before the day on which the meeting is to be held; or (ii) mailed to each Director, postage prepaid, addressed to him or her at his or her residence or usual place of business (or at such other address as he or she may have designated in a written request filed with the Secretary at least seven (7) days before the day on which the meeting is to be held). To discuss matters requiring prompt action, notice of special meetings may be sent to each Director by e-mail, facsimile, or telephone, or given personally, no less than twenty-four hours before the time at which such meeting is to be held, unless the meeting must be held within twenty-four hours.  Notice of a meeting need not be given to any Director who submits a signed waiver of notice whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to him or her.  Waivers of notice sent by email must be able to be reasonably determined to be sent by the Director.  No notice need be given of any adjourned meeting.

Section 4.11    *Quorum.*

Unless a greater proportion is required by law, the quorum shall be a majority of the Entire Board.

Section 4.12    *Voting.*

Except as otherwise provided by law or these By-Laws, at any meeting of the Board at which a quorum is present, the affirmative vote of a majority of the Directors present at the time of the vote shall be the act of the Board.  If at any meeting of the Board there shall be less than a quorum present, the Directors present may adjourn the meeting until a quorum is obtained.  Any one or more Directors of the Board or any committee thereof may participate in a meeting of the Board or committee by means of telephone, video conference or similar communications equipment provided that all persons participating in the meeting can hear each other at the same time and can participate in all matters before the board.  Participation by such means shall constitute presence in person at a meeting.

The following acts of the Board require the affirmative vote of at least two-thirds (2/3) of the Entire Board: (a) a purchase, sale, mortgage or lease of real property of the Corporation if the property constitutes all or substantially all of the assets of the Corporation; (b) a sale, lease, exchange or other disposition of all or substantially all of the assets of the Corporation; or (c) an alteration to these By-Laws or Certificate of Incorporation of the Corporation that would increase the quorum requirement or vote requirement to greater than a majority of the Board present at the time of the vote.

Section 4.13    *Action by the Board.*

Any action required or permitted to be taken by the Board or any committee thereof may be taken without a meeting if all Directors of the Board or the committee consent in writing to the adoption of a resolution authorizing the action.  Such consent may be written or electronic.  If the consent is written, it must be signed by the Director.  If the consent is electronic it must be able to be reasonably determined to have been sent by the Director. The resolution and the written consents thereto by the Directors of the Board or committee shall be filed with the minutes of the proceedings of the Board or committee.

Section 4.14    *Compensation.*

No compensation of any kind shall be paid to any Director for the performance of his or her duties as Director.  This shall in no way limit the reimbursement of reasonable expenses incurred in connection with board service.  Subject to the Corporation's Conflicts of Interest Policy, and provided that there is full disclosure of the terms of such compensation and the arrangement has been determined to be fair and reasonable and approved by the Board, a Director may receive payment for services provided to the Corporation in any capacity separate from his or her responsibilities as a Director.

ARTICLE V

OFFICERS, EMPLOYEES AND AGENTS

Section 5.1    *Executive Officers.*

The officers of the Corporation (the "Officers") shall be shall be the Chairman of the Board, Chief Executive Officer/General Manager and Artistic Director, Chief Financial Officer/Chief Operating Officer, Secretary, Treasurer and such other Officers as are from time to time designated by the Board, as the Board may from time to time appoint.  One person may hold more than one office in the Corporation except that no one person may hold the offices of Chief Executive Officer/General Manager and Artistic Director and Secretary, or Chairman of the Board and Secretary.  The Chairman of the Board and the Chief Executive Officer/General Manager and Artistic Director shall be Directors of the Corporation and shall not be employees of the Corporation.  The other Officers may, but need not, be Directors of the Board.  No instrument required to be signed by more than one Officer may be signed by one person in more than one capacity.

Section 5.2    *Powers and Duties.*

4.2.1 *Chairman of the Board; Vice-Chairmen*: The Chairman of the Board shall be elected at each annual meeting by vote of the majority of the Directors then in office. The Chairman of the Board shall have the power to call meetings of the Board and shall also be the Chairman of the Executive Committee. He or she shall preside at all meetings of the Board and Executive Committee. The Board may from time to time appoint one or more Vice-Chairmen of the Board with such functions as the Chairman of the Board may determine.

4.2.1 *Chief Executive Officer/General Manager and Artistic Director*: The Chief Executive Officer/General Manager and Artistic Director shall have executive supervision over the management of the affairs of the Corporation and shall perform all duties generally incidental to the office of the chief executive Officer of a not-for-profit organization and shall exercise such other duties as the Board may, from time to time, delegate or assign to him or her. The office of Chief Executive Officer/General Manager and Artistic Director shall be deemed the office corresponding to the office of President for purposes of the Not-for-Profit Corporation Law, and therefore may not be an employee of the Corporation.

4.2.2 *Chief Financial Officer/Chief Operating Officer*: The Chief Financial Officer/Chief Operating Officer shall have charge of and general managerial supervision over the day-to-day affairs of the Corporation reporting to, and under the direction of, the Chief Executive Officer/General Manager and Artistic Director and shall coordinate the Board's review of, and action related to, the Board's financial responsibilities and assist staff in developing and implementing financial procedures and systems.

4.2.3 *Secretary*: The Secretary shall keep the minutes of the annual meeting and all meetings of the Board in books provided for that purpose.  He or she shall be responsible for the giving and serving of all notices of the Corporation, performing all the duties customarily

incidental to the office of the Secretary, subject to the control of the Board, and performing such other duties as shall from time to time be assigned by the Board.

4.2.4 *Treasurer*: The Treasurer shall keep or cause to be kept full and accurate accounts of receipts and disbursements of the Corporation, and shall deposit or cause to be deposited all moneys, evidences of indebtedness and other valuable documents of the Corporation in the name and to the credit of the Corporation in such banks or depositories as the Board may designate. At the annual meeting, he or she shall render a report of the Corporation's accounts showing in appropriate detail: (a) the assets and liabilities of the Corporation as of a twelve-month fiscal period terminating not more than six months prior to the meeting; (b) the principal changes in assets and liabilities during that fiscal period; (c) the revenues or receipts of the Corporation, both unrestricted and restricted to particular purposes during said fiscal period; and (d) the expenses or disbursements of the Corporation, for both general and restricted purposes during said fiscal period. Such report shall be filed with the minutes of the annual meeting of the Board. The report to the Board may consist of a verified or certified copy of any report by the Corporation to the Internal Revenue Service or the Attorney General of the State of New York which includes the information specified above. The Treasurer shall, at all reasonable times, exhibit the Corporation's books and accounts to any Officer or Director of the Corporation, and whenever required by the Board, render a statement of the Corporation's accounts and perform all duties incident to the position of Treasurer, subject to the control of the Board.

4.2.5 *Other Officers*: The Board may from time to time designate any other Officers, with such powers and duties as determined by the Board.

Section 5.3    *Election and Term of Office.*

The Officers of the Corporation shall be elected at the annual meeting of the Board, and each shall continue in office until his or her successor shall have been elected and qualified, or until his or her death, resignation or removal.

Section 5.4    *Employees and Other Agents.*

The Board may from time to time appoint such employees and other agents as it shall deem necessary, each of whom shall hold office at the pleasure of the Board, and shall have such authority and perform such duties and shall receive such reasonable compensation, if any, as the Board may from time to time determine. To the fullest extent allowed by law, the Board may delegate to any employee or agent any powers possessed by the Board and may prescribe their respective title, terms of office, authorities and duties.

Section 5.5    *Removal.*

Any Officer, employee or agent of the Corporation may be removed with or without cause by a vote of the majority of the Board.

Section 5.6       *Vacancies.*

In case of any vacancy in any office, a successor to fill the unexpired portion of the term may be elected by the Board.

Section 5.7       *Compensation.*

Any Officer who is not a Director but is an employee or agent of the Corporation is authorized to receive a reasonable salary or other reasonable compensation for services rendered to the Corporation as an employee or agent when authorized by a majority of the Entire Board, and only when so authorized.

Section 5.8       *Sureties and Bonds.*

In case the Board shall so require, any Officer or agent of the Corporation shall execute for the Corporation a bond in such sum and with such surety or sureties as the Board may direct, conditioned upon the faithful performance of his or her duties to the Corporation and including responsibility for negligence and for the accounting for all property or funds of the Corporation that may come into his or her hands.

# ARTICLE VI

## COMMITTEES OF THE BOARD

A committee of the Board is one that shall have authority to bind the corporation and shall be comprised solely of Directors.  There may be committees of the Board, as follows:

Section 6.1       *Executive Committee.*

An Executive Committee which shall consist of at least three Directors, one of whom shall be the Chairman of the Board, who shall also serve as chair of the Executive Committee. The other members of the Executive Committee shall be appointed by the Chairman of the Board, subject to the approval of the Board.  The Executive Committee shall have all the authority of the Board except as to the following matters: (i) the filling of vacancies on the Board or on any committee; (ii) the amendment or repeal of the By-Laws or the adoption of new By-Laws; (iii) the amendment or repeal of any resolution of the Board which by its terms shall not be so amendable or  repealable; and (iv) the fixing of compensation of the Directors for serving on the Board or any committee.

Section 6.2       *Finance Committee.*

A Finance Committee which shall consist of at least three Directors, one of whom shall be the Treasurer.  The other members of the Finance shall be appointed by the Chairman of the Board, subject to the approval of the Board.  The Finance Committee shall advise the Treasurer and the Board in regard to the investments and general fiscal policy of the Corporation.

Section 6.3 *Audit Committee.*

The Audit Committee shall be comprised of at least three Directors, each of whom is an Independent Director as defined in Section 102(a)(21) of the New York Not-for-Profit Corporation Law. The members of the Audit Committee shall be appointed by the Chairman of the Board, subject to the approval of the Board. The Audit Committee will annually retain an independent auditor to review the accounting and financial reporting processes of the Corporation and the audit of the Corporation's financial statements. Upon completion of the independent auditors review, the Audit Committee shall review the results of the audit and any related management letter with the independent auditor.

Section 6.4 *Other Committees of the Board.*

The Board, by resolution adopted by a majority of the Entire Board, may establish and appoint other committees of the Board consisting of at least three Directors with such powers and duties as the Board may prescribe. The members of such committees shall be appointed by the Chairman of the Board, subject to the approval of the Board.

ARTICLE VII

COMMITTEES OF THE CORPORATION

Section 7.1 *Powers.*

The Board by resolution may appoint from time to time any number of persons as advisors of the Corporation to act either singly or as a committee or committees of the Corporation. Each advisor shall hold office during the pleasure of the Board and shall have only the authority or obligations as the Board may from time to time determine.

Section 7.2 *No Compensation.*

No advisor to the Corporation shall receive, directly or indirectly, any salary or compensation for any service rendered to the Corporation as a member of a committee of the Corporation, except that the Board may authorize reimbursement of expenditures reasonably incurred on behalf of activities for the benefit of the Corporation.

# ARTICLE VIII

## FINANCES

Section 8.1      *Checks, Notes and Contracts.*

The Board is authorized to select the banks or depositories it deems proper for the funds of the Corporation and shall determine who shall be authorized on the Corporation's behalf to sign checks, drafts or other orders for the payment of money, acceptances, notes or other evidences of indebtedness, to enter into contracts or to execute and deliver other documents and instruments.

Section 8.2      *Withdrawals.*

Withdrawals by check in the name of the Corporation shall be signed by the authorized signatories as provided from time to time by resolution of the Board.

Section 8.3      *Investments.*

The funds of the Corporation may be retained in whole or in part in cash or be invested and reinvested from time to time in such property, real, personal or otherwise, including stocks, bonds or other securities, as the Board may deem desirable.

# ARTICLE IX

## AMENDMENTS

These By-Laws may be amended or repealed by the majority vote of the Entire Board at any meeting of the Board, except amendments to these By-Laws or to the Certificate of Incorporation that would increase the quorum requirement or vote requirement to greater than a majority of the Board present at the time of the vote shall require a two-thirds vote of the Entire Board.  Any amendment or repeal of these By-Laws is authorized only at a duly called and held meeting of the Board for which written notice of such meeting, setting forth the proposed alteration, is given in accordance with the notice provisions for special meetings set forth in Section 4.9 of these By-Laws or, if notice of such meeting is given (and the written proposed alteration of the By-Laws given) at a meeting of the Board prior to the meeting to amend or repeal the By-Laws.

# ARTICLE X

## INDEMNIFICATION

Section 10.1      *Indemnification.*

The Corporation shall, to the fullest extent now or hereafter permitted by law, indemnify any person made, or threatened to be made, a party to any action or proceeding by reason of the

fact that he or she or his or her testator was a Director, Officer, employee or agent of the Corporation, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorney fees.  No indemnification may be made to or on behalf of any such person if (a) his or her acts were committed in bad faith or were the result of his or her active and deliberate dishonesty and were material to such action or proceeding or (b) he or she personally gained in fact a financial profit  or other advantage to which he or she was not legally entitled in the transaction or matter in which indemnification is sought.

Section 10.2    *Insurance.*

The Corporation shall have the power to purchase and maintain all insurance policies deemed to be in the best interest of the Corporation including insurance to indemnify the Corporation for any obligation which it incurs as a result of its indemnification of Directors, Officers and employees pursuant to Section 10.1 above, or to indemnify such persons in instances in which they may be indemnified pursuant to Section 10.1 above.


ARTICLE XI

MISCELLANEOUS


Section 11.1    *Fiscal Year.*

The fiscal year of the Corporation shall begin on the 1st day of July in each year and terminate on the 30th day of June in each succeeding year.

Section 11.2    *Notices and Waivers Thereof.*

Whenever any notice is required by law, the Certificate of Incorporation, or these By-Laws to be given to any Director, or Officer, such notice, except as otherwise provided by law, may be given by mail, overnight delivery service, personal service, or, in the case of Directors or Officers, electronic transmission (including facsimile, telegram, or cable), addressed to such address as appears on the books of the Corporation.  Any notice given by mail shall be deemed to have been given when deposited in the United States mail with postage thereon prepaid; any notice given by overnight delivery service shall be deemed to have been given when deposited with such service on the day of guaranteed delivery by such service; any notice given by personal service shall be deemed to have been given when delivered; and any notice given by electronic transmission shall be deemed given (a) if by facsimile, when directed to a facsimile telecommunication number at which the Director or Officer has consented to receive notice; (b) if by electronic mail, when directed to an electronic mail address at which the Director or Officer has consented to receive notice; (c) if by posting on an electronic network together with separate notice to the Director, or Officer of such specific posting, upon the later of such posting and the giving of such separate notice; and (d) if by any other form of electronic transmission, when directed to the Director or Officer.  An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

Whenever any notice is required to be given by law, the Certificate of Incorporation, or these By-Laws, a written waiver thereof, signed by the person entitled to such notice, or given by electronic transmission, whether before or after the meeting or the time stated therein, shall be deemed equivalent in all respects to such notice to the full extent permitted by law.

Section 11.3    *Stock of Other Corporations or Other Interests.*

Unless otherwise ordered by the Board, the Chairman of the Board, the Secretary, and such attorneys or agents of the Corporation as may be from time to time authorized by the Board or the Chairman of the Board, shall have full power and authority on behalf of this Corporation to attend and to act and vote in person or by proxy at any meeting of the holders of securities of any corporation or other entity in which this Corporation may own or hold shares or other securities, and at such meetings shall possess and may exercise all the rights and powers incident to the ownership of such shares or other securities which this Corporation, as the owner or holder thereof, might have possessed and exercised if present.  The Chairman of the Board, the Secretary, or such attorneys or agents, may also execute and deliver on behalf of this Corporation powers of attorney, proxies, consents, waivers, and other instruments relating to the shares or securities owned or held by this Corporation.

Section 11.4    *Books.*

There shall be kept at the office of the Corporation correct books of account of the activities and transactions of the Corporation including the minute book, which shall contain a copy of the Certificate of Incorporation, a copy of these By-Laws, and all minutes of meetings of the Board.

Section 11.5    *Non-Discrimination.*

In all of its dealings, neither the Corporation nor its duly authorized agents shall discriminate against any individual or group for reasons of race, color, creed, sex, age, ethnicity, national origin, marital status, sexual preference, mental or physical disability or any category protected by state or federal law.

Section 11.6    *Reference to Certificate of Incorporation.*

References in these By-Laws to the Certificate of Incorporation shall include all amendments thereto or changes thereof unless specifically excepted by these By-Laws.  In the event of a conflict between the Certificate of Incorporation and these By-Laws, the Certificate of Incorporation shall govern.

**<u>Schedule 3</u>**

**Draft of Conflict of Interest Policy**

DRAFT 12/31/15

# NEW YORK CITY OPERA, INC.
# CONFLICT OF INTEREST POLICY

### ARTICLE I PURPOSE

The purpose of this policy (the "Policy") is to protect the interests of New York City Opera, Inc. (the "Corporation") when it is contemplating entering into a transaction or arrangement that might benefit the private interest of a Director, Officer, or Key Employee of the Corporation. The Corporation will not enter into any such transaction or arrangement unless it is determined by the Board in the manner described below to be fair, reasonable and in the best interests of the Corporation at the time of such determination

This Policy is intended to supplement, but not replace, any applicable state and federal laws governing conflicts of interest applicable to non-for-profit and charitable organizations.

### ARTICLE 2 RELATED PARTY TRANSACTIONS AND DUTY TO DISCLOSE

A Related Party Transaction is not necessarily a prohibited transaction.  Under this Policy, if the Corporation contemplates entering into a Related Party Transaction, the Independent Directors of the Board must determine if the transaction is fair, reasonable, and in the best interests of the Corporation at the time of such determination.

If at any time during his or her term of service a Related Party acquires any Financial Interest or when any matter for decision or approval comes before the Board in which a Related Party has a Financial Interest, that Financial Interest or potential Related Party Transaction must be promptly disclosed in writing to each member of the Board, the President, and to the Chair of the appropriate Board Committee, together with all material facts.  The Board will then follow the procedures in Article 4 of this Policy.

*Failure to disclose to the Board a known Financial Interest or a known potential Related Party Transaction may be grounds for removal from the Board or termination from the Corporation.*

### ARTICLE 3 DISCLOSURE AND VOTING

<u>Disclosure</u>.  Any Related Party shall disclose in good faith all material facts of his or her Financial Interest to the Board.

<u>Non-Participation and Review</u>.  All transactions, agreements or any other arrangements between the Corporation and a Related Party, and any other transactions which may involve a potential conflict of interest, shall be reviewed by the Independent Directors of the Board.  All Related

Parties with a Financial Interest shall leave the room in which such deliberations are conducted. The Independent Directors of the Board will then determine whether the contemplated Related Party Transaction is fair, reasonable, and in the best interests of the Corporation at the time of such determination. The Corporation will not enter into any Related Party Transaction unless it is determined to be fair, reasonable and in the best interest of the Corporation at the time of such determination.

Consideration of Alternate Transactions and Comparability Data.  If the contemplated Related Party Transaction pertains to compensation for services or the transfer of property or other economic benefit to a Related Party, the Independent Directors of the Board must determine that the value of the economic benefit provided by the Corporation to the Related Party does not exceed the value of the consideration received in exchange by obtaining and reviewing appropriate comparable data prior to entering the transaction.

In those instances where the contemplated Related Party Transaction does not involve compensation, transfer of property or benefits to a Related Party, the Independent Directors of the Board must consider alternative transactions, to the extent possible, prior to entering into such transaction.

Comparability Data.  When considering the comparability of compensation, for example, the types of relevant Comparability Data which the Independent Directors of the Board may consider include, but are not limited to (1) compensation levels paid by similarly situated organizations, both exempt and non-exempt; (2) the availability of similar services within the same geographic area; (3) current compensation surveys compiled by independent firms; and (4) written offers from similar institutions competing for the same person's services.  When the transaction involves the transfer of real property as consideration, the relevant factors include, but are not limited to (i) current independent appraisals of the property, and (ii) offers received in a competitive bidding process.

Voting.  The Board or shall, after considering alternate transactions and/or comparability data, determine in good faith by vote of the Independent Directors of the Board whether the transaction or arrangement is fair, reasonable, and in the best interest of the Corporation at the time of such decision.  The transaction shall be approved by not less than a majority vote of the Independent Directors or Committee members present at the meeting.  In conformity with the above criteria, the Board shall make its decision as to whether to enter into the transaction or arrangement and shall document the meeting contemporaneously under Article 6 of this Policy.

*All Related Parties with a Financial Interest must not be present for deliberations and voting on the transaction or arrangement in which he or she has a Financial Interest.  However, Related Parties are not prohibited from providing information regarding the transaction to the Board prior to the Board's deliberations. Only Independent Directors of the Board shall vote on Related Party Transactions.  No Director or Officer shall vote, act, or attempt to influence improperly the deliberations on any matter in which he or she has been determined by the Board to have a Financial Interest.  Any attempt to vote, act, or improperly influence deliberations by a Related Party on any matter with which such person has a Financial Interest may be grounds for removal from the Board or termination from the Corporation.*

DM3\3707166.1

Compensation. A voting member of the Board of Directors or an Officer who receives compensation directly or indirectly from the Corporation for services or a Director serving as a voting member of any Committee whose jurisdiction includes compensation matters is precluded from voting or acting on matters pertaining to that Director's or Officer's compensation.

No voting member of the Board or any Committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation, either individually or collectively, is prohibited from providing information to any Committee regarding compensation.

## ARTICLE 4 AUDIT OR OTHER COMMITTEE REVIEW

The Board may delegate to the Audit or other Committee, which shall be composed solely of Independent Directors, the adoption, implementation of and compliance with this policy. The Board may delegate to the Audit or other Committee review and approval of any Related Party Transaction involving a Related Party and the Corporation, as contained in this Policy; provided that if the Related Party Transaction is of a magnitude that would otherwise require full Board approval, the Committee shall submit the Related Party Transaction to the Board for consideration, providing its recommendation as to whether or not to approve it.

In the event the Board delegates the review and approval of Related Party transactions to a committee, all references to Board in this Policy shall be deemed to refer to such Committee and all references to a majority of the Board shall be deemed to refer to a majority of such Committee.

DM3\3707166.1

## ARTICLE 5 RECORDS OF PROCEEDINGS

The minutes of all meetings of the Board and all Committee meetings at which a Related Party Transaction is considered shall contain:

- The names of the persons who disclosed or otherwise were determined to have a potential or actual Financial Interest and/or conflict of interest, the nature of the potential or actual Financial Interest and/or conflict of interest, any action taken to determine whether a Financial Interest or conflict of interest exists, and the Board's decision as to whether a Financial Interest and/or conflict of interest exists.

- The names of the persons who were present for discussions and votes relating to any determinations under Article 6(a) above, including whether the Related Party and any members not considered to be Independent Directors, left the room during any such discussions, the content of such discussions, including discussion of alternative transactions, and whether or not the transaction with the Related Party was approved by the Board.

- The minutes shall be documented contemporaneously to the decision and discussion regarding the Financial Interest or conflict of interest.

## ARTICLE 6 INITIAL AND ANNUAL WRITTEN DISCLOSURES

Prior to a Director's initial election to the Board, or an Officer or Key Employee's employment at the Corporation, and thereafter on an annual basis, all Directors, Officers, and Key Employees shall disclose in writing to the Secretary of the Corporation:

(i)     Any entity of which such person or a Relative of such person is an officer, director, trustee, member, owner, or employee and with which the Corporation has a relationship,

(ii)     Any Financial Interest such person may have in any corporation, organization, partnership or other entity which provides professional or other goods or services to Corporation for a fee or other compensation, and

(iii)     Any position or other material relationship such Director, Officer, Key Employee, or Relative of such person, may have with any not-for-profit corporation with which the Corporation has a business relationship.

A copy of each disclosure statement shall be kept in Corporation's files and made available to any Director, Officer, or Key Employee upon request.

DM3\3707166.1

ARTICLE 7 ANNUAL STATEMENTS

Each Director, Officer, and Key Employee shall annually sign and submit to the Secretary of the Corporation a statement which affirms such person: (a) has received a copy of this Policy, (b) has read and understands the Policy, and (c) has agreed to comply with the Policy.

ARTICLE 8 DEFINITIONS

- <u>Affiliate</u>.  An affiliate of the Corporation is a person or entity that is directly or indirectly through one or more intermediaries, controlled by, in control of, or under common control with the Corporation.

- <u>Board of Directors</u>.  The body responsible for the management of the Corporation.

- <u>Director</u>.  Any voting or non-voting member of the governing board of a corporation, whether designated as a director, trustee, manager, governor, or by any other title.

- <u>Financial Interest</u>.  A person has a Financial Interest if such person would receive an economic benefit, directly or indirectly, from any transaction, agreement, compensation agreement, including direct or indirect remuneration as well as gifts or favors that are not insubstantial or other arrangement involving the Corporation.

- <u>Independent Director</u>.  A member of the Board of Directors (the "Board") who:
  - o  Has not been an employee of the Corporation or an Affiliate of the Corporation within the last three years;
  - o  Does not have a Relative who has been a Key Employee of the Corporation or an Affiliate of the Corporation within the last three years;
  - o  Has not received and does not have a Relative who has received more than $10,000 in compensation directly from the Corporation or an Affiliate of the Corporation in any of the last three years (not including reasonable compensation or reimbursement for services as a Director, as set by the Corporation);
  - o  Does not have a substantial Financial Interest in and has not been an employee of, and does not have a Relative who has a substantial Financial Interest in or was an Officer of, any entity that has made payments to or received payments from, the Corporation or an Affiliate of the Corporation in excess of the lesser of: (a) $25,000 or (b) 2% of the Corporation's consolidated gross revenue over the last three years (payment does not include charitable contribution);
  - o  Is not in an employment relationship under control or direction of any Related Party and does not receive payments subject to approval of a Related Party;
  - o  Does not approve a transaction providing economic benefits to any Related Party who in turn has approved or will approve a transaction providing economic benefits to the Director.

5

- <u>Key Employee</u>.  A Key Employee is a person who is, or has within the last five years, been in a position to exercise substantial influence over the affairs of the Corporation.  This includes, but is not limited to:
  - o  Voting members of the Board;
  - o  Presidents, chief executive officers, chief operating officers or employee of any other title with similar responsibilities;
  - o  Treasurers and chief financial officers or employee of any other title with similar responsibilities; or
  - o  A "highly compensated" employee, within the meaning of section 4958 of the Internal Revenue Code and guidance issued by the Internal Revenue Service, who is in a position to exercise substantial influence over the affairs of the Center.

- <u>Officer</u>.  A person who has the authority to bind the Corporation as designated in the bylaws of the Corporation.

- <u>Related Party</u>.  Persons who may be considered a Related Party of the Corporation or an Affiliate of the Corporation under this Policy include:
  - o  Directors, Officers, or Key Employees of the Corporation or an Affiliate of the Corporation;
  - o  Relatives of Directors, Officers, or Key Employees;
  - o  any entity in which a person in (i) or (ii) has a 35% or greater ownership or beneficial interest or, in the case of a partnership or professional corporation, a direct or indirect ownership interest in excess of 5%;
  - o  Founders of the Corporation;
  - o  Substantial contributors to the Corporation (within the current fiscal year or the past five fiscal years);
  - o  Persons owning a controlling interest (through votes or value) in the Corporation;
  - o  Any non-stock entity controlled by one or more Key Employees.

- <u>Related Party Transaction</u>.  Any transaction, agreement or any other arrangement with the Corporation or an Affiliate of the Corporation in which a Related Party has a Financial Interest.  Any Related Party Transaction will be considered a conflict of interest for purposes of this Policy.

- <u>Relative</u>.  A Relative is a spouse, ancestor, child (whether natural or adopted), grandchild, great grandchild, sibling (whether whole or half blood), or spouse of a child (whether natural or adopted), grandchild, great grandchild or sibling (whether whole or half blood), or a domestic partner as defined in section 2994-A of the New York Public Health Law.

Adopted by the Corporation's Board of Directors at its meeting on _____,  2016 (and supersedes and replaces the prior policies of the Corporation).

DM3\3707166.1

## __Schedule 4__

**Whistleblower Policy**

DM3\3711024.1

# NEW YORK CITY OPERA, INC.

### Whistleblower Policy

### Introduction

New York City Opera, Inc. (the "Corporation") requires its directors, officers, employees and volunteers (each, a "Protected Person"), to observe high standards of business and personal ethics in the performance of their duties on the Corporation's behalf. As employees and representatives of the Corporation, Protected Persons are expected to practice honesty and integrity in fulfilling their responsibilities and are required to comply with all applicable laws and regulations.

The objectives of this Whistleblower Policy are to encourage and enable Protected Persons, without fear of retaliation, to raise concerns regarding suspected unethical and/or illegal conduct or practices on a confidential and, if desired, anonymous basis so that the Corporation can address and correct inappropriate conduct and actions

### Reporting Responsibility

It is the responsibility of all Protected Persons to report in good faith any concerns they may have regarding actual or suspected activities which may be illegal or in violation of the Corporation's policies with respect to, without limitation, fraud, theft, embezzlement, accounting or auditing irregularities, bribery, kickbacks, and misuse of the Corporation's assets, as well as any violations or suspected violations of high business and personal ethical standards, as such standards relate to the Corporation (each, a "Concern"), in accordance with this Whistleblower Policy.

### No Retaliation

No Protected Person who in good faith reports a Concern shall suffer intimidation, harassment, retaliation, discrimination or adverse employment consequence because of such report. Any employee of the Corporation who retaliates against someone who has reported a Concern in good faith is subject to discipline up to and including termination of employment. Notwithstanding anything contained herein to the contrary, this Whistleblower Policy is not an employment contract and does not modify the employment relationship between the Corporation and its employees, nor does it change the fact that employees of the Corporation are employees at will. Nothing contained herein is intended to provide any Protected Person with any additional rights or causes of action, other than those provided by law.

### Reporting Concerns

Any Concerns should be reported as soon as shall be practicable to the Chair of the Corporation's Audit Committee (the "Compliance Officer"). Any questions with regard to the scope, interpretation or operation of this Whistleblower Policy should also be directed to the Compliance Officer.

**New York City Opera, Inc. – Whistleblower Policy**
**Page 2**

## Compliance Officer

The Compliance Officer is responsible for investigating and resolving all reported Concerns and shall advise the Audit Committee of all reported Concerns. The Compliance Officer shall report to the full Board of Directors at each regularly scheduled board meeting on compliance activity.

## Accounting and Auditing Matters

The Audit Committee of the Board of Directors shall address all reported Concerns regarding corporate accounting practices, internal controls or auditing ("Accounting Concerns"). The Compliance Officer shall immediately notify the Audit Committee of any Accounting Concern and shall work with the committee until its resolution. Promptly upon receipt, the Audit Committee shall evaluate whether a Concern constitutes an Accounting Concern and, if so, shall promptly determine what professional assistance, if any, it needs in order to conduct an investigation. The Audit Committee will be free in its sole discretion to engage outside auditors, counsel or other experts to assist in the investigation and in the analysis of results.

## Investigations

The Compliance Officer may delegate the responsibility to investigate a reported Concern, whether an Accounting Concern or otherwise, to one or more employees of the Corporation or to any other individual, including persons not employed by the Corporation, selected by the Compliance Officer; provided that the Compliance Officer may not delegate such responsibility to an employee or other individual who is the subject of the reported Concern or in a manner that would compromise either the identity of an employee who reported the Concern anonymously or the confidentiality of the complaint or resulting investigation. Notwithstanding anything herein to the contrary, the scope, manner and parameters of any investigation of a reported Concern shall be determined by the Audit Committee in its sole discretion and the Corporation and its employees shall cooperate as necessary in connection with any such investigation.

## Acting in Good Faith

Anyone reporting a Concern must act in good faith and have reasonable grounds for believing that the information disclosed may indicate a violation of law and/or ethical standards. Any allegations that prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense.

## Confidentiality

The Corporation takes seriously its responsibility to enforce this Whistleblower Policy and therefore encourages any person reporting a Concern to identify him or herself so as to facilitate any resulting investigation. Notwithstanding the foregoing, in reporting a Concern, a Protected Person may request that such report be treated in a confidential manner (including that the Corporation take reasonable steps to ensure that the identity of the reporting person remains anonymous). Concerns may also be reported on an anonymous basis. Reports of Concerns will

**New York City Opera, Inc. – Whistleblower Policy**
**Page 3**

be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation.

### Handling of Reported Concerns

The Compliance Officer will acknowledge receipt of each reported Concern within five business days, but only to the extent the reporting person's identity is disclosed or a return address is provided. All reports will be promptly investigated; the scope of any such investigation being within the sole discretion of the Audit Committee, and appropriate corrective action will be taken if warranted by the investigation.

### Records

The Audit Committee will retain on a strictly confidential basis for a period of seven years (or otherwise as required under the Corporation's record retention policies in effect from time to time) all records relating to any reported Concern and to the investigation and resolution thereof. All such records are confidential to the Corporation and such records will be considered privileged and confidential.

### Distribution

The Corporation shall distribute a copy of this Whistleblower Policy to all Protected Persons.

### Compliance Officer Contact Information

:                    Steve Acunto
                     Hudson Cliff House
                     131 Alta Avenue
                     New York, NY 10705

Adopted by the Corporation's Board of Directors at its Meeting on _____, 2016 (and supersedes and replaces the prior policies of the Corporation)

## <u>EXHIBIT F</u>

**Name of Person Designated by the Committee to receive MFRs**

1.  Sean C. Southard, Esq.

# EXHIBIT G

### List of Assumed Executory Contracts/Leases[2]

| Agreement | Cure Amount |
|---|---|
| Software License Agreement between Impresario L.L.C. and New York City Opera, Inc. dated June 14, 2004 | $ 0.00 |
| Membership Agreement between Tessitura Network, Inc. and New York City Opera, Inc. effective as of November 1, 2005 | $ 0.00 |

---

[2] The Plan Sponsors reserve the right to amend or supplement this list, including the right to remove any agreement listed herein from the list of Assumed Executory Contracts/Leases under the Plan.