**ERIC T. SCHNEIDERMAN, ATTORNEY**
**GENERAL OF THE STATE OF NEW YORK**
Rose Firestein
120 Broadway, 3rd Floor
New York, NY 10271
(212)416-8325
*Statutory Representative of the Ultimate*
*Charitable Beneficiaries*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                       :
In re New York City Opera, Inc.          :          Chapter 11
                                                       :
               Debtor.                          :          Case No. 13-13240 (SHL)
                                                       :
------------------------------------------------------X

**THE NEW YORK ATTORNEY GENERAL'S RESPONSE**
**TO THE JOINT PLAN FOR REORGANIZATION**
**SUBMITTED BY NYCO RENAISSANCE AND THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**[Docket Nos. 314 and 315]**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

THE LEGAL STANDARD........................................................................................................4

THE PLAN'S FEASIBILITY ....................................................................................................6

    A.    The Plan's Two Sets of Projections and the Charitable Funds............................6

    B.    The OAG's Sources of Information................................................................8

    C.    The Plan's Projected Income and Expenses....................................................9

        1.    Public Support and Other Income ...........................................................10

            a.    Contributions and Grants ............................................................10

            b.    The Thrift Shop........................................................................11

            c.    Pending Bequests......................................................................12

            d.    Bequest Interest Income .............................................................16

        2.    Income and Expenses from Performances and Special Events.................16

        3.    Employment-Related Expenses ..............................................................17

        4.    The Payment to New Vision if the Court Denies
            Its § 503(b) Application.............................................................18

        5.    Advertising and Promotional Activities ..................................................22

        6.    Insurance ...........................................................................................23

CONCLUSION.....................................................................................................................24

## TABLE OF AUTHORITIES

**Federal Statutes**

11 U.S.C. § 503(b) ........................................................................................... 3, 18, 24

11 U.S.C. § 1129(a)(11) ...........................................................................................4

11 U.S.C. § 1129(a)(16) .....................................................................................4, 21

**State Statutes**

NY Estates, Powers and Trusts Law § 8-1.1(c)(1) ........................................... 1, 2, 13

NY Estates, Powers and Trusts Law § 8-1.1(d) ......................................................14

NY Estates, Powers and Trusts Law § 8-1.1(f) .........................................................1

NY Not-for-Profit Corporation Law § 513 ...............................................................1

NY Not-for-Profit Corporation Law § 555 ...............................................................1

NY Not-for-Profit Corporation Law § 555(b) ...........................................................2

NY Not-for-Profit Corporation Law § 555(c) .............................................. 2, 13, 14

NY Not-for-Profit Corporation Law ......................................................................23

**Federal Cases**

*Dish Network Corp. v. DBSD N. Am. Inc.* (*In re DBSD N. Am., Inc.*),
    634 F.3d 79 (2d Cir. 2010)..........................................................................4, 11

*Financial Sec. Assur. V. T-H New Orleans Ltd. Pshp.*, 116 F.3d 790 (5th Cir. 1997) ...................6

*In re K&K Holdings, LLC,* 2014 Bankr. LEXIS 626 (Bankr. N.D. Ill. Feb. 13, 2014)..............5, 6

*In re Plymouth Oil Co., LLC*, 2013 Bankr. LEXIS 4543, *19-*20 (Bankr.
    N.D. Iowa Oct. 28, 2013)..............................................................................5, 6

*In re Smitty Inv. Group, LLC*, 2008 Bankr. LEXIS 1542 (Bankr. D. Idaho May 16, 2008).......5, 6

*In re 20 Bayard Views, LLC*, 445 B.R. 83 (Bankr. E.D.N.Y. 2011)...............................................5

*In re 231 Fourth Ave. Lyceum, LLC*, 506 B.R. 196 (Bankr. E.D.N.Y. 2014)...............................5

*Pan Am Corp. v. Delta Air Lines*, 175 B.R. 438 (S.D.N.Y. 1994) ................................................5

**New York Cases**

*Consumers Union of U.S., Inc. v. State*, 5 N.Y.3d 327 (2005)....................................................21

*Estate of Roche,* August 19, 1998 N.Y.L.J. at 24 (Sur. Ct. Westchester County)........................14

*Matter of Hummel,* 30 A.D.3d 802 (3d Dep't 2006).............................................................. 13, 14

*Matter of Estate of Hummel*,  9 Misc. 3d 996 (Sup. Ct. Albany County 2005) ...........................14

*Matter of Kraetzer*, 119 Misc. 2d 436  (Sur. Ct. Kings Count 1983) ..........................................13

*Matter of Lally*, 112 A.D.3d 1099 (3d Dep't 2013)....................................................................13

*Schneiderman v. Esopus Riv. Watch, Inc.*, 2013 N.Y. Misc. LEXIS 2510
    (N.Y. Sup. Ct. April 8, 2013) ...........................................................................................20

*Sherman v. Richmond Hose Co. No. 2*, 230 N.Y. 462 (1921) ....................................................20

## PRELIMINARY STATEMENT

1.        The Office of the Attorney General of the State of New York (the "**OAG**")

submits this Response  (the "**Response**") to (a) the *First Amended Joint Chapter 11 Plan of*

*Reorganization of NYCO Renaissance Ltd. And Official Committee of Unsecured Creditors for*

*New York City Opera* [docket no. 315] (the "**Plan**"; NYCO Renaissance and the Creditors'

Committee are collectively the "**Sponsor**"), (b) the Summary  of the Plan [docket no. 314-1] (the

"**Summary**") and (c) the First Amended Disclosure Statement for the Plan [docket no. 314].

The OAG is the statutory representative of the ultimate beneficiaries of the charitable gifts given

to New York City Opera, Inc. (referred to as "**City Opera**" pre-confirmation and as the

"**Reorganized Debtor**" post-confirmation, if that occurs), Estates, Powers and Trusts Law

("**EPTL**") § 8-1.1(f).

2.         The OAG's primary concern in this proceeding is that the charitable gifts and

bequests made to City Opera (the "**Charitable Funds**") be used as intended by their individual

donors, as required by New York law.  Not-for-Profit Corporation Law ("**N-PCL**") §§ 513, 555;

EPTL § 8-1.1(c)(1).  The Reorganized Debtor will be unable to use the Charitable Funds as their

donors intended if it cannot sustain its charitable operation.  The soundness of the Sponsor's

financial projections attached to the Summary (the "**Projections**") is therefore central to

determining whether the Reorganized Debtor is likely to be able to comply with the donors'

intent and state law on a long-term basis.

3.        If the Court confirms the Plan, the Charitable Funds will be transferred to the

Reorganized Debtor to be used in accordance with any spending (endowment fund) and use

restrictions imposed by the donors.  If, however, the Plan is not confirmed, the Charitable Funds

will be the subject of proceedings in New York Supreme and/or Surrogate's Court to redirect

them to appropriate charitable organizations.  EPTL § 8-1.1(c)(1); N-PCL § 555(b) and (c)
(collectively "**Cy Pres**" proceedings or relief)  Although the donors would undoubtedly have
chosen to have a solvent City Opera use these funds rather than have them redirected to other
entities, denying confirmation of the Plan will not result in the Charitable Funds being used
contrary to the donors' intent and nonbankruptcy law.    The question is whether the reorganized
City Opera contemplated by the Plan will be able to use the Charitable Funds as intended –
whether the Reorganized Debtor is financially viable and sustainable, whether the Plan is
feasible.

4.      Primarily because of the DeMenasce Pending Bequest, [1] which is unrestricted and
is expected to distribute more than $5 million to the Reorganized Debtor, it appears that the
Sponsor's Plan is financially viable in the short run, but the Reorganized Debtor's ability to
sustain charitable operations in the mid- to long-term is not as clear.  The amount the Sponsor
estimates it will receive in contributions and grants is higher than  might be expected and this
amount is the linchpin for the Plan's sustainability beyond the first few years of operation.
Contributions and grants are crucial because the Plan anticipates meaningful losses on its
operatic productions, a common condition for opera companies.  At this time, the critical
projection of the amount the Reorganized Debtor expects to raise in contributions and grants has
not been supported by any evidence or explanation of how the Sponsor arrived at this estimate.
Indeed, the Sponsor has not provided an evidentiary basis for determining the validity of any of
the items on the Projections, rendering them speculative.

5.      Other aspects of the Sponsor's Projections add to the concern about the long-term
financial health of the Reorganized Debtor.   It has overestimated the size of the Pending

---

[1] Capitalized terms that are not otherwise defined herein have the meaning ascribed to them in the Plan, the
Summary and the Disclosure Statement.

Bequests, including at least one half-million dollar unrestricted gift that it is not reasonably likely to receive. These funds would have provided important support for the Reorganized Debtor's ongoing operations. Other revenue items that may have been too generously estimated are the Thrift Shop and bequest interest income.

6. On the expense side, the Projections do not recognize that if the Court grants the application of New Vision for NYC Opera, Inc. ("**New Vision**") for payment of its administrative expenses including attorneys' fees for its purported "substantial contribution" to the case, 11 U.S.C. § 503(b), the amount the Reorganized Debtor will receive to pay the Debtors' creditors and run New York City Opera, Inc. will be reduced by $300,000.

7. Even if the Court does not approve this payment under the § 503(b) standards, NYCO Renaissance intends to pay $300,000 to New Vision. NYCO Renaissance cannot do this and still fulfill its obligation, stated in the Disclosure Statement, the Plan and the Summary, to transfer $1.25 million to the Reorganized Debtor on the Effective Date toward the payment of the Debtor's creditors. The Reorganized Debtor will undoubtedly make up the $300,000 shortfall in the funds it needs to pay the creditors from income and assets that otherwise would be used to support its charitable operations, reducing its financial stability. If the Court holds that New Vision did not make a substantial contribution, NYCO Renaissance should be required to pay the Reorganized Debtor at least $1.25 million. This may mean that New Vision must pay its own attorneys' fees, but that is to be expected if it did not make a "substantial contribution" to the bankruptcy estate or the case.

8. On the other hand, it appears that the Projections have cut some expenses too close to the bone, creating vulnerabilities that could undermine the Reorganized Debtor's ability

to manage its operation and attract an audience and contributors. These include the amount to be

paid for advertising and promotional activities and for insurance. [2]

## THE LEGAL STANDARD

9.      The confirmation criteria of particular interest to the OAG are that

(a) "Confirmation of the plan is not likely to be followed by the liquidation, or the need

for further financial reorganization, of the debtor or any successor to the debtor under the

plan, unless such liquidation or reorganization is proposed in the plan," 11 U.S.C.

§ 1129(a)(11), the so-called "feasibility test" and (b) "All transfers of property under the

plan shall be made in accordance with any applicable provisions of nonbankruptcy law

that govern the transfer of property by a corporation or trust that is not a moneyed,

business, or commercial corporation or trust," 11 U.S.C. § 1129(a)(16), specifically the

state law requirements that the Charitable Funds be used only for their intended purposes.

10.     "For a plan to be feasible, it must 'offer[] a reasonable assurance of success,' but

it need not 'guarantee[] success. *Kane* [*v. Johns-Manville Corp.*, 843 F.2d 636,] 642 [(2d Cir.

1988)]. Some possibility of liquidation or further reorganization is acceptable and often

unavoidable." *Dish Network Corp. v. DBSD N. Am. Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79,

106-07 (2d Cir. 2010). Two of the factors the court considered in finding Dish Network's plan

---

[2] There is a lingering question whether, as a director, Roy Niederhoffer breached his fiduciary duty of loyalty to City Opera by not recusing himself from board and committee discussions and decisions about NYCO Renaissance's proposal to buy the Debtor's assets despite the significant support he was giving NYCO Renaissance. [docket Nos. 277, 301]  This is an important issue, but it is unlikely to bear heavily on whether the Plan should be confirmed. While Niederhoffer appears to have had a conflict, it also appears that he disclosed his relationship with NYCO Renaissance to the City Opera board and that the board may have implicitly consented to his participation despite his conflict, both of which (disclosure and consent) must be absent for there to be a breach of the duty of loyalty.  It further appears that Niederhoffer did not participate in final decision-making about whether City Opera should select NYCO Renaissance's proposal.  Even if a breach were proven, it does not necessarily follow that Niederhoffer would be barred from being a director of a not-for-profit corporation. In sum, it does not appear to be reasonably likely that (1) Niederhoffer breached his fiduciary duty of loyalty or (2) if he breached this duty, he is unfit to be Chair of the Reorganized Debtor.

feasible were its ability to obtain the capital it needed, including existing commitments to supply working capital for two years, and the "very reasonable" possibility that it would secure additional financing or a strategic investor, coupled with the improvement in the general capital markets.

11.     The reorganization plan sponsor has the burden of proving by a preponderance of the evidence that its plan is feasible. *E.g., In re K&K Holdings, LLC,* 2014 Bankr. LEXIS 626 (Bankr. N.D. Ill. Feb. 13, 2014); *In re Smitty Inv. Group, LLC,* 2008 Bankr. LEXIS 1542 (Bankr. D. Idaho May 16, 2008); *see In re 20 Bayard Views, LLC,* 445 B.R. 83, 93 (Bankr. E.D.N.Y. 2011).

12.     "To establish feasibility, the debtor must present 'proof through reasonable projections that there will be sufficient cash flow to fund the plan and maintain operations according to the plan. Such projections cannot be speculative, conjectural or unrealistic.'" *Pan Am Corp. v. Delta Air Lines,* 175 B.R. 438, 508 (S.D.N.Y. 1994) (*quoting* James F. Queenan, Jr. et. al., 5 *Chapter 11 Theory & Practice* § 30.04 (1st ed. 1994) (*citing In re Nelson,* 84 Bankr. 90, 93 (Bankr. W.D. Tex. 1988)); *In re Plymouth Oil Co., LLC,* 2013 Bankr. LEXIS 4543, *19-*20 (Bankr. N.D. Iowa Oct. 28, 2013) (cases collected); *In re Smitty Inv. Group, LLC,* 2008 Bankr. LEXIS 1542 at *24. "Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation  can be done as a practical matter under the facts." *In re 231 Fourth Ave. Lyceum, LLC,* 506 B.R. 196, 203 (Bankr. E.D.N.Y. 2014) (*quoting Chase Manhattan Mortg. & Realty Trust v. Bergman (In re Bergman),* 585 F.2d 1171, 1179 (2d Cir. 1978).

13.     While feasibility determinations are often based on projections of anticipated revenues and expenses, they must be "grounded in 'financial realit[y]" *In re Plymouth Oil Co.,*

*LLC*, 2013 Bankr. LEXIS 4543 at *20 (*quoting In re Geijsel*, 480 B.R. 238, 258 (Bankr. N.D. Tex. 2012). The projections must be "credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive." *E.g., Financial Sec. Assur. V. T-H New Orleans Ltd. Pshp.*, 116 F.3d 790, 802 (5th Cir. 1997); *In re K&K Holdings, LLC*, 2014 Bankr. LEXIS 626 at *53-*54; *In re Plymouth Oil Co., LLC*, 2013 Bankr. LEXIS 4543, at *22. "There must be sufficient competent evidence for the Court to find the required 'reasonable likelihood' of success" of the reorganization plan. *In re Smitty Inv. Group, LLC*, 2008 Bankr. LEXIS 1542, at *23.

## THE PLAN'S FEASIBILITY

14.     With the DeMenasce bequest and the other unrestricted Charitable Funds backstopping its operation, the Plan is almost certainly financially viable in the short run. This cannot be said for the Plan's financial sustainability beyond its first few years. The Plan's feasibility is therefore in some doubt.

15.     The OAG does not offer an opinion about whether the Plan meets the feasibility standard for confirmation. Instead, this Response describes aspects of the Plan that raise questions about whether it is "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1126(a)(11).

### A.     The Plan's Two Sets of Projections and the Charitable Funds

16.     The Summary presents two sets of Projections that differ based on whether or not the Pending Bequests and Endowment are transferred to the Reorganized Debtor. These two Projections also differ in the amount estimated for several income and expense items: Contributions and grants (income), Full-Time Employee salaries, Payroll Taxes and Benefits,

Contract Labor, Advertising, and Eblasts, Printing and Postage.  The values for these items are

higher on the Projections which assume the Reorganized Debtor will receive the Pending

Bequests and Endowment.  Because it is reasonably likely that the Endowment and all but one of

the Pending Bequests will eventually be transferred to the Reorganized Debtor if the Plan is

confirmed, although not necessarily during the second (first full) year of the Plan's operation,

this Response focuses on the Projections that include the Pending Bequests and Endowment

Fund.

17.    The Projections cover four and a half years:  "**Year 1**," January 2016 through

June 2016; "**Year 2**," July 2016 through June 2017 (City Opera's fiscal year); "**Year 3**," July

2017 through June 2018; "**Year 4**," July 2018 through June 2019; and "**Year 5**," July 2019

through June 2020.  (Affirmation of Rose Firestein, sworn to on January 4, 2016 ["**Firestein**

**Affirmation**" or "**Firestein Aff.**"],  ¶¶ 2, 3, Exhibit 1)[3]

18.    The Charitable Funds consist of three categories of gifts:  the Endowment Fund,

use-restricted gifts and the Pending Bequests.  According to City Opera, the Endowment Fund

currently holds approximately $4,573,481, at least $3,583,507 of which is the Wallace

Endowment which is restricted as to spending but not as to use. This amount is what remains

from the Wallace Endowment's original $41,263,353 which City Opera invaded with court

approval that was granted in 2001 and 2008.  (Firestein Aff., ¶ 10, Exhibit 5)  The use-restricted

gifts must be used for specific purposes, such as supporting City Opera's VOX Festival and

prizes to be awarded to singers at specified points in their careers.  They are currently valued at

approximately $105,535.  (*Ibid.*)

---

[3] The Projections attached to the Summary covered only Years 1 through 4.  Pursuant to a request, the Sponsor's counsel provided the OAG with Projections for Years 1 through 5.  (Firestein Aff. ¶ 3)  The full name of the Firestein Affirmation is *Affirmation in Support of New York Attorney General's (1) Response to the Joint Plan for Reorganization Submitted by NYCO Renaissance and the Official Committee of Unsecured Creditors and (2) Objection to New Vision's Application Pursuant to § 503(b) for Expenses Including Counsel Fees.*

19.    The Sponsor estimates that the Pending Bequests have a gross value of approximately $8,112,500 (*not* net of commissions, attorneys' fees and other administrative expenses and taxes). (Projections, listed under "Public support and other income," Year 2) They include bequests from the DeMenasce, Sagar, Helfman, Schultz, Marcus and Havrilka Estates. (Firestein Aff., ¶¶ 11, 12, Exhibits 6, 16) The DeMenasce and some of the other bequests are unrestricted as to spending and use. (Firestein Aff., ¶ 12) As discussed below, the OAG does not agree that the Reorganized Debtor is reasonably likely to receive the Marcus bequest.

**B.    The OAG's Sources of Information**

20.    The Sponsor has not yet supported its Projections with any evidence. The Plan and Summary describe the assumptions that underlie some of the anticipated income reported in the Projections but is silent with respect to other categories of income and virtually all categories of expenses. In response to its request, NYCO Renaissance and City Opera have provided the OAG with certain additional information that is described in the Firestein Affirmation and explanations that obviated unnecessary disputes.

21.    The OAG has compared some items on the Projections to one of two sets of data: City Opera's experience primarily during the period July 2009 through June 2014 and the experience of 15 opera companies that, according to OPERA America, have annual budgets of between $3 and $10 million, which are referred to as the "**Tier 2**" companies.[4] The data for City

---

[4] The Tier 2 opera companies are The Atlanta Opera, Arizona Opera, Austin Lyric Opera, Boston Lyric Opera, Cincinnati Opera, Fort Worth Opera, The Glimmerglass Festival, Hawaii Opera Theatre, Lyric Opera of Kansas City, Opera San Jose, Opera Philadelphia, Opera Theatre of Saint Louis, Palm Beach Opera, Pittsburg Opera and Portland Opera. (Firestein Aff. ¶¶ 5, 6, Exhibit 2) OPERA America is a membership organization consisting of 150 professional opera companies operating in the United States, individual and other types of opera-related organizations. It provides an array of consulting and other services to members to improve opera production, administration and education. It collects data from what it terms a "constant sample" of opera companies concerning their management, finances productions and performances and analyzes these data longitudinally, presenting them for multi-year periods. OPERA America divides its constant sample into four levels based on the companies' revenue. (*Ibid.*)

Opera and the Tier 2 companies were taken from the informational federal tax returns, Form 990, that the organizations filed with the IRS (the "**990**").

22.     The Tier 2 opera companies comprise the relevant set of comparator opera companies because the Projections estimate that the Reorganized Debtor's total gross income (the sum of "Public support and other income" and "Performance and special event income") for the first four full years of operation will be the following:

| FISCAL YEAR | GROSS INCOME |
|---|---|
| July 2016-June 2017 | $15,174,664 |
| July 2017-June 2018 | $7,524,349 |
| July 2018-June 2019 | $7,875,423 |
| July 2019-June 2020 | $8,263,006 |

(Firestein Aff., ¶ 13, Demonstrative Exhibit A)[5]  The Projection for the gross income for the first full fiscal year includes a one-time payment of the Pending Bequests in the amount of $8,112,500.  Without this item, the Reorganized Debtor's gross income for this year would be in line with the other three years and is within the Tier 2  companies' range of $3 to $10 million.

23.     The methods the OAG used to identify the comparator opera companies and its sources of information in addition to the 990s are described in the Firestein Affidavit. They are not reiterated here.

**C.     The Plan's Projected Income and Expenses**

24.     While the Sponsor may provide evidentiary support for its Projections in its reply which is due January 8, 2016 or at the January 12, 2016 confirmation hearing, it has not yet met its obligation to present evidence to the Court which establishes that its Projections are not merely speculative or visionary but are grounded in financial reality and demonstrate a reasonable likelihood that the Reorganized Debtor can make a go of presenting opera and

---

[5] Demonstrative exhibits to the Firestein affirmation display calculations that were performed on data from the Projections and other sources.  (Firestein Aff. ¶ 7)

providing opera-related educational programs on a long term basis – that it is financially sustainable and the Plan is feasible.

25.     The reasonableness of the Sponsor's Projections of both revenue and expenses, as well as the treatment of restricted funds, should be considered in determining the Plan's feasibility.  The Response reviews the Projections by the categories of income and expenses the Sponsor employed on the Projections, with the addition of the $300,000 New Vision demand.

### 1.     Public Support and Other Income

#### a.     Contributions and Grants

26.     The Projections report contributions separately from grants, but they are combined on the 990.  The Sponsor has stated that the "grants" category on the Projections include both government and foundation grants.  (Firestein Aff., ¶ 14,  Exhibit 7)  The two categories from the Projections are combined for purposes of comparison.

27.     The Projections list expected contributions and grants to be as follows:

|  |  |
|---|---|
| Year 1 (1/16-6/16) | $2,748,000 |
| Year 2 (7/16-6/17) | $3,449,996 |
| Year 3 (7/17-6/18) | $3,914,995 |
| Year 4 (7/18-6/19) | $4,271,495 |
| Year 5 (7-19-6/20) | $4,663,644 |

(Firestein Aff., ¶15, Demonstrative Exhibit B)

28.     Between FY 2008 (7/08-6/09), the year the Great Recession began (Firestein Aff. ¶ 16, Exhibit 8), and FY 2011 (7/11-6/12), City Opera received contributions and grants that ranged from $10.7 million to $17 million.  Contributions and grants decreased somewhat in FY 2012 (7/12-6/13) to $9.5 million and then fell to $2.7 million in FY 2013, the year it filed the bankruptcy petition and ceased operations.  (Firestein Aff., ¶ 16, Exhibit 3, 990 Part I, line 8)

29.    The ability of the sponsor of a reorganization plan to obtain needed capital, including existing commitments for two-years' worth of funding, was an important factor in the Second Circuit's decision in *Dish Network Corp., supra*, that the plan was feasible.  The Sponsor's Plan here, however, makes no mention of pledges, even from the Reorganized Debtor's nominated board members other than Niederhoffer, an historically reliable source of funding for not-for-profit corporations,  (Niederhoffer originally pledged $1.25 million to NYCO Renaissance for the purchase of City Opera's assets.  This was NYCO Renaissance's final bid at the January 2015 auction.)

30.    The Sponsor projects that, starting from scratch after more than two years of not mounting any performances and being out of the public eye (other than in connection with the bankruptcy) and absent from the New York fundraising scene, New York City Opera, Inc. will be able to garner contributions and grants in its first six months of renewed operations that are nearly equal to the amount City Opera, with its long history and revered status, raised in its last fiscal year despite fundraising efforts to save the company.  It also projects that the value of the contributions and grants made to the Reorganized Debtor will continue to increase.  There is no evidentiary basis on which to conclude that these are reasonable expectations, although as discussed below, this income source is pivotal to the Reorganized Debtor's long-term success. This is because the Reorganized Debtor's operatic performances are expected to lose money and other sources of income are unlikely to be as robust as the Sponsor projects.

b.    Thrift Shop

31.    The Projections estimate that the Reorganized Debtor will earn $600,000 from the Thrift Shop during the first six months of 2016 and $1,200,000 during each of the four full years covered by the Projections.  The amount projected for the six month period in the beginning of

2016 is only slightly lower than the amount the Thrift Shop generated during the 12-month period November 2014 through October 2015. The anticipated revenue from the Thrift Shop for each of the full years is approximately $336,000 greater than City Opera earned during the 12 months ending October 2015. (Firestein Aff., ¶ 17, Demonstrative Exhibit C, Debtors' Monthly Operating Reports, November 2014 to October 2015 [docket Nos.232, 248, 266, 276, 278, 279, 285, 290, 299, 304, 317, 318])

c.    <u>Pending Bequests</u>

32.     The Sponsor values all the Pending Bequests at a total $8,112,500 and treats this amount as income to the Reorganized Debtor. The OAG believes this number significantly overstates the value of the Pending Bequests to the Reorganized Debtor.

33.     To begin with, the Projections include the gross value of the Pending Bequests as income to the Reorganized Debtor. (Firestein Aff. ¶ 12, Exhibit 16) At least part of all the Pending Bequests give City Opera a percentage of the residuary estate or the proceeds from the sale of property. The DeMenasce Will contains such a residuary disposition as well as a $250,000 general disposition. (Firestein Aff. ¶¶ 18, 19, Exhibits 9 and 10) Before these bequests can be valued, executors' commissions, administrative expenses, including attorneys' and other professionals' fees, and taxes must be paid out of the estate. This can significantly reduce the amount the beneficiary will actually receive.

34.     At least one Pending Bequest is too speculative to include in the Projections. It is an unrestricted gift from the Estate of James S. Marcus estimated to be worth $500,000 (gross value). (Firestein Aff. ¶ 18; Exhibit 9 includes the Marcus Will) Certain other Pending Bequests discussed below are also speculative, but less so than the Marcus bequest, and the Court might or

-12-

might not consider them to be reasonably likely to be paid to the Reorganized Debtor if the Plan is confirmed.

35.    Unless otherwise specified in the Will, bequests vest on the testator's death.  A charitable organization is entitled to have a vested bequest distributed to it as long as it is providing charitable services.  If, however, the corporation has ceased operating as a charity, even if it continues to have a corporate existence, it is not entitled to receive or use charitable donations.  *E.g., Matter of Lally*, 112 A.D.3d 1099 (3d Dep't 2013)*, Matter of Hummel,* 30 A.D.3d 802 (3d Dep't 2006); *Matter of Kraetzer*, 119 Misc. 2d 436  (Sur. Ct. Kings Count 1983).

36.    City Opera appears to have given its last performance and ceased its charitable operations on September 28, 2013, the date of its last performance, although it continues to exist. (Firestein Aff. ¶ 20, Exhibit 11)  If the Plan is confirmed and the Sponsor becomes the Reorganized Debtor, it will be entitled to receive all of the Pending Bequests that vested before September 28, 2013.

37.    The Reorganized Debtor, however, would not be *entitled* to receive any of the Pending Bequests that vested after that date.  Instead, those bequests must be redirected through a Cy Pres Proceeding held before a New York Surrogate's or Supreme Court.  There is no guarantee, but it is reasonably likely that a state court will order the Pending Bequests that vested on the testator's death after September 28, 2013 be redirected to the Reorganized Debtor if the Plan is confirmed.

38.    The standards for determining an appropriate alternate beneficiary when literal compliance with the restrictions on a charitable gift are unlawful, impossible to achieve, impracticable or wasteful, including when the beneficiary has ceased its charitable activities, are set out in EPTL § 8-1.1(c)(1) and N-PCL § 555(c).  EPTL § 8-1.1(c)(1) provides that the

-13-

charitable disposition be "administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes."  N-PCL § 555(c) requires that the disposition be "consistent" with the restriction in the gift instrument, which approximates the § 8-1.1(c)(1) standard, based on the Commentary for the uniform law that was the source for N-PCL § 555.  Additionally, EPTL § 8-1.1(d) provides that when the bequest is to a charitable organization that cannot accept it, for example because it is not in existence or is not performing charitable activities, the Surrogate's or Supreme Court may grant Cy Pres relief rather than treat a charitable bequest as part of the residuary estate or intestate property, as relevant.  *E.g., Estate of Roche,* August 19, 1998 N.Y.L.J. at 24 (Sur. Ct. Westchester County) (share of residuary estate bequeathed to organization that closed before testator died given to another institution that was not named in the Will); *see Matter of Estate of Hummel*,  30 A.D.3d 802 (3d Dep't 2006), *aff'g* 9 Misc. 3d 996 (Sup. Ct. Albany County 2005) (Cy Pres applied when Child's Hospital ceased to exist after the death of one settlor and before the death of another).  Including all but one of the Pending Bequests in the Reorganized Debtor's projected revenue would therefore seem to be grounded in legal, as well as financial, reality.  Physical transfer of these Charitable Funds may not occur in Year Two of the Plan, as provided on the Sponsor's Projections.

39.    The Pending Bequest from the Marcus Estate, with an estimated gross value of $500,000, should not be included as projected income to the Reorganized Debtor. The testator died in 2015 after City Opera ceased its charitable operations.  The Will provides that "All the residue of my estate of every kind and description (including lapsed legacies and devises) I devise and bequeath as follows:  (A) To such of the following organizations as shall be considered a charitable organization *at the time of such distribution . . .*," including City Opera, and that, "If the disposition under any of Subparts (1) through (17) of this Part [including the

-14-

bequest to City Opera] shall lapse or fail for any reason, the share otherwise passing thereunder shall pass under Part (B) hereof." (Emphasis added) (The Marcus Will is part of Exhibit 9 to the Firestein Affirmation.)  This gift will vest upon distribution, not the testator's death.

40.    If the Court confirms the Plan and the confirmation occurs before the bequest is distributed, the Reorganized Debtor is entitled to it, but if the bequest is distributed before the Plan is confirmed, the Reorganized Debtor could not receive the bequest even under Cy Pres principles.  It would have to be distributed under Part (B) of the Will.[6]  The executors of the Marcus estate have indicated that they do not believe this bequest can be distributed to City Opera or its successor.  (See the cover letter of Henry Christensen for the Marcus estate, which is part of Exhibit 9 to the Firestein Affirmation.)  This Pending Bequest is too speculative for there to be a reasonable likelihood that it will be distributed to the Reorganized Debtor.  Consequently, the projected gross income from the Pending Bequests for Year 2 and the "Temporarily Restricted Funds" on the Sponsor's Projections (listed as $8,112,500) should each be reduced by $500,000, leaving $7,612,500.

41.    The Pending Bequests that might be distributed to the Reorganized Debtor through Cy Pres relief, but not pursuant to the Will because they vested after City Opera had ceased to operate as a charitable corporation, are comprised of bequests from the following:  the Helfman Estate, estimated value of $700,000, testator died on September 28, 2013, the same day City Opera gave its final performance and then ceased its charitable activities; Schultz Estate, estimated value of $51,000 has not yet been distributed, testator died in 2014; Havrilka Estate, estimated value of $600,000, testator died in 2014.  (Firestein Aff., ¶¶ 11, 12, Exhibit 6)  These questionable Pending Bequests total $1,351,000.  If they are not redirected to the Reorganized

_____

[6] Part B and other provisions of the Will were redacted from the copy of this document that City Opera provided to the OAG.  It appears that City Opera may have received this document with these redactions.

Debtor, the Pending Bequests would total $6,261,500 (the Sponsor's estimate of $8,112,500

minus the Marcus bequest of $500,000 and the remaining questionable bequests of $1,351,000).

d.    <u>Bequest Interest Income</u>

42.    Removing any of the questionable bequests from the Pending Requests reduces

the Bequest Interest Income.  The Projections anticipate $310,500 in interest income in Year 2

on Pending Bequests of $8,112,500, which is a rate of 3.83 percent.  Applying this rate, the

interest income on the Pending Bequests without the Marcus bequest is reduced by $19,138  in

Year Two.  The yield is reduced by a total of $70,846 if the Marcus, Helfman, Schultz and

Havrilka bequests are not transferred to the Reorganized Debtor.  (Firestein Aff., ¶ 21,

Demonstrative Exhibit D)  (A rate cannot be calculated for Years 3, 4 or 5 from the information

on the Projections because the estimated value of the Pending Bequests is not given for those

years.)

**2.    Income and Expenses from Performances and Special Events**

43.    The OAG notes at the outset that NYCO Renaissance reports a final surplus from

its March 2015 gala.  (Firestein Aff., ¶ 22, Exhibit 7)

44.    The Projections break out income and expenses for Large Scale Productions,

Small Scale Productions, the VOX Production and Opera for Kids.  Opera for Kids is the

Sponsor's opera education program and it will be transferred to the Reorganized Debtor if the

Plan is confirmed.  (Firestein Aff. ¶ 14, Exhibit 7)  The Projections anticipate losses in each year

from its productions other than the Opera for Kids program:

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Production Income | $956,400 | $1,608,600 | $1,608,600 | $1,608,600 | $1,608,600 |
| Production Expenses | $2,066,475 | $3,531,586 | $3,743,481 | $3,855,786 | $3,971,460 |
| Profit or (Loss) | ($1,110,075) | ($1,922,986) | ($2,134,881) | ($2,247,186) | ($2,362,860) |

(Firestein Aff., ¶ 23, Demonstrative Exhibit E)  These losses are generally lower in absolute

terms than the losses City Opera and Tier 2 companies experienced from their productions that

are not part of an educational or singer-training program.  (Firestein Aff., ¶¶ 23, 24, Exhibits 3

and 4, Demonstrative Exhibits F and G)

45.    One way to compare the significance of losses across opera companies of

roughly similar size with a roughly similar number of performances or productions is to compare

each company's loss as a percentage of its total income.  A lower percentage suggests that the

loss will have a smaller impact on the organization's overall fiscal health.

46.    Using this measure, the Sponsor's losses on productions are generally lower than

the values for the Tier 2 companies.  (Firestein Aff., ¶¶ 23 and 24, Demonstrative Exhibits F and

G and Exhibits 3 and 4)  But this conclusion comes with a very large caveat.  NYCO

Renaissance has provided nothing to support its projected expenses for these productions or for

the Reorganized Debtor's total income, particularly its contributions and grants.  Both of these

critically important items on the Projections may have been based on careful analysis of real

revenue and expense data or they may have simply been pulled out of the air.

### 3.    Employment-Related Expenses

47.    The Projections report employment-related expenses that are incurred in

connection with a production as part of the production expense, not as salaries or as contract

labor.  (Firestein Aff., ¶ 14, Exhibit 7)  It is therefore impossible to compare these costs to the

experience of City Opera or the Tier 2 companies.  For the Tier 2 companies, salary,

compensation and benefits consumed between 28 and 70 percent (average 43.7 percent; median

40.8 percent) of the organization's total revenue.  (Firestein Aff., ¶¶ 23 and 24, Demonstrative

Exhibit G; Exhibit 4, 990 Part I, lines 12 and 15)  Nor do the Plan and Summary provide any

information concerning these costs.  They state only that the Sponsor has signed a memorandum

of agreement with just one of the unions, but do not attach this memorandum or disclose any of

its terms.  (Summary at 6)

### 4.    The Payment to New Vision if the Court Denies Its § 503(b) Application

48.    Pursuant to 11 U.S.C. § 503(b), New Vision has applied to the Court for payment

of $300,000 from the bankruptcy estate for administrative expenses and attorneys' fees based on

its purported "substantial contribution" to the estate.  (*Notice of Application of New Vision*

*Pursuant to § 503(b) for Allowance of Administrative Expenses for Counsel Fees and other*

*Expenses in Making a Substantial Contribution in this Case* [docket no. 321])  While the

Charitable Funds are not part of the estate and cannot be used to pay this claim, any payment to

New Vision will reduce the assets that are transferred to the Reorganized Debtor and will thus

affect its financial viability and sustainability and the Plan's feasibility.  This effect is

exacerbated because when the reorganization plan was amended, the value of the GUC note was

increased to $1,585,000 and the PBGC note rose to $340,000, for a total increase of $525,000,

"in part to limit any impact of the 503(b) application on these creditors."  (Firestein Aff., ¶ 25,

Exhibit 12)  New Vision's demand has the potential for decreasing the Reorganized Debtor's

assets by a total of $825,000 over the five years covered by the Projections (the $300,000

payment plus the $525,000 increase in the two promissory notes).

49.    The OAG sets out its objections in a separate response to New Vision's

application and will not reiterate them here.  Yet, even if the Court were to deny New Vision's

§ 503(b) application, that would not end the impact New Vision's demand for $300,000 could

have on the Reorganized Debtor's financial condition.

50.    NYCO Renaissance's counsel informed the OAG of the following:

> [W]hen we settled the litigation Kaufman's counsel requested some protection so
> that, in the event the Application was denied, his would have some recourse
> given that his client was withdrawing his plan before my client's plan was
> confirmed by the court.  Given that all of the parties desired to move forward with
> the plan process without further delay, and because the withdrawal of Kaufman's
> plan would leave Kaufman with no meaningful recourse if my client's plan was
> not approved with his Application, NYCOR agreed to guarantee the payment of
> the claim. Since the claim is to be paid under the plan and because the plan is
> being funded on the effective date primarily by Roy [Niederhoffer]'s $1.25m
> contribution, it all comes back to NYCOR.

(*Ibid.*)  Paying New Vision's demand will decrease the amount NYCO Renaissance must pay the

Reorganized Debtor on the Effective Date – all of NYCO Renaissance's assets. (Plan, Art. IV,

¶ J at 14)

51.    The Disclosure Statement, provides, "Under the proposed sales, the net proceeds

would have been in the range of $1,250,000 - $1,500,000.  The Plan offers the same general cash

amount to creditors."  (Part IV.D, at 12)   The Plan states, "The Plan will be funded from Cash

on hand of the Reorganized Debtor in the approximate amount of $208,000, the Cash the

Reorganized Debtor derives from NYCO Renaissance in the amount of $1,250,000 . . ."  (Art.

IV, ¶ A, at 10)  The Summary explains the source of NYCO Renaissance's $1,250,000

contribution:

> As of August 2015, the Debtor had approximately $208,000 of Cash on hand. On
> the Effective Date, NYCO Renaissance, through a pledge by Niederhoffer, is to
> contribute $1,250,000 in Cash to the Reorganized Debtor. Based on the Plan
> Sponsors' estimates of Allowed Claims and on the Liquidation Analysis attached
> hereto as Exhibit "3", it is anticipated by the Plan Sponsors that the Debtor's Cash
> on hand, together with the contribution from NYCO Renaissance, will enable the
> Reorganized Debtor to fund distributions required to be made under the Plan.

Summary (Art. III, ¶ C(2), at 10)  The relevance of the Projections and any assessment of the

Plan's feasibility depend on the Reorganized Debtor having the assets that the Projections list,

including the entire amount of Niederhoffer's pledge.  NYCO Renaissance's plan to use these

funds to pay off New Vision for withdrawing its competing bid invalidates the Projections and

conflicts with the Sponsor's commitments.

52.    Moreover, NYCO Renaissance's payment of New Vision's demand even though

New Vision did not make a substantial contribution to the case would be the bankruptcy

equivalent of greenmail – a company's payment to avert a hostile takeover.  While it may be

permissible for the directors of a business corporation to approve such a payment, a not-for-

profit corporation is held to higher standards.  In the seminal case *Sherman v. Richmond Hose

Co. No. 2*, 230 N.Y. 462, 472 (1921) (emphasis added), the Court held:

> Upon the dissolution of [a charitable] corporation, personal property bequeathed
> to it, dedicated to public and charitable purposes, was disposed of by the state
> with due regard to the objects to which it was dedicated. *It was not the property of
> the corporation to be divided among its members as would be the property of a
> purely private or business corporation*. It held the property in trust -- not a trust
> imposed by the donor but by the charter which required the corporation to
> perpetually devote its funds to such [charitable] purposes.

NYCO Renaissance cannot use its funds to pay New Vision's attorneys' fees which were not

incurred to benefit NYCO Renaissance or further its charitable purposes.

53.    If the NYCO Renaissance directors vote to pay New Vision's $300,000 demand

after the Court finds that New Vision did not make a "substantial contribution," they may violate

their fiduciary duty of obedience.  The duty of obedience is a fiduciary's obligation to conduct

all of the not-for-profit corporation's business in accordance with its charitable purposes as

stated in its Articles of Incorporation.  *See Schneiderman v. Esopus Riv. Watch, Inc.*, 2013 N.Y.

Misc. LEXIS 2510, *64 (N.Y. Sup. Ct. April 8, 2013) ("The N-PCL requires directors and

officers of not-for-profit corporations to adhere to basic fiduciary duties that include the duty of

care, the duty of loyalty and the duty of obedience.  N-PCL § 717").  The nature of the duty of

-20-

obedience was described in the dissent in *Consumers Union of U.S., Inc. v. State*, 5 N.Y.3d 327,

370 n16 (2005):

> The common law duty of obedience includes the obligation of directors and
> officers to act within the organization's purposes and ensure that the corporation's
> mission is pursued.  There is no explicit reference to the duty of obedience in the
> N-PCL.  However, the duty may be inferred by the limitations imposed upon
> corporate activities as set forth in the purposes clause of the certificate of
> incorporation (N-PCL §§ 201, 202 & 402(a)(2)) and the directors' and officers'
> obligations as the corporate managers of the not-for-profit organization (N-PCL
> § 701 & 713.  EPTL § 11-2.3(B) explicitly refers to the needs of a trust's
> beneficiaries" (id. at 4).

54.    Paying New Vision's demand for attorneys' fees and other administrative costs in

exchange for withdrawing its proposed reorganization plan in deference to the Sponsor's plan

does not fit within the purposes set out in NYCO Renaissance's Certificate of Incorporation.

(Firestein Aff. ¶ 26, Exhibit 13, NYCO Renaissance's Certificate of Incorporation)

Consequently, approving such a payment would seem to violate the NYCO Renaissance

directors' fiduciary duty of obedience.

55.    A plan is confirmable only if "[a]ll transfers of property under the plan shall be

made in accordance with any applicable provisions of nonbankruptcy law that govern the

transfer of property by a corporation or trust that is not a moneyed, business, or commercial

corporation or trust."  11 U.S.C. § 1129(a)(16).  A plan that allows a successful not-for-profit

plan sponsor to pay the proponent of a withdrawn competing plan whom the court has held did

not provide a "substantial contribution" to the estate or the case would conflict with NYCO

Renaissance's legal obligations as a charitable corporation and its board members' fiduciary

duty.  If the Court holds that New Vision did not make a substantial contribution to the estate or

the case, NYCO Renaissance, a co-sponsor of the Plan, should be required to pay the entire

$1.25 million it committed to pay to the Reorganized Debtor on the Effective Date.

### 5.    Advertising and Promotional Activities

56.    The Projections' estimates for advertising and Eblasts, printing and postage (collectively "**Promotion**"), are lower than expected.  This is an issue because insufficient expenditure in this area could reduce the Reorganized Debtor's ability to garner adequate audiences and donors, which could adversely affect the organization's ability to continue operations.  City Opera failed to meet its fundraising goal during its 2012-2013 Season, finally forcing it to file a bankruptcy petition in October 2013.  Since then, it has produced no operas. The bankruptcy proceeding is the main focus of what publicity City Opera has generated since then.  To change the company's moribund image, the Reorganized Debtor will have to be aggressive in marketing itself as alive and well and returning to the company's historic role in the city's cultural fabric.  Unless that can be achieved, the Reorganized Donor's expected income from contributions and grants – the linchpin for its financial sustainability in light of the projected deficits from its productions – is unlikely to materialize.

57.    The Projections suggest a connection between increased expenditures for Promotion and rising contributions and grants.  When compared to the Projections without the Pending Bequests and Endowment, the Projections that include these additional resources, which can be used to bolster crucial management activities, show both an expected increase in Promotion and in contributions and grants.   (Firestein Aff., ¶ 27, Demonstrative Exhibit H)

58.    The Tier 2 companies' payments for advertising and promotion (990, Part IX, line 12) significantly exceed the Sponsor's projected expenditures for Promotion (using the Projections with the Pending Bequests and Endowment).  The Tier 2 companies, other than Hawaii which did not report any data for this item, spent between $115,170 and $808,922 (average $362,127; median $379,219) for advertising and promotion.  (Firestein Aff., ¶¶ 24, 27,

Demonstrative Exhibits G and H, Exhibit 4)  The Projections anticipate that the Reorganized

Debtor will spend the following combined amounts for Promotion (advertising and Eblasts,

printing and postage) during the four complete years covered by the Plan:

|          |          |
|----------|----------|
| Year 2   | $144,311 |
| Year 3   | $166,060 |
| Year 4   | $190,851 |
| Year 5   | $219,480 |

(Firestein Aff. ¶¶ 27, Demonstrative Exhibit H)  Despite the greater than normal need for

Promotion, especially in the early years of the Reorganized Debtor's operation, the Sponsor has

allocated significantly less than either the average or median expenditure of established, like-

sized opera companies.

### 6.    Insurance

59.    It would be imprudent for a not-for-profit corporation to carry an insufficient

amount of insurance, and directors and officers of not-for-profit corporations must act prudently

on behalf of the corporation.  N-PCL § 717(a).  The Projections' estimate of the Reorganized

Debtor's expenditures for this critical protection appears unusually low compared to City

Opera's past expenditures and those of the Tier 2 companies.  The Projections estimate the

Reorganized Debtor's costs for liability and property insurance at $11,459 for year 2 (the first

full year) and $17,428 for year 5.  (Firestein Aff. ¶ 28, Demonstrative Exhibit I)  City Opera

spent $96,153 for insurance in fiscal year 7/09-6/10 and $108,390 in fiscal year 7/13-6/14.

(Firestein Aff. ¶ 28, Demonstrative Exhibit F, Exhibit 3, 990 Part IX, line 23)  The Tier 2

companies' insurance expenditures ranged from $12,515 to $192,060 (average $61,633; median

$42,806).  (Firestein Aff. ¶ 28, Demonstrative Exhibit G, Exhibit 4, 990 Part IX, line 23)  The

insurance-cost data for City Opera and the Tier 2 companies were taken from their 990s on

which employee benefits, which may include types of employer-paid insurance payments, are

reported separately.

## CONCLUSION

60.     The Reorganized Debtor would have the assets needed to operate at least until the

unrestricted Pending Bequests are exhausted, and it is impossible to predict what, if any, future

bequests will be given to the Reorganized Debtor.  After that point, it might or might not

succeed.  At this time, the record is devoid of the evidence the Court needs to make that

determination.  Assuming the Sponsor provides an evidentiary basis for its Projections, the

crucial factors to determining whether the Plan is feasible in the long-term are the estimates of

the contributions and grants and the Pending Bequests that the Reorganized Debtor can expect to

receive, using an estimate for the Pending Bequests that is net of commissions, taxes, attorneys

and accountants' fees and other expenses; whether the Reorganized Debtor will invest the funds

in the promotional activities needed to attract audiences and donors; and whether its losses on

operatic productions will remain within the Projections' estimates or those losses will ultimately

swamp the company as they did with City Opera.  The issue is whether, once it is proffered, the

credible evidence supports a finding that implementation of the Plan is not reasonably likely to

be followed by the liquidation of the Reorganized Debtor or its need for further financial

reorganization.  If not, the Sponsor will not have met its burden of persuasion and the Plan

cannot be confirmed, in which case the Charitable Funds will be distributed through a Cy Pres

proceeding.

61.     Finally, if the Court denies New Vision's § 503(b) application for administrative

expenses including attorneys' fees, the Court will also have to determine whether NYCO

Renaissance can be permitted to transfer to the Reorganized Debtor on the Effective Date an

amount less than the $1.25 million called for by the Disclosure Statement, the Plan and the

Summary, although doing so would violate nonbankruptcy law.

Dated: January 4, 2016

Respectfully submitted,

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for the Ultimate Charitable Beneficiaries

By: /s/ Rose Firestein
        Assistant Attorney General, Charities Bureau
        120 Broadway, 3rd Floor
        New York, New York 10271
        (212) 416-8325
        rose.firestein@ag.ny.gov