**ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL OF THE STATE OF NEW YORK**
Rose Firestein
120 Broadway, 3rd Floor
New York, NY 10271
(212)416-8325
*Statutory Representative of the Ultimate Charitable Beneficiaries*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                        :

| | | |
|---|---|---|
| In re New York City Opera, Inc. | : | Chapter 11 |
| | : | |
| Debtor. | : | Case No. 13-13240 (SHL) |
| | : | |

------------------------------------------------------X

**AFFIRMATION IN SUPPORT OF THE NEW YORK ATTORNEY GENERAL'S (1) RESPONSE TO THE JOINT PLAN FOR REORGANIZATION SUBMITTED BY NYCO RENAISSANCE AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS [Docket Nos. 314 and 315] AND (2) OBJECTION TO NEW VISION'S § 503(b) APPLICATION FOR EXPENSES INCLUDING COUNSEL FEES [Docket No. 321]**

Pursuant to Fed. R. Civ. P. § 1746, Rose Firestein states under penalty of perjury that the following statements are true to the best of her knowledge:

1. I am an Assistant Attorney General in the Charities Bureau of the Office of the Attorney General of the State of New York (the "**OAG**"). The Attorney General appears in this proceeding as the statutory representative of the ultimate beneficiaries of charitable gifts pursuant to Estates, Powers and Trusts Law ("**EPTL**") § 8-1.1(f). I submit this affirmation (1) in support of the OAG' Response (the "**Response**") to the joint plan to reorganize New York City

Opera, Inc. ("**City Opera**" or the "**Debtor**" before confirmation and the "**Reorganized Debtor**" after confirmation if it is granted) filed by NYCO Renaissance, Ltd. and the Official Committee of Unsecured Creditors (collectively the "**Sponsor**")[1] and (2) in opposition to the application of New Vision for the New York City Opera, Inc. ("**New Vision**") and Gene Kaufman for allowance of administrative expenses, including attorneys' fees, pursuant to 11 U.S.C. § 503(b)(3)(D) and 503(b)(4) based on their purported substantial contribution to the case (the "**§ 503(b) Application**") [docket No. 321].[2]

      A.      **The Sources and Presentation of the Information on which the OAG Relies**

2.      The OAG presents information to the Court concerning the Plan and the Summary, including the Sponsor's financial projections of future income and expenses of the Reorganized Debtor attached to the Summary as Exhibit 2 to Exhibit A, which is the Plan (the "**Projections**").

3.      The Projections contain two sets of estimates of the Reorganized Debtor's income and expenses, one if it receives the Pending Bequests[3] and Endowment Fund and the other if it does not receive these funds. The Projections that were attached to the Summary which was filed with the Court contained information for Plan years one through five for the set without the Pending Bequests and Endowment Fund, but only for Plan years one through four for the other set of Projections. I asked NYCO Renaissance's counsel whether there were Projections for Plan

---

[1] This filing consists of the *First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and Official Committee of Unsecured Creditors for New York City Opera, Inc.* [docket No. 314] (the "**Disclosure Statement**"), which includes as Exhibit A: the *First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, Ltd. and Official Committee of Unsecured Creditors for New York City Opera, Inc.* (the "**Plan**"); and the Summary of the Plan (the "**Summary**"). The Plan was also filed separately as docket No. 315.

[2] Docket No. 321 is entitled *Application of New Vision Pursuant to § 503(b) for Allowance of Administrative Expenses for Counsel Fees and Other Expenses in Making a Substantial Contribution in this Case.*

[3] Capitalized terms that are not otherwise defined herein have the meaning ascribed to them in the Plan, the Summary, the Disclosure Statement and the § 503 Application.

year five and was provided with Projections that contained information for all five Plan years for both sets of data. The type on this document was extremely small and I enlarged it using a copying machine but made no other changes to the document I received from NYCO Renaissance's counsel. A true copy of the enlarged Projections for Plan years one through five is annexed to this affirmation as **Exhibit 1**. (Unless otherwise noted, the term "Projections" as used in this affirmation refers to the information contained on Exhibit 1 that assumes the Reorganized Debtor receives the Pending Bequests and Endowment Fund.)

4.  I compared information concerning the financial and performance characteristics described in the Plan, Summary and Projections to similar information for City Opera and a cohort of 15 opera companies in the United States. To make these comparisons, I used the data contained on the informational tax returns, Form 990, that were filed with the IRS by City Opera and the 15 companies and are open to public inspection (the "**990s**"). I obtained these 990s from the database of 990s maintained by the Economic Research Institute ("**ERI**"), which is a source that the OAG's Charities Bureau routinely uses. (The ERI database can be accessed at http://www.eri-nonprofit-salaries.com/?FuseAction=NPO.Search) There are several databases that contain virtually all 990s filed with the IRS, at least for the last several years, but ERI's is the easiest and fastest to use, which is why I chose to use it.

5.  I identified the 15 comparator opera companies based on the revenue criterion OPERA America uses in its annual longitudinal survey of opera companies. OPERA America describes itself as a membership organization with 150 professional company members, 300 associate and business members, 2,000 individual members and over 16,000 subscribers to its electronic news service. It states that it provides members with an array of resources, including direct consultation by its staff with expertise in opera production, administration and education in

order to maximize the effectiveness of members' financial and human resources, expand their repertoire and programs, and extend their reach to new and diverse audiences. (Information obtained from OPERA America's website, http://operaamerica.org/content/about, last accessed on December 29, 2015.)

6. Among the tools OPERA America makes available to its members is the annual Professional Opera Survey which records the financial positions of its members. The results of the survey are published in OPERA America's *Annual Field Report*, which appears each year in the Winter issue of *Opera America* Magazine. (*Ibid.*) The *Annual Field Report* contains data for a "constant sample" of opera companies divided by their total revenue. Level 2 of this sample consists of opera companies with annual revenue of $3 to $10 million ("**Tier 2**"). (*Ibid.*) The Sponsor's Projections estimate that the Reorganized Debtor will have total revenue within this range for its first four full years of operation, excluding the second year in which it expects to receive more than $8 million from the Pending Bequests. Tier 2, therefore, appears to be the appropriate comparator group. (The list of Tier 2 opera companies is contained in **Exhibit 2**, which consists of a true copy of pages of OPERA America's *Annual Field Report* from the Winter 2015 issue of the *OPERA America* magazine, which was the most recent *Annual Field Report* available when I collected the data for the Tier 2 companies from their 990s.)[4]

7. The Response contains the outcome of calculations made on data contained on the Projections, the 990s and the Debtor's monthly operating reports that it filed with the Court. I performed these calculations by entering the data from these sources into various Excel spreadsheets and using the program's functions to calculate the outcomes, such as the sum,

---

[4] The Tier 2 opera companies are The Atlanta Opera, Arizona Opera, Austin Lyric Opera, Boston Lyric Opera, Cincinnati Opera, Fort Worth Opera, The Glimmerglass Festival, Hawaii Opera Theatre, Lyric Opera of Kansas City, Opera San Jose, Opera Philadelphia, Opera Theatre of Saint Louis, Palm Beach Opera, Pittsburg Opera and Portland Opera.

difference, product, percentage, average or median, of a data set. I used this method for each of these calculations and do not reiterate its description in this affirmation for each calculation. When data reported in the Response were taken from one of these calculations, rather than directly from the Projections, the 990s or the Debtor's monthly operating reports, the data and outcomes are reflected on a demonstrative exhibit that is attached to this affirmation. Exhibits that are original documents are identified by Arabic numbers and demonstrative exhibits are identified by Roman letters.

8. A true copy of excerpts from the 990s for City Opera for its fiscal years covering the period July 2008 through June 2014 is attached as **Exhibit 3**, and a true copy of excerpts from the 990s for the Tier 2 companies for fiscal year 2013 (which ended in mid-2014 for all of the companies) is attached as **Exhibit 4**.[5] I examined the 990s for fiscal years 2011 and 2012 for the Tier 2 companies to determine whether the FY 2013 total revenue was out of line compared to the prior two years. This did not appear to be the case for any of the companies. Cincinnati Opera's total revenue as reported on its 990s was slightly above the upper Tier 2 standard, but this company was retained in the OAG's analysis.

9. The Response relies on information from additional sources, which are identified and described as they become relevant.

B. **The Charitable Funds**

10. The "Charitable Funds" consist of City Opera's Endowment Fund, gifts given subject to a donor-imposed use restriction[6] and the Pending Bequests. The Debtor's counsel provided the OAG with a chart containing the original and recent market values of City Opera's

---

[5] Fiscal years were identified by the period the filer states is covered by a 990.

[6] Pursuant to Not-for-Profit Corporation Law § 555(d), City Opera has notified the OAG that it intends to redirect a "small, old" use-restricted fund – one that is more than 20 years old and has a market value of under $100,000. It is not included in the Charitable Funds discussed in the Response or this affirmation.

donor-restricted assets, which are part of the Charitable Funds. A true copy of this chart and the cover e-mail are annexed to this affirmation as **Exhibit 5**. Exhibit 5 shows that the Wallace Endowment Fund's original value was $41,263,353.50 and that it had a market value of $3,583,507.05 on October 31, 2015. City Opera obtained state court orders in 2001 and 2008 to invade this fund.

11.     The Debtor's counsel provided the OAG with a document containing information about the status and estimated value of the Pending Bequests other than the DeMenasce bequest and requested that only a redacted version of this document be filed with the Court or made public. That redacted version of this document is annexed hereto as **Exhibit 6**. (The cover e-mail from the Debtor's counsel for Exhibit 6 is part of Exhibit 5.)

12.     The Debtor's counsel informed me that each of the Pending Bequests other than the $250,000 general disposition (N-PCL § 1-2.8) from the DeMenasce Will will be funded by specified percentages of the residuary estate or the proceeds from the sale of property. The stated value of each of these Pending Bequests is an estimate provided to the OAG by City Opera's counsel. City Opera's counsel informed the OAG that: (a) she received the valuation information from the estates' executors over the course of 2015 and that these data have not been updated recently, (b) the estates' executors provided her with the stated valuation estimates other than the estimate of the $51,000 value placed on the Pending Bequest from the Schultz Estate which she calculated based on information provided by that estate's executors and (c) the estimated values for all the Pending Bequests, including the DeMenasce bequest, are gross, not net, numbers. A true copy of an e-mail thread in which the Debtor's counsel states that the Pending Bequests' estimated values are gross numbers is annexed to this affirmation as **Exhibit**

**16.** The DeMenasce and some of the other Pending Bequests are unrestricted as to use and/or spending (an endowment fund restriction).

        **C.**      **The Plan's Projected Income and Expenses**

13. The Projections report the Reorganized Debtor's expected income by two categories: "Public support and other income" and "Performance and special event income." I summed the data for these two items for each year in order to determine the Reorganized Debtor's expected total gross income. This calculation is shown on **Demonstrative Exhibit A**.

14. The Projections report expected income from "Grants." NYCO Renaissance's counsel informed the OAG by e-mail that this category includes grants from public and private foundations and government sources. This e-mail also explained that the labor costs associated with productions and performances are included in the cost of the production not as "contract labor," and answered additional questions posed by the OAG. A true copy of this e-mail is annexed to this affirmation as **Exhibit 7**.

15. The Projections report expected income from "Grants" separately from that expected from "Contributions." I summed the data for these two items for each year in order to determine the Reorganized Debtor's expected total gross income from these sources. This calculation is shown on **Demonstrative Exhibit B**.

16. The 990s report a combined total for contributions and grants on Part I, line 8. Exhibit 3 contains City Opera's 990s that begin in its fiscal year July 2008 through June 2009. I selected this as a starting point for collecting information on City Opera's income from grants and contributions because the Great Recession began during this period. Attached as **Exhibit 8** is a true copy of the first page of "The Recession of 2007-2009," Spotlight Statistics, which I

downloaded from the website of the United States Bureau of Labor Statistics (Feb. 2012), at http://www.bls.gov/spotlight/2012/recession/pdf/recession_bls_spotlight.pdf.

17. Information concerning the income the Debtor has received from its thrift shop between November 2014 and October 2015 is contained in the *Corporate Monthly Operating Reports* that it filed with the Court [docket nos. 232, 248, 266, 276, 278, 279, 285, 290, 299, 304, 317, 318]. Each Operating Report states the value of the "Cash Sales" in the "Receipts" section of the Schedule of Cash Receipts and Disbursements. The Operating Reports for November and December 2014 and May 2015 (and no other month in this period) also state the "Total Thrift Shop Income." (The only consistent pagination of these documents is in the imprint at the top of each page from the Court's ECF System. Using this pagination system, the Total Thrift Shop Income is found on page 75 of the November 2014 report, page 70-71 of the December 2014 report and page 54 of the May 2015 report.) **Demonstrative Exhibit C** shows the Cash Sales for each month from November 2014 through October 2015, the Total Thrift Shop Income for the three months for which it was reported and the difference between these values in those months. Based on the relatively small differences between Total Cash Sales and Total Thrift Shop Income in the three months for which both are available ($2,492, $3,234 and $4,297), the value of Total Cash Sales appears to be a reasonable surrogate for thrift shop income during the other months. Demonstrative Exhibit C also shows the difference between the Total Cash Sales and the amount reported on the Projections for thrift shop income for Plan years two through five ($1,200,000).

18. In addition to the list of the Pending Bequests that Debtor's counsel provided to the OAG (Exhibit 6), she provided copies of the Wills that create these bequests other than the DeMenasce bequest. A true copy of the copies of the Wills Debtor's counsel provided to the

OAG, with the cover letters and other transmitting materials from the executors' counsel, is annexed as **Exhibit 9**, except that the papers relating to the informal accounting and ancillary probate of the Will of Virginia Helene Havrilka have not been attached and only one transmission from counsel for the estate of James Marcus has been attached. (Debtor's counsel's e-mail transmitting these documents is part of Exhibit 5). The copy of the Will of James Marcus was redacted when the OAG received it.

19.  Attached as Exhibit A to the *Motion of the Executors of the Estate of Pierre DeMenasce for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1)* [docket no. 253] (the "**Executors' Motion**") is a draft petition for cy pres relief that the executors prepared [docket no. 253-2]. This draft petition contains excerpts from the DeMenasce Will that contain bequests to City Opera. **Exhibit 10** contains a copy of the DeMenasce Will the provenance of which cannot be established. At the time the Executors' Motion was filed, counsel to the executors of the DeMenasce estate indicated that the net value of the bequest to City Opera was expected to be over $5 million.[7]

20.  It appears that City Opera's last performance was on September 28, 2013. A true copy of a September 29, 2013 (Sunday) article from the *New York Times,* "Veterans of City Opera, Proudly Wistful, Reflect as the Curtain Falls," is annexed to this affirmation as **Exhibit 11**. It states that the last performance was the preceding Saturday, which was September 28, 2013.

21.  I calculated the interest rate the Projections estimate the Reorganized Debtor will realize on the Pending Bequests in Year 2, the only year for which the amount of the Pending

---

[7] NYCO Renaissance's counsel has informed me that the executors of the DeMenasce estate estimate that the initial distribution of the DeMenasce bequest to City Opera will be $5.85 million with the remainder of the bequest, the amount of which is unknown, to be distributed from the reserve being held to pay any outstanding taxes and expenses and to cover any contingencies.

Bequests appears on the Projections. I then applied this rate to the estimated gross value of (a) all the Pending Bequests, (b) all the Pending Bequests other than the Marcus bequest and (c) all the Pending Bequests other than the Marcus, Helfman, Schultz and Havrilka bequests. The results of these calculations are presented on **Demonstrative Exhibit D**.

22.     NYCO Renaissance's counsel informed the OAG that its Spring 2015 Gala produced a surplus. (Firestein Aff. ¶ 14, Exhibit 7)

23.     I summed the income the Projections estimate the Reorganized Debtor will earn from Large Scale Productions, Small Scale Productions, and the VOX Production, but not the income from the Opera for Kids educational program. (See Firestein ¶ 14, Exhibit 7 for an explanation of the Opera for Kids program.) I also summed the expenses that the Projections estimate will be incurred for this same group of productions and subtracted the combined expenses from the combined income to determine if the Reorganized Debtor expects to realize a gain or loss from these productions. In all years (Years 1 through 5), this resulted in a loss. I also calculated the percentage the loss was of the Reorganized Debtor's total expected income as stated on the Projections and calculated on Demonstrative Exhibit A. These calculations are presented on **Demonstrative Exhibit E**.

24.     On their 990s, charities disclose their Contributions and grants (Part 1, line 8), Total revenue (Part I, line 12), Salaries, other compensation, employee benefits (Part 1, line 15), the revenue received and expenses paid in connection with program service accomplishments (Part III, line 4), expenditures for Advertising and promotion (Part IX, line 12) and the cost of insurance (Part IX, line 23). I collected the data that City Opera reported in these categories for each fiscal year between July 2009 through June 2014 (from Exhibit 3) and displayed them on **Demonstrative Exhibit F** and the same categories of data that the Tier 2 companies reported for

-10-

Fiscal Year 2013, which ended in mid-2014 for all of these companies (from Exhibit 4). The Tier 2 companies' data are presented on **Demonstrative Exhibit G**. The service accomplishments for which revenue and expenses are reported on Demonstrative Exhibits F and G exclude productions and performances that are connected to educational or singer-training programs if they were reported separately. In general, it appears that the "Main Stage" productions that the companies described on their 990s correspond to the Large Scale, Small Scale and VOX Productions on the Projections. Because this part of the 990 (Part III) is narrative, there probably is not a perfect match between the Sponsor's categories and the programs City Opera and the Tier 2 companies reported on the 990s. The average expenditure for salary, compensation and benefits as a percentage of total revenue was calculated by dividing the companies' average salary costs by their average total revenue, not by averaging the individual companies' averages. The same approach was used to calculate the average loss as a percentage of total revenue.

25. NYCO Renaissance's counsel informed the OAG that if the Court does not approve New Vision's application for an award of administrative expenses including attorneys' fees under 11 U.S.C. § 503(b)(3)(D) and 503(b)(4), NYCO Renaissance will pay New Vision's $300,000 demand. He also brought to the OAG's attention that the amount of both the GUC and PBGC notes increased in the First Amended Plan "in part to limit any impact of the 503b application on these creditors." A true copy of the e-mail from NYCO Renaissance's counsel describing these two developments is attached to this affirmation as **Exhibit 12** (the first two messages in the e-mail thread).

26. I retrieved a PDF copy of NYCO Renaissance's Certificate of Incorporation from the database maintained by the OAG of documents charities submit to OAG's Charities Bureau.

The database with links to not-for-profit corporations' filings, including its 990s and some origination documents such as Certificates of Incorporation, can be accessed at www.nyscharities.com. A true copy of the PDF copy of NYCO Renaissance's Certificate of Incorporation that I obtained from the Charities Bureau's database on December 30, 2015, is annexed to this affirmation as **Exhibit 13**.

27. I summed the Projection's estimates of the amount the Reorganized Debtor will spend in Years 2 through 5 for Advertising and for Eblasts, printing and postage. I did this calculation for both sets of data on the Projections: with and without the Pending Bequests and Endowment Fund. These data are displayed on **Demonstrative Exhibit H**.

28. **Demonstrative Exhibit I** displays the amount the Projections estimate the Reorganized Debtor will spend on property and liability insurance in Years 2 through 5. Demonstrative Exhibit F sets out the amounts City Opera reported on its 990s that it spent for insurance in the Fiscal Years beginning July 2009 and ending in June 2014. Demonstrative Exhibit G presents the same information for the Tier 2 companies in Fiscal Year 2013. The 990s separately report employee benefits which may include employer-paid insurance costs.

29. On December 12, 2015, I accessed the database of corporate filings maintained by the Delaware Department of State, Division of Corporations at https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx. I downloaded the information from this database concerning New Vision for NYC Opera, Inc., a true copy of which is annexed to this affirmation as **Exhibit 14**. It shows an incorporation date of 1/9/2015.

30. On December 26, 2015, I accessed the database of corporate filings maintained by the New York Department of State, Division of Corporations at http://www.dos.ny.gov/corps/bus_entity_search.html. I downloaded the information from this

database concerning New Vision for NYC Opera, Inc., a true copy of which is annexed to this affirmation as **Exhibit 15**. It shows that New Vision initially registered with the New York Department of State as a foreign business corporation on June 11, 2015; it surrendered its authority on August 7, 2015; and it initially registered as a foreign not-for-profit corporation on August 7, 2015.

31. The DeMenasce executors filed the Executors' Motion on April 6, 2014, to pave the way to distributing the City Opera bequests to another charitable organization. The hearing on the Executors' Motion was adjourned several times [docket nos. 259, 4/23/2015; 264, 5/20/15; 270, 7/2/15; 271, 7/6/15].

32. By May 2015, it appeared that reorganization of the Debtor might be possible. The OAG met with the Debtor, NYCO Renaissance and the Creditors' Committee at their request on June 18, 2014, to discuss the parameters of a reorganization plan. Also discussed was how the DeMenasce bequest could be distributed – whether it could go to a Reorganized Debtor of City Opera. The OAG expressed the view that if a reorganization plan were confirmed, the Reorganized Debtor would be the New York City Opera, Inc. and would be entitled to the DeMenasce bequest without having to seek cy pres relief. Following this meeting, I communicated that view to the executors of the DeMenasce estate. The OAG also stated this position in papers it filed with the Court on August 13, 2015 [docket no.282].[8] During this time, I mentioned to New Vision's counsel that the OAG was available to discuss any aspect of the case.

---

[8] Docket no. 282 was entitled *Statement of the New York Attorney General Relating to the Upcoming Settlement Discussions (Consent Order Regarding Sale Motion, Docket No. 281).*

33. On July 13, 2015, the Debtor filed its notice withdrawing its motion to sell its assets [docket no. 271, 7/13/2015].[9] Subsequently, the OAG, Kaufman and Kaufman/New Vision's counsel had a telephone meeting at which Kaufman/New Vision expressed their view about whether the sale of Debtor's assets should proceed and how this related to a possible reorganization of the Debtor, a view with which the OAG did not agree.

Dated: January 4, 2016

                                  s/Rose Firestein
                                  Rose Firestein

---

[9] Docket no. 273 was entitled *Notice of Withdrawal Without Prejudice of Debtor's Motion for Orders (I) Approving (A) Bidding Procedures, (B) Certain Bid Protections, (C) Form and Manner of Sale Notice, and (D) Sale Hearing Date, (II) Authorizing the Debtor to Enter Into the Assigned Contract, and (III) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, and Encumbrances.*