UNITED STATES BANKRUPTCY COURT       Hearing Date:  January 12, 2016[1]
SOUTHERN DISTRICT OF NEW YORK     Hearing Time:  10:00 a.m.

----------------------------------------------------------x

In re                                  Case No. 13-13240 (SHL)

NEW YORK CITY OPERA, INC.         Chapter 11

                  Debtor.

----------------------------------------------------------x

## OBJECTION OF THE UNITED STATES TRUSTEE TO NEW VISION FOR NYC OPERA, INC.'S APPLICATION FOR REIMBURSEMENT OF PROFESSIONAL FEES PURSUANT TO BANKRUPTCY CODE § 503(b)

**TO:  THE HONORABLE SEAN H. LANE,**
      **UNITED STATES BANKRUPTCY JUDGE**:

      William K. Harrington, United States Trustee for Region 2 (the "United States Trustee"), respectfully submits this objection (the "Objection") to the application ( the "Application") of New Vision For NYC Opera, Inc. ("New Vision") seeking the reimbursement of professional fees to its counsel King & Spaulding LLP under 11 U.S.C. §§ 503(b)(3) and (4).  In support of his Objection, the United States Trustee represents and alleges as follows:

## I.    INTRODUCTION

      New Vision seeks the reimbursement of $300,000 from the Debtor's estate for the professional fees of its counsel for what New Vision claims was the substantial contribution it made in this case.  Inherent in the term "substantial" is the concept that the benefit to the estate must be more than an incidental one arising from activities an applicant has pursued in protecting its own interests.  Here, New Vision is merely seeking to be reimbursed for the actions it undertook

---

[1] Counsel to New Vision agreed to extend the United States Trustee's time to object to January 7, 2016.

solely to advance its self-interest in trying to purchase and operate the not-for-profit opera company. As such, the Application should be denied.

As more fully discussed below, New Vision's Application rests on its argument that its losing bid at the auction for the Debtor's assets created value for the Debtor's unsecured creditors. New Vision, however, ignores the case law which holds that generating a higher offer at an auction does not in and of itself constitute a substantial contribution. Further, New Vision's alternative argument, that by withdrawing its own plan of reorganization, New Vision saved the estate substantial expenses is speculative at best. In fact, it was the sizeable bequests to the Debtor that caused the Debtor to abandon its sale strategy and turn its attention to reorganization – not the actions of New Vision.

Rather than substantially contributing to the plan process, New Vision aggressively opposed the Debtor at every stage, and but for the fact that virtually all of the retained professionals worked pro bono, the fees generated by the retained professionals in litigating the myriad issues raised by New Vision would have caused the administrative expenses to skyrocket, significantly depleting any value New Vision purportedly created.

Alternatively, should the Court find that New Vison's competition for the assets and its arguably disruptive tactics did create significant value to the estate, and that New Vision made a substantial contribution, the fees requested are excessive, are not supported by the Application, and should be reduced.

## II.    FACTS

**Background**

1.    On October 3, 2013 (the "Petition Date"), New York City Opera, Inc., (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. ECF Doc. No. 1.

2.      The Debtor is a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this case.

3.      On October 23, 2013, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").  ECF Doc. No. 37.

4.      The Debtor is a New York City opera company founded in 1943.  It operates as a not-for-profit corporation that is exempt for federal income taxation under section 501(c)(3) of the Internal Revenue Code and has been designated as a public charity by the Internal Revenue Service.  See Declaration of George Steel in Support of Chapter 11 Petition and First Day Motions, ECF Doc. 2 at ¶¶ 2, 9.

5.      Prior to the Petition Date, the Debtor's operations had been funded in part through an endowment (the "Endowment"), which consisted of nine individual funds established for a variety of purposes, and which totaled approximately $55 million several years ago, $9 million in 2011, and $5 million in 2012.  Id. at ¶ 16; First Amended Disclosure Statement (the "First Amended Disclosure Statement") for the First Amended Joint Chapter 11 Plan of Reorganization of NYCO Renaissance, LTD ("NYCO Renaissance") and the Committee (the "First Amended Joint NYCOR/Committee Plan"), ECF Doc. No. 314 at II.C.1.  The current principal amount of the Endowment is approximately $4.8 million.  Id.

6.      In addition to the Endowment, the Debtor also relied on gifts by individuals, corporations and foundations.  Id. at II.C.2.  At present, there are at least five (5) charitable bequests (the "Pending Bequests") made to the Debtor by supporters who passed away prior to or subsequent to the Petition Date.  Id.  The Pending Bequests total approximately $8.1 million.  Id.  Assuming that a plan is confirmed and that the Reorganized Debtor continues its not-for-profit operations under the

3

New York City Opera name, the majority of the Pending Bequests, approximately $6.9 million, are in the form of unrestricted gifts which the Debtor may use in its discretion upon receipt.  Id.

**Retentions**

7.    There are four retained professionals ("Retained Professionals") in this case: (i) Lowenstein Sandler LLP ("Lowenstein") and (ii) Ewenstein Young & Roth LLP ("E&R")[2] as bankruptcy counsel and special non-profit counsel to the Debtor, respectively, (iii) Klestadt & Winters LLP[3] as counsel to the Committee and (iv) EisnerAmper LLP as financial advisor to the Committee (collectively, the "Retained Professionals").  ECF Doc. Nos. 58, 74, 78, 93.  All of the Retained Professionals except for E&R are handling this case on a pro bono basis.  Id.

8.    E&R's highest attorney billing rate in this case is $285 per hour. See Application to Retain E&R, ECF Doc. No. 74.

**Kaufman and New Vision**

9.    On December 19, 2013, Gene Kaufman, Architect PC, purchased a $255 claim and became a creditor in this case.  ECF Doc. No. 94.  On July 14, 2014, Gene Kaufman, Architect PC, transferred its claim to Gene Kaufman ("Kaufman") an individual.  ECF Doc. No. 180.

---

[2] The Firm changed its name to Ewenstein & Roth LLP effective May 22, 2015. See Notice of Firm Name Change, filed July 31, 2015.  ECF Doc. No.  280.

[3] Klestadt & Winters is now known as Klestadt Winters Jureller Southard & Stevens, LLP.

10.    Kaufman is the Chairman of New Vision.  See Application at ¶ 11.  There is no

docket entry establishing that Kaufman ever transferred his claim to New Vision.[4]  See Docket.

11.    Throughout the case, Kaufman filed numerous motions and spent almost

$650,000 in legal fees in challenging actions proposed by the Debtor related to the sale and plan

processes, seeking the appointment of a Chapter 11 Trustee and making three separate proposals

to purchase the Debtor's assets.  See Application; see also  ECF Doc. Nos. 174, 204, 219, 277,

293, 303, 316.[5]

**The Sale and Plan Process**

12.    Early in the case, the Debtor decided to sell substantially all of its assets in lieu of

a reorganization (the "Sale Motion").  ECF Doc. No. 213.  On January 20, 2015, the Debtor held

an auction where there were two bidders:  NYCO Renaissance and New Vision.  The Debtor

ultimately determined that the bid from NYCO Renaissance was the highest and best offer, even

though the bid from New Vision had a higher monetary value.  New Vision disputed the

Debtor's determination and thereafter the parties engaged in extensive document discovery and

---

[4]  Although there is no evidence that Kaufman transferred his claim to New Vision, bringing New Vision's standing to bring this Application into question, for purposes of this Objection the United States Trustee will respond as if Kaufman and New Vision are the same entity.

[5]  Objection of Gene Kaufman to Debtors Third Motion To Extend Exclusivity, and Cross-Motion for the Appointment of a Chapter 11 Trustee or Responsible Person to Supervise the Sale Process of the Debtors Assets (ECF Doc. No. 174); Objection of Gene Kaufman to Debtors Fifth Motion To Extend Exclusivity, and Cross-Motion to Compel the Debtor to Sell its Assets in a Court- Supervised Auction (ECF Doc. No. 204); Objection Of Gene Kaufman to Debtors Motion for Orders (I) Approving (A) Bidding Procedures, (B) Certain Bid Protections, (C) Form and Manner of Sale Notice, and (D) Sale Hearing Date, (II) Authorizing the Debtor to Enter Into the Assigned Contract, and (III) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, and Encumbrances (ECF Doc. No. 219); Statement of New Vision for NYC Opera, Inc. With Respect to NYC Opera, Inc.'s Notice to Withdraw its Sale Motion (ECF Doc. Nos. 277, 293); Joint Disclosure Statement for Competing Chapter 11 Plans of Reorganization for New York City Opera, Inc. (ECF Doc. No. 303); Notice of Withdrawal of New Vision for NYC Opera, Inc.'s Competing Chapter 11 Plans of Reorganization (ECF Doc. No. 316).

numerous depositions in preparation of a contested hearing to approve the sale of the Debtor's assets to NYCO Renaissance.

13.     During the discovery period, on April 6, 2015, a motion was filed by the executors of the Estate of Pierre DeMenasce (the "DeMenasce Motion") seeking relief from the automatic stay to permit a state court to decide questions regarding the validity, construction and effect of provisions of Mr. DeMenasce's will, including the Debtor's entitlement to a several million dollar bequest (the "DeMenasce Bequest").  ECF Doc. No. 253.

14.     In June 2015, the Debtor, the Committee, NYCO Renaissance and the Office of the Attorney General of the State of New York (the "OAG") met to discuss the possibility of the reorganization of the Debtor and how the DeMenasce Bequest could be distributed.  The OAG determined that if a plan of reorganization was confirmed and the Reorganized Debtor was the New York City Opera, it would be entitled to the DeMenasce Bequest.  See Statement of the New York Attorney General Relating to the Upcoming Settlement Discussions (Consent Order Regarding Sale Motion, Doc. 281), ECF Doc. No. 282.  Ultimately, the DeMenasce Bequest was resolved by a so-ordered stipulation of settlement agreed to by the DeMenasce executors, the Debtor, NYCO Renaissance, the Committee and the OAG (the "DeMenasce Bequest Stipulation"). ECF Doc. No. 311.  New Vision was not a party to this Stipulation.  Id.

15.     On July 13, 2015, while the DeMenasce Motion was pending, the Debtor filed a notice seeking the withdrawal of the Sale Motion so it could turn its attention to a possible reorganization.  ECF Doc. No. 273.  On July 22, 2015, New Vision filed a Statement in Opposition, arguing that the Debtor's entire sale process, together with alleged conduct of

6

NYCO Renaissance, was an improper attempt to keep Kaufman and New Vision from purchasing the Debtor's assets.  ECF Doc. No. 293.

16.    On August 5, 2015, the Bankruptcy Court entered a consent order (the "Consent Order"), whereby the Sale Motion was adjourned indefinitely to allow interested parties, including NYCO Renaissance and New Vision, to propose their own Chapter 11 plans of reorganization.  ECF Doc. No. 292.

17.    On October 5, 2015, consistent with the Consent Order, NYCO Renaissance and the Committee filed the Joint NYCOR/Committee Plan and related disclosure statement, and on October 19, 2015, New Vision filed its Chapter 11 Plan of Reorganization of New Vision for NYC Opera, Inc. (the "New Vision Plan") and related disclosure statement.  ECF Doc. No. 303.

18.    On November 16, 2015, the Court held a status conference to discuss, among other things, the competing plans filed by the parties, a proposed scheduling order and a path toward an anticipated contested confirmation hearing in January 2016.

19.    Thereafter, an agreement was reached by the parties under which New Vision would withdraw the New Vision Plan from consideration for approval by the Court. See First Amended Joint NYCOR/Committee Disclosure Statement at III.L.  In return, the Committee and NYCO Renaissance agreed, among other things, that New Vision, upon application to the Court, would be allowed an administrative claim under section 503(b) for making a substantial contribution to the Debtor's case in the amount of $300,000.  Id.; see also First Amended Joint NYCOR/Committee Plan at I.A.1(2) and I.A.39.

20.    Confirmation of the First Amended Joint NYCOR/Committee Plan is scheduled for January 12, 2016.

7

**The Application**

21.    The Application, with the time records of King & Spaulding, was filed on

December 16, 2015.  ECF Doc. No. 321.  In support of the Application, New Vision avers that it

has been:

> [I]nstrumental in the successful resolution of this chapter 11 case.  It has
> aggressively made proposals to purchase the Debtor's assets, and to fund a plan of
> reorganization.  Based on these efforts, creditor recoveries have substantially
> increased.  Has New Vision not challenged the Debtor's assets, the Debtor would
> have sold its assets for a *de minimus* amount to  a former insider, and lost a
> substantial gift (the DeManasce bequest), which is an essential part of the
> creditors Committee/NYCO Renaissance plan of reorganization.

Application at ¶ 2.

22.    The Application further states that

> New Vision's participation in the sale process increased the cash portion of the
> Debtor's Estate from $10,000 to $1,250,000.  New Vision's participation in the
> plan process further increased unsecured creditor recoveries by over $500,000 . . .
> . In addition, New Vision's willingness to step aside to avoid the competing plan
> scenario, saved substantial expenses for the Estate, and accelerated the time table
> towards the Debtor's revival of its business.

Id. at ¶ 21.

## III.    LEGAL STANDARDS

Compensation based upon a substantial contribution under section 503(b) is designed to

meet policy objectives of encouraging meaningful participation in the reorganization process,

while also preserving the estate.  In re United States Lines, Inc., 103 B.R. 427, 430 (Bankr.

S.D.N.Y. 1989).  Section 503(b), however, "should not become a vehicle for reimbursing every

creditor who elects to hire an attorney."  In re American Plumbing & Mechanical, Inc., 327 B.R.

273, 279 (Bankr. W.D. Tex. 2005).  Thus, bankruptcy courts construe the substantial

contribution provisions narrowly, and grant such applications only in unusual and "rare"

8

instances.  In re Randall's Island Family Golf Ctrs., Inc., 300 B.R. 590, 598 (Bankr. S.D.N.Y.

2003).

This, as shown below, is not one of those rare instances.

## A.       The Substantial Contribution Standard

Sections 503(b)(3)(D) and (b)(4) provide, in part:

> (b) After notice and a hearing, there shall be allowed administrative expenses,
> other than claims allowed under section 502(f) of this title, including –
> …
>> (3) the actual, necessary expenses, other than compensation and
>> reimbursement specified in paragraph (4) of this subsection,
>> incurred by –
>> …
>>> (D) a creditor, an equity security holder  . . . in making a
>>> substantial contribution in a case under chapter 9 or 11 of
>>> this title;
>> …
>> (4) reasonable compensation for professional services rendered by
>> an attorney or an accountant of an entity whose expense is
>> allowable under paragraph (3) of this subsection, based on the
>> time, the nature, the extent and the value of such services, and the
>> cost of comparable services other than in a case under this title,
>> and reimbursement for actual, necessary expenses incurred by such
>> attorney or accountant . . . .

11 U.S.C. § 503(b).

Compensation under sections 503(b)(3)(D) and (b)(4) is limited to those extraordinary

actions that lead to an "actual and demonstrable benefit to the debtor's estate, its creditors, and to

the extent relevant, the debtor's stockholders."  In re AMR Corp., 2014 WL 3855320, *1 (Bankr.

S.D.N.Y. August 5, 2014); In re Dana Corp., 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); In re

Best Prods. Co., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994); In re Alert Holdings, Inc., 157 B.R.

753, 757 (Bankr. S.D.N.Y. 1993).  These provisions do not change the general rule that an

attorney must look to his client for payment of his fees. <u>In re Granite Partners, L.P.</u>, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).

Whether a creditor has made a substantial contribution to a reorganization case is a question of fact. <u>In re Hooker Invs., Inc.</u>, 188 B.R. 117, 120 (S.D.N.Y. 1995). The burden of proof is on the applicant to show by a preponderance of the evidence that the services it rendered provided a substantial benefit to the estate. <u>Best Prods.</u>, 173 B.R. at 865; <u>In re Villa Luisa, LLC</u>, 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006) (the burden of proof is on the applicant and it is exceedingly difficult because a litigant is presumed to act in its own interest).

In determining whether a creditor has made a substantial contribution, courts generally assess the following:

(1) whether the services benefitted the creditor or all creditors;

(2) whether the services provided a direct, significant and demonstrable benefit to the estate; and

(3) whether the services rendered were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys.

<u>Best Prods.</u>, 173 B.R. at 865.

Inherent in the term "substantial" is the concept that "the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." <u>AMR</u>, 2014 WL 3855320, *2 quoting <u>Dana Corp.</u>, 390 B.R. at 108. Courts have stated that services that warrant a substantial contribution award "generally take the form of constructive contributions in key reorganizational aspects, when *but for* the role of the creditor, the movement towards the final reorganization would have been substantially diminished." <u>Id.</u> quoting <u>U.S. Lines</u>, 103 B.R. at 430.

10

Active participation alone is insufficient to give rise to a substantial contribution claim. Granite Partners, 213 B.R. at 446.  This includes involvement in negotiation, drafting and confirming a plan of reorganization.  In re Baldwin-United Corp., 79 B.R.321, 340-41 (Bankr. S. D. Ohio 1987).  Services that delay rather than enhance the reorganization are likewise not compensable under Section 503(b).  Granite Partners, 213 B.R. at 447.

In addition, unsuccessful bidders for a debtor's assets do not alone make for a substantial contribution award.  In re S&Y Enterprises, LLC, 480 B.R. 452, 461 (Bankr. E.D.N.Y. 2012) (in denying a substantial contribution application, Court found that "at most . . . [these] activities led to an indirect benefit to these bankruptcy cases and plainly that is not enough.  By applicants reasoning, serious but unsuccessful bidders for the debtor's assets would be able to shift their counsel fees and expenses to the estate.  This would make such awards common, not rare or extraordinary.").

Requests for compensation for insubstantial or duplicative services or services that deplete rather than increase the size of estate assets should also be denied.  U.S. Lines, 103 B.R. at 429-430.  An applicant cannot recover fees related to case administration, monitoring and education, including attending hearings, reviewing documents and consulting with clients because these services are performed for the client, not the estate.  Granite Partners, 213 B.R. at 453-454.

Similarly, settlement negotiations require the participation of many parties-in-interest and do not give rise to substantial contribution claims.  See Matter of Columbia Gas Syst., Inc., 224 B.R. 540, 549 (Bankr. D. Del. 1998) (creditor's section 503(b) claims rejected where evidence showed that participation of many parties needed to effectuate a settlement).  Encouraging

compromise, participating in settlement negotiations and proposing settlement terms are the professional obligation of a creditor's counsel.  In re Alumni Hotel Corp., 203 B.R. 624, 630 (Bankr. E.D. Mich. 1996).  All creditors have a strong economic self-interest in settlements that may or may not coincide with the interests of creditors as a whole.  Columbia Gas, 224 B.R. at 549.

Under section 503(b), a creditor who makes a substantial contribution is entitled to reasonable fees and necessary expenses of certain professionals.  Alert Holdings, 157 B.R. at 757.  Under section 503(b)(4), the Court retains the right to review professional fees for reasonableness, but the professional must first establish that it made a substantial contribution. In re Mariner Post-Acute Network, Inc., 267 B.R. 46, 61 (Bankr. D. Del. 2001).  It necessarily follows that the professional, in addition to making a substantial contribution, must also qualify for reimbursement under section 503(b)(4).

**B.    The Reasonableness Standard**

If the Court determines that a "substantial contribution" has been proven, then the standards as set forth in Section 330 of the Bankruptcy Code apply in determining the extent that the fees and expenses of the professional are reimbursable under Section 503(b)(4).  See, e.g., In re Wind N' Wave, 509 F.3d 938, 944 (9th Cir. 2007); In re Celotex Corp., 227 F.3d 1336, 1341 (11th Cir. 2000).

11 U.S.C. § 330[6] provides, in part:

(a)(1) After notice . . . and a hearing . . . the court may award to a . . . professional person employed under section 327 or 1103 –

---

[6] 11 U.S.C. § 330, by its terms, applies only to retained professionals.  Lamie v.United States Trustee, 540 U.S. 526, 536 (2004).

> (A) reasonable compensation for actual, necessary services rendered by the . . . professional person or attorney and by any paraprofessional employed by any such person; and

> (B) reimbursement for actual and necessary expenses.

11 U.S.C. § 330(a)(1).

A non-exclusive list of factors that the Court considers in determining reasonableness are set forth in Sections 330(a)(3). Under Section 330(a)(4), the court shall not allow compensation for --

> (i) unnecessary duplication of services; or

> (ii) services that were not

>> (I) reasonably likely to benefit the debtor's estate; or

>> (II) necessary to the administration of the case.

11 U.S.C. § 330(a)(4).

The applicant has the burden of proving that the services rendered were actual and necessary, and that the compensation sought was reasonable. In re Bennett Funding Group, Inc., 213 B.R. 234, 244 (Bankr. N.D.N.Y. 1997); In re Keene Corp., 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997). Services are necessary if they benefit the estate. Id. The determination of reasonableness is an objective test that considers what services a reasonable lawyer or legal firm would have performed in the same circumstances. In re Ames Dep't. Stores, Inc., 76 F.3d 66, 72 (2d Cir.1996) (citing In re Taxman Clothing Co., 49 F.3d 310, 315 (7th Cir.1995)).

Applicants must support their requests for fees and expenses with specific, detailed and itemized documentation to meet their burden of proof. Bennett Funding, 213 B.R. at 244-245. Under Section 330(a)(1)(B), a professional seeking an expense reimbursement from the estate

13

"must furnish enough specificity for the Court to establish whether a given expense was both actual and necessary." In re Fibermark, Inc., 349 B.R. 385, 399 (Bankr. D. Vt. 2006). Expenses are actual if they are actually incurred and necessary if "reasonably needed to accomplish proper representation of the client." In re Korea Chosun Daily Times, Inc., 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005).

## IV.    OBJECTION

New Vision and Kaufman seek the reimbursement of fees from the Debtors' estate to King & Spaulding in the aggregate amount of $300,000, for legal services which King & Spaulding performed for New Vision after June 25, 2014. The Application states that the actual amount billed by King & Spaulding was $647,928.17, but as a compromise, New Vision is only seeking $300,000. The Court should deny the Application because New Vision has not met its burden of proof under Sections 503(b)(3) and (4) to show that its participation resulted in a substantial, rather than incidental, benefit to the estate. See AMR, 2014 WL 3855320, *1 (applicant must show that its services led to an actual and demonstrable benefit to the debtor's estate); Best Prods., 173 B.R. at 865 (same). Furthermore, should the Court find that New Vision and Kaufman have made a substantial contribution, even in the reduced amount of $300,000, the fees sought are more than any other firm is seeking, are excessive, and are not reasonable.

**1.    The Court Should Deny New Vision's Request for a Substantial Contribution**

New Vision and Kaufman argue that they made a substantial contribution because their admittedly aggressive tactics in seeking to purchase the Debtor's assets, their numerous challenges to the Debtor's strategy- which included a failed attempt to appoint a chapter 11

14

trustee- and their participation in the sale process, increased the cash portion to the Debtor's estate from NYCO Renaissance's $10,000 stalking horse bid to $1,250,000.  In addition, New Vision and Kaufman argue that by withdrawing the New Vision Plan, New Vision saved the estate substantial expenses, presumably the cost of further litigation and delay.  New Vision has failed to meet its burden and its request should be denied.

New Vision and Kaufman, are seeking to be reimbursed for actions which they undertook solely to advance their own interests in trying to purchase and operate the opera company rather than for actions that provided a substantial and demonstrable benefit to the estate.  As this Court has stated, "[i]nherent in the term 'substantial' is the concept that the benefit to the estate must be more than an incidental one arising from activities an applicant has pursued in protecting its own interests."  AMR, 2014 WL 3855320, *2.  Indeed, New Vision and Kaufman submitted three separate proposals which would have Kaufman and/or New Vision purchase the Debtor's assets and fund a reorganization.  One proposal would have made Kaufman the President of the Debtor. The Debtor considered each proposal and found that they all lacked financial and structural integrity and did not provide a proper mechanism for the transfer of any bequest or endowment under State or Federal law.

New Vision's primary argument, that its losing bid at the Auction created value for the Debtor's unsecured creditors not only ignores the case law which holds that generating a higher offer at an auction does not in and of itself constitute a substantial contribution, see In re S&Y, but also ignores the very definition of a stalking horse bid:

> The purpose and goal of any asset sale is to maximize the recovery of value for
> the benefit of the bankruptcy estate. In many instances, a "stalking horse" offer

will facilitate a realization of that value, by establishing a framework for competitive bidding.

In re Peterson 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009)**;** see also In re 310 Assoc., 346 F.3d

31, 34 (2d Cir. 2003) (initial bidder to serve as a so-called "stalking horse," whose initial

research, due diligence, and subsequent bid may encourage later bidders) citing In re Integrated

Resources, Inc.,147 B.R. 650 , 661-62 ( S.D.N.Y. 1992).  While the stalking horse bid in this

case was only $10,000, it served its purpose by acting as a floor to drive up the bidding.

      Nor is there merit to New Vision's alternative argument that by withdrawing its plan of

reorganization, New Vision saved the estate substantial expenses by not having to litigate

competing plans.  It has been long held that encouraging compromise, participating in settlement

negotiations and proposing settlement terms are the professional obligation of a creditor's

counsel.  Alumni Hotel, 203 B.R. at 630.  Moreover, settlement negotiations require the

participation of many parties-in-interest and do not give rise to substantial contribution claims.

Columbia Gas, 224 B.R. at 549 (creditor's 503(b) claims rejected where evidence showed that

participation of many parties needed to effectuate a settlement).  This is because all creditors

have a strong economic self-interest in settlements that may or may not coincide with the

interests of creditors as a whole.  Id.

      This case ultimately achieved consensus not as a result of New Vision and Kaufman's

actions, but rather due to the fruitful negotiations among the Debtor, Committee, NYCO

Renaissance and the OAG regarding the DeMenasce and other bequests.  The DeMenasce

Bequest Stipulation among those parties regarding the ability of the Reorganized Debtor to

receive the bequests is what caused the Debtor to abandon its sale strategy and turn its attention

to reorganization.  Significantly, neither New Vision nor Kaufman participated in these

important and crucial discussions, nor were they parties to the Stipulation which resolved the

issue of the Pending Bequests.

Rather than make a substantial contribution to the case, Kaufman and New Vision's

actions in the pursuit of their self-interest and desire to take over the Debtor resulted in numerous

delays, cost the estate and other parties in interest hundreds of thousands of dollars and, had the

Retained Professionals been billing the estate at their customary rates rather than working <u>pro</u>

<u>bono</u>, their fees litigating the myriad issues raised by New Vision and Kaufman would have

caused the administrative expenses to skyrocket, reducing any creditor recoveries.

For these reasons the Court should deny the Application.

**2.      The Fees Sought By New Vision and Kaufman Are Not Reasonable**

Should the Court determine that Kaufman and New Vision did make a substantial

contribution, the fees requested do not satisfy the reasonableness standard.  First, New Vision

fails to state why a $300,000 reimbursement compromise was reached.  The Application

provides no discussion or detail as to how the parties arrived at that number or what specific

legal services it represents.  Applicants must support their requests for fees and expenses with

specific, detailed and itemized documentation to meet their burden of proof.  <u>Bennett Funding</u>,

213 B.R. at 244-245.

To the extent that New Vision is seeking reimbursement for the time King &

Spaulding billed preparing New Vision's Auction and post-Auction bids, the time entries

<u>specifically</u> detailing that work is approximately $38,000. The United States Trustee

arrived at this figure by reviewing all time entries from December 10, 2014, which is the

17

date the Sale Motion was filed, to February 12, 2015, which is the last date the Auction or

bidding is specifically referenced in the time records.  While there are many time entries

during that period, they are so vague that they are insufficient to allow for an evaluation

of the work done and should not be allowed.  Id., 213 B.R. at 244.  For example,

numerous time entries merely state "Notes from G. Kaufman," "Calls with Kaufman,"

"Note to Southard," "Telephone call with G. Kaufman," "Correspondence with K.

Rosen," "Note from Nicole," "Correspondence regarding documents," "Note to client,"

"Review correspondence," and the like.  It is not possible to determine what matters were

at issue, let alone whether these calls and notes related in any way to the Auction.

Moreover, it is particularly difficult to draw any conclusion regarding the vague

time entries because during that same period, King & Spaulding was spending a good

deal of time doing tax research and preparing the incorporation papers for New Vision.

All fees incurred in the preparation of these papers were performed solely for Kaufman's

benefit and should not be allowed.  Compensation for preparing for and attending the

many Court hearings and conferences should also be disallowed because they too are

deemed to be performed for the client, not the estate.  Granite Partners, 213 B.R. at 453-

454.

Second, should New Vision be seeking reimbursement of fees based on the value

it claims to have added to the estate through the bidding process itself, the fees requested

are still unreasonable.  The difference between the stalking horse bid of $10,000 and the

winning bid of $1,250,000 is $1,240,000.  The $300,000 New Vision seeks is 24% of the

value that it purports to have created.

Third, New Vision makes no attempt to quantify the amount it argues the estate saved by New Vision's withdrawal of its Plan.

Finally, it is not reasonable to pay the customary rates of King & Spaulding attorneys in the case of a non-profit Debtor where three of the Retained Professionals, including Debtor and Committee counsel are working pro bono and E&R, the only law firm billing the estate, is charging $285 per hour.  In contrast, Mr. Steinberg, Kaufman and New Vision's lead attorney, has an hourly billing rate of $1,230, the lowest paid King & Spaulding associate has an hourly billing rate of $570 and three of the five paralegals bill at rates higher than that of the E&R attorney working on this case.

For these reasons, should the Court find that New Vision and Kaufman made a substantial contribution to the case, based on the lack of evidence in support of the Application, they should only be awarded $38,000.

## V.    CONCLUSION

Based on the foregoing, the United States Trustee requests that the Court sustain his Objection and grant such other relief as is just.

Dated: New York, NY
         January 7, 2016

                                    Respectfully submitted,

                                    WILLIAM K. HARRINGTON
                                    UNITED STATES TRUSTEE

                          By:      /s/ Susan D. Golden
                                   Trial Attorney
                                   201 Varick Street, Suite 1006
                                   New York, New York 10014
                                   Tel. No. (212) 510-0500

19